Brendan P. Cullen (SBN 194057)
cullenb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, CA 94301-2010
Tel:  +1-650-461-5600
Fax:  +1-650-461-5700

Alexander J. Willscher (*pro hac vice to be requested*)
willschera@sullcrom.com
Martin Erreich (*pro hac vice to be requested*)
erreichm@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004-2498
Tel: +1-212-558-4000
Fax: +1-212-558-3588

*Counsel for Plaintiffs SVF Aggregator (DE) LLC and SoftBank Vision Fund II-2 L.P.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SVF II AGGREGATOR (DE) LLC, and SB VISION FUND II-2 L.P.<br><br>                               Plaintiffs,<br><br>                    v.<br><br>ABRAHAM SHAFI,<br>YASSIN ANISS,<br>NOAH SHAFI,<br>SHEHAB AMIN,<br>ALIA SHAFI, and<br>JACOB SHAFI<br><br>                               Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs SVF II Aggregator (DE) LLC ("SVF Investor") and SoftBank Vision Fund II-2 L.P. ("SoftBank Vision Fund 2," collectively with SVF Investor, "SoftBank" or "Plaintiffs") allege as follows:

**INTRODUCTION**

1.     In April 2021, Get Together Inc. (a.k.a., "In Real Life," or "IRL") seemingly was one of the fastest growing social media apps for Generation Z.  According to IRL's CEO Abraham Shafi, IRL's mobile app already had been downloaded by 25% of US Teens under 18 years old; IRL had 12 million monthly active users ("MAUs"); and IRL was growing at a "meteoric" 400% year-over-year rate.  Additionally, IRL reported strong user engagement and retention metrics, which showed that nearly 30% of its MAUs were using the platform on a daily basis.  Together, these metrics suggested that IRL had the potential to quickly develop a stream of revenue for the company.  Critically, IRL represented that it accomplished its growth "organically," with minimal expenses devoted to customer acquisition.  Specifically, IRL claimed it spent less than $50,000 per month in user acquisition efforts.

2.     Through these metrics, IRL appeared to already be achieving network effects, and was well positioned for further viral growth—similar to that which drove the emergence of today's largest social media companies.  Based on the data regarding active users and organic growth that IRL and Abraham Shafi presented to SoftBank, IRL convinced SoftBank that a capital infusion would allow IRL to further increase its already-impressive rate of growth and monetize its enthusiastic user base.

3.     On May 18, 2021, SoftBank paid $150 million to purchase IRL shares; both directly from IRL and from individual holders of IRL shares.  SoftBank purchased $125 million of IRL Series C Preferred shares from IRL directly and $25 million of IRL common stock from IRL insiders.  Specifically, SoftBank paid $7,499,982 to defendant Abraham Shafi and $1,249,997 each to defendants Yassin Aniss and Noah Shafi (collectively, the "Secondary Sellers").  SoftBank's share purchase was based on a pre-money[1] valuation of IRL of $1 billion.

4.     Upon information and belief, IRL did not actually have 12 million MAUs during the period when SoftBank conducted diligence for its investment in April and May of 2021.  Nor had 25% of teenagers under 18 years old downloaded IRL's mobile app.  IRL also did not have

---

[1]     A pre-money valuation, as opposed to a post-money valuation, refers to the value assigned to a company before it receives new external financing.

anything close to best-in-class engagement metrics.  To the contrary, it spent substantially more than $50,000 per month to acquire each actual, monetizable user, and despite *explicitly* telling SoftBank that "no [IRL] Active User was generated by any click farm or similar service, bot, automated program or similar device," on information and belief the vast majority of IRL supposed active users actually were bots.

5.     At the time of SoftBank's investment, IRL was funneling tens of thousands of dollars to proxy services to enable an army of "bots," the entire purpose of which was to make IRL appear to be a thriving social media site while Defendants orchestrated an elaborate scheme to defraud investors.  IRL also paid hundreds of thousands of dollars monthly to a firm (the "Agency") secretly operated by IRL's own Head of Growth, in a coordinated scheme to conceal IRL's user acquisition costs and further IRL's image as a thriving social media app.

6.     Abraham Shafi did not mislead SoftBank without help.  His scheme to induce SoftBank's $150 million investment was assisted by his cousins and siblings, co-conspirators Yassin Aniss, Noah Shafi, Shehab Amin, Alia Shafi, and Jacob Shafi (collectively, with Abraham Shafi, "Defendants"), who together operated a sophisticated, years-long scheme to defraud investors for Defendants' own benefit.  As described below, Abraham Shafi and his family members at IRL tightly guarded access to the data behind IRL's user figures so investors could not discover the true nature of IRL's active users.  Abraham Shafi and his family members also conspired to conceal relationships with proxy services that helped deploy bots onto the platform to masquerade as IRL users.

7.     Defendants concealed the scheme from Plaintiffs during the due diligence process through a mixture of misleading statements, omissions of material facts, and efforts to hide the presence of bots.  Beginning in August 2022, when faced with an investigation by the U.S. Securities and Exchange Commission into their fraud, Defendants destroyed relevant evidence. The Secondary Sellers were obligated to provide accurate information regarding IRL's user metrics to Plaintiffs, but they, with the assistance of Amin, Alia Shafi, and Jacob Shafi, deliberately failed to do so.

SULLIVAN & CROMWELL LLP

COMPLAINT

8.      The Secondary Sellers profited from their scheme when they sold IRL shares to Plaintiffs at an inflated price.  All Defendants profited from their scheme by converting investor dollars into inflated salaries, perks, and improper payments from IRL over the two years following Plaintiffs' investment, during which time Defendants continued their scheme to misstate IRL user metrics.

9.      Only after a series of whistleblower complaints, an SEC investigation, an internal investigation by a special committee of IRL's Board of Directors (the "Special Committee"), was Defendants' scheme finally revealed.

10.     The true nature of IRL's user base was further confirmed in April 2023, when IRL suspended Abraham Shafi for unrelated misconduct and subsequently millions of IRL's supposed "users" mysteriously and immediately vanished.

11.     On June 23, 2023, a letter from IRL's acting CEO reported to shareholders that an investigation conducted by counsel to the Special Committee identified the following "areas of concern":

- "Expert analysis showed that 95% of identified users were in fact automated or from bots, not authentic, human users."

- "Substantial evidence to show that former CEO and co-founder Abraham Shafi caused millions of dollars in personal expenses to be charged to or otherwise accrued by the company."

- "Circumstantial evidence to show that Abraham Shafi and certain members of his family failed to comply with document preservation obligations and took steps to delete documents and other materials potentially relevant to the SEC investigation as well as the Special Committee's inquiries."

12.     In light of the investigation findings, following the unanimous vote of IRL's board of directors, a majority of IRL shareholders voted to dissolve the business and transfer substantially all of IRL's assets into a liquidating trust.

13.     As detailed below, Defendants' years-long scheme used IRL to defraud Plaintiffs and, in doing so, violated both Federal and California securities laws.  As a result of Defendants' actions, Plaintiffs suffered losses in excess of $150 million.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action concerns violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, and pursuant to 28 U.S.C. § 1367 because the related state law claims form part of the same case or controversy.

15.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are citizens of diverse states and the amount in dispute is greater than $75,000.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants in this action are domiciled or committed a substantial portion of the wrongful activities in this District.  Venue is further proper pursuant to Section 27(a) of the Exchange Act and 15 U.S.C. § 78aa(a) because transactions, acts, practices, and courses of conduct constituting violations of the securities laws occurred within this District.

**INTRADISTRICT ASSIGNMENT**

17.     This lawsuit should be assigned to the San Francisco or Oakland Divisions of this Court pursuant to Civil L.R. 3-2(c) and General Order No. 44 because a substantial part of the events or omissions that give rise to this lawsuit occurred in San Francisco County.

**THE PARTIES**

18.     Plaintiff SVF II Aggregator (DE) LLC, is a limited liability company organized under the laws of Delaware with its principal place of business in Delaware.  SVF II Investment Holdings (Subco) LLC, a limited liability company organized under the laws of Delaware with its principal place of business in Delaware, is the sole member of SVF Aggregator (DE) LLC.

19.     Plaintiff SoftBank Vision Fund II-2 L.P. is a limited partnership organized under the laws of Jersey with its principal place of business in Jersey.  SoftBank Vision Fund 2 focuses on investing in market-leading, tech-enabled growth companies.  The sole General Partner of SoftBank Vision Fund II-2 L.P. is SVF II GP (Jersey) Limited, a Jersey company.  SoftBank Group Corp., a corporation organized under the laws of Japan with its principal place of business in Japan, is the sole limited partner of SoftBank Vision Fund II-2 L.P.

20.     SVF II Aggregator (DE) LLC is an indirect subsidiary of SoftBank Vision Fund II-2 L.P.

21.     Non-party SoftBank Investment Advisors was the investment manager for SoftBank Vision Fund 2 at the time of the Series C Investment and acted on behalf of SoftBank Vision Fund 2 throughout the deal period.  SoftBank Vision Fund 2 is an affiliated investment fund of SoftBank Group Corp., a leading global investor headquartered in Tokyo, Japan, and publicly traded on the Tokyo Stock Exchange.  SoftBank Group Corp. participates in SoftBank Vision Fund 2 as a limited partner, and SBIA is presently a direct subsidiary.

22.     Defendant Abraham Shafi is a citizen and resident of California.  He is a co-founder of IRL.  He was CEO of the company from its founding in June 2017 until April 2023, when the IRL Board placed him on administrative leave due to misconduct.  He was also a member of the IRL's Board of Directors from its founding until his removal as a director via shareholder vote on June 23, 2023.  He personally sold $7.5 million of IRL common stock directly to SoftBank in connection with SoftBank's investment in IRL.

23.     Defendant Yassin Aniss is a citizen and resident of California.  Aniss was a back-end developer for IRL from its founding in 2017 until June 23, 2023.  Aniss personally sold $1.25 million of IRL common stock directly to SoftBank in connection with SoftBank's investment in IRL.  Aniss is a cousin of Abraham Shafi.

24.     Defendant Noah Shafi, upon information and belief, is a citizen of California.  He is part of the IRL founding team, and was IRL's Head of Engineering at the time of the Series C.  Noah Shafi personally sold $1.25 million of IRL common stock directly to SoftBank in connection with SoftBank's investment in IRL.  Noah Shafi is a brother of Abraham Shafi.

25.     Defendant Shehab Amin is, upon information and belief, a citizen and resident of California.  He was Head of Data at IRL from its founding in 2017 until June 23, 2023.  Amin is a cousin of Abraham Shafi.

26.     Defendant Alia Shafi is a citizen and resident of the State of Washington.  She was a Software Engineer at IRL from November 2019 until June 23, 2023, and a Technical Product Manager at IRL from March 2022 until June 23, 2023.  Alia Shafi is a sister of Abraham Shafi.

27.     Defendant Jacob Shafi is a citizen and resident of California.  He was a Software Engineer at IRL from December 2018 until June 23, 2023.  Jacob Shafi is a cousin of Abraham Shafi.

28.     Abraham Shafi, Alia Shafi, and Noah Shafi are siblings and Yaseen Aniss, Shehab Amin, and Jabob Shafi are all cousins of each other and of the Shafi siblings.

## THE ALLEGATIONS

### *IRL:  The App and Company*

29.     IRL was a social media website and mobile application (or "app") founded in 2017.  Defendants Abraham Shafi, Noah Shafi, Yassin Aniss, and Shehab Amin were all part of IRL's founding team.

30.     IRL branded itself as "The Messaging Social Network for the Next Generation."  IRL was geared specifically towards Generation Z[2] with an emphasis on building a "more intimate internet."

31.     The IRL app offered its users live event discovery, calendaring, public group messaging, and private messaging.  IRL claimed that its focus on "in real life" connections differentiated it from its social media competition, which according to Abraham Shafi were "creating more separation and creating more walls."[3]  "We're the only 'social' app designed to help you get off your screen and go out to be sociable," Abraham Shafi said in an interview with GQ Middle East.[4]

---

[2]     Generation Z or "Gen Z" refers to the generation born after the "Millennials."  Gen Z is commonly understood to include the population born between the late-1990s and the early 2010s.

[3]     Karin Eldo, "The Search For Balance Led Abraham Shafi To His Billion Dollar Tech Unicorn." FORBES, Oct. 10, 2022, https://www.forbes.com/sites/karineldor/2022/10/10/the-search-for-balance-led-abraham-shafi-to-his-billion-dollar-tech-unicorn/?sh=30d2c583472f.

[4]     "Meet IRL's Abraham Shafi – the Middle East's First Founder of a Billion-Dollar Social App," GQ MIDDLE EAST, Jan 11, 2023, https://www.gqmiddleast.com/culture/abraham-shafi-social-app-irl

32.     In January 2018, IRL raised $3 million in seed funding.  In June 2019, IRL raised $11 million more in a Series A financing round.  In September 2020, it raised a further $16 million as a Series B financing round.

33.     By early-2021, IRL determined it would seek additional financing in a Series C round.  At the time of the Series C, IRL had fewer than 20 full-time employees, including the six Defendants named in this action.

### *IRL Solicits Investment in a Series C Financing Round*

34.     On April 5, 2021, in an email to an early investor in IRL, Abraham Shafi stated that "due to a ton of inbound demand," IRL was in a "Series C fundraising process."  Abraham Shafi's email set forth a list of "Highlights," touting IRL's successes with active user growth and retention, and it embedded a graphic listing figures of Daily Active Users and Weekly Active Users (respectively, "DAU" and "WAU"):[5]



_____

[5]     References to "MoM Growth" and "YoY Growth" in the graphic refer to month-over-month and year-over-year growth, respectively.

35.     On April 7, 2021, Abraham Shafi's message was forwarded to an Investment Director at SBIA (the "Investment Director").  The Investment Director scheduled an introductory meeting with Abraham Shafi to learn more about IRL.

36.     On April 13, 2021, the Investment Director and a Vice President at SBIA spoke with Abraham Shafi about the Series C financing opportunity.[6]  Abraham Shafi repeated the user metrics listed in his introductory email, both orally and in writing in the form of an investor presentation.  SoftBank personnel's interest was piqued by IRL's total MAUs, user growth, user engagement (as measured by IRL's strong ratio of DAUs to MAUs), user retention, and user demographics.  SoftBank expressed interest in continuing conversations with IRL, and Abraham Shafi pledged to share further materials with SoftBank.

***Plaintiffs' Robust Due Diligence for the IRL Investment***

37.     The day after their initial meeting, on April 14, 2021 the parties executed a non-disclosure agreement for purposes of SoftBank's due diligence of IRL.  Thereafter, SoftBank began to review materials that, under Abraham Shafi's instructions, were uploaded by IRL to data rooms that contained information supposedly supporting the user-related data from Abraham Shafi's previous presentation.

38.     On April 19, 2021, SoftBank provided to IRL a list of "Follow-Up Due Diligence Questions."  In order for SoftBank to properly value IRL, SoftBank requested responses to certain questions, including the following, about the accuracy and source of IRL's user metrics:

- "What are the current user acquisition channels?"

- "Has there been any paid user acquisition?   What was CAC [customer acquisition cost] in these cases?"

- "The m-o-m [month-on-month] sign-ups tend to fluctuate a bit every month, what is creating the variability month to month?  It appears that in some months, sign-ups have declined."

- Referring to a method of counting active users based on a "session" of platform usage, SoftBank asked "What does a session mean?"

---

[6]     All references to SoftBank and its interactions with IRL refer to actions made by SBIA on behalf of SoftBank.

39.     Over the course of the following week, Abraham Shafi responded to these questions in writing, respectively stating (with emphasis added):

- "The dominant invite flow today is first to groups and second to events.  We grow predominantly through direct SMS based invites from one user to another.  ***This is a free organic channel*** (users are not incentivized or paid for these invites, and must invite each friend individually with no bulk invites.)  ***Unlike other apps that spend aggressively to acquire new users, we spend very little* . . .**"

- "***We spend about $50K a month in paid user acquisition***.  This is mainly to seed new geos [geographies] and interest groups, versus maintaining existing ones.  ***Our CAC is ~$0.50 per new user***, and each new user on average results in a total of 21 additional users organically through multiple generations of referrals."

- "A session is an app open."

- "There is some ***natural variability*** in signups due to seasonality around certain events and when we launch new geos.  ***We have not focused on massive top line growth*** but rather retention & engagement to date to ensure our growth is lasting and that our engagement is deepening."

40.     On April 20, 2021, the Investment Director and other SoftBank representatives met with Abraham Shafi again.  Abraham Shafi repeated the claims in the investor presentation and his responses to follow-up questions about user metrics and user acquisition.

41.     In order to independently assess IRL's reported user figures, SoftBank reviewed a third-party report on the total numbers of users and downloads.  The report suggested that, as of Spring 2021, the IRL app had been downloaded only 9 million times total over the course of its history.  That figure stood in contrast to Abraham Shafi's representations that IRL had 12 million MAUs as of March 2021.  On April 21, 2021, the Investment Director and the Vice President at SoftBank asked via email for Abraham Shafi to explain the discrepancy.  SoftBank further asked Abraham Shafi to explain why IRL exhibited stark variations in monthly download data, as reflected in the third-party reports, and also asked for IRL's definition of a MAU.

42.     Abraham Shafi responded that the third-party report was "definitely not accurate" for two reasons.  First, he explained that the report's focus solely on app downloads would not capture all IRL users who accessed the IRL platform via both the app and the internet website because "[w]e have a younger audience" and "anyone under 18 [years old] is technically not allowed to be tracked or have their data shared due to privacy reasons"—thus, IRL's audience is

1  difficult for auditors to estimate.  He also responded to SoftBank's other questions, explaining that

2  the monthly variations in download data were "due to seasonality," and "MAU is opened app or

3  signed in/signup to web and has a session."

4        43.    Based on what appeared to be meaningful total active users, strong active user

5  growth, user engagement, and a low-cost user acquisition strategy premised on organic, "viral"

6  growth, SoftBank invited Abraham Shafi to present to its leadership on April 22, 2021.  In that

7  presentation, he repeated his previously articulated IRL user metrics, described IRL's growth as

8  "meteoric," and claimed "2M events get planned a day on IRL."

9        44.    On April 27, 2021, Vision Fund 2 (on behalf of itself and its affiliates) and IRL

10  entered into the Term Sheet for Series C Preferred Stock Financing of Get Together Inc. (the "Non-

11  Binding Term Sheet").

12        45.    The Non-Binding Term Sheet provided that Vision Fund 2 would purchase "$150

13  million of shares of Series C Preferred out of a total aggregate investment round of up to $170

14  million," at a pre-money valuation of $1 billion.  The purchase was conditioned "on the completion

15  of due diligence, legal review and documentation that is satisfactory to [Vision Fund 2]."  The

16  Non-Binding Term Sheet established that "up to $25 million of this investment will be used, either

17  directly or indirectly, to acquire capital stock from members of the Company's management (with

18  such allocation as determined by the Company in its sole discretion . . . and if such secondary is

19  structured as a direct purchase by [Vision Fund 2], such acquired shares will be exchanged for

20  shares of Series C Preferred at the Closing)."

21        46.    After signing, SoftBank continued its robust due diligence process of evaluating

22  IRL.  Because IRL did not have any profitable revenue stream, its value to an outside investor like

23  SoftBank depended on its active user metrics as a source of potential future income.   Thus,

24  SoftBank relied on the accuracy of representations from IRL's executives concerning ***both the***

25  ***quantity and quality of IRL's users***:  IRL impressed SoftBank with the sheer number of people

26  allegedly using the platform, and also that those users were engaged and apparently ***generated***

27  ***with minimal expenditure***, signaling authentic interest in the platform.

28

47.     On April 29, 2021, SoftBank held a due diligence meeting with IRL focused on the company's finances.  At the meeting, SoftBank discussed with Abraham Shafi and another IRL Director the questions they had sent to IRL in advance, including the following questions about IRL's user growth:

- "What will be the Company's primary focus on investing / deploying capital in the business?  (User acquisition vs. product vs. other) . . . ."

- "What are the team's thoughts on deploying capital for user acquisition, especially as it relates to new market growth / expansion?"

- "What channels has IRL deployed marketing spend?  Which tend to yield the highest ROI?"

- "Has there been any paid user acquisition?  What was CAC in these cases?"

48.     In response, Abraham Shafi spoke about IRL's historic marketing efforts and plans for future spending on growth.  Among other things, he discussed how IRL's growth was nearly entirely organic, with very limited growth spending only for seeding new geographic regions.  He also spoke of plans to monetize IRL for investors by leveraging users, including charging users a fee for accessing content on the platform.  He did not mention spending to acquire fake users—such as bots—and did not explain that IRL actually had far fewer users than what IRL had represented to SoftBank.  Abraham Shafi also did not reveal that IRL was spending hundreds of thousands of dollars monthly to boost its user population.

49.     SoftBank's robust due diligence process continued with a further due diligence meeting on May 3, 2023 where SoftBank asked about relationships between IRL and its employees and contractors, including whether the company had any material undisclosed agreements with its directors, officers, and others associated with the company.  In a written response, IRL responded it had "[n]one (other than offer letters, advisor agreements, etc.), and that "[t]here are no other related party arrangements."

50.     Through its extensive review of data room materials, third-party reports, and audience surveys, SoftBank took significant measures to verify the claims made by Abraham Shafi and IRL.  However, as discussed below, Defendants had prepared for SoftBank's due diligence and structured IRL's business so that SoftBank could not discover evidence of their fraud.

51. Ultimately, SoftBank's decision to purchase IRL shares at a pre-money $1 billion valuation relied on a series of representations by Abraham Shafi and IRL.

52. First, representations by Abraham Shafi and IRL about IRL's total MAUs were material to SoftBank's investment decision because SoftBank believed a valuation that approximated $75 per active user was reasonable compared to peer companies. For that reason, the Primary Purchase Agreement for SoftBank's purchase of IRL shares (discussed below) included a representation that—to Abraham Shafi's knowledge—IRL had the MAU, WAU, and DAU that it claimed.

53. Second, representations by Abraham Shafi and IRL about user retention, growth, and engagement were material to SoftBank because it believed IRL could leverage network effects to increase growth exponentially. These representations were also important because they implied that the ratio between IRL's DAUs and MAUs, its "DAU/MAU ratio," was over 29%. This high ratio suggested IRL's user base was more actively engaged, and thus potentially more monetizable, than its peer social media platforms.

54. Third, representations by Abraham Shafi and IRL about user demographics were material because SoftBank believed that IRL's younger user profile differentiated IRL from competing products.

55. Fourth, representations by Abraham Shafi and IRL about low customer acquisition cost were material as SoftBank believed that reflected IRL's ability to grow its users without major increases in "growth" spending.

56. Fifth, representations by Abraham Shafi and IRL about relationships with employees and company insiders were important because a potential lack of arm's-length dealing meant that corporate insiders could have used IRL to provide value to themselves to investors' detriment. This significance was reinforced by SoftBank in Section 5.4 of the Investor Rights Agreement, which required IRL to "not make an offer or hire any family member of an employee except with the approval of the Board of Directors of [IRL], including a majority of the [directors appointed by preferred shareholders]."

*Defendants' Scheme to Engineer User Activity*

57.    In his initial presentation to SoftBank, Abraham Shafi claimed IRL's mission was to "help people spend more time together with people doing the things they love in real or remote life."  That goal, however, had little to do with how IRL actually spent its money.  Instead, Defendants utilized IRL's resources to:  (1) use bots to manipulate IRL's MAUs and user metrics; and (2) pay vendors to implement techniques such as "incent"[7] advertising to make IRL appear successful to investors.

58.    A bot is a software application that runs automated tasks usually with the intent to imitate human activity, such as messaging, on a large scale.  Fraudsters can program bots to do any number of activities on an app, including posting content, interacting with human users or fellow bots, or otherwise simulating human behavior.

59.    Abraham Shafi, Shehab Amin, Noah Shafi, Alia Shafi, Yassin Aniss, and Jacob Shafi employed bots to make IRL appear as though it was a growing, thriving app.  In reality, the platform was a virtual ghost town, filled with bots deceptively mimicking active human users.

60.    Defendants concealed their use of bots through the use of proxy IP addresses.  An IP address is a unique set of numbers assigned to each Internet or network device; whereas a proxy IP address is an intermediary IP address through which internet traffic can be routed to conceal its origin.  To defend against bot intrusion, websites often block repeat activity generated by a single IP address.  Using proxy IP addresses allows bots to circumvent those defenses by appearing as though they each emerge from unique devices rather than a single source engaged in deceptively repetitive activity.

61.    Defendants utilized several services that provide proxy IP addresses.  At least one of which advertised itself as providing products that can "bypass[] sophisticated anti-bot systems" and can help customers "appear as an organic user on sites."  A review of invoices and transaction records shows that IRL—through Abraham Shafi, Noah Shafi, and Amin—made payments of *at least* $300,000 to these proxy services.

---

[7]    As described in more detail below, incent" or "incentivized" advertising is a growth tactic in which companies compensate potential customers to use or download a product.

SULLIVAN & CROMWELL LLP

62.  To conceal these proxy services, IRL would pay the proxy service vendors through various intermediaries, including Machine Learning LLC—an entity controlled by Shehab Amin.

63.  Defendants continued this scheme by prohibiting other employees who were not aware of the scheme from accessing core IRL user data.  Unlike similarly situated tech companies, which share user data widely, IRL severely restricted access to only "senior executives" and Shafi family members.  Requests to access user data by IRL employees who believed the user information was important to their job functions were routinely rejected by Defendants.

64.  Further, Aniss, Noah Shafi, Amin, and Alia Shafi were all at various times the primary "back-end" engineers at IRL.  Front-end engineers generally focus on the visual experience of a user on a website or app while back-end engineers generally focus on the website's or app's underlying structures and, essential to IRL, its user data.  By ensuring Defendants were the primary employees whose job responsibilities involved user data, the Defendants prevented other employees from discovering the scheme until the Board's Special Committee put Abraham Shafi on administrative leave for an unrelated issue and the Defendants lost their ability to conceal their fraud.

65.  While the Defendants sought to prevent employees from discovering the scheme, some third-party vendors that routinely interacted with IRL began to notice bots on the platform.  On March 16, 2021, less than a month before the Series C discussions with SoftBank commenced, a CEO of another tech company noted in an email to Abraham Shafi that "IRL got hit by a massive bot attack generating millions of fake groups to join."  But a supposed bot "attack" was not news to Abraham Shafi and it was not an "attack" at all; Abraham Shafi was actively working with Defendants to bring bots to IRL.

66.  Abraham Shafi boasted about IRL's sudden user increase the very next day.  On March 17, 2021, Abraham Shafi received an email from an investment firm who was impressed with IRL's meteoric buildup of active users:  "What's happened with DAUs recently?  Whoa."  In response, Abraham Shafi falsely explained that "[n]othing specific happened" other than "[e]ngagement is increasing and usage is spiking.  Our servers are on fire.  We are just beginning

1   our journey of massive growth and engagement!"  In fact, Abraham Shafi knew bots and other

2   artificial activity drove IRL's increase in DAUs—not authentic human growth and engagement.

3          67.     While Defendants could claim IRL had millions of MAUs and best-in-class user

4   metrics based on the bot traffic they generated with proxy services, they needed confirmation of

5   IRL's success from neutral third parties to attract investment from large investors like SoftBank.

6   Specifically, IRL needed to rank highly on the iOS and Google Play app stores and third-party

7   reports needed to show millions of IRL app downloads; metrics that could not be faked solely with

8   bots.  To generate actual IRL app downloads, Abraham Shafi spent millions of dollars on

9   marketing tactics such as "incent" advertising.

10         68.     "Incent" or "Incentivized" advertising is a growth tactic in which companies

11  compensate potential customers to use, or in IRL's case download, the companies' products.  For

12  example, users of a mobile app gaming platform may be prodded by incent advertising to download

13  another app—such as IRL's app—to earn in-game currency within the app they were already

14  using.  By relying on incent advertising, IRL was able to induce users of popular mobile gaming

15  apps to also download IRL's app.

16         69.     Incent advertising allows companies to quickly gain large numbers of users at a low

17  cost, but it generally results in low user retention—a key metric to SoftBank.  Of course, the

18  Defendants accepted this tradeoff because they were manipulating active user metrics with bots to

19  create the eye-popping demographic, engagement, and retention values that Abraham Shafi and

20  IRL represented to SoftBank.

21         70.     On information and belief, Abraham Shafi and the other Defendants wanted to hide

22  user acquisition tactics like incent advertising because they wanted to project IRL as growing

23  "organically" to investors like SoftBank that place a premium on platforms that demonstrate

24  "viral" growth.  To do this, Abraham Shafi ensured IRL did not pay user acquisition firms directly

25  in a way that SoftBank would discover and instead routed millions of dollars to these firms through

26  the Agency.

27

28

71.     The Agency is a web marketing business run by IRL's own Head of Growth, which claims to provide "SEO-optimized content strategy"[8] for brands through "the creation of eye-catching, high quality content on an ongoing basis."  On its website, the Agency describes itself as a "full-service growth agency" that offers to "set up channels that will grow sustainably for you over time [and] if you want to pour gasoline on the fire – we'll launch and optimize paid campaign as well."

72.     From as early as November 2020, Abraham Shafi and IRL used the Agency to run its user acquisition efforts.  This included shifting to the Agency IRL's existing relationships with growth firms, who began to be paid through the Agency.  Over the ensuing years, IRL would wire funds to the Agency in order to pay various growth firms, then the Agency, through IRL's own employee, would send the payments to the growth firms on IRL's behalf.

73.     The relationship between IRL and the Agency eventually was formalized through a series of backdated invoices to cover the Agency's prior work.  Abraham Shafi used those invoices to further hide the true role of IRL's Head of Growth and the Agency.  From at least as early as December 2020, monthly invoices from the Agency billed IRL for "Services Cost," "Infra Cost," and "Growth Cost."  The Agency invoices to IRL ranged significantly in size.  After SoftBank had invested in IRL, certain of the Agency's monthly invoices exceeded $2.2 million for various, undefined "costs."  In the months before SoftBank's investment, the Agency issued IRL relatively smaller invoices.  In each case, exactly 90% of the invoice was for "Infra [Infrastructure] Cost"; $20,000 was for "Services Cost"; and the comparatively small remainder was for "Growth Cost."  For example, the Agency's February 2021 invoice to IRL listed $511,200 in "Infra Cost"; $20,000 in "Service Cost"; and $36,800 for "Growth Cost."

74.     Although "Infra Cost" accounted for 90% of each invoice, the Agency did not spend the millions of dollars IRL paid to it to enhance IRL's system infrastructure.  Indeed, on their respective websites, neither the Agency nor IRL's Head of Growth indicate that they have

---

[8]     Search engine optimization ("SEO") is a set of practices designed to improve the appearance and positioning of web pages in search engine search results.

1   any proficiency in app or website infrastructure.  Instead, the supposed "Infra Costs" were really

2   expenditures by IRL to growth firms for incent advertising and other user acquisition campaigns.

3        75.    When IRL later hired a Chief Financial Officer who raised questions about

4   payments to the Agency, Abraham Shafi coordinated with the Head of Growth to mislead the CFO

5   about the true nature of IRL's spending.  For example, on July 27, 2022, the Head of Growth noted

6   to Abraham Shafi that the CFO was "asking about our spend projections again," and asked "what

7   you think I should tell him."  Abraham Shafi suggested that the Head of Growth "just say we are

8   experimenting with international."  On August 3, 2022, the Head of Growth sent Abraham Shafi

9   the Agency's invoice for August, asking Abraham Shafi to "let me know if it's good to go" to the

10  CFO.  Abraham Shafi told the Head of Growth to "add [an] extra 98k into infra" and suggested

11  that he "say we are planning on testing pushing a little more sms this month."

12       76.    Despite numerous requests to disclose related party transactions and a clear

13  expectation that IRL should disclose large vendors, IRL's relationships with intermediaries like

14  the Agency and Machine Learning LLC were not properly disclosed to SoftBank.  Their only

15  mention in the due diligence process was on the disclosure schedule to the Primary Purchase

16  Agreement:  there, they were respectively referred to as, providers of "services" and "consulting,"

17  with no disclosure of the Head of Growth's or Shehab Amin's roles, the magnitude of IRL's

18  payments to the companies, or the "services" that they provided.

19       77.    Abraham Shafi and IRL misstated during SoftBank's due diligence process that

20  IRL did not have any undisclosed relationships with related parties, like the Agency and Machine

21  Learning LLC.  All Secondary Sellers knew or should have known SoftBank materially relied on

22  Abraham Shafi and IRL's responses from due diligence, yet failed to correct the record.  And all

23  Defendants participated in the scheme to conceal from SoftBank the services the Agency and

24  Machine Learning LLC actually were providing to IRL.

25       78.    What Abraham Shafi and IRL did share with SoftBank were figures relating to

26  IRL's "operating expenses" which, consistent with the Agency and Machine Learning LLC's

27  deceptive purposes, portrayed relatively high levels of "infrastructure" spending, and lower levels

28  of "growth" costs.

79.     Similarly, Abraham Shafi and IRL misstated IRL's actual business strategy.  Even though they understood that SoftBank believed that IRL's user base consisted of real human users, Defendants never disclosed that IRL's activity was actually built primarily on bot traffic.

80.     Abraham Shafi and IRL misrepresented to SoftBank that IRL had:

- 12 million bona-fide, human-being MAUs, 6.6 million WAUs, and 3.5 million DAUs;

- best-in-class user engagement metrics, including a 28% DAU/MAU ratio;

- impressive user retention metrics by maintaining 63% of users over 19 months; and

- "meteoric" 400% year-over-year growth.

In reality, IRL's "active users" numbers relied heavily on the use of bots, not human users.

81.     Abraham Shafi and IRL also misrepresented that IRL's users were accumulated via organic growth with minimal spending on user acquisition.  In reality, IRL spent millions of dollars on user acquisition, channeled through the Agency and the Head of Growth as supposed "infrastructure" expenditures.

82.     While most IRL employees' access to user data was "unreasonably restricted" from most IRL employees, according to a then-IRL employee, Abraham Shafi and his family members received favored access.  Thus, upon information and belief, other Defendants also understood that IRL's user base was largely not comprised of human users.  As IRL's Head of Data and Abraham Shafi's cousin, Amin had access to data concerning the nature of IRL's user base and knew that IRL did not have the human user activity that it represented to investors.  And, as family members of Abraham Shafi and software engineers with privileged "back-end" access, Aniss, Noah Shafi, Alia Shafi, and Jacob Shafi similarly had access to data concerning the nature of IRL's user base and understood that IRL was built for mostly automated use, not human use.  Indeed, on April 29, 2022, Jacob Shafi and Noah Shafi discussed "Creat[ing] a bot that crawls Facebook and Discord to send DM's to join the same group/server on IRL."

83.     Similarly, all Defendants understood that SoftBank was entering into the Series C investment on false pretenses.  Yet, they participated in the conspiracy to conceal from SoftBank the truth about IRL's active user base.

*Plaintiff SVF Investor Purchases Shares in IRL*

84.    On May 18, 2021, SVF Investor and IRL executed a Series C Preferred Stock Purchase Agreement (the "Primary Purchase Agreement").   SVF Investor also executed a Common Stock Transfer Agreement (the "Secondary Purchase Agreement") with the Defendants and other IRL insiders.  Under the agreements, SVF Investor purchased 6,629,775 shares of Series C Preferred Stock in total at a per share purchase price of $22.6252, for a total purchase price of approximately $149,999,985.34.

85.    Of this approximately $150 million, SVF Investor purchased directly approximately $10 million of shares from Defendants Abraham Shafi, Aniss, and Noah Shafi under the Secondary Purchase Agreement.  Specifically, pursuant to the May 18, 2021 Secondary Purchase Agreement (as amended on September 9, 2021), SVF Investor purchased:

- 333,362 shares of IRL common stock from Abraham Shafi for a total of $7,499,982.30;

- 55,560 shares of IRL common stock from Yassin Aniss for a total of $1,249,997; and

- 55,560 shares of IRL common stock from Noah Shafi for a total of $1,249,997.[9]

Consistent with the Primary Purchase Agreement, these shares were then converted to Series C Preferred Stock.

86.    Given SoftBank's reliance on the accuracy of IRL's information provided as part of SoftBank's robust diligence process, SoftBank insisted that IRL make binding representations as to the authentic nature of IRL's user base.

87.    In his capacity as a director of IRL, Abraham Shafi also signed the Primary Purchase Agreement, which contained numerous representations that he knew or should have known were false at the time they were made:

- Under Section 2.8(e) of the Primary Purchase Agreement, the term "active user" was defined as "a natural person who (i) has registered with the App

---

[9]    SoftBank also paid $7,499,982 each to two non-party co-founders in exchange for 333,362 IRL shares.

as a North American resident and has logged in and engaged with the App at least once during the applicable period and (ii) to the Knowledge of the Company,[10] is in compliance with the App Terms."

- Section 2.8(e) further represented that "to the Company's Knowledge, no Active User was generated by any click farm or similar service, bot, automated program or similar device."

- Section 2.8(e) of the Disclosure Schedule annexed to the Primary Purchase Agreement warranted that the following MAU, WAU, and DAU values were accurate as of the purchase date:

| Month | MAUs | WAUs | DAUs |
|---|---|---|---|
| December 2020 | 11.8M | 5.8M | 2.2M |
| January 2021 | 11.8M | 6M | 2.4M |
| February 2021 | 11.9M | 6.4M | 2.7M |
| March 2021 | 13M | 6.7M | 3.2M |
| April 2021 | 12.8M | 7M | 3.6M |

- Section 2.11(a) of the Primary Purchase Agreement represented "there are no agreements, understanding or proposed transaction (in any case oral or written) between the Company and any of its officers, directors, consultants or Key Employees,[11] or any Affiliate thereof."

- Section 2.21 stated that "[t]he Company has made available to the Purchasers all the information that would reasonably be required for deciding whether to acquire the Shares.  No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made."

- Section 2.23 provided that "[t]he Company has delivered to each Purchaser its unaudited financial statements as of March 31, 2021, and for the fiscal year ended December 31, 2020 . . .  The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein . . ."

88.    Under Section 5(b)(ii) of the Secondary Purchase Agreement, each Secondary Seller represented that they have "had access to such information regarding the business and finances of the Company and such other matters with respect to the Company as a reasonable

---

[10]     Section 1.7 of the Primary Purchase Agreement defined "Company Knowledge" to include the knowledge of Abraham Shafi.

[11]     Section 1.7 of the Primary Purchase Agreement defined "Key Employee" to include any executive-level employee, "including division director and vice president-level positions."  IRL's Head of Growth is a Key Employee under this definition.

1  person would consider in evaluating the transaction contemplated hereby, including, in particular,

2  all information necessary to determine fair market value of the Shares."

3       89.     Due to their involvement in the deal negotiations, the due diligence process, and

4  the representations in the Primary Purchase Agreement, Defendants understood that the issue of

5  IRL's active user count, properly defined, was material to SoftBank's investment decision.

6       90.     Defendants similarly understood that SoftBank believed IRL's customer

7  acquisition costs were very low—less than 50 cents per user—and that IRL's low customer

8  acquisition cost (CAC) was material to SoftBank's investment decision.

9       91.     Defendants also understood from the deal negotiations, the due diligence process,

10  and the representations in the Primary Purchase Agreement that the existence (or not) of

11  agreements or transactions between IRL and its key employees was material to SoftBank's

12  investment decision.

13       92.     Defendants further knew or were reckless in not knowing that SoftBank's beliefs

14  about IRL's active user figures, customer acquisition costs, and insider transactions were based on

15  false information.  They knew or were reckless in not knowing that SoftBank had an erroneous

16  impression of these issues because Defendants had misrepresented material facts and reinforced

17  SoftBank's beliefs rather than correct them.

18       93.     Through the Secondary Purchase Agreement, the Secondary Sellers proceeded to

19  sell their shares of IRL to SoftBank at prices that were inflated based on SoftBank's

20  misimpressions of IRL—the same misimpressions that Defendants knew or should have known

21  were created through their misrepresentations, omissions, and concealment of IRL's relationship

22  with proxy services and the Agency.  Through the Primary Purchase Agreement, SoftBank was

23  induced to purchase of 6,629,775 shares of IRL at the same inflated valuation.

24  ***The Truth about IRL Begins to Emerge***

25       94.     After the Series C investment closed, IRL appeared to maintain its remarkable

26  trajectory.  IRL reported the following growth in user activity:

27

28

| Month | MAUs | WAUs | DAUs |
|---|---|---|---|
| September 2021 | 14M | 8.1M | 3.8M |
| December 2021 | 17M | 9.4M | 4.1M |
| April 2022 | 21M | 13M | 6M |

95.     However, internally at IRL—and unknown to SoftBank—employees were questioning the user metrics that IRL published.  On March 13, 2022, one software engineer's concerns, namely that "99% of images . . . [are] uploaded by bots or scripts – not real users," and that they had "uncovered significant evidence of fraud by the company in trying to inflate its user numbers to the media and investors by including bot traffic," were escalated to Shehab Amin.  On March 18, 2022, that software engineer was terminated.  In an April 2022 letter, to IRL, the engineer stated that IRL "intentionally [lied] to the media and investors about the actual amount of traffic on the company's platform so that it appeared that it [was] being used by far more people than are actually using it, and that IRL knew that the numbers it was disclosing included the high percentage of bot traffic."

96.     On March 17, 2022, IRL changed the company's Slack retention policy.  From this point onward, direct messages between employees and private Slack "channels" were permanently deleted after only 30 days.  What Slack records can be recovered indicate that Slack was a primary means of communication for IRL employees, including the Defendants.

97.     In May 2022, an IRL software engineer prepared a report that noted IRL's user traffic was unstable, with "highly unusual traffic drops" occurring for hours at a time throughout the month.  The software engineer noted that, at one point, "US traffic dropped an extreme amount, very suddenly [and] Latin America traffic spiked up enormously, very suddenly[.]  LatAm traffic 'almost' (but not quite) perfectly 'masked' the US traffic drop: it was hard to spot the traffic drop, because the level of traffic was, at times, almost comparable with US traffic levels."

98.     The same software engineer understood that IRL's reported growth was implausible through legitimate efforts, and concluded that the majority of IRL's 12 million users were bots.  He further found that IRL employees, who were experienced professionals, had their access to user data unreasonably restricted, while Abraham Shafi's family members had favored access to that information.  He raised concerns on a daily basis about IRL's user data reporting and how it was fraudulently hidden from employees and investors, but was ignored.

Case 4:23-cv-03834-YGR   Document 1   Filed 07/31/23   Page 24 of 39

99.    Also in May 2022, IRL's Head of Trust and Safety resigned abruptly, writing to Abraham Shafi and other IRL executives that he "strongly doubt[s] some of the numbers we report externally and internally to employees"; that he "accepted my offer to work at IRL (and stock based compensation) based on IRL MAU/retention information that I have doubts in"; and that IRL's "growth tactics are shady and questionable." He further noted that "Abe's friends and family are not held accountable or to the same standards as other employees – favoritism and nepotism are evident."[12]

100.    On May 12, 2022, an article published in *The Information* questioned IRL's publicly announced MAUs.[13] The article explained that, while IRL was claiming it had over 20 million MAUs in early 2022, employees at the company had "expressed concern to managers about the usage figures the company has touted." The article reported that IRL relied on "an unconventional definition" of active users "to make the app appear bigger than it is." The article further noted that third-party firms that "estimate app usage" suggested that IRL had only "between 1 to 2 million active users of its mobile app on a monthly basis."

101.    *The Information* reported that Abraham Shafi offered several explanations for why IRL user figures were higher than whistleblowers and third-party reports suggested. Abraham Shafi's explanations included that:

- IRL's user demographics (*i.e.*, users primarily under 18 years old) make it difficult for third party reports to track;

- IRL's web users (who, according to Abraham Shafi, account for 20% of IRL's users) are not tracked by third-party reports; and

- "it is difficult for the measurement firms to track users who don't open the IRL mobile app in a particular month but interact with the service through email and text messages or via Google Calendar."

102.    SoftBank noted that Abraham Shafi's definition of "active user" in response to *The Information* differed significantly from what Abraham Shafi had said in response to due diligence questions that SoftBank previously had raised in 2021. In response to those prior questions,

---

[12]    Abraham Shafi is often referred to as "Abe."

[13]    Mark Matousek & Amir Efrati, *SoftBank-Backed Messaging App IRL Says It Has 20 Million Users. Some Employees Have Doubts About That*, THE INFORMATION (May 12, 2022).

SULLIVAN & CROMWELL LLP

-24-

COMPLAINT

1    Abraham Shafi had described a "session" as an "app open," and the definition used in the Primary

2    Purchase Agreement, which requires an "active user" to "log[] in and engage[] with the app."

3            103.     On June 18, 2022, SoftBank asked Abraham Shafi about the prevalence of bots on

4    the platform and IRL's current definition of a MAU.  In response, Abraham Shafi divulged that

5    IRL had removed over 800,000 bots from the platform over the previous 12 months.  He also

6    claimed that, while IRL began with a more expansive definition of a "user," "[r]oughly 2 years

7    ago we transitioned to tracking only web and mobile engagement as a session."

8    ***The Truth about IRL Is Confirmed Despite Defendants' Cover-Up***

9            104.     In August 2022, IRL was served with a subpoena from the U.S. Securities and

10   Exchange Commission.  In response, IRL's Board launched a special committee (the "Special

11   Committee") to oversee the company's response to the SEC investigation and to investigate

12   matters identified in the subpoena.  The special committee retained outside counsel and multiple

13   consulting agencies to investigate IRL's purported user figures and other internal issues.

14           105.     After the SEC investigation commenced, on September 28, 2022, Abraham Shafi

15   acknowledged in an email to SoftBank that operating expenses that IRL had largely attributed to

16   "Infrastructure" was actually spending on "paid acquisition/advertising" that should have been

17   recorded as "Growth."  Abraham Shafi explained that IRL's operating expenses showed a CAC of

18   $0.41, but that the true figure was $1.35—more than three times higher.

19           106.     Upon information and belief, the adjusted CAC reflected the fact that IRL's

20   payments to the Agency (run, secretly, by IRL's own Head of Growth) were not for

21   "infra[strucutre] costs," but instead for the purpose of purchasing and programming bots to create

22   the impression of activity on IRL.  Although he disclosed the revised, higher CAC figure, Abraham

23   Shafi's written and oral representations to SoftBank misleadingly omitted this information and

24   suggested that the higher CAC was an innocuous accounting error.  Abraham Shafi's misleading

25   clarification of CAC allowed Defendants to continue to earn their respective salaries from IRL

26   while continuing to conceal IRL's lack of value as a social media company.

27           107.     By October 2022, SoftBank learned that Abraham Shafi had improperly

28   unilaterally increased his total compensation to over $1.2 million annually.

108.    By April 2023, The Special Committee also discovered that Abraham Shafi caused $2.6 million in acknowledged personal expenses to be charged to or otherwise accrued by the company, and that, while $2.5 million of such expenses were reimbursed after Abraham Shafi was repeatedly confronted by IRL's CFO, an estimated additional $2.385 million in unreimbursed personal expenses appear to have been charged to or accrued by the company for Abraham Shafi's benefit.   As part of Abraham Shafi's continuous misappropriation of IRL resources, he even authorized an IRL corporate credit card to be given to his partner, who did not work for IRL.

109.    As a result of these discoveries, in April 2023, the Special Committee removed Abraham Shafi as CEO and placed him on administrative leave.

110.    Almost immediately after Abraham Shafi's removal, IRL's active user population entirely collapsed, confirming suspicions about the true composition of IRL's user base and bringing scrutiny to the purpose of Abraham Shafi, Noah Shafi, and Amin's payments to proxy services, and how IRL's activity was generated.



111.    In response to the collapse of IRL's active users, the Special Committee retained a third-party expert, Keystone Strategy, to perform an in-depth, technical analysis of IRL's users. On June 21, 2023, Keystone Strategy issued a report *Findings Regarding Bot Activity on the IRL Platform*, (the "Keystone Report") that detailed a number of conclusions about IRL's users and the prevalence of bots on IRL.  The Keystone Report's findings included:

- Beginning on May 1, 2023, IRL's DAUs collapsed from roughly 2.5 million to just tens of thousands a few weeks later.

- IRL had millions of private groups with identical names, such as "Play Video Games" (4.7 million unique groups), "Book Club" (4.3 million unique groups), and "Call of Duty Squad" (2.1 million unique groups). These groups each had a median of around 1.6 chats per day.

- IRL user emails included a significant numbers of obscure email domains (like "@best-john-boats.com" and "dropjar.com") associated with fraudulent traffic, and even among more typical domains, IRL user emails included over six times as many "@Yahoo.com" domains as expected based on the "@Yahoo.com" market share.

- Two separate analyses by Keystone Strategy demonstrated that individual user activity on the app demonstrated "signature patterns" of bot activity.

The Keystone Report concluded that over 95% of IRL users since June 2022 were bots. Specifically, while IRL showed 22,399,127 active users for that month, the Keystone Report found that 21,689,348 of those users were bots, and just 709,779 (3.2%) were non-bots.

112.     According to the findings of the Keystone Report, the sudden drop in active users beginning in May 2023 was due to the fact that bots were no longer engaging with the platform. Even of the tens of thousands of users that remained, the Keystone Report's analysis revealed that more than 70% were bot accounts.

113.     Keystone Research was unable to reach firm conclusions about the prevalence of bots on IRL in spring 2021 because IRL only maintained backups of user data dating from June 2022. The Keystone Report explained that "the absence of this data spanning just two to three years back is unusual," for several reasons. First, such user activity patterns and access metadata is "core to the platform" for a social media operation like IRL. In addition, numerous services provide [low cost] "cold storage" options that make storing such data simple and low-cost. Finally, and most tellingly, this data is "required for identifying bot activity on the platform."

114.     The Special Committee's investigation also showed that Defendants Abraham Shafi, Aniss, Amin, Alia Shafi, and Jacob Shafi took coordinated steps to conceal Defendants' scheme and the true nature of IRL.

*Defendant Alia Shafi's deletion of a Jira ticket relating to bot usage.*

115.     One attempted cover-up by Defendants involved the deletion of a "Jira ticket" created by an IRL employee. A Jira ticket is a project management tool that represents a work

item that is to be addressed within an organization.  Employees create tickets for issues that require attention of others in the company, and the tickets remain open until they are resolved.

116.  On August 19, 2021, an IRL employee created a Jira ticket titled "A series of users for IRL bot that spurs engagement in chat."  The employee sent the ticket to Jacob Shafi, among others.  In the ticket, the employee described a plan to "Add Fake Users & Fake Chats to All Public Groups with Less than 10 People."  Later, the employee updated the ticket with examples of conversations that bots would have with one another ("User 1:  Hey I just joined, what's up?; User 2:  Not a whole lot – a little bored.  How's everyone?; User 1:  I'm fine and you?; User 2:  Great!  What are you doing?").  The Jira ticket was closed on February 8, 2022.

117.  On August 25, 2022—three days after receiving the SEC's subpoena relating to possible fake user activity at IRL—Alia Shafi deleted the Jira ticket.  On information and belief, this deletion was done in an attempt to hide it from discovery in the SEC's investigation.

118.  Further investigation to determine the circumstances of the Jira ticket deletion uncovered additional affirmative steps taken by certain Defendants to hide their scheme to hide information from the investigation of IRL.

*The Defendants' deletion of electronic evidence.*

119.  On March 17, 2023, the Special Committee retained a consultant agency, Stroz Friedberg, to investigate the data found on electronic devices of Abraham Shafi, Aniss, Amin, Alia Shafi, and Jacob Shafi, and any data missing from those devices.  Stroz Friedberg's report issued on June 15, 2023, *Forensic Review of Key Devices Final Report* (the "Stroz Report"), found that these Defendants had each taken steps to conceal information.

120.  Specifically, the Stroz Report's findings included:

- Between October and December 2022, Abraham Shafi, Aniss, Amin, and Jacob Shafi all restored their mobile devices from a backup, within three months of each other.  Each restoration was in advance of the collection of the phone by the Special Committee and was after the announcement of the SEC investigation.  In particular, Abraham Shafi restored his phone from a backup only days before it was to be imaged as part of IRL's response to the SEC investigation.

- Between August 22, 2022 and September 1, 2022 (the days after the announcement of the SEC investigation), Aniss, Jacob Shafi, and Alia Shafi all deleted certain text messages.  For example, Alia Shafi deleted one message sent or received on August 22, 2022.

1  • Between August 22, 2022 and August 30, 2022, there were no identifiable communications between Abraham Shafi, Aniss, Amin, and Alia Shafi.

2  121.  Restoring a mobile device from a backup is a way to conceal data created or

3  modified on the device between the date of the backup and the date of the restoration.  The Stroz

4  Report noted that it is unusual for four out of five devices in a given analysis to have been restored

5  from a backup within a short timeframe.  By restoring their devices before they were imaged as

6  part of the investigation, Abraham Shafi, Aniss, Amin, and Jacob Shafi likely concealed data from

7  the investigation.

8  122.  Deleted messages and a lack of any identifiable communications for certain periods

9  strongly suggests that Defendants were attempting to cover up certain discussions related to the

10  SEC investigation.

11  123.  The Stroz Report also found that Defendant Alia Shafi's mobile device had only

12  two entries related to internet activity between August 22, 2022 and August 30, 2022.  Those

13  entries included (i) a Google search for the term "SEC"; and (ii) a visit to a web page related to

14  the trial of former executives of Theranos, another startup company that infamously defrauded

15  investors by making false claims about its products.

16  **_IRL's Share Value Evaporates and Plaintiffs' Investment Value Vanishes_**

17  124.  By June 2023, it was clear to the IRL Board that any enterprise value of the

18  company was completely destroyed.  IRL's investors had valued the company based on its

19  supposed MAUs, rapid organic growth, user engagement, user retention, and user demographics.

20  With none of these metrics turning out to be real, IRL's only remaining asset was the remaining

21  cash invested by Plaintiffs during the Series C.

22  125.  SoftBank similarly realized the representations and warranties made by IRL in

23  Primary Purchase Agreement were false as well:

24  • Contrary to IRL's representations under Section 2.8(e), IRL did not have the MAUs, WAUS, or DAUs it represented in the Disclosure Schedule, as

25  "Active User" was defined in the agreement.  Moreover, the statement that "to the Company's Knowledge, no Active User was generated by any click

26  farm or similar service, bot, automated program or similar device," was utterly false.

27

28  • Inconsistent with IRL's representations in Section 2.11(a), IRL had a long-running "understanding" with IRL's "Head of Growth" and thus a Key Employee.

- Section 2.21 was similarly misleading as the total omission of the existence and purpose of IRL's payments to proxy services and the Agency prevented SoftBank from having "all the information that would reasonably be required for deciding whether to acquire the Shares."

- And finally Section 2.23 was inaccurate as IRL's financial statements included express misrepresentations about IRL's spending on "infrastructure" and "growth."

126. SoftBank realized that, based on Abraham Shafi's misstatements, and Secondary Sellers failure to correct these misstatements, and Defendants' combined efforts to conceal crucial material facts, its purchase of $150 million of IRL shares would bring no real value, and its investment would be destroyed, in whole or in part.

127. On June 23, 2021, a letter from IRL's acting CEO reported to IRL shareholders that an investigation conducted by counsel to the Special Committee identified the following "areas of concern":

- "Expert analysis showed that 95% of identified users were in fact automated or from bots, not authentic, human users."

- "Substantial evidence to show that former CEO and co-founder Abraham Shafi caused millions of dollars in personal expenses to be charged to or otherwise accrued by the company."

- "Circumstantial evidence to show that Abraham Shafi and certain members of his family failed to comply with document preservation obligations and took steps to delete documents and other materials potentially relevant to the SEC investigation as well as the Special Committee's inquiries."

128. The same day, the IRL board of directors unanimously voted, and SoftBank voted with the requisite number of IRL shareholders, to dissolve the company under Delaware law and return any remaining assets to shareholders.  IRL's website and app went offline for good four days later.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*(Asserted Against Abraham Shafi)*
<u>Securities Fraud under Section 10(b) and Rule 10b-5</u>

129. Plaintiffs hereby incorporate paragraphs 1 through 128 by reference, as if set forth fully herein.

130. Section 10(b) of the Securities Exchange Act of 1934 provides that it "shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of

interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

131.    Rule 10b-5 adopted by the U.S. Securities and Exchange Commission provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [all] in connection with the purchase or sale of any security."

132.    Abraham Shafi's misrepresentations about IRL's lack of bots on the platform, active user totals, retention, engagement, and demographics, organic low-cost growth, and lack of material agreements with insiders, and omissions of IRL's growth strategy and payments to the Agency induced Plaintiffs to enter into the May 18, 2021 purchase agreements, which resulted in SoftBank paying Abraham Shafi $7.5 million[14] for IRL common stock and $150 million in total for IRL stock that was essentially worthless.

133.    Through the conduct alleged herein, Abraham Shafi directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to fraudulently create and conceal material information.

134.    Through the conduct alleged herein, Abraham Shafi knowingly:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged

---

[14]        All references to dollar values in these claims are approximate.

1   in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, all

2   in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

3       135.    The misconduct by Abraham Shafi was in connection with the purchase or sale of

4   securities because Plaintiffs directly or indirectly acquired ownership of 6,629,775 IRL Series C

5   Preferred Shares in total and 333,362 IRL common stock from Abraham Shafi personally.

6       136.    Plaintiffs were deceived into paying $7.5 million to Abraham Shafi personally and

7   $150 million to IRL and other IRL personnel in total by the devices, schemes or artifices to defraud

8   that Abraham Shafi deployed.

9       137.    In purchasing IRL Series C Preferred Shares, Plaintiffs reasonably and justifiably

10  relied on the knowingly false representations that Abraham Shafi made in the diligence process

11  and which he caused IRL to make in the Primary Purchase Agreement.

12      138.    The misconduct by Abraham Shafi caused Plaintiffs to pay an artificially inflated

13  $150 million purchase price for 6,629,775 IRL Series C Preferred Shares in total and $7.5 million

14  for 333,362 IRL common stock from Abraham Shafi personally, and directly and proximately

15  damaged Plaintiffs in an amount to be determined at trial.

16                          **SECOND CLAIM FOR RELIEF**
                            *(Asserted Against Abraham Shafi)*
17                  Control Person Violation under Section 20(a)

18      139.    Plaintiffs hereby incorporated paragraphs 1 through 138 by reference, as if set forth

19  fully herein.

20      140.    Abraham Shafi acted as a controlling person of IRL within the meaning of Section

21  20(a) of the Exchange Act.   Abraham Shafi was a co-founder of the company, a member of the

22  Board of Directors, and the Chief Executive Officer.

23      141.    Through his control position, Abraham Shafi knowingly caused IRL to make false

24  representations and warranties to Plaintiffs in the Primary Purchase Agreement including, but not

25  limited to, the representations and warranties made in Sections 2.8(e), 2.11(a), 2.21, and 2.23.   In

26  doing so, Abraham Shafi caused IRL to violate Section 10(b) of the Securities Exchange Act and

27  SEC Rule 10b-5.

28

142.     Plaintiffs reasonably and justifiably relied on those false representations and warranties in entering into the Series C Primary and Secondary Purchase Agreements and in agreeing to pay $150 million for 6,629,775 IRL Series C Preferred Shares in total and $7.5 million for 333,362 IRL common stock from Abraham Shafi personally.

143.     As a direct and proximate result of Abraham Shafi's wrongful conduct, Plaintiffs suffered damages in connection with its purchase of IRL Series C Preferred Shares to be determined at trial.

### THIRD CLAIM FOR RELIEF
*(Asserted Against Abraham Shafi)*
<u>Fraud in Sale of Securities in Violation of California Corporations Code § 25401</u>

144.     Plaintiffs hereby incorporate paragraphs 1 through 143 by reference, as if set forth fully herein.

145.     California Corporations Code § 25401 provides, in pertinent part, as follows: "It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."

146.     Abraham Shafi was present in California when he knowingly misrepresented IRL's lack of bots on the platform, active user totals, retention, engagement, and demographics, organic low-cost growth, and lack of material agreements with insiders, and omitted mention of IRL's growth strategy and payments to the Agency, material facts to Plaintiff's Series C Investment in IRL and purchase of approximately $7.5 million in IRL common stock from Abraham Shafi personally.

147.     The misrepresentations and omissions by Abraham Shafi were in connection with the purchase or sale of securities because Plaintiffs directly or indirectly acquired ownership of 6,629,775 IRL Series C Preferred Shares in total and 333,362 IRL common stock from Abraham Shafi personally.

148.    Had Abraham Shafi not knowingly misrepresented and omitted material information, Plaintiffs would not have signed and closed the Series C, and purchased $7.5 million of IRL common stock from the Secondary Sellers, and $150 million of IRL stock in total.

149.    As a direct and proximate result of Abraham Shafi's knowing misstatements and omissions, Plaintiffs suffered losses and seek rescission, restitution, or damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
*(Asserted Against Abraham Shafi)*
<u>Fraud Within the Contract</u>

150.    Plaintiffs hereby incorporate paragraphs 1 through 149 by reference, as if set forth fully herein.

151.    As set forth above, Abraham Shafi caused IRL to make numerous false representations and warranties in the Primary Purchase Agreement, including, but not limited to, the representation and warranties made in Sections 2.8(e), 2.11(a), 2.21, and 2.23.

152.    Abraham Shafi caused IRL to make these misrepresentations to Plaintiffs with actual knowledge of their falsity.  Abraham Shafi created, directed the creation of, or was complicit in the creation of a bot army to inflate IRL's active user metrics and induce Plaintiffs to close the Series C and pay $7.5 million to Abraham Shafi personally and $150 million for IRL stock in total, caused IRL to make knowingly false representations and warranties in the Primary Purchase Agreement, and omit material information about IRL's growth strategy, including related party payments for purposes of user acquisition.

153.    Abraham Shafi was a co-founder, director, and the CEO of IRL.  By virtue of his position of authority and control, Abraham Shafi had the ability to, and did in fact, control the contents of the Primary Purchase Agreement, including in particular the contents of the representations and warranties made by IRL.

154.    Abraham Shafi's misrepresentation about IRL's lack of bots on the platform, active user totals, retention, engagement, and demographics, organic low-cost growth, and lack of material agreements with insiders, and omissions of IRL's growth strategy and payments to the Agency were made with the intent to, and did in fact, induce Plaintiffs to participate in the Series

1  C at an inflated price and, in particular, purchase $7.5 million of IRL common stock from Abraham

2  Shafi personally and $150 million of IRL stock in total.

3       155.   Plaintiffs reasonably and justifiably relied on the representations and warranties

4  that Abraham Shafi caused IRL to make in the Primary Purchase Agreement.

5       156.   As a result of this reliance, Plaintiffs sustained losses and seek rescission,

6  restitution, or damages in an amount to be determined at trial.

7                              **FIFTH CLAIM FOR RELIEF**
                              *(Asserted Against all Secondary Sellers)*
8                              <u>Fraudulent Concealment</u>

9       157.   Plaintiffs hereby incorporate paragraphs 1 through 156 by reference, as if set forth

10  fully herein.

11       158.   During the due diligence process, Plaintiffs attempted to determine how many

12  active users IRL had, how much IRL spent on growth and user acquisition, and whether IRL had

13  any material relationships with insiders at IRL.

14       159.   Secondary Sellers knew but did not reveal that IRL's active user base was a sham,

15  built on bot activity.

16       160.   Secondary Sellers also knew but failed to reveal that IRL was paying large sums to

17  acquire users and hide bot activity.

18       161.   Secondary Sellers knew of but did not disclose IRL's growth strategy, or its

19  relationship with the Agency and with proxy services.

20       162.   Secondary Sellers did not reveal these facts so that they could ensure that Plaintiffs

21  remained in the dark about Defendants' scheme to create a bot army to inflate IRL's user metrics.

22       163.   Secondary Sellers concealed these facts through secretive conduct within IRL and

23  routing payments through related entities like the Agency.

24       164.   Had Plaintiffs been provided with *any* of the above information, they would not

25  have signed and closed the Series C and purchased the $10 million of IRL common stock from the

26  Secondary Sellers personally and $150 million of IRL stock in total.

27       165.   As a result of this reliance, Plaintiffs sustained losses and seek rescission,

28  restitution, or damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
*(Asserted Against Defendants)*
<u>Conspiracy to Commit Fraud</u>

166.  Plaintiffs hereby incorporate paragraphs 1 through 165 by reference, as if set forth fully herein.

167.  Defendants agreed to and did in fact work together in an ongoing scheme to defraud Plaintiffs by fraudulently inducing Plaintiffs into purchasing $10 million of IRL common stock from the Secondary Sellers and purchasing $150 million of IRL stock in total, misrepresenting IRL's lack of bots on the platform, active user totals, retention, engagement, and demographics, organic low-cost growth, and lack of material agreements with insiders over the two-year period following the Series C transaction, and concealing and destroying evidence of any misrepresentations of IRL's user metrics.

168.  Defendants committed the overt acts described above in furtherance of their conspiracy.

169.  As a result of Defendants' conduct, Plaintiffs sustained losses and seek rescission, restitution, or damages in an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
*(Asserted Against Defendants)*
<u>Aiding and Abetting Fraud</u>

170.  Plaintiffs hereby incorporate paragraphs 1 through 169 by reference, as if set forth fully herein.

171.  As set forth above, Defendants aided and abetted Abraham Shafi's ongoing scheme to defraud Plaintiffs by fraudulently inducing Plaintiffs into purchasing $10 million of IRL common stock from the Secondary Sellers and purchasing $150 million of IRL stock in total and continuing to misrepresent IRL's lack of bots on the platform, active user totals, retention, engagement, and demographics, organic low-cost growth, and lack of material agreements with insiders over the two-year period following the Series C transaction, and concealing and destroying evidence of any misrepresentations of IRL's user metrics. Defendants also aided and abetted the Secondary Sellers' ongoing scheme to conceal IRL's misrepresentations through secretive conduct within IRL and routing payments through related entities like the Agency.

172.   Defendants engaged in this conduct with actual knowledge that the representations that they made, enabled one another to make, and caused IRL to make to Plaintiffs were false and misleading.

173.   Defendants' conduct was intended to, and did in fact, (1) induce Plaintiffs to sign and close the Series C and purchase $10 million of IRL common stock from the Secondary Sellers and $150 million of IRL stock in total at an inflated price and (2) prevent Plaintiffs from discovering the scheme.  Each of Defendants provided substantial assistance in furtherance of the scheme to defraud Plaintiffs, including by misrepresenting IRL's active user metrics, organic low-cost growth, and lack of material agreements with insiders, and concealing IRL's growth strategy and payments to the Agency.

174.   Plaintiffs reasonably and justifiably relied on the information Defendants provided and the misrepresentations they caused IRL to make when Plaintiffs signed and closed the Series C and purchased approximately $10 million of IRL common stock from Secondary Sellers and $150 million of IRL stock in total at an inflated price not supported by IRL's actual user metrics and relied on information Defendants provided following the Series C that continued to misrepresent IRL's user metrics and concealed Defendants' misrepresentations.

175.   As a result of this reliance, Plaintiffs sustained losses and seek rescission, restitution, or damages in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
*(Asserted Against all Secondary Sellers)*
Unjust Enrichment

176.   Plaintiffs hereby incorporate paragraphs 1 through 175 by reference, as if set forth fully herein.

177.   As set forth above, Abraham Shafi and IRL made numerous false representations and warranties concerning IRL's lack of bots on the platform, active user totals, retention, engagement, and demographics, organic low-cost growth, and lack of material agreements with insiders.

178.   Abraham Shafi and IRL made these misrepresentations to Plaintiffs with knowledge of their falsity, with the intent to induce Plaintiffs to invest an inflated $150 million in

1    IRL and pay Secondary Sellers approximately $10 million based on an overblown $1 billion

2    valuation.

3          179.    Plaintiffs reasonably and justifiably relied on the information Abraham Shafi and

4    IRL provided and the misrepresentations Defendants made when Plaintiffs invested in IRL for the

5    inflated amount of $150 million.

6          180.    Secondary Sellers were each unjustly enriched by directly receiving approximately

7    $10 million for IRL Common Stock that Plaintiffs were induced to enter through fraud and

8    misconduct. Together, Secondary Sellers received a total of approximately $10 million that they

9    would not have received but for their misconduct.

10         181.    As a result of Secondary Sellers' conduct, Plaintiffs suffered losses and seek

11    rescission, restitution, or damages in an amount to be determined at trial.

12                                      **PRAYER FOR RELIEF**

13        **WHEREFORE**, Plaintiffs therefore pray for the following relief:

14        a.      Awarding Plaintiffs compensatory damages, in an amount to be determined at trial,

15    but in any event will exceed $150 million;

16        b.      Awarding Plaintiffs rescission of the Secondary Purchase Agreement;

17        c.      Awarding Plaintiffs punitive damages;

18        d.      Awarding Plaintiffs costs and reasonable attorneys' fees; and

19        e.      Such other and further relief that the Court deems just and proper.

20    Dated: July 31, 2023                **SULLIVAN & CROMWELL LLP**

21                                   By: */s/ Brendan P. Cullen*

                                      Brendan P. Cullen (SBN 194157)

22                                     Alexander J. Willscher (*pro hac vice to be requested*)

                                    Martin Erreich (*pro hac vice to be requested*)

23

24                                     Counsel for Plaintiffs

                                    *SVF Aggregator (DE) LLC and SoftBank Vision*

25                                     *Fund II-2 L.P.*

26

27

28

## JURY DEMAND

Plaintiffs SVF Investor and SoftBank Vision Fund 2 demand a trial by jury

Dated: July 31, 2023

**SULLIVAN & CROMWELL LLP**

By: _/s/ Brendan P. Cullen_
Brendan P. Cullen (SBN 194157)
Alexander J. Willscher (*pro hac vice to be requested*)
Martin Erreich (*pro hac vice to be requested*)

Counsel for Plaintiffs
*SVF Aggregator (DE) LLC and SoftBank Vision Fund II-2 L.P.*