Kalpana Srinivasan (CA Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310)789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

Stephen Shackelford, Jr (*pro hac vice*)
Shawn Rabin (*pro hac vice*)
Eve Levin (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
srabin@susmangodfrey.com
elevin@susmangodfrey.com

Kemper Diehl (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 373-7382
Facsimile: (206) 516-3883
kdiehl@susmangodfrey.com

*Attorneys for Defendant Abraham Shafi*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SVF II AGGREGATOR (DE) LLC, and SB VISION FUND II-2 L.P., <br><br> Plaintiffs, <br><br> vs. <br><br> ABRAHAM SHAFI, YASSIN ANISS, NOAH SHAFI, SHEHAB AMIN, ALIA SHAFI, and JACOB SHAFI <br><br> Defendants. | Case No.: 4:23-cv-03834-YGR <br><br> **DEFENDANT ABRAHAM SHAFI'S NOTICE AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge: Hon. Yvonne Gonzalez Rogers <br> Date: March 12, 2024 <br> Time: 2:00PM <br><br> ORAL ARGUMENT REQUESTED |

**NOTICE OF MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on March 12, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Oakland Federal District Courthouse, 1301 Clay Street, Oakland, California, Courtroom 1, before the Honorable Yvonne Gonzalez Rogers, Defendant Abraham Shafi will, and hereby does, move this Court to dismiss the Complaint filed by Plaintiffs SVF II Aggregator (DE) LLC and SB Vision Fund II-2 L.P. ("Plaintiffs" or "SoftBank") pursuant to Rules 12(b)(6), 8(a), and 9(b) of the Federal Rules of Civil Procedure.  ECF No. 1.

Abraham Shafi seeks an order dismissing the Complaint on the grounds that Plaintiffs have failed to plead claims against him upon which relief can be granted given Plaintiffs' failure to satisfy the heightened pleading standards of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, and on the grounds that Plaintiffs have failed to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: December 4, 2023

Respectfully Submitted,

By:   */s/ Stephen Shackelford, Jr.*

Stephen Shackelford, Jr. (*pro hac vice*)
Shawn Rabin (*pro hac vice*)
Eve Levin (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
srabin@susmangodfrey.com
elevin@susmangodfrey.com

Kemper Diehl (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 373-7382
Facsimile: (206) 516-3883

kdiehl@susmangodfrey.com

Kalpana Srinivasan (CA Bar No. 237460)
**SUSMAN GODFREY L.L.P**.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310)789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

*Attorneys for Defendant Abraham Shafi*

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

ARGUMENT ............................................................................................................................... 3

I.   SoftBank fails to state a claim under federal law. ............................................................. 3

    A.   The metrics on the "IRL at a Glance" graphic and Section 2.8(e) of the Disclosure Schedule (Statements 1, 2, 7) ............................................................. 6

        1.   SoftBank's "supporting facts" do not contribute to an inference of falsity ..................................................................................................... 7

        2.   SoftBank's "supporting facts" do not contribute to an inference of scienter. ................................................................................................. 16

    B.   The "dominant invite flow" was through "direct SMS based invites," (Statement 3), and growth was predominantly organic with limited growth spending (Statement 11). ............................................................................ 17

    C.   The paid user acquisition and CAC statistics. (Statement 4) ..................................... 19

    D.   Definitions of "sessions" and MAU. (Statements 5, 10) ........................................... 20

    E.   Natural variability in signups due to seasonality. (Statements 6, 9) .......................... 20

    F.   That third-party reports were not accurate because the trackers could not capture the data of IRL's young user base. (Statement 8) .......................................... 21

    G.   Disclosure of Agency and Machine Learning transactions. (Statements 12, 15) ...................................................................................................... 21

    H.   The Primary Purchase Agreement's representations about MAU, WAU, and DAU, and representation about the absence of bots. (Statements 13, 14) ............................................................................................. 22

    I.   Section 2.21 of the Primary Purchase Agreement. (Statement 16) ......................... 22

    J.   Section 2.23 of the Primary Purchase Agreement. (Statement 17) ......................... 23

    K.   Plaintiff Vision Fund II-2 is not a proper party. ....................................................... 23

II.   SoftBank fails to state a claim under state law. ............................................................... 24

    A.   Plaintiffs' state law claims fail because they are premised on the same alleged fraud as the deficient federal claims. ............................................................. 24

    B.   Plaintiffs' California Corporations Code § 25401 claim independently fails because the Complaint fails to allege any of the relevant conduct occurred in California. .......................................................................................... 24

CONCLUSION ......................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*David Rovinsky LLC v. Peter Marco, LLC*,
  No. 2:20-CV-02580-ODW, 2020 WL 5645792 (C.D. Cal. Sep. 21, 2020) ...........................24

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ....................................................................................9, 13

*Eckert v. PayPal Holdings, Inc.*,
  831 F. App'x 366 (9th Cir. 2020) ..............................................................................13

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) .............................................................................3, 4, 9

*Hershewe v. JOYY Inc.*,
  No. 2:20-CV-10611-SB-AFM, 2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) .................12, 13

*In re Apple Processor Litig.*,
  No. 18-CV-00147-EJD, 2022 WL 2064975 (N.D. Cal. June 8, 2022)...................................24

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ....................................................................................5

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................................10

*In re Nektar Therapeutics*,
  No. 18-cv-06607-HSG, 2020 WL 3962004 (N.D. Cal. July 13, 2020) ..................................12

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ....................................................................................3

*In re Read-Rite Corp.*,
  335 F.3d 843 (9th Cir. 2003) ......................................................................................4

*In re Robinhood Ord. Flow Litig.*,
  No. 4:20-CV-9328-YGR, 2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) ...............................4

*In re Stone & Webster, Inc., Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003) ........................................................................18

*Jackson v. Fischer*,
  931 F. Supp. 2d 1049 (N.D. Cal. 2013) ......................................................................25

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ....................................................................................4

ii

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
  No. 21-CV-07751-BLF, 2022 WL 2119122 (N.D. Cal. June 13, 2022) ...............................24

*Lyondell Petrochemical Co. Sec. Litig.*,
  985 F.2d 573 (9th Cir. 1993) (unpublished) ..................................................................4

*Masterson v. Cheetah Mobile Inc.*,
  No. CV 17-8141-R, 2018 WL 5099505 (C.D. Cal. June 27, 2018) .................................12

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .................................................................................6

*Mohebbi v. Khazen*,
  50 F. Supp. 3d 1234 (N.D. Cal. 2014) ......................................................................24

*OTC Energy, LLC v. Shen*,
  No. 8:22-cv-01568-FWS-DFM, 2023 WL 2628689 (C.D. Cal. Jan. 11, 2023) ....................25

*Prescott v. Rite Aid Corp.*,
  No. 22-CV-05798-VC, 2023 WL 2753899 (N.D. Cal. Apr. 3, 2023) .................................24

*Richard B. LeVine, Inc. v. Higashi*,
  131 Cal. App. 4th 566 (2005) ..................................................................................24

*Santa Barbara Smokehouse, Inc. v. Aquachile, Inc.*,
  No. CV-19-10733-RSWL-JEM, 2022 WL 672162 (C.D. Cal. Mar. 4, 2022) .....................24

*Sgarlata v. PayPal Holdings, Inc.*,
  409 F. Supp. 3d 846 (N.D. Cal. 2019) ......................................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..............................................................................................4

*Wallack v. Idexx Lab'ys, Inc.*,
  No. 11CV2996-GPC KSC, 2013 WL 5206190 (S.D. Cal. Sept. 12, 2013)..........................24

*Zakinov v. Ripple Labs, Inc.*,
  No. 18-CV-06753-PJH, 2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ..............................25

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...................................................................................4

**Statutes**

15 U.S.C. § 78t(a) .......................................................................................................3

15 U.S.C. § 78u-4(b)(2) ...............................................................................................4

Cal. Corp. Code § 25008..............................................................................................25

iii

Cal. Corp. Code § 25401 ...................................................................24, 25

Cal. Corp. Code § 25501 ........................................................................24

Private Securities Litigation Reform Act ...................................... *passim*

Securities Exchange Act of 1934 Section 10(b) ....................................3, 4

**Rules**

Fed. R. Civ. P. 9(b) .................................................................... *passim*

iv

### MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Abraham Shafi ("Abraham") is a co-founder, former CEO, and former director of Get Together, Inc., which created the social media app "IRL" (short for "In Real Life"). Compl. ¶¶ 1, 22. Launched in 2018, IRL offered its primarily Gen Z users a platform for messaging, live event discovery, and interest group creation. *See* Compl. ¶¶ 22, 30–31.

SoftBank's Complaint against various former IRL employees tells a fanciful tale: Abraham, with the help of his co-Defendant family members, supposedly masterminded a series of secret payments to secret companies that programmed a "bot army" to wildly inflate IRL's user metrics, tricking SoftBank into investing $150 million in May 2021.[1] On SoftBank's account, this scheme culminated in the collapse of IRL's user base after a Special Committee of IRL's Board suspended Abraham from the company and, with Abraham gone, discovered that 95% of IRL's users were bots.

Yet look a little closer, and SoftBank's pleadings tell a different story. By *SoftBank's own admission*, IRL disclosed *to SoftBank* its substantial economic relationship with the companies SoftBank now (baselessly) alleges were conduits for Defendants' supposed scheme. The secret payments were not secret at all—*they were disclosed in the same document from which SoftBank alleges Abraham omitted them*. Compl. ¶ 76; Dkt. 38 ("Chart") Stmt. 12 at 11–12, Stmt. 15 at 14. And SoftBank's Complaint itself alleges these companies provided not bots, but other services, including advertising and proxy services.

As for the collapse of IRL's user base, the Complaint omits the severe technical outages IRL suffered in the weeks after Abraham's departure. This omission is striking because the very third-party report SoftBank relies on for its "95% bots" allegation reveals this critical fact, which far more plausibly accounts for the loss of users than SoftBank's bot story. In fact, although this unsigned, non-expert report forms the cornerstone of SoftBank's case, SoftBank decided not to append it to the Complaint, instead cherry-picking seemingly favorable findings while obscuring the report's unfavorable admissions and shielding its shoddy analyses from scrutiny.

---

[1] Plaintiff SVF II Aggregator (DE) LLC ("SVF Investor") is an "indirect subsidiary" of Plaintiff Softbank Vision Fund II-2 L.P. ("Vision Fund 2") (collectively, "Plaintiffs" or "SoftBank"). Compl. ¶¶ 18–20.

DEFENDANT ABRAHAM SHAFI'S
MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 4:23-cv-03834-YGR

And no wonder. The so-called Keystone Report does not disclose who authored it or what their qualifications are, a defect that alone precludes SoftBank's reliance on it under binding Ninth Circuit precedent. In addition to acknowledging the site outages that explain IRL's loss of users, the report contains multiple other admissions disproving the fiction in SoftBank's Complaint. The report *admits* that IRL properly calculated users in its Series C disclosures—a fact fatal to SoftBank's Complaint. It *admits* that its "95% bots" calculation relied on an experimental database that did not exist until *after* SoftBank's investment (directly contradicting SoftBank's false statement that Defendants destroyed that data, Chart at 4. And it *admits* that the report's objective was not to independently investigate the presence of bots, but rather to *confirm* the presence of bots, a prefabricated conclusion. SoftBank omits those details from its Complaint. Even the report's analyses SoftBank does cite are so patently unreliable that they undermine its claims.

So what, apart from this unreliable and unsigned report, *does* SoftBank allege to back up its claims of an elaborate, multiyear fraud conspiracy? *No* reports of bots from company insiders in the *years* before SoftBank's investment, nor for almost a year thereafter; *no* data indicating bot usage during that key period; *no* communications or other documentary evidence of bot usage in or before 2021; and *no* other internal information indicating the presence of bots in or before 2021, even though SoftBank and its fellow venture capital allies have been in control of IRL's email servers and all of IRL's internal documents since they removed Abraham as CEO without warning in April 2023. SoftBank's theory is that for years (between IRL's launch in 2018 and mid-2022, a year after SoftBank's investment), almost all of IRL's userbase was bots—yet it does not allege that a single company insider, nor a single shred of data, suggested any substantial bot problem during that period.

That failure is not surprising, because the Complaint's fantastical account of Defendants' alleged scheme is false, full stop. But even taking the allegations of the Complaint as true—even crediting the portions of the Keystone Report cherry-picked for the Complaint—SoftBank's Complaint fails to support an inference that any statement that predated SoftBank's investment in IRL was false. Lacking any evidence of bot activity on IRL in the years before SoftBank's May 2021 investment (or even the ten months thereafter), SoftBank's complaint instead relies on the

DEFENDANT ABRAHAM SHAFI'S
MEMORANDUM OF POINTS AND AUTHORITIES

CASE NO. 4:23-cv-03834-YGR

anonymous hearsay of three IRL employees who speculated about bots or user metrics from March 2022 to May 2022, Compl. ¶¶ 95–99, in addition to a May 2022 anonymously-sourced post on tech-industry website *The Information*. Compl. ¶¶ 100–102. Anonymous speculation about bot activity on IRL nearly a year after SoftBank's investment does not remotely meet the Ninth Circuit's standards of reliability and particularity applicable to fraud claims. And the anonymous sources' vague statements, *even if credited*, do not raise an inference of falsity or scienter as to circumstances that existed a year prior, when SoftBank invested. *See* Compl. ¶¶ 95–99.

What SoftBank's Complaint lacks in particularity it attempts to make up for with innuendo and conclusory allegations. When the hand-waving is set aside, the Complaint fails to allege any statement's falsity or Abraham's scienter with particularity. Accordingly, Abraham respectfully requests that SoftBank's Complaint be dismissed.

## ARGUMENT

### I.     SoftBank fails to state a claim under federal law.

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 or SEC Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation omitted). Under Section 20(a), which provides for liability of a "controlling person," 15 U.S.C. § 78t(a), "a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show that the defendant exercised actual power over the primary violator." *Id.*

"Scienter" requires "intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (cleaned up). "[D]eliberate recklessness is an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (internal

3

quotation omitted). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 765 (citation omitted and alteration in original).

SoftBank's claims are all subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and its federal claims are further subject to the Private Securities Litigation Reform Act (the "PSLRA"). Under both Rule 9(b) and the PSLRA, falsity must be plead with "particularity." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted). "[T]o properly allege falsity" with particularity, "a securities fraud complaint must []'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief[,] state with particularity all facts on which that belief is formed." *Zucco Partners,* 552 F.3d at 990–91 (citation omitted). Further, under the PSLRA, to "adequately plead scienter, the complaint must . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* at 991 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added). Allegations raise a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (emphasis added). Scienter is measured from the time of the purported false statement: SoftBank must allege "particular allegations which strongly imply Defendant's *contemporaneous* knowledge that the statement was false *when made*." *In re Read-Rite Corp.*, 335 F.3d 843, 847 (9th Cir. 2003) (emphasis added). Each allegedly false misrepresentation or omission must be considered "individually to determine if dismissal is appropriate." *Lyondell Petrochemical Co. Sec. Litig.*, 985 F.2d 573 (9th Cir. 1993) (unpublished); *see also In re Robinhood Ord. Flow Litig.*, No. 4:20-CV-9328-YGR, 2022 WL 9765563, at *6 (N.D. Cal. Oct. 13, 2022) (Gonzalez Rogers, J.) (examining each statement separately).

4

While each of the alleged misrepresentations is addressed in turn below, three general defects permeate SoftBank's allegations. *First,* SoftBank puts great weight on anonymous reports of (1) an unnamed non-employee, (2) unnamed IRL employees, and (3) a third-party company. These reports are insufficiently reliable to support an inference of falsity or scienter under binding precedent. SoftBank may rely on unnamed sources only if they are "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quotation marks and citation omitted). Courts evaluate the reliability of confidential sources by looking at "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, and similar indicia." *Id.* (quotation marks and citation omitted). SoftBank's confidential sources fall well short of that bar.

*Second*, even if credited, the Complaint's allegations based on anonymous sources at most support an inference that bots were present (to some unspecified degree) on IRL, at earliest, *ten months after* the alleged misrepresentations were made in early 2021. The factual allegations pertain exclusively to the *then-present* state of IRL's users in mid-2022—*not* to the users in the spring of 2021. The temporal disconnect between the alleged misrepresentations and the factual allegations of bots overrunning the site breaks the inferential chain. But the Court need not rely on that alone. By the Complaint's own admission, IRL's circumstances changed dramatically between the spring of 2021 (when SoftBank purportedly relied on the statements) and mid-2022. In the months preceding SoftBank's investment, IRL's reported monthly active users ("MAUs") were relatively stable, with modest increases consistent with IRL's organic growth-and-retention strategy. *See* Compl. ¶ 87 (representing that MAUs had grown from 11.8 million to 12.8 million between December 2020 and April 2021). In the year *following* the SoftBank investment, from April 2021 to April 2022, reported MAUs dramatically increased from 12.8 million to 21 million (as all parties no doubt intended to facilitate with the new funding). *See* Compl. ¶ 94. Even if the Complaint's allegations could raise an inference that IRL was overrun with bots in *mid-2022*—they do not—the

allegations do not remotely support the inferential leap that IRL was virtually all bots *a year earlier*, when it had eight million fewer users.

*Third*, by SoftBank's own admission, IRL's relationship with "The Agency" and "Machine Learning LLC" *were disclosed* to SoftBank. *See* Compl. ¶ 76. IRL disclosed them as significant financial commitments exceeding $250,000.[2] *See infra* section I.G. SoftBank's attempt to paint these relationships as covert side-deals is entirely undermined by its own buried admission.

A. <u>The metrics on the "IRL at a Glance" graphic and Section 2.8(e) of the Disclosure Schedule (Statements 1, 2, 7)</u>

Emblematic of SoftBank's kitchen-sink pleadings is its grouping together, in its chart of alleged misrepresentations, of *eight* distinct statements about IRL's user metrics. SoftBank alleges these statements were made in a single graphic initially sent to someone other than SoftBank and supposedly then repeated to SoftBank. *See* Compl. ¶¶ 34, 36, 40; Chart Stmts. 1, 2, 7. The statements include two growth metrics ("15% MoM Growth Over 12 Months"; "400% YoY Growth"); one retention metric ("63% Monthly Retained 19 Months"); two engagement statistics ("28 Chats per day per DAU"; "1MM+ Hours in Average Time Organized and Spent Together a Day"); and three user count metrics ("3.5M DAU"; "6.3 WAU"; "10% US Population under 30 Uses IRL").

Despite the varied nature of these metrics, SoftBank offers a single blanket reason why all of them were supposedly false: they "were being intentionally manipulated with bots and incent advertising schemes and, accordingly, were not true or accurate statements of the real user metrics." Chart Stmt. 1 at 2. But the alleged use of "incent advertising" is completely irrelevant to the truth of these statements, as incent advertising would result in *human*, rather than bot, users. *See* Compl. ¶ 68. Moreover, as the Complaint itself indicates, incent advertising prompts *downloads* of the promoted app, not the *use* of that app or creation of *accounts* for that app, *see id.*, and thus, incent advertising alone would not result in any inflation of the relevant metrics. What about the alleged bots? Even if SoftBank had adequately alleged that the *user count metrics* were inflated with bots—

---

[2] In ruling on the motion to dismiss, the Court may consider documents incorporated into the complaint by reference. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

1  which it has not, as explained below—the other statements, including those about the platform's

2  "growth" and retention, are entirely distinct from the question of the platform's absolute user count.

3  Nor do any of the alleged "supporting facts" SoftBank marshals give rise to an inference of

4  falsity or scienter.

5  1.   *SoftBank's "supporting facts" do not contribute to an inference of falsity.*

6  *First*, SoftBank relies on the alleged use of proxy IP services as supporting both falsity and

7  scienter. *See* Chart Stmt. 1 at 2; Compl. ¶ 61. But that allegation does not help SoftBank's bot theory,

8  for multiple reasons. For starters, while SoftBank alleges that IRL "made payments of *at least*

9  $300,000 to these proxy services," *id.*, it never alleges (nor could it) that IRL paid (or used) these

10  proxy services *before the Series C closed*. That alone is fatal to the inference SoftBank seeks to draw

11  from this allegation. Moreover, an allegation that IRL made unquantified payments to an unnamed

12  proxy service that advertises its ability to circumvent anti-bot systems, *see id.*, does not give rise to

13  a cogent inference of wrongdoing, either. IRL could have used proxy services, and even bots, for

14  many legitimate reasons having nothing to do with falsely inflating IRL's user metrics. How do we

15  know this? Because the Complaint itself alleges that IRL personnel contemplated using proxy

16  services to crawl *other* social media websites, to encourage their human users to try IRL. Compl.

17  ¶ 82 (alleging that in 2022, two Defendants discussed "[C]reating a bot that crawls Facebook and

18  Discord to send [direct messages] to join the same group/server on IRL"). Even assuming IRL used

19  proxy services to conceal bot usage—an inference the vague and conclusory allegations of the

20  Complaint do not support—the inference those proxy services (and in turn, bots) were used for the

21  legitimate purposes the Complaint itself acknowledges is stronger than the contrary inference that

22  they were used for the illicit purpose of inflating IRL's user numbers.

23  *Second*, SoftBank relies on its vague allegation that IRL "prohibit[ed] other employees who

24  were not aware of the scheme from accessing core IRL user data" as supporting falsity, Compl.

25  ¶¶ 63, 82, and that Abraham was aware of that practice as supporting scienter. Chart Stmt. 1. The

26  Complaint contains no allegations describing what "core IRL user data" others were excluded from;

27  what that data showed; how they were excluded; or who had control over individuals' access. And

28

7

though the Chart claims that Abraham was "aware" of that restricted access, the cited paragraph of the Complaint contains no such allegation. Moreover, the Complaint admits that unnamed "senior executives," *id.*—who are *not* Defendants, are *not* "Shafi family members," and who the Complaint does *not* allege were part of the purported scheme—had access to this data, eliminating any inference of falsity that might arise from the bare fact that some other unspecified IRL employees were restricted from accessing unspecified data, as well as any inference of scienter that might arise from Abraham's knowledge of those restrictions. And finally, the Complaint appears to base this allegation on the account of an unnamed "then-IRL employee." *See* Compl. ¶ 82. This anonymous statement does not remotely meet the standards of reliability required under binding Ninth Circuit precedent, *see infra* 8–9, and does not contribute to any inference of falsity or scienter.

*Third,* SoftBank argues that its allegations that certain Defendants were the "primary employees whose job responsibilities involved user data" (Chart Stmt. 1 at 3) supports an inference of falsity. But SoftBank does not even try to allege that Defendants were the *only* "employees whose job responsibilities involved user data," so the attempted inference that Defendants were hiding bad data from non-"conspirators" fails. Nor does the Complaint contain any details about *when* these individuals held "primary 'back-end' engineer" roles (Compl. ¶ 64). At the time SoftBank invested? Before? After? Continuously? The Complaint says only that they held such roles "at various times." *Id.* Such vague allegations fall far short of the particularity required to support an inference of falsity.

*Fourth,* SoftBank relies on two anonymous statements—made long after SoftBank's investment—bearing none of the indicia of reliability the Ninth Circuit requires. *See* Chart Stmt. 1 at 3; Compl. ¶¶ 95–98. The first, by a "software engineer" in March 2022, allegedly raised generic concerns about bot traffic and claimed that images were being uploaded to IRL by bots "or scripts," Compl. ¶ 95, while the second, by a "software engineer" in May 2022, speculated a year after the SoftBank transaction, when IRL had nine million *additional* MAUs, that IRL's growth was "implausible," and that there had been a one-time "unusual traffic drop." Compl. ¶ 98. The threadbare use of the generic title "software engineer" falls far short of the kinds of allegations necessary to render the statements sufficiently reliable under binding Ninth Circuit precedent. For

example, in *Glazer*, the Ninth Circuit allowed the use of confidential witness statements where the complaint described each individual's job responsibilities in detail and tied those responsibilities to the substance of the statement. 63 F.4th at 771 (holding that allegation that a confidential witness was a "Strategic Account Manager . . . from April 2019 to February 2021, who sold Forescout's products to large enterprises in Houston, Austin, and San Antonio," was sufficient to explain how the witness "possessed the personal knowledge that Forescout lost its largest customer in Texas in May 2019"). In *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), the Ninth Circuit accepted as sufficient detailed explanations of confidential witnesses' roles paired with the specific chain of events by which they came to obtain their personal knowledge. *See id.* at 940. SoftBank's allegations here bear no comparison. The Complaint provides no color on the unnamed individuals' qualifications to make these assessments, nor their exposure to information that would make these allegations reliable. Indeed, their alleged exposure to relevant information is mutually exclusive with other aspects of SoftBank's theory—namely, that Defendants restricted employees' access to the relevant data. Even if credited, though, these allegations do not contribute to an inference of falsity. The Complaint does not specify whether the supposedly "implausible" growth referred to the pre-investment period or the explosive growth in the *post*-investment period. Similarly, the Complaint does not specify whether the image uploads at issue were pre- or post-investment. Nor does it explain why a one-time drop that the employee thought was anomalous is probative of the presence of bots at all, let alone probative of an army of bots a year earlier.

*Fifth*, SoftBank rests on yet another anonymous report from spring 2022, this time by IRL's unnamed Head of Trust and Safety, as supporting falsity. *See* Chart Stmt. 1 at 3; Compl. ¶ 99. Again, the Complaint fails to provide the details necessary to support a finding that this individual's statement was reliable: it contains no details about the "Head of Trust and Safety's" role, his access or insight into user metrics relevant to the alleged misstatements, or when this unnamed individual joined IRL (i.e., before or after the SoftBank investment). Even if credited, this statement is not probative of falsity: the Complaint does not specify what the unnamed individual's vague "doubt" about the "MAU/retention information" was; in what respects this unnamed individual found IRL's

9

growth tactics to be "shady" or "questionable"; and whether those statements pertained to the MAU and related metrics at the time of the SoftBank investment or, rather, a year later, at the time of the statement.

*Sixth*, as to falsity, SoftBank points to a May 2022 post in *The Information*, over a year after the SoftBank investment, parroting unnamed employees' speculation. *See* Chart Stmt. 1 at 3; Compl. ¶¶ 100–101. This allegation suffers the same defects as the unnamed employees' statements: it is unsubstantiated and pertains to IRL's post-investment growth. Under Rule 9(b) and the PSLRA, "newspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). The cited newspaper article is based on anonymous employee speculation, attributing its allegations to "some employees" of IRL, without further elaboration of those individuals' roles or knowledge.[3] *See* Ex. A[4] at 2. Indeed, there is no way to know whether these are the *same* unnamed employees SoftBank relies on elsewhere in the Complaint and thus pure double-counting. Importantly, the article is explicit that the subject of the reported employee speculation is the "nearly double[d]" growth from the time of the SoftBank investment to the time of the article's publication—*not* the user metrics disclosed before the investment. *Id.*

What's more, *the article directly contradicts SoftBank's bot-scheme theory*. The article notes that the unnamed IRL employees attributed the alleged issue with IRL's reported MAU not to the use of bots or any other nefarious scheme, but to the "use of a more expansive definition of active users than that of" other social-media apps. *Id.* Though the article cites certain third-party usage reports as potentially substantiating the employees' claims, it provides no reason to reject an obvious alternate explanation—that the discrepancy was attributable to IRL's young user demographic, an

---

[3] This Article is incorporated by reference in the Complaint, *see* Compl. ¶¶ 100–101, and is therefore properly considered on the motion to dismiss.  *See supra* n.2.

[4] All exhibits herein are to the Declaration of Kemper Diehl that accompanies this motion.

explanation SoftBank itself agreed with in April 2021. Compl. ¶ 42; *see also* Ex. B at 1.[5] Indeed, the third-party usage reports the article cites are inconsistent with SoftBank's theory that IRL's metrics were inflated with bots; despite finding usage lower than that reported by IRL, the article's recounting of the third-party reports substantiates that IRL had millions of authentic human users and makes *no* mention of bot activity. Finally, as explained below, *see infra* 12, third-party reports are subject to the same requirements as confidential witness statements. The article provides no color on the third parties' qualifications or methodologies. Nesting unreliable reports within unreliable reports cannot relieve Plaintiffs of their burden under the PSLRA and Rule 9(b).

*Seventh,* again as to falsity, SoftBank relies on the fact that IRL's active user population abruptly collapsed after Abraham's departure. *See* Chart Stmt. 1 at 3; Compl. ¶ 110. SoftBank's implausible speculation about what precipitated the collapse does not contribute to an inference of falsity. SoftBank's inferential chain requires at least the following steps and premises, none of which is substantiated by well-pled allegations: (1) Abraham chose to immediately stop his secret funding of all bot activity after he was removed as CEO—a nonsensical choice if the scheme were real; (2) notwithstanding almost all the users being bots and Abraham having ordered the entire bot army to stand down, DAU still somehow rebounded from two users on May 13, 2023, to 121,000 users on May 14, 2023, *see* Compl. ¶ 110; and (3) this suggests that *two years earlier, in April 2021,* IRL was so dominated by bots that Defendants' representations about usage metrics were knowingly false.

This rank speculation is rendered even more implausible given that the pattern of user loss alleged is far more consistent with the loss of *human* users due to the *severe site outages IRL suffered after Abraham's departure*. SoftBank's Complaint conveniently never mentions those outages. *See* Compl. ¶ 110. But the Keystone Report, addressed below, which SoftBank's Complaint heavily relies on but conspicuously does not attach, admits they happened.[6] *See* Ex. C ("Keystone Rpt.") ¶ 11 (referencing a "broken" "notification endpoint" having been "discovered" on May 9, and "user

---

[5] This email is incorporated by reference in the Complaint, *see* Compl. ¶ 42, and is therefore properly considered on the motion to dismiss. *See supra* n.2.

[6] The report is incorporated by reference into the Complaint. *See* Compl. ¶¶ 111–113; *supra* n.2.

activity [being] throttled on May 13 due to a database fix"); *id.* ¶ 36 (acknowledging the "outage event on May 13"). Ongoing technical issues so severe that they culminated in IRL having to "throttle" all user activity is an obvious explanation for why the site lost virtually all its users over the first two weeks of May. It is an explanation consistent with millions of *human* users getting increasingly frustrated with the site's increasingly severe technical problems—though SoftBank admits at least 121,000 returned on May 14 to give the site another chance even after the site was completely "throttled." And it is a far more cogent explanation for the drop in user activity than the illogical inference that Abraham voluntarily chose to stop his alleged "bot army" on a dime because he was removed as CEO. In short, the mere fact of a drop-off in users in May 2023 after serious technical outages does not raise an inference of falsity with respect to statements concerning the presence of bots or MAU at all, let alone two years earlier.

*Eighth,* and last as to falsity, the Complaint alleges that a supposed third-party expert, variously referred to in the Complaint as "Keystone Strategy" and "Keystone Research," *compare* Compl. ¶ 111 *with id.* ¶ 113, concluded in June 2023 that a high proportion of IRL's users from June 2022 to June 2023 were bots. *See id.* ¶¶ 111–113. The Complaint does not describe who or what Keystone Strategy (or Research) is, or why its conclusions should be entitled to any more weight than an anonymous employee's. Nor does the Keystone Report itself, which contains no named author or contributors, nor any details about the company's qualifications to make such conclusions. "Because the Report was written by" Keystone, "and not a named author, it falls 'under the umbrella of [information provided by] confidential witnesses.'" *Hershewe v. JOYY Inc.*, No. 2:20-CV-10611-SB-AFM, 2021 WL 6536670, at *4–*6 (C.D. Cal. Nov. 5, 2021) (finding unreliable an "expert" report forming basis of complaint regarding bots and dismissing complaint) (citing *Masterson v. Cheetah Mobile Inc.*, No. CV 17-8141-R, 2018 WL 5099505, at *2 (C.D. Cal. June 27, 2018) (finding unreliable report forming basis of complaint about bots and "click farms")). "That is to say, '[w]here a securities plaintiff relies on an expert opinion, such factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with any confidential informant (or other witness).'" *Id.* at *4 (citing *In re Nektar Therapeutics*, No. 18-cv-06607-HSG, 2020 WL

3962004, at *10 (N.D. Cal. July 13, 2020)).

Even as described in the Complaint, the Keystone Report has myriad hallmarks of unreliability: it relied on "non-public data and information sources"; it "did not corroborate its core conclusions . . . [with] signed, named affidavits from corporate insiders"; and the Complaint "fail[s] . . . to provide basic information about the soundness or quality of the technical analysis contained in the Report, including the qualifications" of the personnel "to perform the analysis, [or] the accuracy of the methodology used to perform the analysis." *Id.* at *5; *see also Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 860 (N.D. Cal. 2019), aff'd sub nom. *Eckert v. PayPal Holdings, Inc.*, 831 F. App'x 366 (9th Cir. 2020). These concerns are compounded by the fact that "[d]ata collection and analysis on the scale" of 20 million users is "a complex and technical task," yet the Complaint contains no allegation "that this task was conducted by a data scientist, machine learning engineer, mathematician, computer scientist, or any other individual with expertise in large-scale data collection and analysis." *Hershewe*, 2021 WL 6536670, at *5, And to make matters worse, the Complaint does not even allege the Report's findings with particularity, instead generalizing that "two separate analyses demonstrated that individual user activity on the app demonstrated 'signature patterns' of bot activity." Compl. ¶ 111. What analyses? What patterns? According to whom? The Complaint does not say. Its allegations are a far cry from the type of detailed methodological allegations the Ninth Circuit regards as sufficient to survive review under Rule 9(b) and the PSLRA. *See, e.g.*, *E. Ohman J:or Fonder AB*, 81 F.4th at 930–31.

Even if the Court were to consider the Report itself, it confirms its unreliability to support SoftBank's pleadings. The Report admits that the data underlying its analysis was unreliable and incomplete. It states that IRL maintained two databases with user data—"BigQuery Data" and "Request Data" (the latter of which was stored in the "RedShift" database). Keystone Rpt. ¶¶ 5–6. Despite acknowledging that BigQuery was the "source of truth for counting active users," and the RedShift database was not employed until "mid/late 2021"—*after the SoftBank investment*—and was not fully populated until "only after early 2022," *id.* ¶ 6 (quotations omitted), the Report nonetheless bases its "bot classification" analysis on the RedShift data. *Id.*

Not only was the dataset unreliable; the analyses on which the Keystone Report—and, in turn, the Complaint—principally relies are facially implausible and unsubstantiated. The Report's first "[k]ey finding" relied on by SoftBank in its Complaint is the high number of duplicate group names within IRL. *See* Keystone Rpt. ¶¶ 2(a), 13; *see also* Compl. ¶ 111 (highlighting the Report's finding that "IRL had millions of private groups with identical names"). Yet the Report (though not the Complaint) acknowledges that users were prompted to create groups upon onboarding and the app *suggested the names of the groups to be created*. Keystone Rpt. ¶ 64. To account for this, the Report purportedly undertook an analysis of "chat activity patterns within the most frequently created groups," and found the level of activity to be largely similar across the millions of groups with five most common names. *See id.* ¶¶ 65–67, fig. 16. Yet the Report fails to give any reason why similar amounts of activity across the large sample set of groups potentially created the same way (during onboarding by human users) is indicative of *bot* activity rather than *human* activity. *See id.* ¶¶ 64–66. Millions of low-activity groups with the same names would be *precisely the expected outcome from IRL's method of onboarding human users.*

Next, the Complaint highlights that IRL usernames "included a significant number of obscure email names" and the proportion of common domain names did not match the prevalence of those domain names in the general public. *See* Compl. ¶ 111; Keystone Rpt. ¶¶ 14–15, 69. But the Report's results show that the *vast* majority of sign-ups came from gmail.com, hotmail.com, yahoo.com, icloud.com, outlook.com, or no email address at all—i.e., what the Report itself characterizes as popular domains. For example, of the email addresses arbitrarily sampled from the "Play Video Games" Group, 99% (4,687,432 of 4,712,647 group members) came from these common domain names. Keystone Rpt. ¶¶ 63, 69. Nor does the Report justify its inferential leap between the observed distribution among these domain names and bot activity. And, like all the analyses highlighted in the Complaint and all of the Report's bot analysis, the analysis relied on the data from the unreliable, incomplete, and irrelevant (due to its temporal limitations) RedShift database. *See id.* ¶¶ 62–63. The Report itself indicates that the "spikes" in signups for the purportedly overrepresented email domains occurred months *after* the Series C. *See id.* ¶ 70 & fig. 18.

The data with respect to signups from "obscure email domains" is even more limited. The data in the Report shows around 200,000 sign-ups, during the irrelevant December 2021–March 2022 period, from what it classifies as obscure domain names. *Id.* ¶ 71 & tbl. 15. But the Report does not explain (1) why those obscure domain names would be associated with bots; (2) whether those domain name *signups* affected MAUs, DAUs, or WAUs during the relevant time frames, and/or were purged from the platform by anti-bot technology (including the massive bot purge IRL independently undertook in mid-2022, *see* Compl. ¶ 103), or (3) how 200,000 obscure-name sign-ups in a three-month period postdating SoftBank's investment supports SoftBank's allegations of many millions of fake users months earlier.[7]

Perhaps most striking is the Keystone Report's own acknowledgment that its conclusions were *limited to the period after June 2022*. The report itself does not even draw the inference SoftBank asks the Court to draw here: that the supposed presence of bots on IRL over a year *after* SoftBank's investment indicates the presence of bots on IRL a year earlier. To the contrary, the Report "*verified* IRL's MAU count during the Series C funding rounds," based on the BigQuery Data. *Id.* ¶ 61 (emphasis added).

Though SoftBank attempts to cast the purported absence of data before June 2022 in a suspicious light, those suppositions are unsupported. The Complaint misleadingly states that "IRL only maintained backups of user data dating from June 2022." Compl. ¶ 113. And SoftBank's Chart even more misleadingly bemoans "Defendants' *deletion* of data." Chart Stmt. 1 at 4 (emphasis added). But the Keystone Report proves the purported deletion is a lie: Keystone admits IRL stored user data in BigQuery, which it regarded as the "source of truth for counting active users," beginning in "at least 2019." Keystone Rpt. ¶ 5. IRL implemented a *separate*, experimental database, RedShift, in mid-to-late 2021, *id.* ¶ 6, but only began fully populating that database in 2022. *Id.* Contrary to SoftBank's implication, IRL collected (and did not delete) user data from "at least 2019," and RedShift data from before the Series C is "missing" because IRL did not even *start* collecting such

---

[7] SoftBank's Complaint also relies on "[t]wo separate analyses by Keystone Strategy demonstrat[ing] that individual user activity on the app demonstrated "signature patterns" of bot activity," Compl. ¶ 111, but it does not identify the analyses or patterns to which it refers.

data until *after* the Series C—not because it deleted any data.

The Keystone Report should be disregarded because it bears no indicia of reliability; but even if it met the Ninth Circuit's reliability test, it still fails to raise an inference of falsity.

2. *SoftBank's "supporting facts" do not contribute to an inference of scienter.*

SoftBank relies on four additional allegations as supporting scienter alone.

*First,* the Complaint alleges that a CEO from an unnamed company wrote to Abraham that there had been a "bot attack" on IRL, and that the next day, Abraham touted the platform's Daily Active Users to an investor. Chart Stmt. 1 at 2; Compl. ¶¶ 65–66. This allegation fails to raise an inference of scienter because it relies on the statement of an unnamed witness that lacks the indicia of reliability required under Ninth Circuit precedent.

The Complaint provides no basis to believe that a CEO of a different company—described generically as a "tech" company—would have any reliable basis for identifying a "bot attack" on IRL. Absent any details about this CEO's role, exposure to IRL, knowledge of bots, or method of inferring there had been a "massive bot attack," these generic allegations fall far short of the types of confidential witness reports the Ninth Circuit has found sufficient. Regardless, the statement does not raise an inference of scienter. That IRL suffered a one-time, external "attack" has nothing to do with the elaborate scheme SoftBank alleges in which IRL used bots on the *inside* to inflate its user metrics (with Abraham's knowledge). And even a "bot attack generating millions of fake *groups* to join" could have a *de minimis* effect on DAU (the statistic Abraham allegedly touted the next day), because the Complaint does not allege whether each purported bot-made group was made by a separate bot account. This allegation does not contribute to any inference of scienter.

*Second*, SoftBank points to Abraham's awareness of the purported proxy service payments as supporting scienter. Chart Stmt. 1 at 2; Compl. ¶ 61. But for the reasons explained above, *see supra* 7, this allegation is entirely irrelevant to SoftBank's bot theory and does not contribute to an inference of scienter.

*Third*, SoftBank's chart lists the allegation that in March 2022, IRL changed its Slack retention policy, with the effect of "permanently deleting substantial amounts of communications

16

between Defendants." Chart Stmt. 1 at 3 (citing Compl. ¶ 96). But the Complaint itself contains no corresponding allegation that the policy change resulted in the deletion of any communications between Defendants (let alone "substantial amounts"). *See* Compl. ¶ 96. This belated attempt to bootstrap additional allegations must be disregarded. Moreover, the Complaint contains no allegations at all indicating that the change in the Slack retention policy was at Abraham's direction or with his knowledge; nor would a going-forward change in a document retention policy nearly a year after the Series C be sufficient to support scienter as to the sweeping pre-Series C scheme SoftBank alleges.

*Finally,* SoftBank alleges that a third-party report, the so-called Stroz Report, found that Abraham restored his phone from a backup. Chart Stmt. 1 at 3; Compl. ¶¶ 119–123. The "Stroz Report," like the Keystone Report, is subject to the exacting standard that applies to reports by confidential witnesses. The Complaint contains no details about Stroz Friedberg nor the methodology it applied. These deficiencies render it unreliable for the purposes of satisfying the PSLRA. And in any event, restoring a phone from a backup is unremarkable, and SoftBank fails to plausibly allege that Abraham's restoration of his phone lost *any* messages, let alone any messages relevant to the pre-Series C time period. What's more, SoftBank's Chart again mischaracterizes the allegations of its Complaint, impermissibly adding new allegations. Where the Complaint, blindly speculating, alleges that the restorations "likely concealed data from the [SEC] investigation," Compl. ¶ 121, SoftBank's Chart alleges that the Report found that Defendants "t[ook] steps to conceal information *likely concerning the fraud scheme*." Chart Stmt. 1 at 3 (emphasis added). This material attempt to amend the pleadings must be disregarded.

### B. The "dominant invite flow" was through "direct SMS based invites," (Statement 3), and growth was predominantly organic with limited growth spending (Statement 11).

SoftBank next alleges that Abraham represented that IRL's "*dominant* invite flow" was through "direct SMS based invites" that were a "free organic channel." Chart Stmt. 3 at 5; Compl. ¶ 39 (emphasis added). It argues that this claim was false because "IRL's primary means of acquiring non-bot users was through incent advertising, which was not 'free' or 'organic,'" because IRL "spent

aggressively on incent advertising." Chart Stmt. 3 at 5. But even accepting SoftBank's premise that IRL "spent aggressively on incent advertising" as true, its conclusion does not follow. Irrespective of how much IRL spent on user acquisition, SoftBank failed to allege any facts disproving that IRL's "*dominant* invite flow" was organic. Absent any allegations about the relative predominance of paid, non-organic growth versus organic growth, the Complaint has failed to allege falsity or scienter. Total expenditures on paid invites has no relation to the predominance of organic or non-organic growth, particularly because the nature of organic growth is that each additional user added by paid means might spawn *more* users by organic means (e.g., friend to friend invites). And absent allegations about what *other apps* typically spend on user acquisition, SoftBank has not adequately alleged that Abraham's characterization of the user acquisition cost as "[u]nlike other apps" and "very little"—whether above $0.50 or not—was false.

The Complaint's allegations about organic growth and "incent advertising" are further undermined by internally inconsistent allegations about payments to the Agency. In some places, the Complaint alleges that the "infra" costs attributed to the Agency were for incent advertising and other paid user acquisition strategies. *See* Compl. ¶ 74. Elsewhere, the Complaint alleges, upon information and belief, that the "infra" costs attributed to the Agency were "for the purpose of purchasing and programming bots to create the impression of activity on IRL." Compl. ¶ 106. These internal inconsistencies—each nothing more than speculation—entirely fail to meet Rule 9(b) and the PSLRA's strictures. *See, e.g.*, *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 120 (D. Mass. 2003) ("[I]nternally inconsistent" allegations "fail to meet the particularity standard because the allegations . . . do not set forth facts that show exactly why the statements or omissions were misleading.").

Next, SoftBank's Chart attempts to characterize its Complaint as alleging that "IRL paid millions of dollars to a firm secretly operated by IRL's own Head of Growth (the 'Agency') to pass through incent advertising firms." Chart Stmt. 3 at 5 (citing Compl. ¶¶ 5, 70–73). But nowhere in the Complaint does SoftBank allege that the person operating the Agency was an IRL employee (let alone the Head of Growth) *at the time of SoftBank's investment*—an allegation SoftBank cannot

make, because it is not true. Moreover, the implication that IRL's payments to the Agency were kept secret from SoftBank is false. Buried in SoftBank's pleadings is the fact that IRL *disclosed* its relationship with the Agency in its Primary Purchase Agreement with SoftBank. *See* Chart Stmt. 12 at 11 (acknowledging that the Agency was disclosed "on the disclosure schedule to the Primary Purchase Agreement"); Compl. ¶ 76 (same); *see also infra* section I.G.

Finally as to falsity, the Complaint additionally alleges that in September 2022, Abraham acknowledged in an email that certain payments to the Agency that were invoiced as "infra" should have instead been invoiced as "growth," and therefore IRL's customer acquisition cost (CAC) estimates needed to be revised upward. *See* Compl. ¶ 105. Yet again, the Complaint contains no details whatsoever to permit an inference that these costs in September 2022, sixteen months *after* the SoftBank investment, had anything do with customer acquisition costs in April and May 2021. There is no basis to infer that the revised CAC in September 2022 is probative of the falsity of the CAC as stated in the spring of 2021—let alone the further inference that the inaccuracy of the CAC in September 2022 necessarily rendered false Abraham's open-ended characterization of the "dominant invite flow" as organic in April 2021. Moreover, the Complaint does not allege that the responsibility for allocating these costs were Abraham's, the mistake his, or that it even happened with his knowledge¶.

SoftBank additionally relies on Abraham's acknowledgement of an inaccuracy in CAC as of September 2022 as probative of scienter. Chart Stmt. 3 at 5. But the fact that Abraham openly acknowledged that growth costs had been mis-billed as "infra" costs, more than a year after the statement in question, cuts *against* scienter. Instead of attempting to conceal this honest mistake, Abraham acknowledged it openly once it was revealed to him and attempted to fix it.

### C. The paid user acquisition and CAC statistics. (Statement 4)

Next, SoftBank's Chart homes in on the specific representation that CAC in April 2021 was about $0.50 per user. *See* Chart Stmt. 4 at 5–6. SoftBank offers no specific rationale as to why this statement was false, beyond referencing by incorporation the same allegations made for Statement 3. For the same reasons stated above, these allegations fail to raise an inference of falsity or a strong

inference of scienter.

D.   <u>Definitions of "sessions" and MAU. (Statements 5, 10)</u>

Abraham's fifth and tenth alleged Statements were that, during the pre-Agreement due diligence process in April 2021, IRL was measuring "session[s]" as app opens, *see* Compl. ¶ 39, and that it was measuring MAU as an "opened app or signed in/signup to web and has a session." *See* Compl. ¶ 42; Chart Stmts. 5 at 6–7, 10 at 10. SoftBank's Chart relies on the same deficient allegations as it does with respect to Statements 1, 2, and 7 to support this claim. For the same reasons described *supra*, these allegations fail. They also fail because the existence of a bot scheme is unrelated to how IRL defined a given unit of measurement ("sessions" or "MAU"). Indeed, if Defendants had been using bots to imitate real users and generate fake engagement, there would be no incentive to massage engagement metrics by defining MAU to include interactions through email, text message, or Google calendar.

The sole additional allegation the Complaint adds beyond those addressed *supra* to support scienter (as to Statement 5 only) is that in May 2022—a year after SoftBank's investment, and nine million reported MAUs later—Abraham told *The Information* the definition of MAU that IRL was *then* using was more capacious. Compl. ¶¶ 101–102. But how IRL defined MAU in Spring 2022 is irrelevant to how it defined MAU in Spring 2021—and in any event, the idea that Abraham would openly explain this definition of MAU to *The Information* is entirely at odds with SoftBank's theory that massaging IRL's MAU numbers was part of a covert, fraudulent, yearslong scheme, and especially at odds with any inference of scienter.

Moreover, the Keystone Report directly contradicts this claim. It explains that the MAU reported during the Series C was consistent with the then-current BigQuery data. *See* Keystone Rpt. ¶ 61. And it further alleges that a "session" comprising the BigQuery MAU count was tallied with reference to particular API requests. *See* Keystone Rpt. ¶ 6 n.4. These admissions—obscured by SoftBank's decision to omit the Report from its Complaint—entirely undercut this claim.

E.   <u>Natural variability in signups due to seasonality. (Statements 6, 9)</u>

Statements 6 and 9 are both alleged representations in April 2021 that month-to-month

signups fluctuated somewhat due to seasonality and natural variability, as well as a generic statement that IRL was "focused on . . . retention and engagement." *See* Compl. ¶¶ 39, 42. SoftBank offers only the same deficient allegations as support Statements 1, 2, 3, and 7 in support of this theory, and it fails for the same reasons as do those statements. It additionally fails because the existence of seasonal variability (even in genuine, human sign ups) and IRL's focus on generating retention and engagement are logically independent from the existence of any bot scheme or incent advertising.

F. <u>That third-party reports were not accurate because the trackers could not capture the data of IRL's young user base. (Statement 8)</u>

SoftBank alleges that a statement that third-party trackers could not reliably track the data of users under 18 was misleading for the same reasons it alleges Statements 1 and 3 are misleading. SoftBank has failed to allege falsity or scienter for Statement 8 for the same reasons as Statements 1 and 3. Moreover, SoftBank has not alleged—nor could it—that third-party tracking services *can* reliably track the data of individuals under 18. Indeed, SoftBank enthusiastically accepted this explanation at the time, and noted that the third-party tracking service itself qualified its findings with the same limitation. *See* Ex. B at 1 ("[A]gree with you on the data discrepancies w/ App Annie, they highlighted the issue with tracking users under 18 y/o and understand that it is their best estimate. . . . [M]akes complete sense!").

G. <u>Disclosure of Agency and Machine Learning transactions. (Statements 12, 15)</u>

SoftBank alleges that IRL made a material misrepresentation in the "Disclosure Schedule to the Primary Purchase Agreement"—yet in the same breath SoftBank admits that IRL disclosed its relationships with the Agency and Machine Learning "on the disclosure schedule to the Primary Purchase Agreement." Chart Stmt. 12 at 11. Namely, the Disclosure Schedule disclosed agreements with both entities in section 2.10(a)(i) as "agreements, understandings, instruments, contracts, or proposed transactions to which the Company is a party or by which it is bound that involve . . . obligations . . . [of] the Company in excess of $250,000."[8] Ex. D § 2.10(a)(i); *see also* Ex. E

---

[8] Both the Primary Purchase Agreement and the Disclosure Schedule thereto are incorporated in the Complaint by reference and therefore properly considered on the Motion to Dismiss. *See supra* n.2.

§ 2.10(a)(i). SoftBank would have preferred the agreements to have been disclosed under section 2.11. SoftBank's theory thus amounts to little more than a technical objection to the subsection of the Disclosure Schedule on which the relationships with those entities appeared.

SoftBank has also failed to allege with particularity any falsity or scienter. Section 2.11(a) of the Primary Purchase Agreement required IRL to disclose any "agreements, understanding or proposed transaction . . . between the Company and any of its officers, directors, consultants, or Key Employees, or any Affiliate thereof." Compl. ¶ 87. But the only connection the Complaint alleges between the Agency and individuals associated with IRL is that "[t]he Agency is a web marketing business run by IRL's own Head of Growth." Compl. ¶ 71. According to the Complaint, the "Head of Growth" position at IRL constitutes a "Key Employee" for purposes of the Primary Purchase Agreement. *Id.* ¶ 87 n.11. But the Complaint conspicuously does *not* allege that the person who ran The Agency was the Head of Growth at IRL (or even an IRL employee) *at the time of SoftBank's investment*. Nor could it, because he was not. As for the alleged connection between Machine Learning and Shehab Amin, IRL does not allege that Amin was *ever* a "Key Employee" of IRL under the contract, let alone at the time of SoftBank's investment. *Id.* (mentioning only "IRL's Head of Growth"). SoftBank's theory of falsity fails on its face. Moreover, that IRL actively disclosed its relationship with both entities cuts strongly against any inference of scienter.

### H. The Primary Purchase Agreement's representations about MAU, WAU, and DAU, and representation about the absence of bots. (Statements 13, 14)

SoftBank alleges that certain representations in the Primary Purchase Agreement regarding the platform's user metrics and absence of bots were false for the same reasons that Statement 1 is false. As explained above, SoftBank has failed to allege falsity or scienter as to these representations.

### I. Section 2.21 of the Primary Purchase Agreement. (Statement 16)

Statement 16, in Section 2.21 of the Primary Purchase Agreement, is a catch-all that warrants that no material misrepresentations or omissions were made in the Primary Purchase Agreement or Disclosure Schedule. SoftBank has not articulated any independent reason why the statement was

---

The entity referred to in the Complaint as "The Agency" is referred to in the Disclosure Schedule as "Format Agency, LLC." *See* Ex. E at § 2.10(a)(i).

false when made, nor has it marshaled any distinct facts in support of its theory, apart from the other alleged misrepresentations. It fails for the same reasons as Statements 1, 3, 5, 12, and 15.

J.   <u>Section 2.23 of the Primary Purchase Agreement. (Statement 17)</u>

Finally, SoftBank claims in its Chart that IRL's statement that it had delivered unaudited financial statements for several years, and that those statements represented all material respects of the financial condition and operating results of the company, was false because those statements did not accurately reflect infrastructure and growth expenditures. Chart Stmt. 17 at 15–16. Yet the Complaint contains no allegations about the contents of any financial statements delivered to SoftBank in May 2021. Having failed to plead what those financial statements said, or what they should have said, SoftBank has not satisfied its pleading obligations with respect to this alleged false statement.

In support of scienter, SoftBank's Chart alleges that Abraham had "knowledge of and directed IRL's significant spending on incent advertising," Chart Stmt. 17 at 15 (citing Compl. ¶¶ 72–73), that the Agency "issued IRL inaccurate invoices to conceal payments to incent advertising firms at the direction of Abraham," *id.* (citing Compl. ¶¶ 74–75), and that Abraham "continued to direct IRL to misrepresent its growth spending to SoftBank until September 2022," *id.* (citing Compl. ¶¶ 75, 105–106). But none of those allegations appear in SoftBank's Complaint. The cited paragraphs contain *no* allegations that Abraham "directed" the fraudulent accounting of IRL's incent advertising expenditures. At most, the Complaint alleges an email exchange in the summer of 2022 between Abraham and IRL's Head of Growth, where, *in response to the Head of Growth's inquiries*, Abraham provided guidance on IRL's spend projections and asked how to record certain expenditures on an August 2022 invoice. *See* Compl. ¶ 75. The Complaint contains no allegation whatsoever that the relevant invoices or projections were false, nor that Abraham (beyond this stray exchange) was regularly in the business of directing how costs were accounted for. The Chart's additional allegations and editorializing must be disregarded.

K.   <u>Plaintiff Vision Fund II-2 is not a proper party.</u>

Plaintiff SoftBank Vision Fund II-2 ("Vision Fund 2")'s claims should be dismissed for the

23

1    independent reason that the Complaint fails to allege any loss or damage suffered by Vision Fund 2.

2    Vision Fund 2 did not purchase any IRL equity, nor was it a party to either Purchase Agreement.

3    Compl. ¶¶ 84, 85. The *only* action the Complaint pleads Vision Fund 2 took even arguably in reliance

4    on the alleged misrepresentations was entering into a *non-binding* Term Sheet for the purchase of

5    the equity. Compl. ¶ 45. This fails to meet the economic loss element of Vision Fund 2's claims.

6    **II.    SoftBank fails to state a claim under state law.**

7            **A.    Plaintiffs' state law claims fail because they are premised on the same alleged fraud**

8                  **as the deficient federal claims.**

9           "[D]ismissal of[] federal securities claims warrants dismissal of []state law claims" premised

10   on the same alleged fraud. *LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, No. 21-CV-07751-

11   BLF, 2022 WL 2119122, at *6 (N.D. Cal. June 13, 2022); *see also Mohebbi v. Khazen*, 50 F. Supp.

12   3d 1234, 1252 (N.D. Cal. 2014) ("Plaintiff has not pleaded sufficient facts to show any material

13   misrepresentation [under Section 10b] . . . . Having failed to do so, he cannot state a claim for a

14   violation of § 25401"); *Wallack v. Idexx Lab'ys, Inc.*, No. 11CV2996-GPC KSC, 2013 WL 5206190,

15   at *12–*13 (S.D. Cal. Sept. 12, 2013) (dismissing § 25401 and common law intentional

16   misrepresentation and fraudulent concealment claims because plaintiff had not adequately pled its

17   Section 10b claims). And because the various state-law fraud claims fail, so too do the conspiracy,

18   aiding and abetting, and unjust enrichment claims. *Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App.

19   4th 566, 574 (2005) (conspiracy); *David Rovinsky LLC v. Peter Marco, LLC*, No. 2:20-CV-02580-

20   ODW, 2020 WL 5645792, at *8 (C.D. Cal. Sep. 21, 2020) (same); *Santa Barbara Smokehouse, Inc.*

21   *v. Aquachile, Inc.*, No. CV-19-10733-RSWL-JEM, 2022 WL 672162, at *9 (C.D. Cal. Mar. 4, 2022)

22   (aiding and abetting); *Prescott v. Rite Aid Corp.*, No. 22-CV-05798-VC, 2023 WL 2753899, at *2

23   n.2 (N.D. Cal. Apr. 3, 2023) (unjust enrichment); *In re Apple Processor Litig.*, No. 18-CV-00147-

24   EJD, 2022 WL 2064975, at *12 (N.D. Cal. June 8, 2022) (same).

25           **B.    Plaintiffs' California Corporations Code § 25401 claim independently fails because**

26                 **the Complaint fails to allege any of the relevant conduct occurred in California.**

27          "A primary violation under Section 25401 and 25501 requires that (i) a Defendant offered or

28

24

sold a security, (ii) in California, (iii) by means of a material misrepresentation or omission.' (internal quotations omitted))." *OTC Energy, LLC v. Shen*, No. 8:22-cv-01568-FWS-DFM, 2023 WL 2628689, at *5 (C.D. Cal. Jan. 11, 2023). To satisfy the "in California" requirement, the geographic nexus must be to the offer or acceptance of the sale of the security, not to the misrepresentations. *See Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 922815, at *16 (N.D. Cal. Feb. 26, 2020) (citing Cal. Corp. Code § 25008). Apart from alleging that Abraham is a California resident and a conclusory allegation in the "Claims for Relief" section that "Abraham Shafi was present in California" when he made the alleged misrepresentations, *see* Compl. ¶ 146, the Complaint is silent as to where any of the conduct occurred.

Moreover, Plaintiffs at most can maintain their § 25401 cause of action against Abraham with respect to only the $7.5 million purchase directly from him, rather than the entirety of their investment, because a § 25401 "impose[s] liability only on the actual seller of the security." *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1063 (N.D. Cal. 2013). Abraham and Plaintiff SVF Investor were only in direct privity with respect to that purchase, so the claim must be dismissed insofar as it concerns the direct sale of equity by IRL itself.

## CONCLUSION

For the foregoing reasons, Defendant Abraham Shafi respectfully requests that the Court dismiss SoftBank's complaint in its entirety.

Dated: December 4, 2023

Respectfully Submitted,

By:  */s/ Stephen Shackelford, Jr.*

Stephen Shackelford, Jr.
(*pro hac vice*)
Shawn Rabin (*pro hac vice*)
Eve Levin (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
srabin@susmangodfrey.com

25

elevin@susmangodfrey.com

Kemper Diehl (*appearance pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 373-7382
Facsimile: (206) 516-3883
kdiehl@susmangodfrey.com

Kalpana Srinivasan (CA Bar No. 237460)
**SUSMAN GODFREY L.L.P**.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310)789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

*Attorneys for Defendant Abraham Shafi*

26

## PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of New York, State of New York. I am over the age of 18 and not a party to the within action; my business address is 1301 Avenue of the Americas, 32nd Floor, New York, New York 10019.

On December 4, 2023, I served the foregoing document(s) described as follows:

**DEFENDANT ABRAHAM SHAFI'S NOTICE OF MOTION TO DISMISS AND MEMORANDUM OF LAW**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as follows:

___      BY MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___      BY PERSONAL SERVICE:
I caused to be delivered such envelope by hand to the offices of the addressee.

___      BY FEDERAL EXPRESS OR OVERNIGHT COURIER

___      BY FAX
I served by facsimile as indicated on the attached service list.

_XX_ BY ELECTRONIC MAIL
I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail as indicated on the attached service list.

Executed on December 4, 2023, at New York, New York.


Eve Levin _____          _/s/ Eve Levin_____
     (Type or Print Name)                              (Signature)

27

DEFENDANT ABRAHAM SHAFI'S                              CASE NO. 4:23-cv-03834-YGR
MEMORANDUM OF POINTS AND AUTHORITIES

1

## SERVICE LIST

2

Brendan P. Cullen
**SULLIVAN & CROMWELL LLP**
3  550 Hamilton Avenue
Palo Alto, CA 94301
4  Telephone: (650) 461-5650
Facsimile: (650) 461-5700
5  cullenb@sullcrom.com

6  Alexander Willscher (*pro hac vice*)
Martin Erreich (*pro hac vice*)
7  **SULLIVAN & CROMWELL LLP**
125 Broad Street
8  New York, NY 10004
Telephone: (212) 558-4104
9  Facsimile: (212) 558-3588
willschera@sullcrom.com
10  erreichm@sullcrom.com

11  *Attorneys for Plaintiffs*

12

Gail Shifman (Cal. Bar No. 147334)
13  **SHIFMAN GROUP**
2431 Fillmore Street
14  San Francisco, CA 94115
Telephone: (415) 551-1500
15  Facsimile: (415) 551-1502
gail@shifmangroup.com
16

Tracy A. Miner (*pro hac vice*)
17  Megan A. Siddall (*pro hac vice*)
**MINER SIDDALL LLP**
18  101 Federal Street, Suite 650
Boston, MA 02110
19  Telephone: (617) 202-5890
Facsimile: (617) 202-5893
20  tminer@msdefenders.com
msiddall@msdefenders.com
21

*Attorneys for Defendant Alia Shafi*
22

Adam Fee
**PAUL HASTINGS LLP**
1999 Avenue of the Stars, 27th Fl.
Century City, CA 90067
Telephone: (310) 620-5719
Facsimile: (310) 620-5819
adamfee@paulhastings.com

Ben Nicholson
**PAUL HASTINGS LLP**
695 Town Center Drive, 17th Fl.
Costa Mesa, CA 92626
Telephone: (805)248-5467
bennicholson@paulhastings.com

*Attorneys for Defendants Noah Shafi, Jacob Shafi, Shehab Amin, and Yassin An*

23

24

25

26

27

28

DEFENDANT ABRAHAM SHAFI'S                               CASE NO. 4:23-cv-03834-YGR
MEMORANDUM OF POINTS AND AUTHORITIES