Brendan P. Cullen (SBN 194057)
cullenb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, CA 94301-2010
Tel:  +1-650-461-5600
Fax:  +1-650-461-5700

Alexander J. Willscher (*pro hac vice*)
willschera@sullcrom.com
Martin Erreich (*pro hac vice*)
erreichm@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004-2498
Tel: +1-212-558-4000
Fax: +1-212-558-3588

*Counsel for Plaintiffs SVF II Aggregator (DE) LLC and SoftBank Vision Fund II-2 L.P.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SVF II AGGREGATOR (DE) LLC, and SB VISION FUND II-2 L.P., | Case No. 4:23-cv-03834-YGR |
| Plaintiffs, | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT** |
| v. | |
| ABRAHAM SHAFI, YASSIN ANISS, NOAH SHAFI, SHEHAB AMIN, ALIA SHAFI, and JACOB SHAFI, | The Hon. Yvonne Gonzalez Rogers Hearing Date: March 12, 2024 Hearing Time: 2:00 p.m. |
| Defendants. | |

-1-

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ALLEGATIONS OF THE COMPLAINT...................................................................................3

I.      The Series C Investment ....................................................................................................3

II.     The Defendants' Fraudulent Scheme Is Revealed. .............................................................6

ARGUMENT ...............................................................................................................................9

I.      The Legal Standard ............................................................................................................9

II.     Abraham Shafi Violated Federal and State Securities Laws and Committed
        Common Law Fraud. ........................................................................................................10

        A.      Abraham Shafi's representations about IRL's growth were false. .......................12

        B.      Abraham Shafi's representations about IRL's active user metrics were
                false. ....................................................................................................................16

        C.      Abraham Shafi's representations about IRL's related-party relationships
                were false. ............................................................................................................25

        D.      Abraham Shafi made his false statements with scienter. .....................................27

III.    Counts Five through Eight against Yassin Aniss and Noah Shafi Are Sufficiently
        Pled. ..................................................................................................................................31

        A.      Yassin Aniss and Noah Shafi fraudulently concealed material information
                regarding IRL's bot activity...............................................................................31

        B.      Yassin Aniss and Noah Shafi participated in the conspiracy to defraud
                Plaintiffs. .............................................................................................................35

        C.      Yassin Aniss and Noah Shafi aided and abetted Abraham Shafi's ongoing
                scheme to defraud Plaintiffs................................................................................37

        D.      Yassin Aniss and Noah Shafi were unjustly enriched by their misconduct. .........38

IV.     Shehab Amin, Jacob Shafi and Alia Shafi Are Liable on Counts Six and Seven..............39

        A.      Each Defendant participated in the conspiracy to defraud Plaintiffs....................39

        B.      Each Defendant aided and abetted Abraham Shafi's ongoing scheme to
                defraud. ...............................................................................................................41

CONCLUSION..........................................................................................................................41

-ii-

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Allstate Life Ins. Co. Litig.*,
2013 WL 2474508 (D. Ariz. June 10, 2013) ...........................................................40

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...........................................................24

*Apple Inc.* v. *Samsung Elecs. Co.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) ...................................................................31

*AREI II Cases*,
157 Cal. Rptr. 3d 368 (Cal. Ct. App. 2013) .......................................................35, 36

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009).....................................................................................................9

*Astiana* v. *Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ...............................................................................37, 38

*Berson* v. *Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...............................................................................26, 29

*Bly-Magee* v. *California*,
236 F.3d 1014 (9th Cir. 2001) .....................................................................................9

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund* v. *Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)........................................................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010) ....................................................................32

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) ......................................................................40

*City of Indus.* v. *City of Fillmore*,
129 Cal. Rptr. 3d 433 (Cal. Ct. App. 2011) ..............................................................35

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr.* v. *RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ....................................................................23

*City of Sunrise Firefighters' Pension Fund* v. *Oracle Corp.*,
527 F. Supp. 3d 1151 (N.D. Cal. 2021) ....................................................................19

*Cooper* v. *Pickett*,
137 F.3d 616 (9th Cir. 1997) .....................................................................................12

-iii-

*In re Daou Sys., Inc., Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................20, 23

*Diamond Multimedia Sys., Inc.* v. *Super. Ct.*,
19 Cal. 4th 1036 (1999) ................................................................................10

*DocuSign, Inc.* v. *Clark*,
2022 WL 18956601 (N.D. Cal. Sept. 27, 2022) ............................................31

*Doshi* v. *eCommission Sols., LLC*,
2018 WL 4562628 (S.D. Cal. Sept. 24, 2018)................................................10

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .........................................................................11

*Falk* v. *Gen. Motors Corp.*,
496 F. Supp. 2d 1088 (N.D. Cal. 2007) ........................................................33

*Fecht* v. *Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .........................................................................13

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt. LLC.*,
376 F. Supp. 2d 385 (S.D.N.Y. 2005)............................................................11

*Glazer Cap. Mgmt., L.P.* v. *Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ...........................................................................9

*Hershewe* v. *JOYY Inc.*,
2021 WL 6536670 (C.D. Cal. Nov. 5, 2021)................................19, 20, 21

*Hinesley* v. *Oakshade Town Ctr.*,
37 Cal. Rptr. 3d 364 (Cal. Ct. App. 2005) ...............................................34, 38

*Iowa Pub. Employees' Ret. Sys.* v. *MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)..........................................................................24

*Jaeger* v. *Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022).......................................................27

*Kay* v. *Copper Cane, LLC*,
549 F. Supp. 3d 1014 (N.D. Cal. 2021) .........................................................38

*Khoja* v. *Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .........................................................................18

*Laatz* v. *Zazzle, Inc.*,
2023 WL 4600432 (N.D. Cal. July 17, 2023)............................................33, 36

*Lack* v. *Cruise Am., Inc.*,
2017 WL 3841863 (N.D. Cal. Sept. 1, 2017) ................................................12

-iv-

*Lewy* v. *SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)........................................................21

*LiMandri* v. *Judkins*,
  60 Cal. Rptr. 2d 539 (Cal. Ct. App. 1997).........................................................33

*Los Angeles Unified Sch. Dist.* v. *Great Am. Ins. Co.*,
  234 P.3d 490 (Cal. 2010)................................................................................33

*Macovski* v. *Groupon, Inc.*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021)................................................................25

*Masterson* v. *Cheetah Mobile Inc.*,
  2018 WL 5099505 (C.D. Cal. June 27, 2018).....................................................20

*McCraner* v. *Wells Fargo & Co.*,
  2023 WL 2728719 (S.D. Cal. Mar. 30, 2023) .....................................................32

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015)..............................................................26

*Mulderrig* v. *Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020)..............................................................29

*Nasrawi* v. *Buck Consultants LLC*,
  231 Cal. App. 4th 328 (2014).........................................................................36

*Neilson* v. *Union Bank of California, N.A.*,
  290 F. Supp. 2d 1101 (C.D. Cal. 2003) ...........................................................40

*Nissan Motor Acceptance Cases*,
  277 Cal. Rptr. 3d 914 (Cal. Ct. App. 2021).......................................................31

*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. July 13, 2020).....................................................20

*Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .......................................................................19

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .......................................................................10

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .......................................................................29

*Prakashpalan* v. *Engstrom, Lipscomb & Lack*,
  167 Cal. Rptr. 3d 832 (Cal. Ct. App. 2014).......................................................37

*Prodanova* v. *H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) .......................................................................29

-v-

*Robinson Helicopter Co.* v. *Dana Corp.*,
    102 P.3d 268 (Cal. 2004) ................................................................................................11

*Romero* v. *Flowers Bakeries, LLC*,
    2015 WL 2125004 (N.D. Cal. May 6, 2015) ..................................................................38

*RSB Vineyards, LLC* v. *ORSI*,
    223 Cal. Rptr. 3d 458 (Cal. Ct. App. 2017) ..................................................................32

*S. Ferry LP #2* v. *Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ....................................................................29

*S.E.C.* v. *Todd*,
    642 F.3d 1207 (9th Cir. 2011) ......................................................................................10

*Schulz* v. *Neovi Data Corp.*,
    60 Cal. Rptr. 3d 810 (Cal. Ct. App. 2007) ....................................................................37

*SEB Inv. Mgmt. AB* v. *Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........................................................................27

*Snellink* v. *Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ..........................................................................26

*Spencer* v. *Mowat*,
    260 Cal. Rptr. 3d 372 (Cal. Ct. App. 2020) ..................................................................36

*In re Stone & Webster, Inc., Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003) ..........................................................................14

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ...............................................................................................11, 27

*Tigo Energy Inc.* v. *SunSpec All.*,
    2023 WL 4269762 (N.D. Cal. June 28, 2023) ..............................................................11

*Torres* v. *Adventist Health Sys./W.*,
    77 Cal. App. 5th 500 (2022) ..........................................................................................36

*W. Pac. Elec. Co. Corp.* v. *Dragados/Flatiron*,
    534 F. Supp. 3d 1209 (E.D. Cal. 2021) ........................................................................34

**Statutes**

15 U.S.C. § 78u-4(b)(1) ............................................................................................................10

15 U.S.C. § 78u-4(b)(2) ............................................................................................................10

15 U.S.C. § 78u-4(b)(3) ............................................................................................................10

California Corporations Code § 25008 ......................................................................................10

-vi-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

California Corporations Code § 25401 .................................................................................10

Fed. R. Civ. P. 8(d)(2)...........................................................................................................38

Fed. R. Civ. P. 9(b) ...........................................................................................................9, 13

Fed. R. Civ. P. 10b-5............................................................................................................10

Fed. R. Civ. P. 12(b)(6).........................................................................................................9

Private Securities Reform Act of 1995 ....................................................................10, 11, 23

Securities Exchange Act of 1934 § 10(b) ........................................................................10, 11

Securities Exchange Act of 1934 § 20(a) .............................................................................10

**Other Authorities**

*About Keystone*, KEYSTONE, https://www.keystone.ai/about-us/ (last visited
    February 12, 2024).......................................................................................................20

*Our Experts*, KEYSTONE, https://www.keystone.ai/our-experts/ (last visited
    February 12, 2024).......................................................................................................20

-vii-

**PRELIMINARY STATEMENT**

Plaintiffs in this action are the victims of a sophisticated fraud, perpetrated by the Defendants in a years-long effort to turn investor capital into tens of millions of dollars in personal gain.  Defendants held out their social media app, IRL, as a phenomenon—already downloaded by 25% of Americans under 18 years old and about to achieve viral growth.  Without any revenue, Defendants were able to turn the potential of these prime-age users into a valuation exceeding $1 billion and attract an investment of $150 million from SoftBank.[1]

Defendants' fraud had multiple aspects:  using incentive (or "incent") advertising to ensure IRL sat at the top of the key app stores best-seller lists; using proxy services to make bots appear as real human users on IRL; and using pass-through entities controlled by IRL insiders to hide their scheme.  But when employees outside of the Defendants' inner circle started asking questions about suspicious traffic on the app, this set off a chain reaction that ultimately led to government investigations, the collapse of IRL's purported users, over $100 million of losses for SoftBank, and this lawsuit.

Abraham Shafi operated from the center of the scheme.  He was a co-founder, board member, and the CEO of IRL.  In early 2021, he solicited SoftBank's investment, trumpeting IRL's exceptional active user metrics.  He then repeatedly presented to SoftBank about IRL, answered SoftBank's questions about the Company, and participated in due diligence meetings. He represented to SoftBank that IRL had tens of millions of active users, that IRL's active user growth was both "meteoric" and "organic," that IRL did an extraordinary job of retaining and engaging its users, and that IRL spent very little on paid user acquisition.  He caused IRL to sign a purchase agreement representing its exact monthly, weekly, and daily active users (MAUs, WAUs, and DAUs), that its purported active users were human (not bots), and that IRL did not make any undisclosed related-party payments to its employees.  All false.

While Abraham Shafi sat at the center of the scheme, he was aided by the Defendants—all of whom are his siblings or cousins—who each held strategic positions in IRL,

---

[1]    Dollar values associated with the Series C financing are all approximate.  Paragraphs 84 and 85 of the Complaint set out the exact figures.

both to perpetrate the fraud and to prevent its discovery.  Abraham Shafi personally benefitted from the fraud by selling $7.5 million of IRL shares to SoftBank and charging millions of dollars of personal expenses to IRL credit cards.  Two of his family members, Yassin Aniss and Noah Shafi, benefitted from the fraud by each selling $1.25 million of IRL shares to SoftBank.  All Defendants benefitted from salaries and inflated perks, all from a company that never made any meaningful revenue.

Defendants' motions to dismiss primarily do what a motion to dismiss cannot do: dispute the particularized factual allegations of the Complaint with what they contend are different facts—namely, that IRL was not overwhelmingly populated by bots, that IRL did not spend hundreds of thousands of dollars monthly on incent advertising, and that IRL did not fail to disclose related-party payments with its employees.  Defendants ask the Court to ignore Abraham Shafi's specific representation that IRL was spending $50,000 a month on growth and that IRL's customer-acquisition-cost ("CAC") was approximately $0.50 per user, even though the Complaint specifically alleges that IRL was spending hundreds of thousands of dollars every month on incent advertising and Abraham Shafi himself admitted that IRL's actual CAC was $1.35.  Defendants ask the Court to believe IRL's millions of supposedly devoted users all simultaneously decided to stop using the app because of a notification issue and a single day outage.  They also ask the Court to ignore the specific finding of Keystone Strategy (an independent third party consultant) that IRL was overrun with bots enabled by proxy services.  Instead they ask that the Court accept their assertion that the Defendants were spending hundreds of thousands of dollars on proxy services to place bots on *other* websites.  They further ask the Court to treat the non-disclosure of millions of dollars of payments to entities controlled by IRL insiders as a minor "technical" mistake.  Finally, they ask the Court to reward their non-retention and destruction of data—turning their failure to properly retain IRL's active user data and their destruction of their communications into a "deficiency" of SoftBank's Complaint.

For the five Defendants who did not make specific representations to SoftBank, they ask that their role in the scheme go unpunished even though several sold shares directly to SoftBank, destroyed evidence, and prevented uncompromised IRL employees from discovering

-2-

1  the fraud sooner.  Through their coordinated actions, the Defendants not only defrauded SoftBank

2  when SoftBank invested $150 million in IRL, the Defendants continued to defraud SoftBank for

3  years after, enriching themselves with investor money while knowing IRL's purported user base

4  was nearly entirely a collection of bots.

5          SoftBank's Complaint alleges in detail employee concerns, documentary evidence,

6  and expert reports supporting its claims.  SoftBank's Complaint describes the misrepresentations

7  Abraham Shafi made and the role he and every other Defendant played in the scheme.  And it

8  describes in detail when and how the truth—that, in real life, IRL was essentially nonexistent—

9  was revealed and SoftBank's enormous resulting damages.  SoftBank respectfully requests that

10 the Court deny Defendants' motions to dismiss.[2]

11                        **ALLEGATIONS OF THE COMPLAINT**

12 **I.      The Series C Investment**

13         On April 5, 2021, Abraham Shafi approached SoftBank with the opportunity to

14 participate in a Series C financing round in his social media company, IRL.[3]  Compl. ¶ 34.  While

15 he did not suggest that IRL had any profits (or even any material revenues), Abraham Shafi did

16 represent that IRL had millions of "active users," that IRL was rapidly growing, that IRL's users

17 were highly engaged with the app, and that they were predominantly teens—a key demographic

18 for social media success.  *Id.*; Dkt. No. 38 ("Chart") Stmt. 1.  Most importantly, Abraham Shafi

19 shared active user metrics that suggested that IRL was on the verge of achieving "viral" growth

20 and becoming a social media phenomenon.  Compl. ¶ 43.

21         Based on the strength of the active user metrics that he shared, SoftBank set up a

22 

23 ───────────────

   [2]      On November 8, 2023, Abraham Shafi requested (and SoftBank consented to) an extended
   briefing schedule for Defendants' motions to dismiss.  On November 15, 2023, Abraham Shafi

24 filed a lawsuit against SoftBank and other IRL investors in the Delaware Court of Chancery,
   *Abraham Shafi et al.* v. *Chien et al.*, C.A. No. 2023-1157-LWW.  That complaint, among other

25 things (and incredibly), claims that Abraham Shafi was *defamed* by statements about the
   proliferation of bots on IRL.  That complaint also made no mention of this already pending action.

26 Abraham Shafi has refused to stay that Delaware action in favor of this proceeding.  SoftBank
   anticipates filing a motion to dismiss, or in the alternative to stay, that action on February 20, 2024.

27 [3]      Terms not otherwise defined herein have the same meaning as those in Plaintiff's

28 Complaint.  Dkt. No. 1 ("Complaint" or "Compl.").

                                           -3-

1   meeting with Abraham Shafi on April 13, 2021, to further discuss the investment opportunity.  *Id.*

2   ¶ 35.  During that meeting, Abraham Shafi repeated the active user metrics he had previously

3   shared with SoftBank via email and pledged to provide further materials supporting IRL's active

4   user metrics after the parties had executed a non-disclosure agreement.  *Id.* ¶ 36; Chart Stmt. 2.

5   The next day, SoftBank and Abraham Shafi (on IRL's behalf) entered into an NDA, IRL began to

6   provide the promised materials, and SoftBank started carefully reviewing this purported backup to

7   Abraham Shafi's representations.  Compl. ¶ 37.

8            On April 19, 2021, SoftBank asked Abraham Shafi a series of follow-up questions

9   about IRL's growth spending, what defined a user "session" on IRL, and the cause of month-over-

10   month variations in IRL's active user growth.  *Id.* ¶ 38.  In response, Abraham Shafi represented

11   that IRL's growth was overwhelmingly "organic," *i.e.*, primarily based on "free" user-generated

12   invitations and without needing to "spend aggressively to acquire new users."  *Id.* ¶ 39; Chart Stmt.

13   3.  He even provided specific estimates of IRL's monthly spending on paid user acquisition ("about

14   $50K") and CAC ("~$0.50").  Compl. ¶ 39; Chart Stmts. 3, 4.  He also was clear that a "[a] session

15   is an app open" and that any monthly variation in IRL's active user growth was due to

16   "seasonality."  Compl. ¶ 39; Chart Stmts. 5, 6.

17            SoftBank posed further questions on April 21, 2021.  In response, Abraham Shafi

18   repeated that monthly variations in IRL's download metrics were due to seasonality and provided

19   IRL's definition of an "active user."  Compl. ¶¶ 41-42; Chart Stmts. 9-10.  He also assuaged

20   SoftBank's expressed concern that a third-party report had suggested IRL had far fewer downloads

21   than he had previously suggested.  Compl. ¶ 41.  Specifically, Abraham Shafi wrote that the third-

22   party report was "definitely not accurate" because it did not consider IRL's web traffic and it was

23   unable effectively to track IRL's very young user base.  *Id*. ¶¶ 41-42; Chart Stmt. 8.

24            On April 20 and 22, 2021, Abraham Shafi repeated his active user and growth

25   spending representations in further meetings with SoftBank.  Compl. ¶¶ 40, 43; Chart Stmt. 7.

26   Based on these representations, SoftBank entered into a non-binding Term Sheet for a Series C

27   Preferred Stock Financing of Get Together Inc. on April 27.  Compl. ¶¶ 43-44.  The term sheet

28   provided that upon completion of due diligence, SoftBank would purchase $150 million of Series

-4-

1   C Preferred shares in IRL at a pre-money valuation of $1 billion and that up to $25 million of

2   SoftBank's investment would be used in a secondary purchase of common stock from IRL's

3   founders.  *Id.* ¶ 45.

4          SoftBank continued to perform due diligence on IRL after executing the non-

5   binding term sheet, including in an April 29, 2021 due diligence meeting in which SoftBank further

6   pressed Abraham Shafi on IRL's historic and planned growth spending.  *Id.* ¶ 47.  In the meeting,

7   Abraham Shafi again described how IRL's growth was nearly entirely organic.  *Id.* ¶ 48; Chart

8   Stmt. 11.  On May 3, 2021, SoftBank and IRL held another due diligence meeting in which

9   SoftBank asked whether IRL had any material undisclosed agreements with its directors, officers,

10  and others associated with the company.  Compl. ¶ 49.  In a written response, IRL replied it had

11  none and that it had "no other related party arrangements."  *Id.* ¶ 49; Chart Stmt. 12.

12         Throughout these presentations, written responses and meetings, Abraham Shafi

13  consistently represented that (i) IRL spent very little on paid user acquisition and instead relied on

14  "organic" growth, (ii) IRL's active user metrics were accurate and consistent with the definitions

15  of "session" and "active user" that he provided, and (iii) IRL did not have any undisclosed related-

16  party relationships.  Compl. ¶¶ 52-56.  SoftBank relied on these representations in making its

17  ultimate decision to invest in IRL and in assigning IRL its $1 billion pre-money valuation.  *Id.*

18  ¶ 51.

19         On May 18, 2021, SoftBank executed the Series C Preferred Stock Purchase

20  Agreement with IRL and the Common Stock Transfer Agreement with Defendants Abraham Shafi,

21  Yassin Aniss, Noah Shafi, and other IRL insiders.  *Id.* ¶ 84.  Through these agreements, SoftBank

22  purchased $150 million of IRL shares in total and, of that amount, $10 million of IRL shares from

23  these Secondary Sellers.  *Id.* ¶ 85.

24         SoftBank required that IRL make binding representations in the Primary Purchase

25  Agreement consistent with Abraham Shafi's statements during the due diligence process,

26  including that:  IRL's definition of an "active user" was a "natural person" who was a "North

27  American resident" and "no Active User was generated by any click farm or similar service, bot,

28  automated program or similar device" (*Id*. ¶ 87; Chart Stmt. 13); IRL had 12.8 million MAUs,

7 million WAUs, and 3.6 million DAUs in April 2021 (Compl. ¶ 87; Chart Stmt. 14); IRL did not have any "agreements, understanding or proposed transaction (in any case oral or written) between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof" (Compl. ¶ 87; Chart Stmt. 15); IRL had "made available to the Purchasers all the information that would reasonably be required for deciding whether to acquire the Shares" (Compl. ¶ 87; Chart Stmt. 16); and IRL's financial statements "fairly present in all material respects the financial condition and operating results of the Company." Compl. ¶ 87; Chart Stmt. 17. Abraham Shafi, Aniss, and Noah Shafi each represented that they had "had access to such information regarding the business and finances of [IRL] and such other matters with respect to [IRL] as a reasonable person would consider in evaluating the transaction contemplated hereby, including, in particular, all information necessary to determine fair market value of the Shares." Compl. ¶ 88.

**II.    The Defendants' Fraudulent Scheme Is Revealed.**

At first, the Series C investment appeared to supercharge IRL's growth and, by April 2022, IRL reported that it had 21 million MAUs, 12 million WAUs, and 6 million DAUs. Comp. ¶ 94. Internally, and in reality, IRL was in trouble and would soon face an SEC investigation; Abraham Shafi's suspension as CEO; the disappearance of IRL's purported active users; those supposedly-human users being revealed to be almost entirely bots; and, ultimately, the exposure of the Defendants' fraud.

The first domino to fall came on March 13, 2022, when an IRL software engineer realized that bots uploaded 99% of all images to IRL and he reported his concerns to Defendant Shehab Amin. *Id.* ¶ 95. Defendants quickly responded to the employee's realization by changing on March 17, IRL's Slack retention policy to permanently delete the Defendants' communications and by terminating the employee the very next day. *Id.* ¶¶ 95-96.

Despite the Defendants' quick actions and their longstanding practice of restricting access to IRL user data to only the Defendants (a practice sharply out of line with industry standards), it was becoming impossible to hide that IRL's purported active users were almost entirely bots. *Id.* ¶¶ 63, 97-99. In May 2022, another employee noticed traffic patterns on IRL

consistent with bot activity and IRL's Head of Trust and Safety resigned abruptly, writing that he doubted IRL's active user metrics, thought IRL's growth tactics were "shady and questionable," and that Abraham Shafi's "friends and family" were "not held accountable." *Id.* Many of IRL's senior software engineers were members of Abraham Shafi's family:  Noah Shafi (part of IRL's founding team and IRL's head of engineering at the time of the Series C investment) is Abraham Shafi's brother; Alia Shafi (a software engineer and technical product manager at IRL) is Abraham Shafi's sister; and Shehab Amin (IRL's Head of Data), Jacob Shafi (a software engineer at IRL), and Yassin Aniss (another early IRL employee and a back-end engineer at IRL) are all Abraham Shafi's cousins.

On May 12, 2022, employee concerns were further reflected in an article from *The Information*, which reported that IRL relied on "an unconventional definition" of active users "to make the app appear bigger than it is." *Id.* ¶¶ 100-02.  In response to questions from SoftBank, Abraham Shafi admitted that the article was correct that IRL began with a more expansive definition of a "user," however, IRL had transitioned to a more traditional active user definition consistent with what he and IRL had shared during the Series C investment process "[r]oughly two years ago." *Id.* ¶ 103.

In August, the SEC served a subpoena on IRL.  In response, IRL's Board began receiving regular updates concerning the management-led investigation. *Id.* ¶ 104.  Faced with further scrutiny of IRL's finances, on September 28, 2022, Abraham Shafi admitted that IRL had been misallocating "paid acquisition/advertising" as "infrastructure" spending. *Id.* ¶ 105. Abraham Shafi also admitted that IRL's CAC was three times what he had previously represented to SoftBank. *Id.*

While Abraham Shafi obfuscated the trust and framed the mis-description of its spending as an innocuous accounting error, SoftBank would later learn that this "error" had concealed millions of dollars of "incent advertising" spending that IRL had routed through related-party payments. *Id.* ¶ 106.  Incent advertising is a form of low-retention marketing in which potential customers are incentivized in some way to take an action—in this case, to download the IRL app. *Id.* ¶ 69.  SoftBank now understands that IRL used incent advertising to maintain its

1  position at the top of specific Apple iOS and Google Play app store most-downloaded lists, then

2  used bots to make it appear that IRL retained users who only had downloaded the app in order to

3  obtain the incentive.  *Id.* ¶ 70.  SoftBank also now understands that the misclassification of "paid

4  acquisition/advertising" as "infrastructure" was accomplished by Abraham Shafi's routing of

5  masked payments to growth firms through the Agency, a web marketing business run by IRL's

6  Head of Growth.  *Id.* ¶¶ 71-72.  At Abraham Shafi's direction, the Agency issued IRL invoices for

7  "infra[structure]" services when, in reality, the Agency was a pass-through from IRL to growth

8  firms.  *Id.* ¶¶ 74-75.

9          In October 2022, as scrutiny of IRL's finances continued, SoftBank learned that

10  Abraham Shafi unilaterally doubled his salary to over $1.2 million.  Then, in April 2023, SoftBank

11  learned Abraham Shafi had charged over $2.385 million of personal expenses to IRL corporate

12  credit cards without reimbursing IRL.  *Id.* ¶ 108.  Based on that financial misconduct, the Special

13  Committee, in April, 2023, suspended Abraham Shafi from his role as CEO.  *Id.* ¶ 109.

14          Almost immediately after Abraham Shafi's suspension, IRL's active user

15  population collapsed, and IRL employees—now with access to IRL user data—began to identify

16  multiple indicia of bot activity on the app.  *Id.* ¶ 110.  Recognizing that IRL's value was

17  inextricably tied to its population of active, human users, the Special Committee commissioned a

18  report from Keystone Strategy, an independent, third-party consultant, to confirm whether

19  employee suspicions were true.  *Id.* ¶ 111.  Keystone confirmed those suspicions, found extensive

20  evidence of the use of proxy services to hide the prevalence of bots on IRL, and concluded that at

21  least 95% of IRL's reported users were bots.  *Id.* ¶ 111.  Keystone's findings were consistent across

22  all user data for which IRL retained sufficient metadata to perform bot analyses.  *Id.* ¶ 112.

23  Keystone and IRL employees also found evidence of payments from IRL to proxy services

24  providers—one of which advertised itself as providing products that can "bypass[] sophisticated

25  anti-bot systems" and can help bots "appear as an organic user on sites."  *Id.* ¶ 61.  SoftBank has

26  now identified Defendants Abraham Shafi, Noah Shafi, and Shehab Amin as having made

27  payments to these proxy service providers.  *Id.* ¶¶ 61-62.

28          SoftBank also learned that several of the Defendants had deleted evidence in the

-8-

course of the SEC's investigation, in violation of their document preservation obligations.  First, on August 25, 2022 (three days after IRL had received the SEC's subpoena), Alia Shafi deleted a Jira ticket concerning the use of bots on IRL that Jacob Shafi had previously been sent.  *Id.* ¶¶ 115-17.  Second, between August 22, 2022 and September 1, 2022, Defendants Yassin Aniss, Jacob Shafi, and Alia Shafi all deleted certain text messages.  *Id.* ¶ 120.  Third, in the fall of 2022, Defendants Abraham Shafi, Yassin Aniss, Shehab Amin, and Jacob Shafi all restored their mobile devices from a backup, all immediately before the imaging of the devices in response to the SEC subpoena and clearly for the purpose of ensuring that the data on those devices could not be collected and turned over to the Special Committee or SEC.  *Id.* ¶ 121.

By June 2023, it was clear that IRL's enterprise value was completely destroyed. On June 23, IRL's replacement CEO wrote in a letter to IRL's shareholders that:  (i) 95% of IRL's users were automated or from bots; (ii) Abraham Shafi had caused millions of dollars in personal expenses to be charged to IRL; and (iii) Abraham Shafi and certain members of his family deleted documents potentially relevant to the SEC investigation into IRL.  *Id.* ¶ 127.  The same day, IRL's board of directors and IRL's shareholders voted to dissolve the Company.  *Id.* ¶ 128.  SoftBank's investment of $150 million was rendered worthless.

## ARGUMENT

### I.   The Legal Standard

"A 12(b)(6) motion test[s] the adequacy of the complaint's allegations."  *Glazer Cap. Mgmt., L.P.* v. *Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007)).  In evaluating a motion to dismiss, the Court accepts "all factual allegations as true and view[s] them in the light most favorable to Plaintiffs."  *Glazer Cap. Mgmt., L.P.* v. *Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023).

As each of Plaintiffs' claims are premised on fraudulent conduct by the Defendants, Plaintiffs' claims are subject to the heightened pleading requirements of Rule 9(b).  "To comply

-9-

1   with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the

2   particular misconduct which is alleged to constitute the fraud charged so that they can defend

3   against the charge and not just deny that they have done anything wrong.'" *Bly-Magee* v.

4   *California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner* v. *Milken*, 6 F.3d 666, 671

5   (9th Cir. 1993)).   The Private Securities Reform Act of 1995 (PSLRA) applies to claims arising

6   under Sections 10(b) and 20(a) of the Securities Act.   15 U.S.C. § 78u-4(b)(1).   As a result, for

7   Plaintiffs' first and second claims, Plaintiffs are required to "specify each statement alleged to have

8   been misleading, the reason or reasons why the statement is misleading" and allege facts with

9   sufficient particularity to raise a "strong inference" of scienter.   15 U.S.C. § 78u-4(b)(1)–(3).

10  ## II.   Abraham Shafi Violated Federal and State Securities Laws and Committed Common Law Fraud.

11

12             Plaintiffs' first and second claims are brought under the Securities Exchange Act

13  of 1934.   To state a claim under Section 10(b) of the Act and Rule 10b-5 promulgated thereunder,

14  a plaintiff must allege:   "(1) a material misrepresentation or omission by the defendant [("falsity")];

15  (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

16  of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

17  causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation omitted).

18  "[U]nder Section 20(a), a defendant may be liable for securities violations if (1) there is a violation

19  of the Act and (2) the defendant directly or indirectly controls any person liable for the violation."

20  *S.E.C.* v. *Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (citations omitted).

21             The remainder of Plaintiffs' claims arise under California statutory and common

22  law.   Plaintiffs' third claim is for violations of California Corporations Code § 25401.   To show a

23  violation of this section, a plaintiff must allege that "there was a sale or purchase of stock in

24  California by fraudulent untrue statements or by omitting material facts that would by omission

25  make the statements misleading." *Doshi* v. *eCommission Sols., LLC*, 2018 WL 4562628 at *5

26  (S.D. Cal. Sept. 24, 2018).[4]

27  _____
    [4]     Contrary to Abraham Shafi's unsupported suggestion (Dkt. No. 47 at 25), courts interpret

28  the "in California" element of California Corporations Code § 25401 broadly based on the definition contained in California Corporations Code § 25008.   *See Diamond Multimedia Sys., Inc.*

Plaintiffs' fourth and fifth claims are predicated on common law fraud. "The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co.* v. *Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004). The PSLRA does not apply to Plaintiffs' California statutory and common law claims. *See Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 406–07 (S.D.N.Y. 2005), *as amended* (July 6, 2005) (applying the PSLRA to Section 10(b) claims but not to state common law fraud claims).

In his motion to dismiss, Abraham Shafi narrowly focuses on rebutting the first two elements of SoftBank's federal securities fraud claim.[5] First, he argues that each of his statements to SoftBank was not false and, second, that SoftBank insufficiently alleges scienter.[6] He attempts to address each misstatement independently and, in so doing, fails respond to SoftBank's broader allegation: that Defendants "structured IRL's business so that SoftBank could not discover evidence of their fraud." Compl. ¶ 50. Understanding how the many elements of the Defendants' scheme worked together is essential because, not only does the Court read the complaint "holistically," but each misstatement contributed to a wider fraudulent scheme premised on holding IRL out to investors as a thriving social media platform, when in reality it existed to enrich Defendants. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 941 (9th Cir. 2023); *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007) ("[T]he court's job is not to scrutinize each

---

v. *Super. Ct.*, 19 Cal. 4th 1036, 1050–51 (1999) ("[U]nder section 25008, a sale occurs in California if the offer emanates from this state.").

[5]     To the extent that the remaining Defendants incorporate Abraham Shafi's arguments or contest whether IRL made the misstatements alleged by SoftBank, this section responds to those as well.

[6]     Abraham Shafi provides no substantive discussion of the third through sixth elements of a SoftBank's federal securities fraud claim, and thereby has conceded that SoftBank adequately alleged each of these four elements. Nor may he assert any challenge to SoftBank's pleading of those elements for the first time in his reply brief. *See Tigo Energy Inc.* v. *SunSpec All.*, 2023 WL 4269762 (N.D. Cal. June 28, 2023) ("Raising the issue for the first time in a reply brief does not suffice; *reply* briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.") (emphasis in original and quotations omitted).

-11-

allegation in isolation but to assess all the allegations holistically.").

### A.     Abraham Shafi's representations about IRL's growth were false.

#### 1.     Abraham Shafi made multiple false statements about IRL's "organic" growth and the magnitude of IRL's growth spending.

Abraham Shafi's unambiguous representations that IRL spent only "$50K a month on paid user acquisition" and that IRL's CAC was only "~$0.50" were essential to his fraudulent scheme.  Compl ¶ 39.  "Organic growth" sufficient to place IRL alongside top social media apps on the relevant charts provided SoftBank with confirmation from established third parties (Apple and Google) that the active user metrics that Abraham Shafi provided were accurate and that IRL was experiencing the type of "viral" growth that is key to a social network's success.  *Id*. ¶ 70.  The materiality of this representation to SoftBank's investment decision is reflected in the numerous times SoftBank specifically asked Abraham Shafi about IRL's growth practices and the numerous times he stated IRL's growth was "organic." *Id*. ¶¶ 38-39, 47-48.

SoftBank specifically alleges the "who, what, when, where, and how" of Abraham Shafi's misrepresentations regarding IRL's growth spending.  *Cooper* v. *Pickett*, 137 F.3d 616, 627 (9th Cir. 1997); *see also Lack* v. *Cruise Am., Inc*., 2017 WL 3841863 at *4 (N.D. Cal. Sept. 1, 2017).  SoftBank identifies three separate misstatements that Abraham Shafi made to SoftBank (the "who").  SoftBank alleges that he misrepresented: (i) that "[u]nlike other apps that spend aggressively to acquire new users, we spend very little . . ." (Compl. ¶ 39; Chart Stmt. 3); (ii) that IRL spent "$50K a month in paid user acquisition," and that IRL's CAC was "~$0.50" (Compl. ¶ 39; Chart Stmt. 4); and (iii) that IRL's growth was almost entirely organic (*i.e.*, the "what"). Compl. ¶ 48; Chart Stmt. 11.  SoftBank alleges that Shafi made the first two misstatements in writing the week of April 19, 2021 and the third misstatement in a due diligence meeting on April 29, 2021 (the "when" and "where").  Compl. ¶¶ 39, 48.  Finally, SoftBank alleges "how" these statements are misleading, by describing IRL's relationship with the Agency and that IRL— contrary to Abraham Shafi's representations—actually spent millions of dollars on growth and incent advertising. *Id*. ¶¶ 67-75.

Specifically, SoftBank alleges that Abraham Shafi and IRL used the Agency

-12-

"[f]rom as early as November 2020," six months before the Series C closed, "to run [IRL's] user acquisition efforts." *Id.* ¶ 72.  The Complaint alleges that "from at least as early as December 2020,"—five months before the Series C closed—"IRL would wire funds to the Agency in order to pay various growth firms, then the Agency, through IRL's own employee, would send the payments to the growth firms on IRL's behalf." *Id.*  The Complaint alleges that, over time, IRL "routed millions of dollar to these firms through the Agency."  Compl. ¶ 70.  In February 2020 alone—three months before the Series C closed—IRL paid the Agency $568,000 that was then passed onto growth firms "for incent advertising and other user acquisition campaigns." *Id.* ¶¶ 73-74.

### 2.    Abraham Shafi's arguments that his statements about IRL's growth were not false fail.

Abraham Shafi argues that SoftBank's falsity allegations about IRL's "organic" growth are insufficient.  These arguments all fail.

*First*, Abraham Shafi argues that, even if IRL "spent aggressively on incent advertising," that is insufficient to allege that "organic growth" was not IRL's "dominant invite flow," and that, "absent allegations about what other apps typically spend on user acquisition," SoftBank does not allege that his characterization of the IRL's CAC "whether above $0.50 or not" was false.  Dkt. No. 47 at 17-18.  SoftBank does not specifically allege the proportion of IRL's users that it acquired in the months leading up to the Series C were specifically generated by "direct SMS based invites" versus incent advertising.

Ninth Circuit precedent permits the falsity requirement of Rule 9(b) to be satisfied by circumstantial evidence that "explains how and why the statement was misleading when made." *Fecht* v. *Price Co.*, 70 F.3d 1078, 1085 (9th Cir. 1995).  In the first place, SoftBank's uncontested allegation that IRL was actually spending hundreds of thousands of dollars monthly on inorganic user acquisition and Abraham Shafi's representation that IRL's CAC was "~$0.50," are irreconcilable with "direct SMS based invites" being to dominant driver of IRL's growth.  If IRL really were gaining two users for every dollar that it spent on marketing (as Abraham Shafi claimed to SoftBank) and IRL spent $568,000 on incent advertising in February 2021 (as it later turned out

-13-

to be the case), then IRL should have gained approximately 1.1 million active users in February 2021.  But the Disclosure Statement to the Primary Purchase Agreement represented that IRL only grew by 100,000 MAUs from January to February 2021.  Compl. ¶ 87.  And for "direct SMS based invites" to drive user growth, IRL *already had to have* a thriving population of active human users to send those "direct SMS based invites."  As discussed at length below, SoftBank adequately alleges that IRL had no such thing.  *See infra* Section II.B.

*Second*, Abraham Shafi argues that SoftBank's allegations regarding IRL's growth spending are "internally inconsistent."  Dkt. No. 47 at 18.  He does not attack SoftBank's consistent, coherent allegations about:  (i) his and IRL's relationship with the Agency; (ii) his representations about IRL's growth spending; or (iii) IRL's use of incent advertising in paragraphs 67 to 77 of the Complaint.  *Id.*  Rather, Abraham Shafi argues that because paragraph 106 of the Complaint *also* connects the Agency with purchasing bots, the Court should discount all of SoftBank's growth spending allegations.  *Id.*

Unlike *In re Stone & Webster*, the sole case Abraham Shafi cites in response to SoftBank's allegations regarding Statements 3, 4, and 11, SoftBank's allegations are not inherently "conflicting."  *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 121 (D. Mass. 2003) (noting even though "the Amended Complaint is to be read with indulgence toward the plaintiffs," plaintiffs' allegations were impossible to reconcile as they alleged a project was both "dead" in 1997 and "alive" in 1998).  The Agency could very well have paid for incent advertising *and* bots; after all, the Complaint alleges "the Agency's monthly invoices exceeded $2.2 million for various, undefined 'costs,'" and these "costs" may have included bots.  Compl. ¶ 73.  Further, the Complaint alleges that IRL's massive payments to growth firms for incent advertising are part of a single, unified scheme, and Abraham Shafi provides no basis for the Court to infer otherwise.  *Id.* ¶ 106.

*Third*, he argues that SoftBank insufficiently alleges whether "the person operating the Agency was an IRL employee (let alone the Head of Growth) at the time of SoftBank's investment."  Dkt. No. 47 at 18.  This is classic factual conflict that should be resolved in favor of SoftBank on a motion to dismiss:  SoftBank alleges the Head of Growth was a "Key Employee"

-14-

1   while Abraham Shafi argues that he was not.  *Id.* ¶ 87 n.11.  But even assuming Abraham Shafi

2   were correct (he is not), the specific employment status of IRL's Head of Growth in April 2021 is

3   entirely irrelevant to whether he was facilitating payments of hundreds of thousands of dollars

4   from IRL to growth agencies.  The Complaint alleges with particularity that he was and that

5   Abraham Shafi's representations to SoftBank were false.  Compl. ¶ 73.

6           *Finally*, Abraham Shafi argues that SoftBank fails to connect his September 2022

7   admission, that expenses had been misleadingly allocated to "infra[structure]" when they were

8   actually spending on "growth," to SoftBank's Series C investment in April 2021.  Dkt. No. 47 at

9   18-19.  He also suggests that the Complaint does not allege that he had "responsibility for" the

10  misallocation or that it "happened with his knowledge."  *Id.*  He is wrong on both counts.

11          SoftBank does not allege that Abraham Shafi's admission covered a specific period

12  of misallocations because Abraham Shafi did not limit his admission in that way.  Compl. ¶ 105.

13  Abraham Shafi's admitted "error" was necessarily backward-looking and, taking all reasonable

14  inferences in favor of SoftBank, there is no reason to assume (certainly Abraham Shafi provided

15  none) that the misallocation *did not* stretch back to April 2021 when Abraham Shafi was

16  attempting to induce SoftBank to invest in IRL, including by claiming that IRL spent no real

17  money on user acquisition.

18          Moreover, IRL's purported CAC was consistent from the time of the Series C

19  investment ("~$0.50") through the moment before Abraham Shafi admitted the misallocation in

20  September 2022 ("$0.41").  That consistent pattern suggests that factors driving the admitted

21  misallocated CAC in September 2022 were also driving the alleged misallocated CAC in April

22  2021.  *Id.* ¶¶ 39, 105.  "In light of the similarity of the problems described by reports and witnesses

23  with respect to practices before and after the date of the [alleged misstatement]—and given that

24  all facts in the Complaint are taken as true and all reasonable inferences are drawn in Plaintiffs'

25  favor at this stage—it is reasonable to infer that the practices were in place at the time of the

26  [alleged misstatement]."  *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund* v.

27  *Transocean Ltd.*, 866 F. Supp. 2d 223, 241 (S.D.N.Y. 2012).

28          SoftBank also alleges specific facts showing that invoices from the Agency were

-15-

doctored at the time of the Series C.  SoftBank specifically alleges that, in every pre-Series C invoice, *exactly* 90% was assigned to "infra[structure]" when the Agency and its founder (IRL's Head of Growth) had no experience in app infrastructure.  *Id.* ¶ 73.  Rather, the Agency was advertised as a "full-service growth agency" which specialized in "SEO-optimized content."  *Id.* ¶¶ 71, 74.

And finally, SoftBank alleges specific facts that make clear that the misallocation not only occurred with Abraham Shafi's knowledge, but at his direction.  SoftBank alleges that, before the Series C, he "shifted" IRL's relationships with growth firms so that, rather than IRL engaging and paying those firms directly, payments to those firms were laundered through the Agency.  *Id.* ¶ 72.  SoftBank further alleges that, after the Series C, he instructed IRL's Head of Growth to "mislead [IRL's] CFO about the true nature of IRL's spending" with the Agency.  *Id.* ¶ 75.

**B.     Abraham Shafi's representations about IRL's active user metrics were false.**

**1.     Abraham Shafi made multiple false statements about IRL's active user metrics and used those metrics to further mislead SoftBank.**

IRL's active user metrics were inextricably linked to its valuation and SoftBank's decision to invest in the Company.  As alleged in the Complaint, IRL did not have any profitable revenue streams to support a traditional valuation.  Rather, SoftBank valued IRL at over $1 billion based on the extraordinary active user metrics represented by Abraham Shafi, including in the Primary Purchase Agreement.  Compl. ¶ 46.  As three IRL employees suggested and as Keystone ultimately confirmed, those active user metrics were false.  They were manufactured using bots and were the key piece in the Defendants' scheme to defraud investors.  *Id*. ¶ 4.  The moment Abraham Shafi was suspended as IRL's CEO, IRL's DAUs collapsed and with them, the value of SoftBank's investment in IRL.  *Id*. ¶ 124.

Abraham Shafi's representations about IRL's active users permeated the Series C investment process.  His first email to SoftBank focused almost entirely on IRL's active user metrics.  Compl. ¶ 33.  He used IRL's active user metrics to demonstrate that IRL had achieved scale, with 12 million MAUs and 3.5 million DAUs; that IRL was engaging to its users, with a DAU/MAU ratio of 28% and a 19-month retention rate of 63%; that IRL was rapidly growing,

-16-

with 400% year-over-year growth; and that IRL appealed to teens, a key demographic for social media networks.  Compl. ¶ 34; Chart Stmts. 1, 2, 7.  He used IRL's active user metrics to assuage SoftBank's concerns about third-party verification services (Compl. ¶¶ 41-42; Chart Stmt. 8) and its concerns about IRL's abnormal month-over-month user growth patterns.  Compl ¶¶ 39, 42; Chart Stmts. 6, 9.  He also used the active user metrics listed in the Disclosure Schedule to the Primary Purchase Agreement to give SoftBank comfort that its investment was on solid ground.  Compl. ¶ 87; Chart Stmt. 14.  He even repeatedly provided SoftBank with unambiguous explanations as to how IRL defined an active user (Compl ¶¶ 39, 42; Chart Stmts. 5, 10) and made absolutely clear that "[a]n 'active user' is 'a natural person'" and "no Active User was generated by any click farm or similar service, bot, automated program or similar device."  Compl. ¶ 87; Chart Stmt. 13.

These statements were all false.  As set out in the Complaint, the overnight collapse of IRL's users following Abraham Shafi's suspension; Keystone's finding that IRL purported active users were "95% bots"; Defendants' enormous spending on proxy services; IRL employee reports that IRL's active user metrics were inaccurate; and IRL employee allegations that Defendants prevented access to IRL active user data; and Defendants' repeated destruction of evidence, all demonstrate that *all* of IRL's active user metrics were manipulated at the time of the Series C financing.  Compl. ¶¶ 61, 95-99, 110-23.

### 2.   Abraham Shafi fails to refute any of SoftBank's particularized allegations that IRL's user metrics were false.

Abraham Shafi claims that "Defendants' alleged scheme is false" and attempts to explain away all of the particularized facts that make clear that IRL's users were nearly all bots.[7] He fails utterly.

---

[7]   Shafi's argument that "statements, including those about the platform's 'growth' and retention, are entirely distinct from the question of the platform's absolute user count," is nonsensical.  Dkt. No. 47 at 7.  What would be growing *but* the number of IRL's active users? Who would be retained *but* IRL's active users?  SoftBank's allegation that bots impacted IRL's true active user base is relevant to all of Shafi and IRL's representations based on those metrics. Compl. ¶ 46.  SoftBank will continue to treat these metrics collectively in this Section.

-17-

1

        **a.**      **The immediate collapse of IRL's "user base" after Abraham Shafi's suspension.**

2

SoftBank points to the total, overnight collapse of IRL's DAUs in the immediate

3

aftermath of Abraham Shafi's suspension as powerful evidence that those users were not real,

4

contrary to Abraham Shafi's representation about IRL's active users.  Abraham Shafi does not

5

dispute: (i) that in April 2021, IRL represented to SoftBank that it had 3.6 million active users who

6

interacted with the app every single day; (ii) that in April 2022, IRL publicly announced it had 6

7

million DAUs; or (iii) that in April 2023, an internal IRL active user dashboard suggested IRL had

8

approximately 2.5 million DAUs.  Compl. ¶¶ 87, 94, 110.  He also does not dispute that he was

9

suspended in April 2023, and that, by May 2023, IRL's DAUs had collapsed to roughly 50,000

10

(which was approximately 2% of the number of reported IRL's DAUs immediately prior to Shafi's

11

suspension from IRL).  *Id*. ¶¶ 109-10.  Instead, he offers his own explanation of its factual cause—

12

namely, "severe site outages IRL suffered after Abraham's departure."  Dkt. No. 47 at 11.

13

Of course, even if Abraham Shafi provided a reasonable explanation of the

14

catastrophic and instantaneous loss of users, he cannot obtain a ruling at the motion to dismiss

15

stage that his explanation is more plausible than SoftBank's.  But in any event, his explanation

16

fails on its own terms.  To support this theory, that the cause of IRL's active user collapse was

17

severe site outages, Abraham Shafi points to the Keystone Report.[8]  Dkt. No. 47 at 11; *Id.* Ex. C

18

("Keystone Rep.").  While it is true that the Keystone Report refers to outages on IRL after

19

Abraham Shafi's dismissal, the Keystone Report specifically states that active user activity began

20

"slowing on May 3," that a notification issue was detected on May 9, and that user activity was

21

only throttled on May 13.  Keystone Rep. ¶ 11.  That order of operations on its own significantly

22

23

---

[8]    As the Ninth Circuit has repeatedly made clear, a document that is not attached to a

24

complaint (as the Keystone Report was not) cannot be incorporated by reference in order to resolve factual disputes in favor of the party moving to dismiss the complaint.  *Khoja* v. *Orexigen*

25

*Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018) ("The incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual

26

disputes in favor of the plaintiff at the pleading stage.").  Accordingly, the Court need not credit any of Abraham Shafi's arguments based on aspects of the Keystone Report that do not appear in

27

the Complaint.  As set forth herein and in any event, the Keystone Report does not support the arguments he attempts to make based on it.

28

-18-

1    discounts Shafi's theory:  how could IRL have lost 1.5 million of the app's most devoted, *daily*

2    users, from a notification issue?  How could the connectivity issues on a single day cause the rest

3    of IRL's devoted daily users to leave the app and never return?  Shafi's suggestion that 98% of

4    IRL's DAUs' deciding to quit the app within a week of one another is "consistent with millions of

5    human users getting increasingly frustrated" asks the Court draw a series of implausible inferences

6    to which Shafi is not entitled on a motion to dismiss.  Dkt. No. 47 at 11.

7            Abraham Shafi also suggests that it would have made no sense for him to have

8    "chose[n] to immediately stop his secret funding of all bot activity after he was removed as CEO"

9    and that IRL's single-day rebound to 121,000 users on May 14 is inconsistent with his ordering

10   his "entire bot army to stand down."  Dkt. No. 47 at 11.  Both arguments have nothing to do with

11   SoftBank's actual allegations, as SoftBank never alleged that Abraham Shafi "ordered the entire

12   bot army to stand down."  *Id.*  Abraham Shafi may well have issued such an order—potentially to

13   make it more difficult to track the origin of the bots on IRL—or the bots may have disappeared for

14   some other reason.  Time (and discovery) will tell.  The undisputed fact is that IRL's millions of

15   active users disappeared almost immediately after Abraham Shafi was suspended and the far more

16   likely inference is that these "users" acted in this oddly uniform and simultaneous manner because

17   they were bots and not real human users.

18        **b.    IRL employees' and Keystone Strategy's evidence that IRL's users were nearly all bots.**

19

20           SoftBank alleges that the report prepared by Keystone Strategy and its finding that

21   IRL's active user base was at least "95%" bots for as long as the Defendants' maintained data also

22   demonstrate the falsity of Abraham Shafi's active user representations.  Compl. ¶ 111-13.  The

23   Ninth Circuit has long held that a securities plaintiff may use the findings of an expert report to

24   support its allegations, where the expert's methods "with sufficient particularity" establish the

25   basis for their findings.  *Nursing Home Pension Fund, Local 144* v. *Oracle Corp.*, 380 F.3d 1226,

26   1232–34 (9th Cir. 2004) (crediting an expert analysis provided by Plaintiff who reviewed internal

27   information from the Defendant); *See City of Sunrise Firefighters' Pension Fund* v. *Oracle Corp.*,

28   527 F. Supp. 3d 1151, 1076–76 (N.D. Cal. 2021).

-19-

1        In his motion, Abraham Shafi relies on *Hershewe* v. *JOYY Inc.*, 2021 WL 6536670

2   at \*4–5 (C.D. Cal. Nov. 5, 2021) in arguing for the application of the Ninth Circuit's confidential

3   witness standard to the Keystone Report.  Dkt. No. 47 at 12.  But what Shafi deceptively fails to

4   mention in his motion, is that the ***Hershewe concerns an anonymous "expert" report issued by a***

5   ***short seller***.  *See Hershewe* v. *JOYY Inc.*, 2021 WL 6536670 at \*4 (C.D. Cal. Nov. 5, 2021)

6   ("Plaintiffs rely heavily, if not exclusively, on the conclusions of the Report written by short seller

7   Muddy Waters").  As explained in *Hershewe*, courts are inherently suspicious of short sellers as

8   they have a "financial stake in the decline" of the targets of their reports and "have an obvious

9   motive to exaggerate."  *Id.*; *see also Masterson* v. *Cheetah Mobile Inc.*, 2018 WL 5099505, at \*2

10  (C.D. Cal. June 27, 2018) (analyzing an anonymous short seller report as a confidential witness);

11  *In re Nektar Therapeutics*, 2020 WL 3962004, at \*10 (N.D. Cal. July 13, 2020) (same).

12       The only similarity between the reports cited by Shafi and the Keystone Report is

13  that they are referred to as "reports."  Otherwise, the Keystone Report shares none of the

14  characteristics that make short seller reports unreliable:  Keystone is not anonymous, rather it is a

15  respected consulting agency that publicly lists the experts it relies upon.[9]  Keystone had no

16  "financial stake" in the outcome of its bot analysis.  Rather, it was a consultancy hired by IRL's

17  Special Committee to assist in that independent board committee's investigation.  Compl. ¶ 111.

18  Because the Keystone Report was not a short seller report (and because Keystone is not some

19  anonymous "confidential witness"), the Court need only focus on whether SoftBank pleads "with

20  sufficient particularity" to establish the basis for Keystone's findings—a standard the Complaint

21  easily meets.[10]

22

23  [9]      *Our Experts*, KEYSTONE, https://www.keystone.ai/our-experts/ (last visited February 12, 2024).  Contrary to Shafi's suggestion that Keystone also suggestion that Keystone lacks experience with "large-scale data collection and analysis," (Dkt. No. 47 at 13), Keystone's website specifically calls attention to their work in AI, machine learning, data analytics, and algorithms. *About Keystone*, KEYSTONE, https://www.keystone.ai/about-us/ (last visited February 12, 2024).

26  [10]     Even if the Court were to require SoftBank to meet the confidential witness requirements— to plead with "sufficient particularity to support the probability" that Keystone was in a position to "possess the information alleged," and provide "adequate corroborating details" for Keystone's conclusions—the Complaint easily satisfies this standard as well.  *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (internal citations and quotations omitted).

-20-

1   The Complaint alleges that Keystone performed an "in-depth, technical analysis of

2   IRL's users," specifically points to the multiple data sources Keystone relied upon, and explains

3   why those data sources suggest IRL's active users were overwhelming composed of bots.  Compl.

4   ¶ 111.  In fact, Keystone's Report is the exact type of report that should be given deference.[11]

5   Abraham Shafi attempts to explain away the numerous findings from Keystone and

6   IRL employees that suggest IRL was overwhelmingly populated with bots from at least June 2022

7   onward.  Dkt. No. at 13-16.  Yet he offers no answer to several of Keystone's essential findings:

8   Why were *all* of the millions of identically named groups referenced in the complaint private

9   groups?  Compl. ¶ 111; Keystone Rep. ¶ 13.  Why did they all have virtually identical activity?

10  Compl. ¶ 111; Keystone Rep. ¶ 13.  Why were IRL users six times more likely to have a Yahoo

11  email domain than expected based on IRL's purported demographics?  Compl. ¶ 111; Keystone

12  Rep. ¶ 69.

13  Further, Shafi does not even begin to engage with Keystone's two analyses cited in

14  the Complaint, *despite attaching the Keystone Report to his Motion.*  Dkt. No. 47 at 13.  Instead,

15  he throws up his hands and asks rhetorical questions: "What analyses?  What patterns?  According

16  to whom?  The Complaint does not say."  *Id.*  Even a cursory review of the report reveals

17  Keystone's analyses, the patterns it identified, and the basis for its findings.  First, Keystone

18  showed that the activity of IRL's users showed repeated patterns of behavior, which was further

19  reflective of programmed activity rather than human use.  Keystone Rep. ¶ 15.  Keystone explained

20  that human users would naturally show a "variation in actions performed" on IRL during their

21  visits to the site, but Keystone found that suspected bot accounts "repeat[ed] a set of signature

22  patterns."  *Id.*  In one example, Keystone found that a single "user" performed a set of 12 activities

23  on IRL in only 22 seconds; that same user performed the exact same set of activities in only 17

24

25  [11]   Abraham Shafi likely recognized as much when he chose to selectively quote from *Hershewe*.  Dkt. No. 47 at 13.  In *Hershewe*, Judge Blumenfeld compared the unreliable short

26  seller report plaintiffs relied upon with a far more credible report that was accepted by the Southern District of New York in *Lewy* v. *SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *14 (S.D.N.Y.

27  Sept. 10, 2012):  "Unlike the short seller in *SkyPeople Fruit Juice*, [this short seller report] did not corroborate its core conclusions . . . with an *independent investigation* or signed, named affidavits

28  from corporate insiders."  *Hershewe*, 2021 WL 6536670 at *5 (emphasis added).

-21-

1    seconds the following day.  *Id*. ¶ 16.[12]

2              Keystone's second analysis evaluated the IP addresses of IRL's users.[13]  In doing

3    so, Keystone found that IRL's users were logging in with different IP addresses and different

4    devices much more frequently than an average human user.  *Id*. ¶ 13.  As Keystone explained,

5    normal human user behavior would show some "small number of changes to their IP address" that

6    reflect circumstances such as logins from different locations.  *Id*.  A human user might also access

7    IRL through a couple of different devices, such as a phone and a personal computer, but IRL's

8    user base showed, however, "large volumes of instances" where single IRL accounts "cycl[ed]

9    rapidly through IP addresses and device types."  *Id*.  For example, in June 2022 alone, IRL reported

10   22.4 million total users, but 19.9 million of them changed IP addresses every time they logged in

11   to the platform.  *Id*.

12             Keystone concluded that this abnormal cycling of IP addresses was a deliberate

13   effort to mask bot activity by relying on "proxy services."  Compl. ¶ 60; Keystone Rep. ¶ 12.  As

14   Keystone highlights, IRL defended against automated activity by preventing a sole IP address from

15   accessing a platform too many times in a short period.  *Id*.  To "circumvent" such defenses—and

16   thereby repeatedly access a website despite originating from a single source—an army of bots can

17   "mask" its true IP address by shuffling through a set of "proxy" IP addresses provided by a proxy

18   service provider.  *Id*.  By rotating through various "proxy" IP addresses, a single "bot farm[]" can

19   thus sidestep bot defenses and generate a high volume of seemingly organic, human activity.  *Id*.

20             Keystone further confirmed the use of proxy IP addresses by analyzing the actual

21   IP addresses used to log in to IRL.  Keystone reviewed a sample of 1,000 accounts suspected to

22   be bots, and found that for 99.5% of them, "more than 90% of their IP addresses" were also used

23   by other IRL users.  Compl. ¶ 60; Keystone Rep. ¶ 16.  Keystone also found that many IP addresses

---

24   [12]      The closest that Abraham Shafi comes to contesting Keystone's analyses is critiquing the
25   data that Keystone relied upon.  Dkt. No. 47 at 13.  Keystone *extensively* discusses data quality in
     the report and the actions that it was able and unable to take based on Defendants' highly suspect
26   data retention practices.  Keystone Rep. ¶¶ 3-9.  As discussed below, *Defendants'* failure to
     maintain user data is not a viable critique of Keystone's methodology.  *See infra* 24-25.

27   [13]      As explained in the Complaint, "[a]n IP address is a unique set of numbers assigned to each
28   Internet or network device."  Compl. ¶ 60.

1    used by this population appeared on public lists of IP addresses that are "known for proxy server

2    or bot abuse."  *Id*.

3                            c.        **IRL employees' identification of evidence of bots.**

4                SoftBank also points to a series of internal IRL whistleblower reports in March and

5    May of 2022, the *Information Article*, and Defendants' responses to these reports as also showing

6    the falsity of Abraham Shafi's active user representations.  *First*, a software engineer's report that

7    on IRL "99% of images . . . [are] uploaded by bots or scripts—not real users."  Compl. ¶ 95.

8    *Second*, another software engineer's report that IRL's user traffic was unstable, with "highly

9    unusual traffic drops."  *Id*. ¶ 97.  And *third*, a report from IRL's Head of Trust and Safety that he

10   "strongly doubt[s] some of the numbers we report externally and internally to employees."  *Id*.

11   ¶ 99.  Two of the three also critique how IRL prevented employees outside of the Shafi family

12   from accessing IRL user data.  *Id*. ¶¶ 95, 97.  The *Information Article* also questioned IRL's

13   reported MAUs.  *Id*. ¶ 100.

14               In response, Abraham Shafi first argues that these employees are confidential

15   witnesses and, thus, any allegations relating to their findings or communications are subject to a

16   heightened pleading standard under the PSLRA.  Dkt. No. 47 at 7-9.  But these are not

17   "confidential witnesses" as that term is used in the context of motions to dismiss securities

18   complaints.  These are not persons whose identities are known only to Plaintiffs' counsel and who

19   only said the things attributed to them in the Complaint in private conversations with Plaintiffs'

20   counsel, such that additional indicia of reliability are required.  *See Daou*, 411 F.3d at 1015

21   (emphasizing that a confidential witness analysis is tied to "personal sources of information").

22               But even if these employee statements were construed as confidential witness

23   statements, they still meet the pleading requirements under the PSLRA.  First, each witness is

24   "described with sufficient particularity to establish his or her reliability and personal knowledge."

25   *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr*. v. *RH, Inc.*, 302 F. Supp. 3d

26   1028, 1044 (N.D. Cal. 2018).  While Abraham Shafi argues the employees' titles alleged are

27   "generic," such broad titles are expected at an early-stage startup that had fewer than 20 employees

28

                                                  -23-

in 2021.  Compl. ¶ 33.  Further, the alleged employee titles support the employees having personal knowledge of the key items they wrote about—it is reasonable to expect employees with titles like "software engineer" and "Head of Trust and Safety" at a social media company to be familiar with how data is (or is not) shared within an organization.[14]  *Second*, the statements described articulate the "personal knowledge" their statements are based upon.  *Id.* (quoting *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009)).  In fact, the software engineers' statements specifically identify the data upon which they base their conclusions.  Compl. ¶¶ 95, 97.

### d.      IRL's failure to retain key user data.

Abraham Shafi repeatedly argues throughout his motion that the Complaint is unable to connect its allegations of misconduct post-dating the Series C investments to the state of affairs existing at the time of those investments.  He claims that this is "alone is fatal" to the Complaint, but he cites to no case that supports this conclusion.  Dkt. No. 47 at 7.  This is because courts routinely allow *exactly* this inference where it is non-speculative.  *See Iowa Pub. Employees' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) ("[d]epending on the problem, its existence in February 2008 may support an inference that it was present six months earlier," which is "sufficient to raise [the plaintiffs'] right to relief above the speculative level"); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (defendant's statement that "he saw signs that were 'particularly bad'" in November 2019 yielded the inference that troubling signs existed in preceding months).

The inference that SoftBank asks the Court to draw is non-speculative.  SoftBank specifically alleges that *all IRL user data with sufficient metadata to be analyzed* indicates that IRL's purported human active users predominantly consisted of bots.  Compl. ¶ 111.  If SoftBank

---

[14]      Abraham Shafi's argument that these employees' "alleged exposure to relevant information is mutually exclusive" with the same employees' suggestions that "Defendants restricted employees' access to the relevant data" fails to recognize that data access at IRL need not have been an all-or-nothing affair.  Dkt. No. 47 at 9.  Certain information (like email domain metrics or group counts) could be withheld from non-Defendant employees while other information (like geographic origin of traffic or image sources) could disclosed.

-24-

1    cannot evaluate directly whether IRL's active users were overwhelmingly bots at times other than

2    those covered by the available data, that is because of the Defendants' intentionally poor data

3    retention practices (and their purposeful destruction of data).   *Id.* ¶ 113 (Defendants only

4    maintained "backups of user data dating from June 2022.").   Abraham Shafi's emphasis in his

5    motion on IRL's retention of low-quality data resistant to bot analyses (Dkt. No. 47 at 15), does

6    not remotely suggest IRL had human users at the time of the Series C; especially, when considered

7    alongside SoftBank's particularized allegations that the Defendants destroyed data when faced

8    with a SEC investigation.  Compl. ¶ 120.

9         Further, SoftBank alleges numerous specific facts that make clear that IRL's active

10   user base was predominantly bots *before* the Defendants' active user data runs out, including:  the

11   May 2022 allegations from IRL's Head of Data and a software engineer, the March 2022

12   allegations from a different software engineer, the ongoing practice of excluding non-Defendants

13   from accessing IRL active user data, and the March 2021 email from a tech company CEO noting

14   IRL "got hit by a massive bot attack."  Ultimately, it is not speculative for SoftBank to allege that

15   if IRL never had a meaningful number of active, human users in 2022 while Shafi held out to

16   world (and SoftBank) that it had tens of millions, then IRL did not have tens of millions of users

17   in May 2021 either.  *See Macovski* v. *Groupon, Inc*., 553 F. Supp. 3d 460, 475–76 (N.D. Ill. 2021)

18   (extrapolating a problem specifically alleged in one month to "the second half of 2019").

19   **C.     Abraham Shafi's representations about IRL's related-party relationships were false.**

20   **1.     Abraham Shafi misrepresented that IRL did not have any undisclosed relationships with its employees and, as a result, he misrepresented**
21   **IRL's financial position.**

22        The final piece of Abraham Shafi's fraudulent scheme was the non-disclosure of

23   related-party payments to the Agency and Machine Learning LLC.  Compl. ¶ 78.  As alleged in

24   the Complaint, payments to these entities allowed Abraham Shafi to conceal IRL's spending on

25   incent advertising, bots, and proxy services from SoftBank and allowed him to manipulate IRL's

26   financial statements so as to make IRL appear more attractive to investors.  *Id.*; Chart Stmt. 17.

27   SoftBank repeatedly asked for disclosure of related-party payments:  first, in a due diligence

28

-25-

1   meeting and, second, in the Primary Purchase Agreement.  *Id.* ¶¶ 49, 87.  Despite Abraham Shafi's

2   knowing about such payments, he *never* disclosed that IRL was paying hundreds of thousands of

3   dollars to entities directly controlled by its Head of Growth and Head of Data.  *Id.*; Chart Stmts.

4   12, 15.

5            **2.      Abraham Shafi's arguments about the Agency and Machine Learning
              LLC fail.**

6

7            Abraham Shafi argues that, because the Agency and Machine Learning LLC were

8   listed as contractors on the Disclosure Schedule accompanying the Primary Purchase Agreement,

9   payments to them were not "secret."  Dkt. No. 47 at 1 ("The secret payments [to the Agency and

10  Machine Learning LLC] were not secret at all—they were disclosed in the same document from

11  which SoftBank alleges Abraham omitted them.")   As a result, Abraham Shafi claims that

12  "SoftBank's theory thus amounts to little more than a technical objection to the subsection of the

13  Disclosure Schedule on which the relationships with those entities appeared."  *Id.* at 21.  But

14  SoftBank does not allege that the *existence* of a relationship between IRL and these entities was

15  secret—SoftBank alleges the *nature* of the relationship between these IRL and these entities

16  (including that these entities were in fact owned and controlled by IRL executives) was secret.

17  Compl. ¶ 76.  Abraham Shafi never points to any disclosure of the relationship between these

18  entities and IRL employees.  He also never points to any disclosure of what payments to these

19  entities were actually for.  This misleadingly incomplete disclosure created an "impression of a

20  state of affairs that differs in a material way from the one that actually exist[ed]."  *Berson* v.

21  *Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody* v. *Transitional

22  Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002)).  Plainly, pointing out the non-disclosure of

23  payments totaling hundreds of thousands of dollars to entities controlled by IRL insiders is not

24  raising merely a "technical objection" to IRL's disclosure schedule, especially when SoftBank

25  alleges that these payments were used to further the Defendants' fraudulent scheme by permitting

26  IRL to buy downloads at a rate vastly greater than what Abraham Shafi disclosed.  Courts routinely

27  find such non-disclosures are the basis for securities fraud.  *See In re Montage Tech. Grp. Ltd. Sec.

28  Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015) (finding that non-disclosure of related-party

-26-

1  transactions "alone establishes the falsity of [defendant's] financial disclosures"); *Snellink* v. *Gulf*

2  *Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) (same).

3         Abraham Shafi's argument that neither IRL's Head of Growth nor Head of Data

4  were "Key Employees" at IRL is similarly unavailing.  Dkt. No. 47 at 22.  First, this distinction is

5  not relevant to SoftBank's question in the due diligence meeting—which was not limited by the

6  Key Employee language.  Compl. ¶ 49.  Second, on a motion to dismiss, it is reasonable to infer,

7  by virtue of their titles alone, that both IRL's *Head* of Growth and *Head* of Data were "division

8  directors" and, thus, Key Employees at the time of the Series C.  *Id.* ¶ 87 n.11.  Third, SoftBank

9  clearly alleges that IRL's Head of Growth and Head of Data were employees of IRL and Abraham

10  Shafi's counter-assertion that they were not will have to await discovery and later proceedings in

11  this case before it can be resolved (and, in any event, Section 2.11(a) of the Primary Purchase

12  Agreement is expressly not limited to IRL employees, *id.* ¶ 87 (referring to IRL's "consultants")).

13  **D.    Abraham Shafi made his false statements with scienter.**

14         To plead scienter, SoftBank must allege facts, "taken collectively," that suggest that

15  Abraham Shafi had a mental state to "deceive, manipulate or defraud."  *Tellabs*, 551 U.S. at 319,

16  322 (quotations omitted).  SoftBank's Complaint alleges many such facts:  pointing to both

17  "smoking-guns," where Abraham Shafi made representations he plainly knew were false,

18  Abraham Shafi's role at IRL, and his document destruction.

19         **1.    SoftBank's Complaint alleges several "smoking gun" statements that
               Shafi knew were false when made.**

20

21         "A plaintiff can plead scienter by alleging that defendants actually knew of, or had

22  access to, information contradicting the challenged statements."  *Jaeger* v. *Zillow Grp., Inc.*, 644

23  F. Supp. 3d 857, 873 (W.D. Wash. 2022) (citing *S. Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776,

24  786 (9th Cir. 2008)); *see also SEB Inv. Mgmt. AB* v. *Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133

25  (N.D. Cal. 2020) ("that the defendants published statements when they knew facts suggesting the

26  statements were inaccurate" is "classic evidence of scienter").  SoftBank's Complaint points to

27  several facts that Abraham Shafi knew to be true at the time of the Series C, yet chose to

28  misrepresent to SoftBank.

1        *First*, Abraham Shafi unambiguously told SoftBank that IRL was spending "$50K

2  a month" on growth, yet the Complaint alleges with particularity that he knew that IRL was paying

3  the Agency hundreds of thousands of dollars every month to pass onto growth firms.  *Id.* ¶¶ 39,

4  73.  In fact, the Complaint specifically alleges that Abraham Shafi "shifted" IRL's relationships

5  with growth firms from a direct relationship to one in which the Agency acted as an intermediary

6  in November 2020 and that he knew IRL paid the Agency $560,000, *over ten times the "$50K a*

7  *month" he told SoftBank IRL spent on growth*, in February 2021 alone.  *Id.* ¶ 73.  Tellingly,

8  Abraham Shafi never references his "$50K a month" misstatement in his entire Motion.

9        Instead, Abraham Shafi argues that his ultimate admission that growth spending

10  had been "misallocated" to infrastructure spending suggests it was an "honest mistake."  *Id*.  But

11  this admission was a long time coming, and not before, as SoftBank alleges, he attempted to

12  conceal IRL's growth spending from its CFO.  Compl. ¶ 75 (alleging that on both July 27, 2022

13  and August 3, 2022, Abraham Shafi told the Head of Growth to mislead IRL's CFO, including by

14  suggesting that he should "add [an] extra 98k into infra").  What changed between then and

15  Abraham Shafi's admission on September 28, 2022 was IRL's receiving a subpoena from the SEC

16  and Abraham Shafi facing the very real threat that his misrepresentations to IRL's CFO and

17  SoftBank would come to light.  *Id*. ¶¶ 104-05.  The fact that Abraham Shafi finally told the truth

18  when it became clear that, and right before, his lies were sure to be revealed is evidence that those

19  lies were made knowingly, not the opposite.

20        *Second*, Abraham Shafi caused IRL to represent to SoftBank in the Primary

21  Purchase Agreement that "no Active User was generated by any click farm or similar service," yet

22  SoftBank specifically alleges that he was informed by another tech CEO on March 16, 2021 (less

23  than a month before Abraham Shafi held out IRL's active user metrics to SoftBank) that "IRL got

24  hit by a massive bot attack generating millions of fake groups to join."  Compl. ¶¶ 65, 87.  Abraham

25  Shafi's proposed competing inference (that activity sufficient to create millions of fake groups on

26  IRL "could have a *de minimis* effect on [IRL's] DAU" (Dkt. No. 47 at 16) is nowhere near as

27  compelling as SoftBank's:  that the "bot attack" was not an attack at all, but part of (and thus

28  evidence of) IRL's fraudulent business plan to create the illusion of huge numbers of users.

-28-

1    *Third*, Abraham Shafi caused IRL to represent to SoftBank in the Primary Purchase

2    Agreement that IRL did not have any "agreements, understanding or proposed transaction[s]" with

3    its Key Employees or any of their affiliates, yet, as discussed above, SoftBank specifically alleges

4    that he knew about payments of hundreds of thousands of dollars to the Agency—clearly an

5    affiliate of IRL's Head of Growth.  Compl. ¶¶ 71-73, 85.

6                    **2.       SoftBank's Complaint alleges specific circumstances which support**
                            **Abraham Shafi's scienter under the core operations doctrine.**
7

8             "The core operations theory of scienter relies on the principle that corporate officers

9    have knowledge of the critical core operation of their companies."  *Police Ret. Sys. of St. Louis* v.

10   *Intuitive Surgical, Inc*., 759 F.3d 1051, 1062 (9th Cir. 2014).  "There are three circumstances under

11   which core operations allegations can support a strong inference of scienter:  (1) when they, along

12   with other allegations, support a cogent and compelling inference of scienter, (2) when they are

13   themselves particular and suggest that the defendants had actual access to the disputed information,

14   and (3) in the 'rare circumstances' when they are not particularized, but 'the nature of the relevant

15   fact is of such prominence that it would be absurd to suggest that management was without

16   knowledge of the matter.'"  *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th

17   Cir. 2021).  SoftBank's Complaint supports a strong inference that Abraham Shafi acted with

18   scienter under all three prongs.

19            *First*, at the time of the Series C investment, Abraham Shafi was the co-founder,

20   CEO, and a board member of IRL; his family members and friends held positions of authority

21   across the Company; IRL only had 20 full-time employees; and he held himself out as IRL's public

22   face.  Compl. ¶¶ 22, 30, 33.  Combining these undisputed facts with SoftBank's particularized

23   allegations of fraud crossing IRL's "critical core operation[s]" (those devoted to its user growth

24   and user base), it would have been impossible for Abraham Shafi not to have been involved in the

25   fraud against SoftBank given his representations about IRL's user base.  *See, e.g.*, *Berson* v.

26   *Applied Signal Tech., Inc*., 527 F.3d 982, 988 (9th Cir. 2008) ("[I]t is hard to believe that

27   [defendants] would not have known about stop-work orders that allegedly halted tens of millions

28   of dollars of the company's work.");  *Mulderrig* v. *Amyris, Inc*., 492 F. Supp. 3d 999, 1027 (N.D.

-29-

Cal. 2020) ("That [defendants] would not have known that the millions of dollars in revenues had not been realized, despite their constant monitoring of the company's debts and the revenues, and their duties to active remediation plan on the financial controls issues, rises to the level of the 'absurd.'"); *S. Ferry LP #2* v. *Killinger*, 687 F. Supp. 2d 1248, 1256 (W.D. Wash. 2009) (plaintiffs adequately pleaded that financial institution's "technological capabilities were critical to its core operations").

*Second*, SoftBank alleges that (i) Abraham Shafi and the other Defendants had access to IRL's active user data and (ii) IRL's active user data contained obvious indicia of bots. Compl. ¶¶ 63, 111. In fact, the indicia were so obvious that uncompromised IRL employees began identifying them soon after Abraham Shafi was suspended. *See* Keystone Rep. ¶ 1 ("This analysis follows . . . the identification of suspicious user behavior patterns on the platform.").[15] Additionally, SoftBank alleges that "Abraham Shafi, Noah Shafi, and Amin" "made payments of *at least* $300,000" to proxy services and that one of these services "advertised itself as providing products that can 'bypass[] sophisticated anti-bot systems'" and can help customers "appear as an organic user on sites." Compl. ¶ 61. The Keystone Report further confirms this allegation and attaches invoices for payments to proxy services suggesting that IRL spent over $70,000 on proxy services in November 2022 alone. Keystone Rep. at 58-61. Abraham Shafi suggests that "IRL could have used proxy services, and even bots, for many legitimate reasons having nothing to do with falsely inflating IRL's user metrics." Dkt. No. 47 at 7; *see also* Dkt. No. 46 at 1. That is one possible inference that conceivably could be drawn from the data set out in the Complaint and in the Keystone Report. The more compelling inference is that IRL was spending hundreds of thousands of dollars to perpetrate the scheme detailed in the Keystone Report.

### 3. SoftBank's Complaint alleges Abraham Shafi's document destruction demonstrates his scienter.

*Finally*, SoftBank alleges that Abraham Shafi's destruction of evidence demonstrates his scienter. SoftBank alleges that Abraham Shafi restored his phone from a backup,

---

[15]     It was these findings by IRL employees that Keystone was asked to "confirm." Shafi's suggestion that this suggests Keystone's conclusion was "prefabricated" is entirely unsupported. *See* Dkt. No. 2.

1  destroying information on the device, **one day before it was to be imaged** as part of the SEC's

2  investigation and that such an action "is a way to conceal data created or modified on the device

3  between the date of the backup and the date of the restoration." Compl. ¶ 120. Abraham Shafi's

4  response to this allegation is, first, to attack the reliability of the independent, third-party expert

5  that identified the restoration and, second, to suggest that "SoftBank fails to plausibly allege that

6  Abraham's restoration of his phone lost any messages, let alone any messages relevant to the pre-

7  Series C time period." Dkt. No. 17. SoftBank also alleges that IRL changed its Slack retention

8  policy **one day before firing a whistleblower**. Compl. ¶ 96. Abraham Shafi's response to this is

9  to argue SoftBank does not allege he ordered the change and, again, to suggest that SoftBank's

10  failure to allege the content of the destroyed messages renders the allegations insufficient. *See*

11  Dkt. No. 47 at 16-17.

12  The reasonable inference to be drawn from Defendants' spoliation of information

13  is the one that courts routinely draw (or instruct juries that they may draw): that the information

14  destroyed was damaging to the parties who destroyed it. *See Apple Inc.* v. *Samsung Elecs. Co.*,

15  881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012) ("A trial court's discretion regarding the form of a

16  spoliation sanction is broad, and can . . . [include] instructing the jury that it may draw an adverse

17  inference."). Further, SoftBank alleges reasons to believe this maneuver destroyed relevant

18  evidence, including that there remain no identifiable communications among Abraham Shafi and

19  several key IRL employees in the days after the SEC subpoena. Compl. ¶ 122. And that, based

20  on the limited Slack records SoftBank could recover, it appears Slack was the "primary" means of

21  communication for the Defendants. Compl. ¶ 96.

22  **III.  Counts Five through Eight against Yassin Aniss and Noah Shafi Are Sufficiently Pled.**

23  **A.  Yassin Aniss and Noah Shafi fraudulently concealed material information regarding IRL's bot activity.**

24

25  To establish a fraudulent concealment claim under California law, "(1) the

26  defendant must have concealed or suppressed a material fact; (2) the defendant must have been

27  under a duty to disclose the fact to the plaintiff; (3) the defendant must have intentionally concealed

28  or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff must have been

-31-

1   unaware of the fact and would not have acted as he did if he had known of the concealed or

2   suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff must

3   have sustained damage." *DocuSign, Inc.* v. *Clark*, 2022 WL 18956601, at *5 (N.D. Cal. Sept. 27,

4   2022) (quoting *Nissan Motor Acceptance Cases*, 277 Cal. Rptr. 3d 914, 941–42 (Cal. Ct. App.

5   2021)).  None of Defendants Aniss and Noah Shafi's arguments for dismissal withstand scrutiny.

6            *First*, they argue that SoftBank fails to plead with particularity that there was

7   significant bot activity on IRL.  Dkt. No. 46 at 5.  But as explained above, SoftBank has adequately

8   pleaded that Abraham Shafi's representations on active users were false because of the prevalence

9   of bots on IRL.  (*See supra* Section II.B.)  Aniss and Noah Shafi attempt to refute their knowledge

10  of this activity.  But their argument (that an allegation that they "should have known" of Abraham

11  Shafi's and IRL's misrepresentations to SoftBank is insufficient to prove actual knowledge) fails.

12  Dkt. No. 46 at 7.  "[A]ctual knowledge can be inferred from circumstances such that the defendant

13  'must have known.'"  *McCraner* v. *Wells Fargo & Co.*, 2023 WL 2728719, at *4 (S.D. Cal. Mar.

14  30, 2023) (quoting *RSB Vineyards, LLC* v. *ORSI*, 223 Cal. Rptr. 3d 458, 465 (Cal. Ct. App. 2017)).

15  A claim survives a motion to dismiss "by alleging circumstantial facts that, if proven, support the

16  same inference."  *Id.*; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d

17  1011, 1024 (N.D. Cal. 2010) ("[I]t is generally inappropriate to resolve the fact-intensive

18  allegations of fraudulent concealment at the motion to dismiss stage.") (quotations omitted).  For

19  example, in *McCraner*, which involved a claim against Wells Fargo for providing banking services

20  to fraudulent marketing schemes, the court held that allegations that "Wells Fargo knew that the

21  [fraudsters] employed 'extremely troubling direct-to-consumer sales tactics'" and that their

22  accounts "generated an unusually high number of chargeback requests" were "sufficient to support

23  an inference that Wells Fargo must have known the [fraudsters] were defrauding their customers."

24  2023 WL 2728719 at *5.

25           So too here.  SoftBank alleges numerous specific facts demonstrating that Yassin

26  Aniss and Noah Shafi knew of, and were instrumental in, the manipulation of IRL's active user

27  metrics.  The Complaint alleges that manipulation of IRL's active user metrics would have been

28  obvious to any back-end engineers, and specifically identifies Aniss as a "back-end developer for

-32-

1   IRL from its founding in 2017 until June 23, 2023" and Noah Shafi as a member of "the IRL

2   founding team" and "IRL's Head of Engineering at the time of the Series C."  Compl. ¶¶ 23-24.

3   In fact, the Complaint alleges that Aniss and Noah Shafi were the "primary 'back-end' engineers

4   at IRL" with "privileged" access to user data, and thus "understood that IRL was built for mostly

5   automated use, not human use." *Id.* ¶¶ 64, 82.  Additionally, the Complaint alleges that invoices

6   and transaction records reflect that Noah Shafi facilitated payments from IRL to proxy services

7   (*id.* ¶ 61); points to an April 29, 2022 conversation between Jacob Shafi and Noah Shafi discussing

8   "[c]reat[ing] a bot that crawls Facebook and Discord to send DM's to join the same group/server

9   on IRL" (*id.* ¶ 82); and cites to the Stroz Report, which concluded that Aniss and others restored

10  their mobile devices following the announcement of the SEC investigation and deleted certain text

11  messages. *Id.* ¶ 120.

12          *Second*, Aniss and Noah Shafi argue that they did not owe a duty to disclose the

13  alleged material facts to SoftBank.  Dkt. No. 46 at 7.  "A failure to disclose or concealment can

14  constitute actionable fraud in four circumstances: (1) when the defendant is in a fiduciary

15  relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts

16  not known to the plaintiff; (3) when the defendant actively conceals a material fact from the

17  plaintiff; and (4) when the defendant makes partial representations but also suppresses some

18  material fact." *Falk* v. *Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094–95 (N.D. Cal. 2007)

19  (quoting *LiMandri* v. *Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997)).  While Aniss and

20  Noah Shafi may not have stood in a fiduciary relationship with SoftBank, the remaining

21  circumstances are applicable here.  That is because "even in the absence of a fiduciary relationship,

22  a party to a transaction has a duty to disclose facts if it knows both the materiality of the omitted

23  matters and that they were inaccessible to the other party." *Laatz* v. *Zazzle, Inc*., 2023 WL

24  4600432, at *13 (N.D. Cal. July 17, 2023) (quotations omitted).

25          Defendants alone had knowledge of material facts that were not accessible to

26  SoftBank.  The information was clearly material because, as described above, SoftBank "depended

27  on [IRL's] active user metrics as a source of potential future income" and would not have signed

28  and closed the Series C and purchased $150 million of IRL stock had it been provided with

-33-

1   information regarding Defendants' scheme to engineer user activity.  Compl. ¶¶ 46, 51, 86.  *See*

2   *Los Angeles Unified Sch. Dist.* v. *Great Am. Ins. Co.*, 234 P.3d 490, 496 n.5 (Cal. 2010) ("[A]

3   party having exclusive knowledge of information materially affecting the value of a transaction

4   may have a duty to disclose that information to the other party even in the absence of a fiduciary

5   relationship.").  Aniss and Noah Shafi argue that Plaintiffs "had sufficient access to the information

6   they claim to not know" because they reviewed a third-party report on IRL's total users and

7   downloads and had sufficient opportunity to uncover these facts during the due diligence process.

8   Dkt. No. 46 at 8.  But SoftBank's access to this information was obstructed precisely because of

9   Defendants' inaccurate representations and half-truths.   As alleged in the Complaint, when

10  SoftBank identified purported discrepancies from third-party sources of information, Aniss and

11  Noah Shafi "reinforced SoftBank's beliefs rather than corrected them."  Compl. ¶¶ 42, 92-93.

12          *Third*, contrary to Aniss and Noah Shafi's suggestion, the Complaint sufficiently

13  alleges that Aniss and Noah Shafi suppressed this information with the intent to defraud.  Taking

14  Plaintiffs' factual allegations to be true, Defendants intentionally failed to clarify specific

15  disclosures relating to IRL's total active users, lack of bot activity, and relationships with third

16  parties like the Agency and Machine Learning LLC.  Compl. ¶¶ 60-62, 77.

17          *Fourth*, the Complaint clearly identifies the damages that Plaintiffs have suffered

18  as a result of the omissions.  As the Complaint alleges, had SoftBank been aware of the omitted

19  information, SoftBank "would not have signed and closed the Series C and purchased the $10

20  million of IRL common stock from the Secondary Sellers personally and $150 million of IRL

21  stock in total."  Compl. ¶ 164.  *See W. Pac. Elec. Co. Corp.* v. *Dragados/Flatiron*, 534 F. Supp.

22  3d 1209, 1251 (E.D. Cal. 2021) ("[R]eliance in [a] fraudulent concealment case . . . is established

23  by showing that had the omitted information been disclosed one would have been aware of it and

24  behaved differently.").  Aniss and Noah Shafi claim that their omissions could not have caused

25  Plaintiffs' harm because SoftBank "contractually disavowed reliance" on any extra-contractual

26  representations they made. Dkt. No. 46 at 11-12.  But such "integration clauses" do not bar a claim

27  of fraud.  Rather, "[f]raud in the inducement renders the entire contract voidable, including any

28  provision in the contract providing the written contract is, for example, the sole agreement of the

-34-

1    parties, that it contains their entire agreement and that there are no oral representations." *Philips*

2    *Med. Cap., LLC* v. *Med. Insights Diagnostics Ctr., Inc.*, 471 F. Supp. 2d 1035, 1044 (N.D. Cal.

3    2007) (quoting *Hinesley* v. *Oakshade Town Ctr.*, 37 Cal. Rptr. 3d 364, 372 (Cal. Ct. App. 2005)).

4            Moreover, this argument ignores the plain language of the Primary and Secondary

5    Purchase Agreements.  In the Primary Purchase Agreement, IRL represented: (i) that "no Active

6    User was generated by any click farm or similar service, bot, automated program or similar

7    device"; (ii) that certain MAU, WAU and DAU values "were accurate as of the purchase date";

8    and (iii) that "there are no agreements, understanding or proposed transaction" with related parties.

9    Compl. ¶ 87.  While Aniss and Noah Shafi were not parties to the Primary Purchase Agreement,

10   they represented in the Secondary Purchase Agreement that they "had access to such information

11   regarding the business and finances of the Company and such other matters with respect to the

12   Company as a reasonable person would consider in evaluating the transaction contemplated

13   hereby, including, in particular, all information necessary to determine fair market value of the

14   Shares."  *Id.* ¶ 88.  SoftBank's decision to invest in IRL and purchase shares from the Secondary

15   Sellers was a direct result of these representations.  Compl. ¶¶ 46, 51-56, 93.

16   **B.    Yassin Aniss and Noah Shafi participated in the conspiracy to defraud**
             **Plaintiffs.**

17

18           A claim for civil conspiracy under California law involves "(1) the formation of a

19   group of two or more persons who agreed to a common plan or design to commit a tortious act;

20   (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages." *City of Indus.*

21   v. *City of Fillmore*, 129 Cal. Rptr. 3d 433, 450 (Cal. Ct. App. 2011), *as modified* (Aug. 24, 2011).

22   Aniss and Noah Shafi seek to dismiss the conspiracy claim against them on the basis that "there is

23   no underlying actionable fraud." Dkt. No. 46 at 12-13.  For the reasons explained above, SoftBank

24   has more than sufficiently pled a fraudulent scheme that was perpetuated by IRL and Abraham

25   Shafi.  Their remaining arguments are similarly lacking.

26           *First*, Aniss and Noah Shafi argue that there was no agreement to conspire and that

27   their only ties to the alleged conduct is their "familial relation" to Abraham Shafi.  Dkt. No. 46 at

28   13.  Not so.  As alleged in the Complaint, Aniss and Noah Shafi held significant roles at IRL in

-35-

1   which they were the "primary 'back-end' engineers . . . whose job responsibilities involved user

2   data," and that Noah Shafi facilitated payments from IRL to proxy services.  Compl. ¶¶ 61, 64.

3   Further, they "prohibit[ed] other employees . . . from accessing core IRL user data." *Id.* ¶ 63.  As

4   courts have recognized, "because of the very nature of a conspiracy, its existence must often be

5   inferentially and circumstantially derived from the character of the acts done, the relations of the

6   parties and other facts and circumstances suggestive of concerted action." *AREI II Cases*, 157 Cal.

7   Rptr. 3d 368, 382 (Cal. Ct. App. 2013) (quotations omitted).  Accordingly, "a complaint is

8   sufficient if it apprises the defendant of the 'character and type of facts and circumstances upon

9   which she was relying to establish the conspiracy.'" *Id.*  The Complaint clearly "pleads facts and

10   circumstances that permit a reasonable inference [that Defendants were] aware of the plan to

11   defraud, at least as to the plan to conceal" Abraham Shafi's overall scheme to manipulate IRL's

12   active user metrics. *Id.*  Indeed, given that the scheme's principal objective was the falsification

13   of IRL's user metrics, it is difficult to see how Abraham Shafi could have carried it out without

14   the knowledge and active involvement of Aniss and Noah Shafi, who were two of few individuals

15   who controlled access to IRL's user data.  Compl. ¶¶ 64, 82.

16        *Second*, Aniss and Noah Shafi contend that they did not participate in any wrongful

17   conduct in furtherance of the conspiracy because the Complaint only states that "Defendants failed

18   to correct alleged misrepresentations by Abraham."  Dkt. No. 46 at 14.  But Plaintiffs are not

19   required to allege that Aniss and Noah Shafi made any misrepresentations to SoftBank or played

20   an active role in the negotiation of the Primary Purchase Agreement. *AREI II*, 157 Cal. Rptr. 3d

21   at 384.  That is because "the purpose of conspiracy allegations is to establish a conspirator's

22   liability as a joint tortfeasor 'regardless of whether the conspirator was a direct participant in the

23   wrongful act.'" *Id.*; *see also Spencer* v. *Mowat*, 260 Cal. Rptr. 3d 372, 383 (Cal. Ct. App. 2020)

24   ("A participant in the conspiracy effectively adopts as his or her own the torts of other

25   coconspirators within the ambit of the conspiracy.") (quotations omitted).  Far from merely

26   operating within "the ordinary course of their employment" (Dkt. No. 46 at 15), the allegations

27   that Noah Shafi facilitated payments to proxy services and that Aniss deleted text messages

28   following the commencement of the SEC investigation clearly allege that they participated in

-36-

efforts to conceal Abraham Shafi's scheme.  Compl. ¶¶ 61, 120.  *See, e.g.*, *AREI II*, 157 Cal. Rptr. 3d at 384–85 (allegations that defendant "participated in efforts to conceal" felony conviction of business owner "in materials it prepared . . . supports the conclusion that [defendant] did not just provide ordinary business services but actively agreed to participate in the conspiracy").

*Third*, Aniss and Noah Shafi claim that they are "legally incapable" of committing civil conspiracy because they owed no duty to Plaintiffs.  Dkt. No. 46 at 15.  As set out above, however, Aniss and Noah Shafi had a legal duty to disclose the omitted facts about IRL's true user metrics because these facts were not "reasonably accessible" to Plaintiffs.  *Zazzle*, 2023 WL 4600432, at *13.

*Finally*, contrary to Defendants' arguments (Dkt. No. 46 at 16), Plaintiffs are not "foreclose[d]" from alleging that Defendants caused them harm by reason of the Primary Purchase Agreement.  *See supra* 34-35.

### C.   Yassin Aniss and Noah Shafi aided and abetted Abraham Shafi's ongoing scheme to defraud Plaintiffs.

"A defendant is liable for aiding and abetting another in the commission of an intentional tort, including a breach of fiduciary duty, if the defendant knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act." *Nasrawi* v. *Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014) (quotations omitted). Again, Aniss and Noah Shafi seek to dismiss the underlying fraud claim (Dkt. No. 46 at 17), which is properly asserted.  *See supra* Section II.  They then try to argue (i) that there was no substantial assistance by Aniss and Noah Shafi and (ii) that there was no duty breached.  Dkt. No. 46 at 17-19.  Both of these arguments fail.

*First*, the Complaint alleges that Defendants assisted in Abraham Shafi's scheme to artificially inflate IRL's user numbers.  It pleads that Aniss and Noah Shafi knew of Abraham Shafi's misrepresentations to SoftBank regarding its active users, user acquisition costs, and insider transactions, and concealed the truth from SoftBank.  Compl. ¶¶ 88-93; *see also Schulz* v. *Neovi Data Corp.*, 60 Cal. Rptr. 3d 810, 817 (Cal. Ct. App. 2007) (rejecting argument that there was no substantial assistance because defendants "were doing no more than providing their usual,

-37-

1    legitimate service of processing credit card payments").

2         *Second*, as explained above, the Complaint plainly alleges that Aniss and Noah

3    Shafi owed a duty to SoftBank.  Aniss and Noah Shafi argue that the Complaint does not allege

4    that they "were even aware of the terms or representation made in the Primary Purchase

5    Agreement."  Dkt. No. 46 at 19.  But SoftBank's allegations make clear that "[d]ue to their

6    involvement in the deal negotiations, the due diligence process, and the representations in the

7    Primary Purchase Agreement, Defendants understood that the issue of IRL's active user count,

8    properly defined, was material to SoftBank's investment decision" and that they "misrepresented

9    material facts."  Compl. ¶¶ 89, 92.

10        **D.      Yassin Aniss and Noah Shafi were unjustly enriched by their misconduct.**

11             A claim of unjust enrichment involves the "receipt of a benefit and unjust retention

12   of the benefit at the expense of another."  *Prakashpalan* v. *Engstrom, Lipscomb & Lack*, 167 Cal.

13   Rptr. 3d 832, 855 (Cal. Ct. App. 2014), *as modified on denial of reh'g* (Feb. 27, 2014) (quotations

14   omitted).  "When a plaintiff alleges unjust enrichment, a court may construe the cause of action as

15   a quasi-contract claim seeking restitution."  *Astiana* v. *Hain Celestial Grp., Inc.*, 783 F.3d 753,

16   762 (9th Cir. 2015) (quotations omitted).  Aniss and Noah Shafi attempt to dismiss this claim on

17   the grounds that (i) there was no actionable misrepresentation, (ii) there is an adequate remedy at

18   law, and (iii) Plaintiffs waived the unjust enrichment claim by suing in tort.  Dkt. No. 46 at 19-22.

19   These arguments fail.

20             *First*, and again, the Complaint adequately alleges that Aniss and Noah Shafi

21   committed an actionable misrepresentation because they failed to correct SoftBank's misbeliefs

22   about IRL's active user figures and they were under a duty to do so.  Dkt. No. 46 at 20.  These

23   allegations are sufficient to withstand a motion to dismiss.  *Kay* v. *Copper Cane, LLC*, 549 F.

24   Supp. 3d 1014, 1025-26 (N.D. Cal. 2021) (declining to dismiss unjust enrichment claim where

25   winemaker's "myriad general references to Oregon and its coasts could lead a consumer to believe

26   the wine originated in Oregon"); s*ee also, e.g.*, *Astiana*, 783 F.3d at 762 (plaintiff could state a

27   restitution claim based upon quasi-contract because she adequately alleged that defendant's

28   misleading labels duped her into purchasing a product); *Romero* v. *Flowers Bakeries, LLC*, 2015

-38-

1    WL 2125004, at *9 (N.D. Cal. May 6, 2015) (allegations that defendant enticed plaintiff to

2    purchase products through misleading labels stated a claim for quasi-contract).

3          *Second*, Defendants argue that unjust enrichment is unavailable because there is

4    "an existing written contract that governs the parties' rights."  Dkt. No. 46 at 21.  As explained

5    above, however, the Primary and Secondary Purchase Agreements are voidable on the basis of

6    Defendants' fraud.  *Hinesley*, 37 Cal. Rptr. 3d at 372.  In the same vein, Plaintiffs did not waive

7    the unjust enrichment claim by asserting other tort claims.  Courts have expressly rejected this

8    argument.  "[T]hat an unjust enrichment claim may be nonsensical because it was duplicative of

9    or superfluous to a plaintiff's other claims is not grounds for dismiss[al]."  *Romero*, 2015 WL

10   2125004, at *9 (quotations omitted); *see also* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or

11   more statements of a claim or defense alternatively or hypothetically, either in a single count or

12   defense or in separate ones.").

13   **IV.     Shehab Amin, Jacob Shafi and Alia Shafi Are Liable on Counts Six and Seven.**

14       **A.     Each Defendant participated in the conspiracy to defraud Plaintiffs.**

15          Defendants Amin, Jacob Shafi, and Alia Shafi seek to downplay their roles in the

16   conspiracy to defraud Plaintiffs by ignoring their roles at IRL and minimizing the allegations in

17   the Complaint to "little more than facts illustrating their family ties."  Dkt. No. 46 at 4.  But these

18   familial ties were integral to the concealment of Abraham Shafi's scheme through a closely held

19   corporation.  The central thrust of the scheme was that "Abraham Shafi and his family members

20   at IRL tightly guarded access to the data behind IRL's user figures" and "conspired to conceal

21   relationships with proxy services that helped deploy bots onto the platform."  Compl. ¶¶ 6, 63, 82,

22   98, 99.  Defendants "received favored access" to user data that most other IRL employees were

23   restricted from accessing.  *Id.* ¶ 82.  The Complaint also pleads specific facts as to the integral

24   roles Defendants played in the conspiracy.  It alleges that Shehab Amin was the "Head of Data at

25   IRL from its founding in 2017 through June 23, 2023" and controlled an entity called Machine

26   Learning LLC, which functioned as an intermediary to launder IRL's payments to proxy service

27   vendors.  Compl. ¶¶ 25, 62.  Jacob Shafi and Alia Shafi were software engineers at IRL and both

28   deleted electronic evidence in violation of their document preservation obligations following

-39-

1    receipt of the SEC subpoena.  *Id.* ¶¶ 26-27, 120-22, 127.  Additionally, the Complaint pleads that

2    Jacob Shafi discussed "Creat[ing] a bot that crawls Facebook and Discord to send DM's to join

3    the same group/server on IRL" and that Alia Shafi deleted a Jira ticket describing a plan to "Add

4    Fake Users & Fake Chats to All Public Groups with Less than 10 People."  *Id.* ¶¶ 82, 115-18.

5            In her motion to dismiss, Alia Shafi attempts to characterize her deletion of the Jira

6    ticket as "a routine responsibility for technical staff" which was not "at all anomalous or

7    suspicious."  Dkt. No. 45 at 10.  She further argues that "[i]n August 2022, the ticket had already

8    been closed for six months and there was no basis for keeping it open."  *Id.*  To the contrary, Alia

9    Shafi had an explicit obligation to keep the ticket open in August 2022 pursuant to her document

10    preservation obligations under the SEC subpoena as well as the Special Committee's investigation.

11    Compl. ¶¶ 104, 115-18, 127.  Alia Shafi also argues that her deletion of the Jira ticket and other

12    electronic evidence could not have caused SoftBank harm because "the Jira ticket was created on

13    August 19, 2021, three months after SoftBank invested in IRL and after its due diligence was

14    complete . . . . It is implausible to think that a Jira ticket after the investment had any influence

15    whatsoever on SoftBank's investment."  Dkt. No. 45 at 10, 12.

16            But Defendants' scheme did not simply end when SoftBank made its Series C

17    investment, nor is it limited to the due diligence process leading up to it.  The fraud was ongoing,

18    and the Complaint plainly alleges that Defendants held key positions within IRL either since its

19    founding or soon after, and that they continued to conceal the truth about IRL's user metrics by

20    employing bots and paying proxy service vendors, restricting other employees' access to user data,

21    and deleting electronic evidence even after the Series C.  Compl. ¶¶ 23-27, 63, 82, 98, 115-23.

22    Efforts to cover up a fraudulent scheme clearly fall within the scope of acts furthering that

23    conspiracy.  *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab.*

24    *Litig.*, 295 F. Supp. 3d 927, 968 (N.D. Cal. 2018) ("close link between Defendants' alleged conduct

25    and Plaintiffs' injury" existed in civil RICO action where plaintiffs alleged that defendants "were

26    involved in the scheme *from the beginning*," the defendants "exercised tight control over the

27    coding and other aspects of the software," and they "participated in the affairs of the Enterprise by

28    concealing the software functions from U.S. regulators") (emphasis in original).

**B.    Each Defendant aided and abetted Abraham Shafi's ongoing scheme to defraud.**

The Complaint similarly alleges that each of Defendants Amin, Jacob Shafi, and Alia Shafi aided and abetted Abraham Shafi's ongoing scheme to defraud Plaintiffs.  The Complaint sets forth that IRL made payments to proxy service vendors through intermediaries (including an entity owed by Shehab Amin) and that "[u]nlike other similarly situated tech companies, which share user data widely, IRL severely restricted access to only 'senior executives' and Shafi family members" and routinely rejected requests to access user information from other employees who "believed the user information was important to their job functions."  Compl. ¶¶ 60-63.  Defendants do not refute these allegations but instead contend that they were "routine" acts undertaken in the "ordinary course."  Dkt. No. 46 at 15; Dkt. No. 45 at 10, 16.  But courts have emphasized that "[a] party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge."  *Neilson* v. *Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1121 (C.D. Cal. 2003) (quotations omitted); *see also In re Allstate Life Ins. Co. Litig.*, 2013 WL 2474508, at *7 (D. Ariz. June 10, 2013) ("[I]f a method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.").

The allegations in the Complaint are sufficient to pass muster on a motion to dismiss.  Defendants did more than execute their ordinary job responsibilities.  Instead, they made use of their "privileged 'back-end' access . . . to data concerning the nature of IRL's user base" to conceal Abraham Shafi's fraudulent scheme from SoftBank and other IRL employees.  Compl. ¶¶ 63, 82, 98-99.  *See, e.g.*, *McCraner*, 2023 WL 2728719, at *6 ("substantial assistance" element of aiding and abetting claim was adequately pled where complaint alleged that Wells Fargo helped "shell companies secure merchant processing services from other banks by providing reference letters with [the customer's] name removed, concealing [their] association with the shells" and additional "atypical banking procedures").

**CONCLUSION**

For these reasons, Defendants' motions to dismiss should be denied.  As this is the first instance the Court has reviewed this securities fraud complaint, if any claims are dismissed,

-41-

1  SoftBank respectfully requests to leave to file an amended complaint.  *See* Fed. R. Civ. P. 15(a)(2);

2  *Cook, Perkiss & Liehe, Inc.* v. *N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (the

3  court should give leave to amend unless "the pleading could not possibly be cured by the allegation

4  of other facts.").

5  Dated: February 12, 2024                    By:   /s/ *Brendan P. Cullen*

6

7                                                          **SULLIVAN & CROMWELL LLP**
                                                           Brendan P. Cullen (SBN 194157)
8                                                          550 Hamilton Avenue
                                                           Palo Alto, CA 94301-2010
9                                                          cullenb@sullcrom.com

10                                                         Alexander J. Willscher (*pro hac vice*)
                                                           Martin Erreich (*pro hac vice*)
11                                                         125 Broad Street
                                                           New York, NY 10004-2498
12                                                         willschera@sullcrom.com
                                                           erreichm@sullcrom.com

13                                                         *Counsel for Plaintiffs*
                                                           *SVF II Aggregator (DE) LLC and*
14                                                         *SoftBank Vision Fund II-2 L.P.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-42-