Brendan P. Cullen (SBN 194057)
cullenb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, CA 94301-2010
Tel: +1-650-461-5600
Fax: +1-650-461-5700

Alexander J. Willscher (*pro hac vice*)
willschera@sullcrom.com
Martin Erreich (*pro hac vice*)
erreichm@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004-2498
Tel: +1-212-558-4000
Fax: +1-212-558-3588

*Counsel for Plaintiff SVF II Aggregator (DE) LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SVF II AGGREGATOR (DE) LLC, <br><br> Plaintiff, <br><br> v. <br><br> ABRAHAM SHAFI, <br> GENRIKH KHACHATRYAN, <br> YASSIN ANISS, <br> NOAH SHAFI, and <br> SHEHAB AMIN, <br><br> Defendants. | Case No. 4:23-cv-03834-YGR <br><br> **AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff SVF II Aggregator (DE) LLC ("SoftBank") alleges as follows:

## INTRODUCTION

1. In April 2021, Get Together Inc. (a.k.a., "IRL") seemingly was one of the fastest growing social media apps for Generation Z. According to IRL's CEO Abraham Shafi, IRL's mobile app already had been downloaded by 25% of U.S. Teens under 18 years old; IRL had 12 million monthly active users ("MAUs"); and IRL was growing at a "meteoric" 400% year-over-

year rate. Additionally, Abraham Shafi reported strong user engagement and retention metrics, which showed that nearly 30% of its MAUs were using the platform on a daily basis. Together, these metrics suggested that IRL had the potential to quickly develop a stream of revenue for the company. Critically, Abraham Shafi represented that IRL accomplished its growth "organically," with minimal expenses devoted to customer acquisition. Specifically, Abraham Shafi claimed IRL spent less than $50,000 per month in user acquisition efforts.

2. Through these metrics, IRL appeared to already be achieving network effects, and was well positioned for further viral growth—similar to that which drove the emergence of today's largest social media companies. Based on the data regarding active users and organic growth that IRL and Abraham Shafi presented to SoftBank, Abraham Shafi convinced SoftBank that a capital infusion would allow IRL to further accelerate its already-impressive rate of growth and monetize its enthusiastic user base.

3. On May 18, 2021, SoftBank paid $150 million to purchase IRL shares; both directly from IRL and from individual holders of IRL shares. SoftBank purchased $125 million of IRL Series C Preferred shares from IRL directly and $25 million of IRL common stock from IRL insiders. Specifically, SoftBank paid $7,499,982 each to defendants Abraham Shafi and Genrikh Khachatryan, and $1,249,997 each to defendants Yassin Aniss and Noah Shafi (collectively, the "Secondary Sellers"). SoftBank's share purchase was based on a pre-money valuation of IRL of $1 billion.[1]

4. But—consistent with the accounts of multiple whistleblowers from within the Company; the sudden disappearance of IRL's millions of purported "human" users; IRL transaction records; and numerous indicia outlined in a report from an external consultant—IRL did not actually have 12 million MAUs during the period when SoftBank conducted diligence for its investment in April and May of 2021. Nor had 25% of teenagers under 18 years old downloaded IRL's mobile app. IRL also did not have anything close to best-in-class engagement metrics. And its growth was anything but "organic."

---

[1] A pre-money valuation, as opposed to a post-money valuation, refers to the value assigned to a company before it receives new external financing.

AMENDED COMPLAINT

5.     At the time of SoftBank's investment, Defendants—who were all IRL insiders—were engaged in a sophisticated, multi-part scheme to defraud investors in IRL.

6.     The scheme had four key elements.  First, Defendants needed IRL to appear successful on the Apple App Store and Google Play Store.  To accomplish that goal, IRL needed people to download the app.  Contrary to Abraham Shafi's statements to SoftBank that IRL spent just "$50k" monthly on growth efforts and that IRL's growth was predominantly "organic," invoices from marketing agencies and communications by Abraham Shafi show that IRL spent hundreds of thousands of dollars each month on "incent advertising" schemes to accomplish this goal.  Through that strategy, Defendants achieved millions of downloads of IRL—not by marketing its features or demonstrating its utility, but by directly compensating individuals for downloading the app.

7.     Second, Defendants needed to convert IRL's downloads into devoted "Active Users" of IRL whom the Company could monetize or (more importantly for Defendants' purposes) market to potential investors.  But the actual humans who downloaded IRL did not do so for its features or promise of "a more intimate internet."  Rather, they downloaded IRL in order to earn an incentive, and once they earned the incentive, they had no reason to actually use the platform.  Entirely undisclosed to SoftBank and inconsistent with Abraham Shafi's and IRL's representations, Defendants manipulated IRL's reported active user figures.  Defendants did this (i) through an undisclosed and overly broad definition of an "Active User"; and (ii) by using proxy services to facilitate the presence of artificial Active Users, thereby turning human downloads into artificial bot "users"—who simulated actual, monetizable, human activity.  To enable and perpetuate the scheme, Defendants restricted access to granular user data to only those IRL employees who were participants in the conspiracy.  By contrast, Defendants stonewalled those un-compromised IRL employees who tried to uncover the truth.

8.     Third, Defendants sought to conceal IRL's spending on incent advertising and proxy services from SoftBank and IRL employees who were not part of the scheme.  Abraham Shafi knew investors would inquire about IRL's expenses, so—undisclosed to SoftBank and contrary to Abraham Shafi's and IRL's representations—Defendants funneled IRL's suspect

charges through personal credit cards paid by the Company and related-party entities controlled by IRL employees. This, again, was contrary to Abraham Shafi's and IRL's representations to SoftBank that "there [were] no agreements . . . between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof."

9. Fourth, Defendants needed to profit from their scheme. Defendants extracted millions of dollars from SoftBank directly through a secondary sale of their common shares. But Defendants' efforts did not stop there. IRL *never* earned any material revenue, yet Abraham Shafi charged millions of dollars in personal expenses to corporate cards, unilaterally increased his salary, and paid inflated salaries to the other participants in the scheme.

10. The multi-pronged scheme could not stay hidden forever. Detailed whistleblower reports began to emerge from uncompromised IRL employees within the year following SoftBank's investment, investigative news reports followed soon after, and the SEC began investigating IRL in August 2022. With the walls closing in, Defendants destroyed their communications—first by changing IRL's Slack retention policy days after the first whistleblower report was made; then by deleting text messages and files; and finally, by wiping information from their phones.

11. Discovery of the initial document destruction, among other things, resulted in outside directors on IRL's board forming a special committee (the "Special Committee") in order "to oversee the Company's response to the SEC investigation" and "to conduct any investigation into [the SEC's] Allegations that the Special Committee shall deem necessary."

12. The Special Committee investigation was initially impeded by continued document destruction by Abraham Shafi, Yassin Aniss, and Shehab Amin, as well as Abraham Shafi's and Amin's unwillingness to provide the data necessary to perform a robust analysis of IRL's users. However, when the investigation eventually revealed Abraham Shafi's personal expense practices and he was suspended by the Board, everything changed in terms of both the Special Committee's investigation and the continued viability of Defendants' scheme.

13. Immediately after Abraham Shafi's suspension, Defendants lost access to IRL credit cards and bank accounts; not coincidentally, IRL's "Active Users" began to rapidly

disappear, declining from millions to tens of thousands in a few short days. Also, user data that Abraham Shafi and Shehab Amin previously had claimed was enormously burdensome to provide suddenly became accessible. Initial analysis of user data by IRL employees immediately suggested the presence of inauthentic user activity. A subsequent detailed analysis by an external consultant retained by the Special Committee, Keystone Strategy, confirmed what all involved now suspected: over 95% of IRL purported users were bots.

14.  On June 20, 2023, counsel for the Special Committee presented the following findings to the Board:

(i)  "there is substantial evidence that the Company's number of authentic, human users was dramatically inflated," and that "95% of the Company's users were likely non-humans/bots";

(ii)  "there is substantial evidence to show that the Company, with the then-Chief Executive Officer Abraham Shafi's knowledge, inaccurately represented its marketing and user acquisition costs to investors";

(iii)  "there is substantial evidence that Mr. Shafi caused" the Company to incur costs of millions of dollars for his own "personal expenses," and that he owed the Company "an estimated current total of $2.385 million" for "unreimbursed personal expenses";

(iv)  "there is substantial evidence that five entities that should have been disclosed as related parties were omitted from the disclosures required in connection with the Company's Series C financing and approximately $2.9 million in payments were made to vendors that were owned by the Company's directors, officers, employees (or former employees) or their immediate or extended family in the 12 months preceding to the Series C financing and approximately $25 million in payments to vendors meeting this criteria from the time of the Series C financing to July 2022"; and

(v)  "there is circumstantial evidence to show that certain Company employees, including Mr. [Abraham] Shafi, took steps to delete documents potentially relevant to the SEC's (and the Committee's) inquiries."

15.  In light of the investigation findings, and following the unanimous vote of IRL's board of directors, a majority of IRL shareholders voted to dissolve the business and transfer substantially all of IRL's assets into a liquidating trust.

16.  As detailed below, Defendants' years-long scheme used IRL to defraud Plaintiff and, in doing so, violated both Federal and California securities laws. As a result of Defendants' actions, Plaintiff suffered losses in excess of $150 million.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action concerns violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, and pursuant to 28 U.S.C. § 1367 because the related state law claims form part of the same case or controversy.

18. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are citizens of diverse states and the amount in dispute is greater than $75,000.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants in this action are domiciled or committed a substantial portion of the wrongful activities in this District. Venue is further proper pursuant to Section 27(a) of the Exchange Act and 15 U.S.C. § 78aa(a) because transactions, acts, practices, and courses of conduct constituting violations of the securities laws occurred within this District.

## THE PARTIES

20. Plaintiff SVF II Aggregator (DE) LLC ("SVF Investor"), is a limited liability company organized under the laws of Delaware with its principal place of business in Delaware. SVF II Investment Holdings (Subco) LLC, a limited liability company organized under the laws of Delaware with its principal place of business in Delaware, is the sole member of SVF Investor.

21. SVF Investor is an indirect subsidiary of SoftBank Vision Fund II-2 L.P ("Vision Fund 2"), a limited partnership organized under the laws of Jersey with its principal place of business in Jersey.

22. Non-party SB Investment Advisors (US) ("SBIA") was an investment advisor for SoftBank Vision Fund 2 at the time of the Series C Investment and acted on behalf of SoftBank Vision Fund 2 throughout the deal period. At the time of the Series C Investment, SBIA maintained an office in San Carlos, California. Employees of SoftBank Investment Advisors based out of this office led Plaintiff's investment in IRL. Employees of SoftBank Investment Advisors were located in California when they communicated with Abraham Shafi about the Series C Investment.

23. Defendant Abraham Shafi is a citizen and resident of California. He is a co-founder of IRL. He was CEO of the company from its founding in 2016 until April 2023, when the IRL Board placed him on administrative leave due to misconduct. He was also a member of IRL's Board of Directors from its founding until his removal as a director via shareholder vote on June 23, 2023. He personally sold IRL common stock directly to SoftBank for $7,499,982.30 in connection with SoftBank's investment in IRL.

24. Defendant Genrikh "Henry" Khachatryan is, on information and belief, a citizen and resident of California. Khachatryan was a co-founder of IRL and a senior engineer at the Company from 2016 until June 2023. He personally sold IRL common stock directly to SoftBank for $7,499,982.30 in connection with SoftBank's investment in IRL.

25. Defendant Yassin (a/k/a "Yaseen") Aniss is a citizen and resident of California. Aniss was a back-end developer for IRL from its founding in 2017 until June 23, 2023. Aniss personally sold IRL common stock directly to SoftBank for $1,249,997 in connection with SoftBank's investment in IRL. Aniss is a cousin of Abraham Shafi.

26. Defendant Noah Shafi, upon information and belief, is a citizen of California. He is part of the IRL founding team, and was IRL's Head of Engineering at the time of the Series C. Noah Shafi personally sold IRL common stock directly to SoftBank for $1,249,997 in connection with SoftBank's investment in IRL. Noah Shafi is a brother of Abraham Shafi.

27. Defendant Shehab (a/k/a "Shahab") Amin is, upon information and belief, a citizen and resident of California. He was an IRL employee from 2017 until June 2023. On information and belief, Amin was a data engineer at the time of Series C Investment. By July 2021 IRL's "Director of AI" reported to Amin, and in March 2022 Amin was given the title of "Data Team Lead," which Amin's LinkedIn profile now characterizes as "Head of Data Engineering." Amin is a cousin of Abraham Shafi.

28. Abraham Shafi and Noah Shafi are siblings. Yassin Aniss and Shehab Amin are cousins of each other and of the Shafi siblings.

# THE ALLEGATIONS

## *IRL:  The App and Company*

29.    IRL, founded in 2017, operated a social media website and mobile app.  Defendants Abraham Shafi, Genrikh Khachatryan, Noah Shafi, Yassin Aniss, and Shehab Amin were all part of IRL's founding team.

30.    IRL branded itself as "The Messaging Social Network for the Next Generation." IRL was geared specifically towards Generation Z with an emphasis on building a "more intimate internet."[2]

31.    The IRL app offered its users live event discovery, calendaring, public group messaging, and private messaging.  IRL claimed that its focus on connections "in real life" differentiated it from its social media competition, which, according to Abraham Shafi, were "creating more separation and creating more walls."[3]  "We're the only 'social' app designed to help you get off your screen and go out to be sociable," Abraham Shafi said in an interview with GQ Middle East.[4]

32.    In January 2018, IRL raised $3 million in seed funding.  In June 2019, IRL raised $11 million more in a Series A financing round.  In September 2020, it raised a further $16 million as a Series B financing round.

33.    By early 2021, IRL determined it would seek additional financing in a Series C round.  At the time of the Series C, IRL had 15 full-time employees, including Defendants and two non-party family members of Abraham Shafi:  Alia Shafi and Jacob Shafi.

---

[2]    Generation Z or "Gen Z" refers to the generation born after the "Millennials."  Gen Z is commonly understood to include the population born between the late-1990s and the early 2010s.

[3]    Karin Eldo, "The Search For Balance Led Abraham Shafi To His Billion Dollar Tech Unicorn." FORBES, Oct. 10, 2022, https://www.forbes.com/sites/karineldor/2022/10/10/the-search-for-balance-led-abraham-shafi-to-his-billion-dollar-tech-unicorn/?sh=30d2c583472f.

[4]    "Meet IRL's Abraham Shafi – the Middle East's First Founder of a Billion-Dollar Social App," GQ MIDDLE EAST, Jan 11, 2023, https://www.gqmiddleeast.com/culture/abraham-shafi-social-app-irl

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

*IRL Solicits Investment in a Series C Financing Round*

34.     On April 5, 2021, in an email to an early investor in IRL, Abraham Shafi stated that "due to a ton of inbound demand," IRL was in a "Series C fundraising process." Abraham Shafi's email set forth a list of "Highlights," touting IRL's successes with active user growth and retention, and it embedded a graphic listing figures of Daily Active Users and Weekly Active Users (respectively, "DAU" and "WAU"):[5]



35.     On April 7, 2021, Abraham Shafi's message was forwarded to an investment director at SBIA, who was based out of SBIA's California office (the "Investment Director"). The Investment Director scheduled an introductory meeting with Abraham Shafi to learn more about IRL.

36.     On April 13, 2021, the Investment Director and a Vice President at SBIA—also based out of SBIA's California office—spoke with Abraham Shafi about the Series C financing

---

[5]     References to "MoM Growth" and "YoY Growth" in the graphic refer to month-over-month and year-over-year growth, respectively.

opportunity.[6] Abraham Shafi repeated the user metrics listed in his introductory email, both orally and in writing in the form of an investor presentation, and further claimed that "25% [of] US teens under 18 [u]se IRL." SoftBank personnel's interest was piqued by IRL's total MAUs, user growth, user engagement (as measured by IRL's strong ratio of DAUs to MAUs), user retention, and user demographics. SoftBank expressed interest in continuing conversations with IRL, and Abraham Shafi pledged to share further materials with SoftBank.

***Plaintiff's Robust Due Diligence for the IRL Investment***

37.     The day after their initial meeting, on April 14, 2021 the parties executed a non-disclosure agreement for purposes of SoftBank's due diligence of IRL. Thereafter, SoftBank began to review materials that, in accordance with Abraham Shafi's instructions, were uploaded by IRL to data rooms that contained information supposedly supporting the user-related data from Abraham Shafi's previous presentation. Besides for Abraham Shafi, SoftBank was also introduced to Khachatryan as a member of IRL who was assisting with IRL's responses to due diligence questions.

38.     To help properly value IRL, on April 19, 2021, SoftBank requested responses to certain "Follow-Up Due Diligence Questions," including the following about the accuracy and source of IRL's user metrics:

- "What are the current user acquisition channels?"

- "Has there been any paid user acquisition? What was CAC [customer acquisition cost] in these cases?"

- "The m-o-m [month-on-month] sign-ups tend to fluctuate a bit every month, what is creating the variability month to month? It appears that in some months, sign-ups have declined."

- Referring to a method of counting active users based on a "session" of platform usage, SoftBank asked "What does a session mean?"

39.     Over the course of the following week, Abraham Shafi responded to these questions in writing, respectively stating (with emphasis added):

---

[6]     All references to SoftBank and its interactions with IRL refer to actions made by SBIA on behalf of SoftBank.

- "The dominant invite flow today is first to groups and second to events. We grow **predominantly** through direct SMS based invites from one user to another. This is *a free organic channel* (**users are not incentivized or paid for these invites**, and must invite each friend individually with no bulk invites.) **Unlike other apps that spend aggressively to acquire new users, we spend very little** . . ."

- "**We spend about $50K a month in paid user acquisition**. This is **mainly to seed new geos** [geographies] and interest groups, versus maintaining existing ones. **Our CAC is ~$0.50 per new user**, and each new user on average results in a total of 21 additional users organically through multiple generations of referrals."

- "A session is an **app open**."

- "There is some natural variability in signups due to seasonality around certain events and when we launch new geos. **We have not focused on massive top line growth** but rather retention & engagement to date to ensure our growth is lasting and that our engagement is deepening."

40.     On April 20, 2021, the Investment Director and other SoftBank representatives met with Abraham Shafi again. Abraham Shafi repeated the claims in the investor presentation and his responses to follow-up questions about user metrics and user acquisition.

41.     In order independently to assess IRL's reported user figures, SoftBank reviewed a third-party report on the total numbers of users and downloads. The report suggested that, as of Spring 2021, the IRL app had been downloaded only 9 million times total over the course of its history. That figure stood in contrast to Abraham Shafi's representations that IRL had 12 million MAUs as of March 2021. On April 21, 2021, the Vice President at SoftBank asked via email for Abraham Shafi to explain the discrepancy. SoftBank further asked Abraham Shafi to explain why IRL exhibited stark variations in monthly download data, as reflected in the third-party reports, and also asked for IRL's definition of a MAU. Abraham Shafi forwarded the email to Yassin Aniss.

42.     Abraham Shafi later responded to SoftBank that the third-party report was "definitely not accurate" for two reasons. First, he noted that the report's focus solely on app downloads would not capture all IRL users who accessed the platform via IRL's internet website. Second, he explained that IRL's audience is difficult for auditors to estimate because "[w]e have a younger audience" and "anyone under 18 [years old] is technically not allowed to be tracked or have their data shared due to privacy reasons." He also responded to SoftBank's other questions,

explaining that the monthly variations in download data were "due to seasonality," and "MAU is opened app or signed in/signup to web and has a session."

43. Based on what appeared to be meaningful total active users, strong active user growth, user engagement, and a low-cost user acquisition strategy premised on organic, "viral" growth, SoftBank invited Abraham Shafi to present to its leadership on April 22, 2021. In that presentation, he repeated his previously articulated IRL user metrics, described IRL's growth as "meteoric," and claimed that "2M events get planned a day on IRL."

44. On April 27, 2021, Vision Fund 2 (on behalf of itself and its affiliates) and IRL entered into the Term Sheet for Series C Preferred Stock Financing of Get Together Inc. (the "Term Sheet").

45. The Term Sheet provided that Vision Fund 2 would purchase "$150 million of shares of Series C Preferred out of a total aggregate investment round of up to $170 million," at a pre-money valuation of $1 billion. The Term Sheet was non-binding and conditioned SoftBank's investment "on the completion of due diligence, legal review and documentation that is satisfactory to [Vision Fund 2]." The Term Sheet established that "up to $25 million of this investment will be used, either directly or indirectly, to acquire capital stock from members of [IRL's] management (with such allocation as determined by [IRL] in its sole discretion . . . and if such secondary is structured as a direct purchase by [Vision Fund 2], such acquired shares will be exchanged for shares of Series C Preferred at the Closing)."

46. After signing the Term Sheet, SoftBank continued its robust due diligence process of evaluating IRL. Because IRL did not have any profitable revenue stream, its value to an outside investor like SoftBank depended on its active user metrics as a source of potential future income. Thus, SoftBank relied on the accuracy of representations from IRL's executives concerning ***both the quantity and quality of IRL's users***. Abraham Shafi impressed SoftBank with the sheer number of people supposedly using the platform, and also by the fact that those users were engaged and apparently ***generated with minimal expenditure***, signaling authentic interest in the platform.

47. On April 29, 2021, SoftBank held a due diligence meeting with IRL leadership focused on the company's finances. At the meeting, SoftBank discussed with Abraham Shafi and

another IRL Director the questions they had sent to IRL in advance, including the following questions about IRL's user growth:

- "What will be the Company's primary focus on investing / deploying capital in the business?  (User acquisition vs. product vs. other) . . . ."

- "What are the team's thoughts on deploying capital for user acquisition, especially as it relates to new market growth / expansion?"

- "What channels has IRL deployed marketing spend?  Which tend to yield the highest ROI?"

- "Has there been any paid user acquisition?  What was CAC in these cases?"

48.     In response, Abraham Shafi spoke about IRL's historic marketing efforts and plans for future spending on growth.  Among other things, he described how IRL's "best" growth channels were "Snapchat, Reddit, Google Search Ads, and TikTok."  He also spoke of plans to monetize IRL for investors by leveraging users, including charging users a fee for accessing content on the platform.

49.     SoftBank's due diligence process continued with a further due diligence meeting on May 3, 2021.  At that meeting, SoftBank asked about related party relationships between IRL and its employees and contractors, including whether the company had any "material agreements with its directors, officers, and members."  In a written response, IRL, on information and belief as directed by Abraham Shafi, responded it had "[n]one (other than offer letters, advisor agreements, etc.)."  During the due diligence meeting, IRL told SoftBank that "[t]here are no other related party arrangements" aside from "[p]rior investor side letters."

50.     Through its extensive review of data room materials, third-party reports, and audience surveys, SoftBank took significant measures to verify the claims made by Abraham Shafi and IRL.  However, as SoftBank would eventually learn, Defendants had prepared for SoftBank's due diligence and structured IRL's business so that SoftBank could not discover evidence of their fraud.

***Plaintiff SVF Investor Purchases Shares in IRL***

51.     On May 18, 2021, SVF Investor and IRL executed a Series C Preferred Stock Purchase Agreement (the "Primary Purchase Agreement").  SVF Investor also executed a

Common Stock Transfer Agreement (the "Secondary Purchase Agreement") with Abraham Shafi, Genrikh Khachatryan, Noah Shafi, Yassin Aniss, and another IRL insider. Under the agreements, SVF Investor purchased 6,629,775 shares of Series C Preferred Stock in total at a per share purchase price of $22.6252, for a total purchase price of $149,999,985.34.

52. Of this approximately $150 million, SVF Investor purchased directly approximately $17.5 million of shares from the Secondary Sellers under the Secondary Purchase Agreement. Specifically, pursuant to the May 18, 2021 Secondary Purchase Agreement (as amended on September 9, 2021), SVF Investor purchased:

- 333,362 shares of IRL common stock from Abraham Shafi for a total of $7,499,982.30;

- 333,362 shares of IRL common stock from Genrikh Khachatryan for a total of $7,499,982.30;

- 55,560 shares of IRL common stock from Yassin Aniss for a total of $1,249,997; and

- 55,560 shares of IRL common stock from Noah Shafi for a total of $1,249,997.[7]

Consistent with the Primary Purchase Agreement, these shares were then converted to Series C Preferred Stock.

53. Given SoftBank's reliance on the accuracy of information provided as part of SoftBank's diligence process, SoftBank insisted that IRL make binding representations as to the authentic nature of IRL's user base.

54. In his capacity as a director of IRL, Abraham Shafi also signed the Primary Purchase Agreement, which contained numerous representations (qualified in certain cases by a Disclosure Schedule attached to the agreement), including:

- Under Section 2.8(e) of the Primary Purchase Agreement, the term "active user" was defined as "a natural person who (i) has registered with the App as a North American resident and has logged in and engaged with the App

---

[7] SoftBank also paid $7,499,982 to a non-party co-founder in exchange for 333,362 IRL shares.

at least once during the applicable period and (ii) to the Knowledge of the Company,[8] is in compliance with the App Terms."

• Section 2.8(e) further represented that "to the Company's Knowledge, no Active User was generated by any click farm or similar service, bot, automated program or similar device."

• Section 2.8(e) of the Disclosure Schedule annexed to the Primary Purchase Agreement warranted that the following MAU, WAU, and DAU values were accurate as of the purchase date:

| Month | MAUs | WAUs | DAUs |
|---|---|---|---|
| December 2020 | 11.8M | 5.8M | 2.2M |
| January 2021 | 11.8M | 6M | 2.4M |
| February 2021 | 11.9M | 6.4M | 2.7M |
| March 2021 | 13M | 6.7M | 3.2M |
| April 2021 | 12.8M | 7M | 3.6M |

• Section 2.11(a) of the Primary Purchase Agreement represented that "there are no agreements, understanding or proposed transaction (in any case oral or written) between the Company and any of its officers, directors, consultants or Key Employees,[9] or any Affiliate thereof."

• Section 2.21 stated that "[t]he Company has made available to the Purchasers all the information that would reasonably be required for deciding whether to acquire the Shares. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made."

• Section 2.23 provided that "[t]he Company has delivered to each Purchaser its unaudited financial statements as of March 31, 2021, and for the fiscal year ended December 31, 2020 . . . The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein . . ."

55.     Under Section 5(b)(ii) of the Secondary Purchase Agreement, each Secondary Seller represented that they "had access to such information regarding the business and finances of the Company and such other matters with respect to the Company as a reasonable person would

---

[8]     Section 1.7 of the Primary Purchase Agreement defined "the Company's Knowledge" to include the knowledge of Abraham Shafi, Genrikh Khachatryan, and one other IRL co-founder.

[9]     Section 1.7 of the Primary Purchase Agreement defined "Key Employee" to include any executive-level employee, "including division director and vice president-level positions." Defendants were each Key Employees under this definition.

consider in evaluating the transaction contemplated hereby, including, in particular, all information
necessary to determine fair market value of the Shares."

**_Representations and Materiality_**

56. Ultimately, SoftBank's decision to purchase IRL shares at a pre-money $1 billion valuation relied on a series of 13 representations by Abraham Shafi and IRL that can be grouped into six overlapping categories: (i) those concerning user data; (ii) those concerning measurement of user data; (iii) those concerning user base growth methods; (iv) those concerning payments to affiliated entities; (v) those concerning IRL's definition of an "Active User"; and (vi) broad representations in the Primary Purchase Agreement.

57. **_First_**, Abraham Shafi made representations to SoftBank concerning user data in his initial email to SoftBank on April 5, 2021; in his presentation to SoftBank on April 12, 2021; and in his presentation to SoftBank on April 20, 2021. Abraham Shafi also caused IRL to make representations to SoftBank concerning user data in Section 2.8(e) of IRL of the Disclosure Schedule.

58. Representations concerning IRL's total MAUs, and in particular that IRL had 12.8 million MAUs in April 2021, were material to SoftBank's investment decision because SoftBank understood that its ability to earn a return from its investment in IRL depended largely on the amount of people that actively used IRL. SoftBank believed a valuation that approximated $75 per MAU was reasonable compared to peer companies.

59. Representations about IRL's 14% month-over-month and 400% year-over-year user growth rates were material to SoftBank because (particularly when combined with other representations about the "organic" nature of IRL's growth and its limited growth spending) they suggested IRL had achieved "viral" growth driven by its own user base.

60. Representations about IRL's user engagement, including its implied 29% ratio between IRL's DAUs and MAUs (its "DAU/MAU ratio") and retention, including that the app retained 63% of users over a 19-month period, were material to SoftBank as they suggested IRL's user base would ultimately be monetizable.

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

61. Representations about IRL's user demographics, including that 10% of the U.S. population under 30 used IRL and 25% of U.S. teens under 18 used IRL, were material to SoftBank because IRL's purported younger user profile set IRL apart from competing platforms, such as Facebook and Instagram.

62. ***Second***, Abraham Shafi made representations to SoftBank concerning measurement of IRL's users in his written answers to SoftBank questions over the week of April 19, 2021 and in his email to SoftBank on April 21, 2021.

63. Abraham Shafi's representations that month-to-month variations in IRL's downloads were due to "seasonality" were material to SoftBank as they provided a plausible explanation for download patterns that would otherwise be suggestive of inorganic growth.

64. Abraham Shafi's representations that third-party tracking services were inaccurate because they didn't track IRL's web users and because of the demographic profile of IRL's users were material to SoftBank as they provided plausible explanations for why IRL's purported user metrics were inconsistent with those reported by third parties.

65. ***Third***, Abraham Shafi made representations to SoftBank in his written answers to SoftBank questions over the week of April 19, 2021 and in his oral response to SoftBank questions in a due diligence meeting on April 29, 2021 concerning IRL's user base growth methods.

66. Representations about the Company's "~$0.50" customer acquisition cost, the Company's user acquisition channels, whether the IRL had any "paid user acquisition," that IRL's growth was "predominantly" "organic," that IRL spent "$50k" a month on growth, that IRL's growth spending was limited to "seeding new geos," and that IRL hadn't "focused" on massive topline growth were each material to SoftBank as they suggested that IRL's existing user base was driving its growth in a "viral" manner, IRL's growth could be sustained without large increases in growth spending, that IRL had effective growth spending strategy, and that IRL's growth to-date reflected real engagement with the app.

67. These representations were also consistent with Abraham Shafi's claim that IRL had high user retention. Organic growth, driven by personal invitations from friends, would be far

more likely to result in users' continued use of the app compared to lower retention forms of growth spending.

68.     ***Fourth***, IRL, on information and belief as directed by Abraham Shafi, represented to SoftBank in a due diligence meeting on May 3, 2021 that it did not have "material agreements with its directors, officers, and members." Abraham Shafi also caused IRL to make representations to SoftBank in Section 2.10 of the Disclosure Schedule and Section 2.11(a) of the Primary Purchase Agreement concerning agreements and transactions with Key Employees and consultants.

69.     Details about IRL's relationships with its employees and consultants were material because a potential lack of arm's-length dealing meant that corporate insiders could have used IRL to provide value to themselves to investors' detriment.[10]

70.     ***Fifth***, Abraham Shafi made representations concerning IRL's definition of "session" and "MAU" to SoftBank in his written answers to SoftBank questions over the week of April 19, 2021 and in his April 21, 2021 email to SoftBank. Abraham Shafi caused IRL to represent how it defined an "active user" in Section 2.8(e) of the Primary Purchase Agreement.

71.     Representations that IRL required a "user" to open the app to be counted towards its user metrics were material to SoftBank as they suggested that "users" were actually engaging with the App's features.

72.     SoftBank also understood that Abraham Shafi's and IRL's purported definition of a "user" was generally consistent with other social media companies. This allowed SoftBank to compare IRL's active user metrics with those of other social media companies on a one-to-one basis.

73.     ***Sixth***, Abraham Shafi caused IRL to make broad representations to SoftBank in Sections 2.21 and 2.23 of the Primary Purchase Agreement that IRL had made "all the information

---

[10]     This importance to SoftBank of IRL's transactions with related parties was further reflected in Section 5.4 of an Investor Rights Agreement, executed with the Series C Investment, which prohibited IRL from hiring "any family member of an employee except with the approval of the Board of Directors of [IRL], including a majority of the [directors appointed by preferred shareholders]."

that [SoftBank] would reasonably require" to make SoftBank's investment decision and that IRL's financial statements "fairly present" IRL's "financial condition."

74. Those representations made either directly by Abraham Shafi or made by IRL at his direction were material to SoftBank because they affirmed that SoftBank's investment decision was based on a complete and accurate record.

***The Truth about IRL Begins to Emerge***

75. After the Series C Investment closed, IRL appeared to maintain its remarkable growth trajectory. IRL reported the following growth in active users:

| Month | MAUs | WAUs | DAUs |
|-------|------|------|------|
| September 2021 | 14M | 8.1M | 3.8M |
| December 2021 | 17M | 9.4M | 4.1M |
| April 2022 | 21M | 13M | 6M |

76. However, internally at IRL—and unknown to SoftBank—employees were questioning the user metrics that IRL published. On March 13, 2022, Cameron Boehmer, a Staff Software Engineer at IRL, announced internally that "99% of images . . . [are] uploaded by bots or scripts - not real users," and that he had "uncovered significant evidence of fraud by the company in trying to inflate its user numbers to the media and investors by including bot traffic." These concerns were soon escalated to Shehab Amin.

77. Four days later, on March 17, 2022, IRL, on information and belief at the direction of Defendants, changed the Company's Slack retention policy. From that point onward, direct messages between employees and private Slack "channels" were permanently deleted after only 30 days.

78. Slack was a primary means of communication for IRL employees, including Defendants. In fact, in a July 2021 email discussing related-party payments (that were not disclosed to SoftBank), Abraham Shafi instructed Chief Financial Officer Gabi Loeb to "keep everything in Slack please."

79. On March 18, 2022, Boehmer was terminated from the Company. Soon after, two other engineers who aided Boehmer in his investigation of IRL's users, Sean Abreau and Shahen Mizoyan, resigned. In an April 2022 letter to IRL, Boehmer stated that IRL "intentionally [lied]

-19-

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

that [SoftBank] would reasonably require" to make SoftBank's investment decision and that IRL's financial statements "fairly present" IRL's "financial condition."

74. Those representations made either directly by Abraham Shafi or made by IRL at his direction were material to SoftBank because they affirmed that SoftBank's investment decision was based on a complete and accurate record.

***The Truth about IRL Begins to Emerge***

75. After the Series C Investment closed, IRL appeared to maintain its remarkable growth trajectory. IRL reported the following growth in active users:

| Month | MAUs | WAUs | DAUs |
|-------|------|------|------|
| September 2021 | 14M | 8.1M | 3.8M |
| December 2021 | 17M | 9.4M | 4.1M |
| April 2022 | 21M | 13M | 6M |

76. However, internally at IRL—and unknown to SoftBank—employees were questioning the user metrics that IRL published. On March 13, 2022, Cameron Boehmer, a Staff Software Engineer at IRL, announced internally that "99% of images . . . [are] uploaded by bots or scripts - not real users," and that he had "uncovered significant evidence of fraud by the company in trying to inflate its user numbers to the media and investors by including bot traffic." These concerns were soon escalated to Shehab Amin.

77. Four days later, on March 17, 2022, IRL, on information and belief at the direction of Defendants, changed the Company's Slack retention policy. From that point onward, direct messages between employees and private Slack "channels" were permanently deleted after only 30 days.

78. Slack was a primary means of communication for IRL employees, including Defendants. In fact, in a July 2021 email discussing related-party payments (that were not disclosed to SoftBank), Abraham Shafi instructed Chief Financial Officer Gabi Loeb to "keep everything in Slack please."

79. On March 18, 2022, Boehmer was terminated from the Company. Soon after, two other engineers who aided Boehmer in his investigation of IRL's users, Sean Abreau and Shahen Mizoyan, resigned. In an April 2022 letter to IRL, Boehmer stated that IRL "intentionally [lied]

SULLIVAN & CROMWELL LLP

-19-

AMENDED COMPLAINT

to the media and investors about the actual amount of traffic on the company's platform so that it appeared that it [was] being used by far more people than are actually using it, and that IRL knew that the numbers it was disclosing included the high percentage of bot traffic."

80.     In May 2022, Nick Grant, an IRL Software Engineer who was personally responsible for the operation of IRL's live systems for 12 hours of the day, prepared a contemporaneous report that noted IRL's user traffic was unstable, with "highly unusual traffic drops" occurring for hours at a time throughout the month. Grant noted that, at one point, "US traffic dropped an extreme amount, very suddenly [and] Latin America traffic spiked up enormously, very suddenly[.] LatAm traffic 'almost' (but not quite) perfectly 'masked' the US traffic drop: it was hard to spot the traffic drop, because the level of traffic was, at times, almost comparable with US traffic levels."

81.     In May 2022, Rae Allie, IRL's Head of Trust and Safety, resigned abruptly, writing to Abraham Shafi and other IRL executives that:

> "I have come across information (from both internal and external resources) that leads me to strongly doubt some of the numbers we report externally and internally to employees. I accepted my offer to work at IRL (and stock based compensation) based on IRL MAU/retention information that I have doubts in. Despite asking several senior leaders to walk me through our data I have not seen it — all I have is aggregate data but I am unable to verify the raw data that leads to this aggregate information and our definition of MAU isn't consistent nor clear. Seeing the raw data was important because I found some other internal information that contradicts MAU (and other numbers) reported in the Destiny Dashboard."

82.     Allie also observed that: "[o]ur growth tactics are shady and questionable and some ads/offers are potentially in violation of FTC laws around deceptive marketing. Despite raising these concerns for months little has been done." And "Abe's friends and family are not held accountable or to the same standards as other employees - favoritism and nepotism are evident."[11]

---

[11]     Abraham Shafi is often referred to as "Abe."

83.     On May 12, 2022, an article published in *The Information*, a tech-focused publication, questioned IRL's publicly announced MAUs.[12]  The article explained that, while IRL was claiming it had over 20 million MAUs in early 2022, employees at the company had "expressed concern to managers about the usage figures the company has touted."  The article reported that IRL relied on "an unconventional definition" of active users "to make the app appear bigger than it is."  The article further noted that third-party firms that "estimate app usage" suggested that IRL had only "between 1 to 2 million active users of its mobile app on a monthly basis."

84.     *The Information* reported that Abraham Shafi offered several explanations for why IRL user figures were higher than whistleblowers and third-party reports suggested.  Abraham Shafi's explanations included that:

- IRL's user demographics (*i.e.*, users primarily under 18 years old) make it difficult for third-party reports to track;

- IRL's web users (who, according to Abraham Shafi, account for 20% of IRL's users) are not tracked by third-party reports;[13] and

- "it is difficult for the measurement firms to track users who don't open the IRL mobile app in a particular month but interact with the service through email and text messages or via Google Calendar."

85.     SoftBank noted that Abraham Shafi's reference to "users who don't open the IRL mobile app" in response to questions from *The Information* differed significantly from what he had said in response to due diligence questions that SoftBank previously had raised in 2021.  In response to those prior questions, Abraham Shafi had described a "session" as an "app open."  And under the definition used in the Primary Purchase Agreement, an "active user" was one that "logged in and engaged with the app."

86.     On June 18, 2022, SoftBank asked Abraham Shafi about the prevalence of bots on the platform and IRL's current definition of a MAU.  In response, Abraham Shafi divulged that

---

[12]     Mark Matousek & Amir Efrati, *SoftBank-Backed Messaging App IRL Says It Has 20 Million Users. Some Employees Have Doubts About That*, THE INFORMATION (May 12, 2022).

[13]     *The Information* noted that, despite Abraham Shafi claiming 20% of IRL's users were through its website, "web analytics site Similarweb, which tracks a group of web users, estimated IRL's site received 267,400 visits from desktop and mobile web users in March of this year."

IRL had removed over 800,000 bots from the platform over the previous 12 months.  He also claimed that, while IRL began with a more expansive definition of a "user," "[r]oughly 2 years ago we transitioned to tracking only web and mobile engagement as a session."

87.    Also in response to *The Information* article, IRL senior leadership, including Abraham Shafi and on information and belief Defendants, solicited questions from IRL employees about the article and then prepared responses aimed at easing employee concerns.

88.    One employee's question asked "how do we track [active users]?"  In notes preparing a response, IRL's senior leadership wrote that "[s]ince 2021" IRL had used a "standard" active user definition, but that "Historically . . . email and sms was leveraged heavily."

89.    Another employee's question asked about a supposed "dashboard," which displayed information about active users but was only available to certain employees.  In response, IRL's senior management wrote that "[t]hat dashboard is currently available to senior leadership. When IRL first started and we were less than 20 people, the dashboard was available to all employees.  However as the company has scaled up (by nearly 600% since then), access to certain company information including the dashboard has naturally become only accessible to senior leadership."

90.    Other questions from IRL employees that IRL senior management did not prepare answers for included:

- "How do you intend to create increased transparency around the areas addressed in the article going forward?"
- "How many of our users are possibly bots?"
- "Why has the need for proper data analytics been suppressed or deprioritized across the org?"
- "Why doesn't our on-app activity align with the behavior of 20M MAU?"
- "Why do most of our users appear to be scams, spam, or bots?"
- "Why have we been so protective about access to MAU/WAU/DAU data, especially broken across demographics?"
- "If we tote [*sic*] these numbers in decks and to boards, and say we have 20mil MAU and a very high percentage is Gen Z but we can't necessarily see this in the app behavior and usage etc it feels concerning."

AMENDED COMPLAINT

- Why would we count a user that hasn't opened up the app? We know the app forces text messages and has a problem unsyncing google calendar. This is seems disingenuous in the article it talks about how we are defining active users being quite different than other social platforms."

- "At most tech companies, they make the data about users open to nearly everyone at the company. Why dont we do that here?"

91. In June 2022, IRL fired 25% of its workforce. In a memorandum accompanying the layoff, Abraham Shafi emphasized the need for organizational "discipline." "[L]ike the Olympics, we know most people don't want to be Olympians. In the same way, not everyone will want to walk the path we are walking. But for those that want to push their limits and find out what they are capable of, this culture is for you."[14] Abraham Shafi's family members, including Shehab Amin, Yassin Aniss, and Noah Shafi, and non-parties Alia Shafi and Jacob Shafi, were not among those terminated in the layoff.

### *The SEC and Special Committee Investigations*

92. In August 2022, in the wake of the revelations in *The Information*, IRL was served with a subpoena from the U.S. Securities and Exchange Commission. The subpoena requested a broad swath of information, including information and data related to IRL's finances, active users, bots, fake accounts, and download volumes. The subpoena also requested "documents concerning Series B and C financing rounds."

93. On September 28, 2022, Abraham Shafi acknowledged in an email to SoftBank that IRL had "gone back and taken a fresh look at how we reported certain of our vendor expenses." Abraham Shafi explained that, during that process, IRL discovered "discrepancies between how we've reported certain operating expenses to you before and what buckets they should have been reported in." Although "[t]otal operating expenses are unchanged," Abraham Shafi noted that "over 90% of the actual spend was in paid acquisition/advertising which should have been recorded as 'Growth' on our P&L" rather than as "infrastructure." Abraham Shafi explained that "[t]he % of operating expenses that are Infrastructure dropped from 36% LTD to 11% and likewise,

---

[14] Natasha Mascarenhas & Amanda Siberling, "Social App IRL lays off 25% of team, says it has enough cash to last well into 2024," TECHCRUNCH (June 2, 2022), https://techcrunch.com/2022/06/02/irl-layoffs-abraham-shafi-social-media/

AMENDED COMPLAINT

Growth increased from 11% to 35% of operating expenses." As a result of this shift, IRL revised its purported CAC from $0.41 to $1.35—more than three times higher.

94. On October 12, 2022, Abraham Shafi circulated a draft board resolution which "confirmed" his salary of $750,000. Abraham Shafi would go on to explain that he had unilaterally increased his salary (without board approval or knowledge) from $250,000 before SoftBank's investment, to a base salary of $750,000 with discretionary bonuses after the Series C Investment. From May 2021 until October 2022, Abraham Shafi effectively paid himself $1.2 million annually with no disclosure to or approval from IRL's board.[15]

95. On November 2, 2022, for the first time, Abraham Shafi disclosed to SoftBank the "current" salaries of his various family members who worked for IRL, including: Shehab Amin ($350,000), Yassin Aniss ($350,000), and Noah Shafi ($350,000). These "current" salaries did not reflect what IRL actually paid employees earlier in 2022. Amin, for example, was paid a $500,000 base salary from at least March 2022 onward.

96. SoftBank and independent directors on IRL's board were shocked by Abraham Shafi's unilateral decision to increase his salary, especially in light of the fact that IRL had yet to earn any revenue and had recently completed a round of employee layoffs.

97. On November 11, 2022, Abraham Shafi's mobile phone was imaged as part of the Company's response to SEC investigation.

98. In November 2022, it was revealed that another of Abraham Shafi's siblings, non-party Alia Shafi who worked at the Company as a backend engineer, deleted a "Jira Ticket" related to placing bots onto IRL three days after the Company received its first SEC subpoena.[16] In December 2022, the board we made aware of this issue.

99. Also in November 2022, IRL replaced the law firm Cooley LLP ("Cooley") with Faegre, Drinker, Biddle & Reath LLP ("Faegre") as IRL's SEC investigation counsel. Initially

---

[15] This self-determined salary was counter to the Amended and Restated Bylaws of Get Together Inc., Section 28, under which: "[t]he salaries and other compensation of the officers of [IRL] will be fixed by or in the manner designated by the Board of Directors."

[16] Jira is a project management platform and a Jira Ticket is an open project tracked on the platform.

undisclosed to SoftBank or the Company's Board, Faegre was also retained by Abraham Shafi, Aniss, Amin, and non-parties Jacob Shafi and Alia Shafi.

100.    In December 2022, Nick Grant filed a whistleblower grievance against IRL, Abraham Shafi, and Shehab Amin in which he expanded on his May 2022 findings, and his broader experience at IRL.  He described how "Abraham Shafi had loyal family members in positions at the top level where ordinarily in a tech company it would be littered with senior tech people"; how he and IRL's data science team had "access to data [that] was severely restricted, which caused them a major impairment in their ability to function in their role"; and that, despite these data restrictions, he and multiple employees (including Cameron Boehmer, Sean Abreau, and Shahen Mizoyan) concluded that "the majority of IRL 'users' are in fact, bots, controlled by a botnet."

101.    Nick Grant further attached screenshots of over 60 Slack Messages in which he requested data access from Shehab Amin and other IRL managers.  As detailed in the Slack Messages, even when Grant was ultimately given access to the Redshift database, which tracked detailed information about IRL user activity, he was *not* given access to the "users" and "users friends" tables, which Grant described as "pretty fundamental" to his job.  It does not appear Grant *ever* received access to certain IRL servers.

102.    When the Grant whistleblower grievance was eventually shared with SoftBank, Abraham Shafi discounted it by critiquing Nick Grant's reliability and describing the May 2022 incident (in which IRL's U.S. active users dropped dramatically and were almost simultaneously replaced by users from South America) as a "glitch" in the system.

103.    On January 25, 2023 IRL's board (including Abraham Shafi) unanimously voted to form the Special Committee.[17]  In the Special Committee's authorizing declaration, the Board acknowledged that "should the [SEC's] Allegations be proven true, this would be of material import to the Company."

---

[17]    The Special Committee resolution did not include the replacement of Faegre as investigation counsel.  When the Special Committee ultimately made the decision to retain its own counsel—who, unlike Faegre, was not conflicted by its representation of the Shafi family—Abraham Shafi repeatedly objected.

104.    On February 3, 2023, IRL management terminated Nick Grant's employment.  On March 9, 2023, Grant filed a lawsuit alleging that he was fired in retaliation for his whistleblower report.

105.    By early March 2023, the Special Committee formalized its decision to retain its own counsel to conduct an independent investigation.

106.    At this stage, Faegre's investigation (which was directed by Abraham Shafi and senior IRL management) focused on how IRL *calculated* its purported Active Users.  In other words, the investigation explored whether the Company's process of converting "session information" contained in the BigQuery database into the MAUs, WAUs, and DAUs IRL and Abraham Shafi represented to the Board and investors was consistent with IRL's purported definitions of a MAU, WAU, and DAU.

107.    But the "session information" contained in BigQuery was only a partial output of the user data flowing through IRL's servers and contained in the more-detailed Redshift database, and thus could not be used to evaluate whether bots were present on IRL.  As a result, the Special Committee decided to take a deeper look at IRL's data beyond the surface-level information contained in BigQuery.

108.    To aid in this process, in March 2023, the Special Committee retained Keystone Strategy ("Keystone"), a highly respected economics & technology consultant with specific experience analyzing bot farms and detection systems, and analyzing network traffic between devices and servers.  At the time of its investigation, Keystone employed dozens of computer and data scientists experienced in complex data extraction and analysis, and reverse engineering of applications.  Members of the Keystone team that worked this investigation included:  a Ph.D in Mathematics and experience in data mining & analysis; a Ph.D in Economics with extensive computer science experience; and a co-lead of Keystone's Information Strategy & Risk practice.

109.    Keystone was initially contacted by Cooley in December 2022 to perform an expansive analysis of IRL's purported active users.  However, when Cooley was replaced by

Faegre, the Company instead retained Celerity, a different consultant who was given a much narrower mandate.[18]

110.    Once retained, Keystone and counsel for the Special Committee repeatedly asked the Company for access to the data necessary to perform its analysis.  Abraham Shafi and Shehab Amin, however, were less than forthcoming with the information Keystone needed.

111.    On March 29, 2023, an IRL insider emailed the Special Committee on behalf of Shehab Amin encouraging the Special Committee to withdraw Keystone's requests for two sets of data that related to the validity of IRL user activity, *i.e.*, whether every user of IRL was an actual human.  The insider argued that Amin was incredibly overburdened with Celerity's analysis and that fulfilling Keystone's requests related to IRL user validity would take months to complete.

112.    Throughout early April 2023, Keystone asked that Shehab Amin provide basic, non-session event data from BigQuery.[19]  Despite repeated requests from Keystone and counsel for the Special Committee, Amin delayed sending to Keystone this simple export of data from an already-existing database for weeks.

113.    The Special Committee also sought to take a deeper look at document destruction issues.  As a result, also in March 2023, counsel for the Special Committee retained Stroz Friedberg, a leading digital forensics, investigation, and eDiscovery consultant, to image the

---

[18]    Celerity was tasked with analyzing one indicia of bots on IRL from Cloudflare—a cloud service provider that companies use to optimize and protect internet traffic and activity.  At various times in 2022, Cloudflare registered as little as 3% of IRL's traffic as human.  At the direction of Faegre and the Company, Celerity performed a series of analyses to evaluate whether "bot scores" assigned by Cloudflare were reliable.  Even under conditions tightly controlled by the Company, a majority of Celerity's tests of Cloudflare's bot detection were inconclusive and one text, in fact, revealed an IP address which displayed "certain patterns of activity and user account characteristics that seemed inconsistent with human use."  However, because in a controlled test Cloudflare flagged traffic from a single, legitimate IP address as "likely" from a bot, Celerity narrowly concluded "Cloudflare cannot be used as a proxy to determine the prevalence of malicious bot activity within IRL's system."

[19]    Such non-session data represented what a given user actually did on the IRL platform after they logged in and began a "session," *e.g.*, whether they sent a direct message to another user or whether they joined a public group.

personal devices of Yassin Aniss, Shehab Amin, Alia Shafi, and Jacob Shafi. The devices were imaged from March 31 to April 6, 2023.[20]

114.    On April 5, 2023, SoftBank's designee to IRL's board and Abraham Shafi held a meeting. Although the focus of the meeting was intended to be exclusively on IRL's business, Abraham Shafi repeatedly turned the conversation to the work of the Special Committee, urging it to pull back Keystone's efforts.

115.    On April 6, 2023, Abraham Shafi emailed the Special Committee, writing: "[m]y understanding is that the goal with Keystone has been to validate how we calculate MAU. What is currently being asked seems to significantly exceed that scope. The company is working on providing what was requested but I wanted to keep you in the loop on the potential expansion of scope beyond MAU calculation validation."

116.    Abraham Shafi and Shehab Amin tried to obstruct Keystone's access to data, and Abraham Shafi pressed the Special Committee to narrow the scope of Keystone's work, because they did not want Keystone to discover that a substantial portion of IRL's active users were not authentic. Abraham Shafi and Shehab Amin understood that, if Keystone did the analysis it was seeking to perform, IRL would be exposed as a sham.

117.    In mid-April 2023, the Special Committee also discovered that Abraham Shafi caused $2.6 million in acknowledged personal expenses to be charged to or otherwise accrued by the company, and that, while $2.5 million of such expenses had been reimbursed after Abraham Shafi was repeatedly confronted by IRL's CFO Gabi Loeb, an estimated additional $2.385 million in unreimbursed personal expenses appeared to have been charged to or accrued by the company for Abraham Shafi's benefit. As part of Abraham Shafi's continuous misappropriation of IRL resources, he even authorized an IRL corporate credit card to be given to his wife, who did not work for IRL but still charged hundreds of thousands of dollars in personal expenses. Unreimbursed personal expenses incurred by Abraham Shafi and his wife included, at minimum,

---

[20]    The Stroz Friedberg team that worked on this investigation included digital forensics experts with Global Information Assurance Certifications in iOS and macOS examination, forensics examination, forensics analysis, and threat detection.

$300,000 on luxury hotels and resorts (including the Four Seasons Resort Hualalai, Ritz Carlton at Waikiki Beach, and Mauna Kea Resort); $70,000 on a celebrity photographer; $15,000 on helicopter rides; and dozens of smaller expenses on items ranging from luxury clothes (approximately $5,800 on Brunello Cucinelli) to tea (approximately $3,100 at Global Tea Hut) to the "Academy of Oracle Arts" ($7,687.95).

118.    As a result of these discoveries, on April 28, 2023, the Special Committee removed Abraham Shafi as CEO and placed him on administrative leave.

119.    With Abraham Shafi's suspension, the Special Committee ensured Defendants no longer had unfettered access to IRL's bank accounts and credit cards.

### *IRL's Reliance on Bots Is Revealed*

120.    Almost immediately after Abraham Shafi's removal and with Defendants' access to IRL funds cut off, the IRL app saw a sudden, sustained collapse of its active user population. Over the course of two weeks from late April to mid-May 2023, IRL's DAUs declined from 2.5 million users to approximately 50,000 users.[21]



---

[21]    Accompanying the collapse, IRL experienced outages and technical disruptions for several days. The cause of the outages is unknown. IRL routinely experienced outages and technical disruptions prior to Abraham Shafi's dismissal, however those outages did not result in a total collapse of IRL's users. Additionally, IRL employees recognized the outages couldn't have caused the total collapse of IRL's users out of sheer user frustration, because only a portion of IRL's MAUs accessed the app on a given day, so many would not have been impacted by the outages.

121.     With the sudden collapse of IRL's users simultaneously with Abraham Shafi's departure, it was clear to the Special Committee and IRL's uncompromised employees that something was *very* wrong at the Company.

122.     In immediate response to the collapse, and with Abraham Shafi no longer in position to directly interfere with investigations of inauthentic user traffic, IRL's Head of Product Engineering Alex Strand took a closer look at IRL's user base during May 2023.  What he found, as detailed in a memorandum prepared in the last week of May 2023, was extensive use of "proxy" IP addresses among IRL's purported users, which showed that IRL's supposed active user population actually consisted of millions of bots rather than human users.

123.     Every device that is connected to the internet has a unique identifier known as an IP (or "Internet Protocol") address.  With the right tools, web platforms such as IRL are able to monitor the IP addresses of the devices that access it, and regularly use IP information to help defend against bot traffic.

124.     Web platforms will seek to mitigate bot traffic by preventing a single IP address from accessing them too many times in a short period.  If a single computer server sends an army of bots to generate large volumes of inauthentic activity, that traffic will be stopped because all of those inauthentic users would share a single IP address associated with the device that sent them, and the web platform's defenses will disallow their entry.

125.     To circumvent those defenses—and thereby repeatedly access a website despite originating from a single source—an army of bots can mask its true IP address by relying on a larger set of "proxy" IP addresses.  A proxy IP address stands between the device from which a user (or a fake user) emanates and the web platform that the user is seeking to access.  When the user reaches the website, it arrives with the proxy IP address rather than the actual IP address associated with the device it originated from.  Thus, by filtering bot traffic through a set of proxy IP addresses, typically facilitated with the help of paid proxy service providers, a web platform's defenses can be breached to allow for high volumes of inauthentic user activity.

126.     As part of his investigation of IRL's user base, Alex Strand aggregated a list of the top 40,000 IP addresses that were used to access IRL from April 1, 2023 through May 24, 2023.

Those 40,000 IP addresses, Strand found, were associated with millions of supposed IRL users—meaning, multiple users actually shared multiple IP addresses.

127.    Alex Strand also purchased access to a list of IP addresses—maintained by Spur Intelligence Corporation, a security vendor that specializes in detecting bot activity on web platforms—that were known to be proxy addresses.

128.    Comparing the top 40,000 IP addresses of IRL's users against the list of documented proxy IP addresses, Alex Strand found that 23,418 of them were already known to be proxy addresses just based on the single list to which he had access.  As Strand observed, the actual number of analyzed IP addresses that were actually proxy IP addresses was likely much higher, because his analysis was based only on one list of already-identified proxy IP addresses.

129.    Many of IRL's top 40,000 IP addresses were associated with particular proxy service providers, known as OxyLabs and SmartProxy.  In fact, IRL maintained relationships with OxyLabs and SmartProxy and had been paying them for services—though those payments were often filtered through third-party consultants rather than settled directly by IRL.

130.    IRL's many payments to OxyLabs were filtered through an entity called Machine Learning LLC, an entity controlled by Shehab Amin.[22]  Payments to SmartProxy were at times handled by Noah Shafi.  And payments to both entities were, prior to the issuance of the SEC Subpoena, made through Format Agency, a consulting firm that Abraham Shafi relied on as an intermediary for relationships that he wanted to conceal.[23]

131.    The fact that a large number of IRL's users accessed IRL with known proxy IP addresses demonstrated that a high percentage of IRL's purported user activity was actually generated by bots.  And the fact that those proxy IP addresses were associated with OxyLabs and SmartProxy demonstrated that the bot traffic was deliberately engineered by IRL employees—at minimum those with access to IRL's user data such as Defendants in this action.

---

[22]    For example, in November 2022 Oxylabs sent an invoice of $22,800 to Machine Learning LLC for "traffic sent through [Oxylab's] infrastructure" that month.

[23]    Format Agency is discussed in more detail *infra* at ¶¶170-177.

SULLIVAN & CROMWELL LLP

132.    Alex Strand's finding that IRL's active user population was riddled with bots was emphatically confirmed by the findings of Keystone Strategy.

133.    With Abraham Shafi no longer in position to directly obstruct Keystone's access, Keystone obtained from Alex Strand and the Company the data it needed to perform an analysis of IRL's users.  Keystone's review culminated in a 61-page report to the Special Committee (the "Keystone Report") (Exhibit A) dated June 21, 2023 that detailed numerous indicia of bots on the platform.

134.    As outlined in the Keystone Report, the finding that IRL was riddled with fake user activity was confirmed based on both aggregate information on the IRL platform and an analysis of user-specific data.

135.    For example, Keystone found that IRL had millions of group chats with identical names, such as 4.7 million group chats all titled "Play Video Games," 2 million groups named "Call of Duty Squad," and over a million chats called "Watch Netflix Together."  That was not because millions of human users coincidentally created millions of group chats with identical generic names, but rather reflected inauthentic traffic engineered to pose as real user activity.

136.    Further reinforcing the conclusion that these groups were not driven by human behavior, Keystone found that these millions of identically named group chats exhibited a remarkable level of "consistency in activity" instead of a "natural level of variation in activity levels."  (*Id.* at 38.)  Active group chats named "Play Video Games," for example, had the same average daily activity—1.6 chats per day—as did the millions of groups named "Call of Duty Squad," "Book Club," "Besties," and "Family."  This, too, was not because all the groups in these various categories happened to share an average chat volume.  Rather, it was because the chat activity in these groups came from the same artificial programming.

137.    Keystone also identified as significant the fact that the email domains of IRL's users did not align with IRL's purported user demographics.  Analyzing the users behind the 4.7 million groups named "Play Video Games," Keystone observed that about 2.4 million of their emails were Hotmail or Yahoo domains, while only 1.5 million were Gmail users.  Those figures stood in "stark contrast to recent trends" for popular email domains among IRL's purported younger

demographic—which overwhelmingly prefers Gmail to Hotmail and Yahoo. The reason why the email domains of IRL's users did not match the actual preferences of the age group of its purported user base was because IRL's users largely were not real people.

138. Keystone also documented a strange frequency of chat groups with "[n]onsensical" names, such as 400 groups called "Fuyccg," 394 groups named "Kvjfdu," and 378 groups named "Zcfhfj." These groups with identical nonsensical names were not likely the result of hundreds of different people creating groups by that name; rather, they reflected fake user activity.

139. Next, Keystone determined that IRL's supposed users were likely bots based on their IP addresses and device types. Reviewing user access metadata, Keystone found that IRL's users were logging in with different IP addresses and different devices much more frequently than an average human user. A human user would exhibit some small variation in IP addresses and devices, reflecting logins from different locations and various different devices (such as a mobile phone, a tablet, and/or a laptop computer). IRL's user base, by contrast, showed large volumes of users that cycled rapidly through IP addresses and device types. In the month of June 2022 alone, for example, nearly 90% of IRL's nearly 20 million users for that month changed IP addresses *every time they logged in to the platform*.

140. Consistent with Alex Strand's findings, Keystone confirmed that this evidenced a deliberate effort to mask bot activity through the use of proxy services. IRL's supposed users arrived with different IP addresses and device types because their visits to the platform were filtered through proxies, in an effort to mask the fact that many users were bots that came from a shared source.

141. Reviewing a sample of 1,000 suspected bot accounts, Keystone found that 99.5% of them shared more than 90% of their IP addresses with *other* supposed IRL users, further demonstrating that their visits to IRL were facilitated by shared proxy service providers.

142. Also consistent with Alex Strand's analysis, the Keystone Report confirmed that many IP addresses used by this population appeared on lists of IP addresses that are "known for proxy server or bot abuse."

143.     In addition, the Keystone Report observed that suspected bot accounts tended to repeat patterns of conduct upon visiting IRL, rather than showing a larger variation in the actions they performed on the platform, as a human user would.

144.     Overall, based on its analysis of available IP address information, Keystone determined that, of the user figures that IRL presented to investors, data was available to perform a reliable bot analysis for approximately 50% of them from June 2022 and on.  Of that population, IP address data showed that 95% were bots—in other words, just under half of the users reported to investors were demonstrably bots.

145.     Keystone further concluded that the remaining users—the ones that lacked the granular levels of data necessary to perform a bot analysis—also were not likely human.  It was this population that vanished, never to return, in May 2023, just after Abraham Shafi's suspension.  Keystone concluded that those accounts were likely "not representative of organic human activity" in part by observing that some of the suspicious group chat coincidences, such as identical average activity across millions of groups with generic names, ceased when those accounts disappeared.

146.     While the data showing the prevalence of bots on IRL was only available from June 2022, the Keystone Report noted that the absence of data going back further was "unusual" for several reasons.  First, such user activity patterns and access metadata is "core to the platform" for a social media operation like IRL.  In addition, numerous services provide [low cost] "cold storage" options that make storing such data simple and low-cost.  Finally, and most tellingly, this data is "required for identifying bot activity on the platform."

147.     IRL did not report a dramatic rise in user figures in June 2022 specifically.  Rather, IRL's users increased gradually from before the Series C investment in May 2021 until June 2022.  It is therefore unlikely that a large proportion of IRL's users were bots in June 2022 but were not bots before then.  If millions of bots were introduced in June 2022, reported users in the months leading up to June 2022 should have been significantly fewer.  Thus, if a substantial amount of IRL's reported MAUs in June 2022 were bots, there is every reason to believe that the same proportion of IRL's reported MAUs were bots at the time of the Series C.

148. As catalogued by multiple whistleblowers, shown by Alex Strand's independent analysis after Abraham Shafi's dismissal, and further confirmed by the many indicia set forth in the Keystone Report, Defendants had long employed bots to make IRL appear as though it was a growing, thriving app. In reality, the platform was a virtual ghost town, filled with bots deceptively mimicking active human users.

149. Abraham Shafi, with the help of Shehab Amin and Noah Shafi, facilitated IRL's use of bots through the use of proxy IP addresses. To conceal payments to these proxy services and their purpose, Abraham Shafi paid the proxy service vendors through various intermediaries, including Format Agency and Machine Learning LLC, and Company credit cards. A review of invoices and transaction records shows that IRL paid OxyLab—primarily through Format Agency—over $318,000 from December 2021 through December 2022.

150. Charges for "Paddle" on Company credit cards (an alternative name to SmartProxy) were placed under the heading "growth infrastructure" in Company accounting documents dating back to January 2020, although the volume of transactions increased substantially following the Series C Investment. Noah Shafi alone charged $54,448.00 to his corporate credit card for Paddle's services from September 2021 to November 2021.[24]

151. IRL CFO Gabi Loeb repeatedly inquired about payments to proxy providers given their enormous size relative to IRL's other vendors. By October 2022, IRL was spending over $80,000 monthly on proxy service providers without any clear justification for those expenditures. In notes from March 2022, Loeb commented that Shehab Amin was "cagey" when asked about charges to Paddle.net. Loeb found this "a bit concerning," because "[i]f it's being hidden from me, then it feels like something is wrong." He further noted that people with knowledge of those charges were "hiding the ball and I don't know why."

152. Also in September 2021, Noah Shafi paid $145,153.94 for Amazon Web Services ("AWS"). AWS is the largest cloud computing platform upon which developers can rent computer power. On information and belief, this payment was not for the AWS account upon which the vast

---

[24] Noah Shafi also made multiple payments to Oxylabs and Luminati (another proxy service provider) in October and November 2021.

majority of IRL's servers operated.  Rather, this AWS account operated in secret, outside of the knowledge of the knowledge of Gabi Loeb and Alex Strand.  It was from this AWS account that the bots Defendants placed on IRL originated.

153.    Defendants continued this scheme by prohibiting other employees who were not aware of the scheme from accessing core IRL user data.  Unlike similarly situated tech companies, which share user data widely, IRL severely restricted access to only "senior executives" and Shafi family members.  Requests to access user data by IRL employees who believed the user information was important to their job functions were routinely rejected by Defendants.

154.    Further, Yassin Aniss, Noah Shafi, and Shehab Amin, were all at various times prior to the Series C Investment "back-end" engineers at IRL.  Genrikh Khachatryan also worked on IRL's back-end systems.  Front-end engineers generally focus on the experience of a user on a website or app, whereas back-end engineers generally focus on the website's or app's underlying structures and, essential to IRL, its user data.  By ensuring Defendants were the primary employees whose job responsibilities involved user data, Defendants prevented other employees from discovering the scheme until the Special Committee put Abraham Shafi on administrative leave for his improper expense practices and Defendants lost their ability to conceal their fraud.

155.    While Defendants sought to prevent employees from discovering the scheme, some third-party vendors that routinely interacted with IRL began to notice bots on the platform.  On March 16, 2021, less than a month before the Series C discussions with SoftBank commenced, the CEO of Mammoth Media noted in an email to Abraham Shafi that "IRL got hit by a massive bot attack generating millions of fake groups to join."  But a supposed bot "attack" was not news to Abraham Shafi and it was not an "attack" at all; Abraham Shafi was actively working with Defendants to bring bots to IRL.

156.    Abraham Shafi boasted about IRL's sudden user increase the very next day.  On March 17, 2021, Abraham Shafi received an email from an investment firm who was impressed with IRL's meteoric buildup of active users: "What's happened with DAUs recently?  Whoa."  In response, Abraham Shafi falsely explained that "[n]othing specific happened" other than "[e]ngagement is increasing and usage is spiking.  Our servers are on fire.  We are just beginning

our journey of massive growth and engagement!"  In fact, Abraham Shafi knew bots and other artificial activity drove IRL's increase in DAUs—not authentic human growth and engagement.

157.   IRL's value was unquestionably tied directly to its user metrics.  But Abraham Shafi and IRL misrepresented (i) how many active users were on IRL and their behavior, (ii) IRL's measurement of its active users, and (iii) even how IRL defined an active user.[25]

158.   All Defendants had access to Company dashboards and back-end systems.  All Defendants were the best positioned employees in the organization to observe IRL's active user activity (or its absence) on its servers and dashboards.  And all Defendants participated in the operation of the Company, despite clear evidence of fraud.  Fundamentally, all Defendants had access to material information about IRL that SoftBank did not have when Defendants sold millions of dollars' worth of IRL shares to SoftBank.

### *IRL's Enormous Growth Spending Is Revealed*

159.   When Abraham Shafi—faced with an SEC enforcement investigation—admitted to SoftBank in September 2022 that IRL had "discrepancies" in its accounting of growth and infrastructure, he did not further admit the equally material facts that (i) these "discrepancies" had been present at the time of the Series C Investment, and (ii) these "discrepancies" concealed millions of dollars of spending (both before and after the Series C Investment) on "Incent Advertising."

160.   "Incent" or "Incentivized" advertising is a growth tactic in which companies compensate potential customers to use, or in IRL's case download, the companies' products.  For example, users of a mobile app gaming platform may be prodded by incent advertising to download another app—such as IRL's app—to earn in-game currency within the app they were already

---

[25]    Abraham Shafi *admitted* to *The Information* that IRL's MAU definition was different from what he told SoftBank.  When he was confronted by SoftBank about this, he tried to correct the record and said that IRL had adopted a standard active user definition in approximately June 2020—the year during which the bulk of IRL's MAU growth occurred and the most relevant time period to SoftBank's investment.  The omission of this change and its effect on IRL's MAUs over time is, on its own, a basis for this Amended Complaint.  Further, as shown on page 51 of the Keystone Report, there was no sudden downward adjustment to IRL's MAUs in or around June 2020 when the change was purportedly made, suggesting that Abraham Shafi's explanation was still inaccurate.

using. By relying on incent advertising, IRL was able to induce users of popular mobile gaming apps to also download IRL's app.

161. Incent advertising allows companies to quickly gain large numbers of users at a low cost, but it generally results in low user retention—a key metric to SoftBank. Of course, Defendants accepted this tradeoff because they were manipulating active user metrics with bots and IRL's expansive active user definition to create the eye-popping demographic, engagement, and retention values that Abraham Shafi and IRL falsely represented to SoftBank.

162. IRL used AdAction Interactive LLC ("AdAction") for incent advertising beginning in, at latest, December 2019. IRL paid AdAction on a per "conversion" (*i.e.* download) basis. Through AdAction spending, IRL was able to generate *millions* of downloads of the app at significant expense.

163. From an initial December 31, 2019 invoice until May 15, 2021, IRL was billed over $3.2 million (over $180,000 per month) by AdAction for services overwhelmingly categorized as "INCENT."[26]

| Invoice Date | AdAction Invoice Total |
|---|---|
| Dec. 31, 2019 | $195,492.20 |
| Jan. 15, 2020 | $217,239.30 |
| Jan. 30, 2020 | $198,364.90 |
| Feb. 15, 2020 | $158,119.60 |
| Feb. 29, 2020 | $180,653.10 |
| Mar. 15, 2020 | $122,575.20 |
| Mar. 31, 2020 | $89,547.90 |
| Aug. 31, 2020 | $109,025.94 |
| Nov. 15, 2020 | $83,299.65 |
| Nov. 30, 2020 | $89,521.11 |
| Dec. 15, 2020 | $94,610.03 |
| Dec. 30, 2020 | $92,325.41 |
| Jan. 15, 2021 | $87,503.58 |
| Jan. 31, 2021 | $95,493.61 |

---

[26]     $43,963.80 of the $3,223,003.45 was for non-incentivized marketing. The remaining $3,179,039.65 was for services categorized as "INCENT."

| Invoice Date | AdAction Invoice Total |
|---|---|
| Feb. 15, 2021 | $98,867.50 |
| Feb. 28, 2021 | $58,775.54 |
| Mar. 15, 2021 | $154,778.36 |
| Mar. 31, 2021 | $351,635.12 |
| Apr. 15, 2021 | $258,925.50 |
| Apr. 30, 2021 | $242,598.90 |
| May 15, 2021 | $243,651.00 |
| **Total:** | **$3,223,003.45** |

164. Abraham Shafi was the sole IRL employee copied on emails with AdAction from as early as March 2020. Abraham Shafi also was aware of the amount IRL was spending with AdAction. In September 2020, AdAction emailed Abraham Shafi directly asking for payment on a $109,025.95 invoice. In October 2020, AdAction emailed Abraham Shafi directly for approval of a $124,755.80 invoice. And in November 2020, AdAction again emailed Abraham Shafi for approval of a $83,299.65 invoice.

165. Following the Series C Investment, IRL continued to spend huge amounts with AdAction without disclosure to the SoftBank or IRL's Independent Directors. By September 2022, IRL cumulatively had spent over $14.8 million with AdAction.

166. IRL also received services before the Series C from Mammoth Media, another firm that helped IRL with growth efforts. Invoices from Mammoth Media to IRL from January to April 2021 total $1.7 million (or $425,000 per month).

| Invoice Date | Mammoth Media Invoice Total |
|---|---|
| Feb. 19, 2021 | $53,511.50 |
| Feb. 28, 2021 | $214,695.00 |
| Mar. 11, 2021 | $1,073,512.00 |
| Mar. 31, 2021 | $386,263.50 |
| **Total:** | **$1,727,982** |

167. Abraham Shafi was copied on emails with Mammoth Media in February 2021 which tracked daily "group joins" on IRL generated by Mammoth Media marketing. In addition

to the daily "group joins," Mammoth Media noted to Abraham Shafi the *daily* spending on its marketing efforts (sometimes as high as $30,000) and provided the cost-per-install for its services ($1.50).

168.     Abraham Shafi was also included on an email thread with Mammoth Media in late-March and early-April 2021 regarding the performance of a Mammoth Media marketing campaign.

169.     On information and belief, Abraham Shafi sought to hide user acquisition tactics like incent advertising because he wanted to project IRL as growing "organically" to investors like SoftBank that place a premium on platforms that demonstrate "viral" growth.  To do this, Abraham Shafi ensured IRL did not pay user acquisition firms directly in a way that SoftBank would discover.  Instead, he routed millions of dollars to these growth firms through external entities, such as Format Agency.

170.     Format Agency is a web marketing business run by Michael Sutyak, who was IRL's "Director of Growth."  Format Agency claims to provide "SEO-optimized content strategy"[27] for brands through "the creation of eye-catching, high quality content on an ongoing basis."  On its website, Format Agency describes itself as a "full-service growth agency" that offers to "set up channels that will grow sustainably for you over time [and] if you want to pour gasoline on the fire – we'll launch and optimize paid campaign as well."

171.     From as early as October 2020, Abraham Shafi used Format Agency to run IRL's user acquisition efforts.  This included Abraham Shafi having Format Agency pay AdAction's invoices issued to IRL.  Over the ensuing years, IRL would wire funds to Format Agency in order to pay various growth firms, then Format Agency, through Sutyak—at this point an employee of IRL—would send the payments to the growth firms on IRL's behalf.

172.     Abraham Shafi routinely corresponded with Sutyak regarding Format Agency's payment of outstanding AdAction invoices.  For example, on January 14, 2021, Sutyak emailed

---

[27]     Search engine optimization ("SEO") is a set of practices designed to improve the appearance and positioning of web pages in search engine search results.

Abraham Shafi asking for IRL to complete reimbursement to Format Agency for three AdAction invoices dated December 3, 2020, December 12, 2020, and January 7, 2020, totaling $267,430.79.

173.    The relationship between IRL and Format Agency eventually was formalized through a series of backdated invoices to cover Format Agency's prior work.  Abraham Shafi used those invoices to further hide the true role of Michael Sutyak and Format Agency.  From at least as early as December 2020, monthly invoices from Format Agency billed IRL for "Services Cost," "Infra Cost," and "Growth Cost."  Format Agency invoices to IRL ranged significantly in size. After SoftBank had invested in IRL, certain of Format Agency's monthly invoices exceeded $2.2 million for various, undefined "costs."  In the months before SoftBank's investment, Format Agency issued IRL relatively smaller invoices.  In each case, exactly 90% of the invoice was for "Infra [Infrastructure] Cost"; $20,000 was for "Services Cost"; and the comparatively small remainder was categorized as "Growth Cost."  For example, Format Agency's February 2021 invoice to IRL listed $511,200 for "Infra Cost"; $20,000 for "Service Cost"; and $36,800 for "Growth Cost."

174.    Although "Infra Cost" accounted for 90% of each invoice, Format Agency did not spend the millions of dollars IRL paid to it to enhance IRL's system infrastructure.  Indeed, on their respective websites, neither Format Agency nor Michael Sutyak indicate that they have any proficiency in app or website infrastructure.  Instead, the supposed "Infra Costs" were actually payments by IRL to *growth* firms like AdAction and Mammoth Media for incent advertising and other user acquisition campaigns.

175.    When IRL hired Gabi Loeb as Chief Financial Officer soon after the Series C Investment, he repeatedly raised questions about IRL's payments to Format Agency.  Despite his role in the organization, he was unable to gain insight into Format Agency's spending for months on end.  In September 2021 notes from a meeting with Abraham Shafi, Loeb wrote that payments to Format Agency were "outside our standard process and I'd like to get them there b/c they are our biggest service provider by far ($6M paid in 2021 so far)" and asked why IRL couldn't bring its relationship with Mammoth Media "in house."

176.    But Michael Sutyak and Abraham Shafi refused to give Gabi Loeb access.  In an internal memorandum Loeb wrote to Abraham Shafi in April 2022, Loeb highlighted the "lack of transparency from Format [Agency]" and that "I don't feel like I can do my job if 30% of the costs are basically hidden from me."  In May 2022 Gabi Loeb further wrote that "I've worked with Growth teams at every company, big and small.  What is new is being ignored and stonewalled. I've never been anywhere that I've been ignored."

177.    On July 27, 2022, Michael Sutyak noted to Abraham Shafi that Gabi Loeb was "asking about our spend projections again," and asked "what you think I should tell him." Abraham Shafi suggested that Sutyak "just say we are experimenting with international."  On August 3, 2022, Sutyak sent Abraham Shafi Format Agency's invoice for August, asking Abraham Shafi to "let me know if it's good to go" to Loeb.  Abraham Shafi told Sutyak to "add [an] extra 98k into infra" and suggested that he "say we are planning on testing pushing a little more sms this month."[28]

178.    Abraham Shafi entered IRL into relationships with both Format Agency and Michael Sutyak personally as IRL's "Director of Growth."

179.    Michael Sutyak's employment at IRL was memorialized in an agreement dated May 18, 2021—*just one day* after the Series C Investment closed.  Under the agreement, Sutyak's employment was effective as of May 3, 2021.

180.    Abraham Shafi knew SoftBank had inquired about related parties during its due diligence of IRL and had required IRL disclose certain related parties in the Primary Purchase Agreement.  Yet Abraham Shafi failed to disclose a forthcoming employment offer to Michael Sutyak the day after the Series C Investment closed, even though he knew that IRL had a significant relationship with Format Agency and that Sutyak controlled Format Agency.  The timing of the employment offer shows that Shafi wanted to take every possible step to hide from SoftBank the true role of Format Agency.

---

[28]    "sms" refers to text-messages supposedly sent by IRL to engage its purported users.

181. In fact, Abraham Shafi knew that Sutyak was already working for IRL from before the Series C Investment. Sutyak was assigned his own email address with an IRL domain before discussions about SoftBank's Series C Investment began. Indeed, at the time that this Action was initiated, Michael Sutyak's LinkedIn profile stated that he was "Head of Growth" at "Memix" beginning in October 2020.[29]

182. Abraham Shafi's bad-faith failure to disclose that Format Agency's sole employee was also acting as an IRL employee was an actionable omission based on the related party questions during SoftBank's due diligence and the Section 2.11(a) in the Primary Purchase Agreement. It was also the exact type of information that IRL was required to disclose under Section 2.21 of the Primary Purchase Agreement, which represented that it had "made available to [SoftBank] all the information that would reasonably be required for deciding whether to acquire the Shares."

183. Abraham Shafi's statements to SoftBank about IRL's growth methods were false and misleading, and made with scienter.

- Abraham Shafi knew IRL was spending on average over $760,000 dollars a month on user growth strategies from January 1, 2021 through May 1, 2021, but when SoftBank asked whether there had "been any paid user acquisition" at IRL, Abraham Shafi stated that IRL was only spending "about $50K a month in paid user acquisition" and that IRL was "[u]nlike other apps that spend aggressively to acquire new users."

- Abraham Shafi knew that IRL's growth spending was focused on generating large numbers of indiscriminate downloads through its relationships with AdAction and Mammoth Media, but when SoftBank asked about IRL's "current user acquisition channels" he told SoftBank that IRL's spending was "mainly to seed new geos" and failed to disclose IRL's relationships with those agencies.

- Abraham Shafi knew that Mammoth Media's charge to IRL per *app download* (which did not guarantee actual use of the app) was $1.50, but he told SoftBank IRL's CAC was "~$0.50." Abraham Shafi has himself admitted this representation was false and that IRL's CAC was actually $1.35, not $0.41.

---

[29] Memix was a separate app launched by IRL in December 2022. Sutyak continues to hold himself out as having served as a "Director, Growth & Product" at a "Tech Unicorn" starting in October 2020.

- Abraham Shafi told SoftBank—also in response to SoftBank's questions about "user acquisition channels"—that IRL's growth was "predominantly" through a "free organic channel" and IRL had "not focused on massive top line growth," but failed to disclose that, in fact, IRL spent heavily (approximately 10% of all investor capital raised at the time of the Series C) on incent advertising.

### ***Related-Party Payments to Entities Controlled by Defendants Are Revealed***

184. The Special Committee's review of Company spending extended beyond Abraham Shafi's personal expenses. The Special Committee identified multiple entities which were controlled by IRL insiders and were receiving payments from the Company at the time of the Series C Investment. Each of these entities should have been disclosed to SoftBank.

185. First, "Live Awake, Inc." is a California Corporation with Abraham Shafi listed as its registered agent and Abraham Shafi's personal address (from the shell entity's founding until March 4, 2022) listed as its place of business. Between January 7, 2020 and March 29, 2021, IRL paid Live Awake, Inc. at least $620,000 dollars in a series of 20 payments labeled as alternatively for "contractors" or "payroll & salary & wages."

186. Despite Abraham Shafi appearing to control Live Awake Inc., and IRL paying Live Awake Inc. hundreds of thousands of dollars, Live Awake Inc. was not disclosed in Section 2.10 of the disclosure schedule. Nor did Abraham Shafi disclose the payments to Live Awake Inc. to SoftBank during the due diligence process.

187. Second, "Socialite Studios" is affiliated with Genrikh Khachatryan. From January 2020 to May 2021, IRL paid Socialite Studios at least $234,215.91 for "consulting" services. Socialite Studios also was not disclosed in Section 2.10 of the disclosure schedule, and Abraham Shafi did not disclose the payments to Socialite Studios to SoftBank during the due diligence process.

188. Third, "App Inc." is a Delaware corporation affiliated with Noah Shafi and Yassin Aniss. App Inc.'s California subsidiary was created by Noah Shafi and lists Noah Shafi as its CEO and CFO. From January 2020 to May 2021, IRL paid App Inc. at least $294,000, largely in response to unaddressed invoices for "So. ware Services." App Inc. was not disclosed in Section 2.10 of the disclosure schedule, and Abraham Shafi did not disclose the payments to App Inc. to SoftBank during the due diligence process.

189.    Fourth, "Machine Learning LLC" is controlled by Shehab Amin.  From January 2020 to December 2020, IRL paid Machine Learning LLC at least $35,103.93.  In June 2021, IRL paid Machine Learning LLC $500,000.  A "Consulting Agreement" between "Machine Learning Incorporated" and IRL is disclosed in Section 2.10 of the disclosure schedule.  But Amin's control over the entity was not disclosed to SoftBank as a related party transaction.

190.    The non-disclosure of these payments to shell entities controlled or affiliated with co-founders of the Company and family members of Abraham Shafi is wholly inconsistent with IRL's representation, made on information and belief at the direction of Abraham Shafi, that IRL lacked any material undisclosed relationships with its officers and directors, and that it had "no other related party arrangements" besides "prior investor side letters."

191.    It is also inconsistent with the Primary Purchase Agreement, which required disclosure of "understandings" with "officers, directors, consultants or Key Employees, or any Affiliate thereof."  Each of these affiliated entities received numerous payments over time, often for services IRL classified as "consulting."

192.    At the time of the Series C Investment, IRL had only 15 employees.  That five of them were being paid tens and even hundreds of thousands of dollars through shell entities would have been material to SoftBank (as it would to any investor).  It was information exclusively in the possession of Defendants, yet was not disclosed to SoftBank.

### *Destruction of Evidence by Defendants and their Co-conspirators is Revealed*

193.    The Special Committee's investigation also revealed that Defendants Abraham Shafi, Yassin Aniss, and Shehab Amin, and non-party co-conspirators Alia Shafi and Jacob Shafi, took coordinated steps to conceal Defendants' scheme and the true nature of IRL.

194.    To assess whether Defendants deleted information from their personal devices, Stroz Friedberg relied on a TransPerfect image of Abraham Shafi's iPhone and itself imaged Yassin Aniss's iPhone and MacBook, Shehab Amin's iPhone, Alia Shafi's iPhone and MacBook Pro, and Jacob Shafi's iPhone and MacBook.  Stroz Friedberg used two "industry-standard forensic imaging tools" to image the devices:  Cellebrite UFED 4PC (for mobile devices) and Cellebrite Digital Collector (for MacBook devices).

195.   On June 15, 2023 Stroz Friedberg issued a *Forensic Review of Key Devices Final Report* (the "Stroz Report") (Exhibit B), the Stroz Report found that these Defendants had each taken steps to conceal information.

196.   Specifically, the Stroz Report's findings included:

- Between October and December 2022, Abraham Shafi, Yassin Aniss, Shehab Amin, and Jacob Shafi all restored their mobile devices from a backup, within three months of each other. Each restoration was in advance of the collection of the phone by the Special Committee and was after the announcement of the SEC investigation. In particular, Abraham Shafi restored his phone from a backup only two days before it was to be imaged as part of IRL's response to the SEC investigation.

- Between August 22, 2022 and September 1, 2022 (the days after the announcement of the SEC investigation), Aniss, Jacob Shafi, and Alia Shafi all deleted certain text messages. For example, Alia Shafi deleted one message sent or received on August 22, 2022—the date of the SEC Subpoena.[30]

- Between August 22, 2022 and August 30, 2022, improbably, there were no identifiable communications between Abraham Shafi, Aniss, Amin, and Alia Shafi.

197.   Restoring a mobile device from a backup is a way to conceal data created or modified on the device between the date of the backup and the date of the restoration. The Stroz Report noted that it is unusual for four out of five devices in a given analysis to have been restored from a backup within a short timeframe, as such restorations are usually reserved for "when a new phone is purchased or a phone needs to be reset due to a significant malfunction." By restoring their devices before they were imaged as part of the investigation, Abraham Shafi, Yassin Aniss, Shehab Amin, and Jacob Shafi concealed data from the investigation.

198.   Deleted messages and a lack of any identifiable communications for certain periods strongly suggests that Defendants were attempting to cover up certain discussions related to the SEC investigation.

---

[30]   To determine whether Defendants' deleted messages, Stroz Friedberg reviewed the "sms.db" database in each of the iPhones. As Stroz Report explained, "[t]he sms.db database has multiple tables that keep track of SMS and iMessages sent or received on the device. . . . Those messages are stored in databases within the application's folders on the device. Each time an SMS or iMessage is sent or received, it is assigned a consecutive ID number in the messages table in the sms.db database. Once removed from the database table, the records of who, when, and what is deleted are lost. As a result, missing rows are the main indicia of deleted SMS and iMessages."

199.   The Stroz Report also found that Alia Shafi's mobile device had only two entries related to internet activity between August 22, 2022 and August 30, 2022.  Those entries included (i) a Google search for the term "SEC"; and (ii) a visit to a web page related to the trial of former executives of Theranos, another startup company that infamously defrauded investors by making false claims about its products.

200.   Finally, the Stroz Report found that Jacob Shafi had deleted a user account named "jacobshafi1994" off of his MacBook on April 5, 2023, the day before the device was imaged. Stroz Friedberg was unable to recover any data from this profile due to the deletion.

### *IRL's Share Value Evaporates and Plaintiff's Investment Value Vanishes*

201.   On June 23, 2023, a letter from IRL's acting CEO reported to IRL shareholders that an investigation conducted by counsel to the Special Committee identified the following "areas of concern":

- "Expert analysis showed that 95% of identified users were in fact automated or from bots, not authentic, human users."

- "Substantial evidence to show that former CEO and co-founder Abraham Shafi caused millions of dollars in personal expenses to be charged to or otherwise accrued by the company."

- "Circumstantial evidence to show that Abraham Shafi and certain members of his family failed to comply with document preservation obligations and took steps to delete documents and other materials potentially relevant to the SEC investigation as well as the Special Committee's inquiries."

202.   The same day, the IRL board of directors unanimously voted, and SoftBank voted with the requisite number of IRL shareholders, to dissolve the company under Delaware law and return any remaining assets to shareholders.  IRL's website and app went offline for good four days later.  Today, the Company has approximately $30 million remaining, none of which has been distributed to investors.  Government investigations against the Company remain ongoing.

### *Conclusion*

203.   IRL's demise made abundantly clear that SoftBank's decision to invest in the Company was the result of fraud by Defendants.  Abraham Shafi knowingly made or caused IRL to make misrepresentations and omissions across six categories of issues material to SoftBank for

reasons described above. Now, the realization of those misrepresentations and omissions left IRL worthless and Defendants enriched.

204. ***First,*** Abraham Shafi made knowing misrepresentations and omissions—and caused IRL to make material misrepresentations and omissions—to SoftBank concerning IRL's user metrics, including: IRL's MAUs, WAUs, and DAUs; IRL's user growth rate; IRL's user demographics; and IRL's DAU/MAU ratio.

205. The overnight collapse of IRL's active users, the millions of groups with identical group names and activity, and the number of identically, nonsensically named groups show that IRL's users were largely bots in spring 2023. Keystone's detailed findings based on IRL's users' IP addresses, which it obtained from IRL's own internal data, show that IRL was riddled with bots from at least June 2022 to spring 2023, and there is no indication that this did not stretch back earlier in time. Whistleblower reports show that IRL's users were virtually all illegitimate as early as March 2022. Credit card statements show IRL spent tens of thousands of dollars on proxy services which enable bots from at least September 2021. And in March 2021, the CEO of Mammoth Media remarked to Abraham Shafi that a flood of bots onto IRL was causing "millions" of fake group joins. Each of these facts point to the same conclusion: IRL lacked users at the time of the Series C Investment, and Abraham Shafi's user metrics representations were false and misleading.

206. Defendants controlled IRL's user data prior to the Series C Investment until Abraham Shafi's suspension. Unlike most IRL employees, they had access to IRL's active user dashboard. Widespread artificial user activity on IRL would have been obvious to any observer, let alone to software engineers like Defendants. Not only were Abraham Shafi's and IRL's user metrics representations to SoftBank false, Defendants had exclusive access to this information and failed to disclose it to SoftBank.

207. ***Second***, Abraham Shafi, with the knowledge of Yassin Aniss, made knowing misrepresentations and omissions to SoftBank concerning multiple points related to the measurement of IRL's users, including: (i) the cause of periodic changes in IRL's user growth

was "seasonality" and (ii) third-party reports of IRL's downloads didn't align with IRL's purported active user metrics because of IRL's web presence and its user demographics.

208.    As IRL's users were not real, their behavior couldn't be modified by "seasonality." As IRL's users were not real, they couldn't be so young as not to be tracked.

209.    **Third**, Abraham Shafi made knowing misrepresentations and omissions to SoftBank concerning IRL's spending and user base growth methods.

210.    Abraham Shafi's representation that IRL spent approximately $50,000 monthly on user growth was false because IRL was spending (with the knowledge of and at the direction of Abraham Shafi) approximately $180,000 monthly with AdAction alone from December 2019 to May 2021 and approximately $425,000 monthly with Mammoth Media alone from January 2021 to May 2021.  Abraham Shafi's representations that IRL's CAC was approximately $0.50 were false by his own admission a year and a half later.  Abraham Shafi's representations that IRL's growth was "predominantly" "organic," that IRL had "not focused on massive top line growth," and that IRL's growth spending was focused on "seeding new geos" misleadingly omitted that IRL had spent almost $3.2 million (10% of all capital raised over the lifetime of the Company) on incent advertising and $4.95 million (15% of all capital raised over the lifetime of the Company) on growth just between AdAction and Mammoth Media.

211.    SoftBank even asked Abraham Shafi during its diligence process to name the places where IRL had "deployed marketing spend," yet he omitted to disclose payments to AdAction and Mammoth Media.

212.    **Fourth**, Abraham Shafi knowingly caused IRL to make misrepresentations and omissions to SoftBank concerning IRL's related-party relationships.

213.    While Abraham Shafi caused IRL to tell SoftBank that it lacked "understandings" and "agreements" with its officers, directors, contractors, and Key Employees, in reality, IRL paid shell entities affiliated with each of Defendants collectively over $1 million in addition to their IRL salaries prior to the Series C Investment.  With the exception of the entity affiliated with Shehab Amin (whose affiliation with that entity was not disclosed to SoftBank) none of these entities were disclosed to SoftBank at all in connection with the Series C Investment.

214. Defendants knew or were reckless in not knowing that these entities were not disclosed on the Disclosure Schedule to the Primary Purchase Agreement and knew or were reckless in not knowing that SoftBank lacked access to information disclosing the "understandings" and "agreements" between SoftBank and these entities. Defendants concealed payments to these entities because they knew that payments of hundreds of thousands of dollars of corporate assets to entities controlled by Defendants—IRL insiders—would have raised red flags. Defendants completely failed to disclose these payments.

215. Abraham Shafi further delayed Sutyak's official hiring as IRL's Head of Growth to one day after the Series C Investment closed to avoid additional disclosures of Format Agency and its relationship to Sutyak. This bad faith maneuvering also was a material omission.

216. *Fifth*, Abraham Shafi made knowing misrepresentations and omissions—and caused IRL to make misrepresentations and omissions—to SoftBank concerning IRL's definition of an "active user" and "session."

217. Abraham Shafi never told SoftBank that IRL's active user definition had changed over time. Abraham Shafi told *The Information* that IRL's definition of an active user included those who "interact with [IRL] through email and text messages or via Google Calendar." This was inconsistent with his and IRL's representations that an individual must open and engage with IRL's web platform or app to be counted as an "active user." It is not apparent where in IRL's log of active users this change occurred.

218. Defendants controlled IRL's user data from prior to the Series C Investment until Abraham Shafi's suspension, and they had access to IRL's active user dashboard. IRL's reliance on an overly expansive definition of active users, which was inconsistent with the definition reported to SoftBank, therefore should have been obvious to them, as it was to internal whistleblowers whose access to user data was restricted. Not only were Abraham Shafi's and IRL's representations about IRL's active user definition false, Defendants had exclusive access to this information and failed to disclose it to SoftBank.

SULLIVAN & CROMWELL LLP

219. **Sixth**, Abraham Shafi knowingly caused IRL to make misrepresentations to SoftBank that IRL had disclosed all material information to SoftBank and IRL had properly disclosed its financial position. But IRL failed to disclose the many issues discussed above.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*(Asserted Against Abraham Shafi)*
Securities Fraud under Section 10(b) and Rule 10b-5

220. Plaintiff hereby incorporates paragraphs 1 through 219 by reference, as if set forth fully herein.

221. Section 10(b) of the Securities Exchange Act of 1934 provides that it "shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

222. Rule 10b-5 adopted by the U.S. Securities and Exchange Commission provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [all] in connection with the purchase or sale of any security."

223. Abraham Shafi misrepresented and omitted to disclose to Plaintiff facts concerning IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's definition of a "session" and "MAU," and IRL's broad representations in the Primary Purchase Agreement. These facts were material to Plaintiff's

purchase of $150 million of IRL Series C Preferred Shares in total and $7.5 million in IRL common stock from Abraham Shafi personally.[31]

224.    Through the conduct alleged herein, Abraham Shafi directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to fraudulently create and conceal material information.

225.    Through the conduct alleged herein, Abraham Shafi knowingly:    (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

226.    The misconduct by Abraham Shafi was in connection with the purchase or sale of securities because Plaintiff directly acquired ownership of 6,629,775 IRL Series C Preferred Shares in total and 333,362 IRL common stock from Abraham Shafi personally.

227.    Plaintiff was deceived into paying $7.5 million to Abraham Shafi personally and $150 million to IRL and other IRL personnel in total by the devices, schemes or artifices to defraud that Abraham Shafi deployed.

228.    In purchasing IRL Series C Preferred Shares, Plaintiff reasonably and justifiably relied on the knowingly false representations that Abraham Shafi made during the diligence process and which he caused IRL to make in the Primary Purchase Agreement.

229.    The misconduct by Abraham Shafi caused Plaintiff to pay an artificially inflated $150 million purchase price for 6,629,775 IRL Series C Preferred Shares in total and $7.5 million for 333,362 IRL common stock from Abraham Shafi personally, and directly and proximately damaged Plaintiff in an amount to be determined at trial.

---

[31]    All references to dollar values in these claims are approximate.

## SECOND CLAIM FOR RELIEF
*(Asserted Against Abraham Shafi)*
<u>Control Person Violation under Section 20(a)</u>

230. Plaintiff hereby incorporates paragraphs 1 through 229 by reference, as if set forth fully herein.

231. Abraham Shafi acted as a controlling person of IRL within the meaning of Section 20(a) of the Exchange Act. Abraham Shafi was a co-founder of the company, a member of the Board of Directors, and the Chief Executive Officer.

232. Through his control position, Abraham Shafi knowingly caused IRL to issue false representations and warranties to Plaintiff including, but not limited to, the representations and warranties made in Sections 2.8(e), 2.11(a), 2.21, and 2.23 of the Primary Purchase Agreement. In doing so, Abraham Shafi caused IRL to violate Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

233. Plaintiff reasonably and justifiably relied on those false representations and warranties in entering into the May 18, 2021 purchase agreements and in agreeing to pay $150 million for 6,629,775 IRL Series C Preferred Shares in total and $7.5 million for 333,362 IRL common stock from Abraham Shafi personally.

234. As a direct and proximate result of Abraham Shafi's wrongful conduct, Plaintiff suffered damages in connection with its purchase of IRL Series C Preferred Shares to be determined at trial.

## THIRD CLAIM FOR RELIEF
*(Asserted Against Abraham Shafi)*
<u>Fraud in Sale of Securities in Violation of California Corporations Code §§ 25401 and 25501</u>

235. Plaintiff hereby incorporates paragraphs 1 through 234 by reference, as if set forth fully herein.

236. California Corporations Code § 25401 provides, in pertinent part, as follows: "It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."

none

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

237.     California Corporations Code § 25501 provides, in pertinent part, as follows: "Any person who violates Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security) . . . . Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff."

238.     Abraham Shafi repeatedly represented Plaintiff that he was a resident of California in the Secondary Purchase Agreement, the Amended and Restated Voting Agreement which accompanied the Series C Investment, and in a know-your-customer ("KYC") form that he executed in connection with the sale of his IRL shares. Abraham Shafi told Plaintiff that he was in Berkeley, California during SoftBank's due diligence of IRL. Abraham Shafi was present in California when he made offered sale of IRL shares and SoftBank accepted his offer. SoftBank employees were present in California when Abraham Shafi offered sale of IRL shares to SoftBank and SoftBank accepted his offer. IRL was headquartered in California at the time of the Series C Investment. SoftBank maintained an office in California at the time of the Series C Investment.

239.     Abraham Shafi misrepresented and omitted to disclose to Plaintiff facts concerning IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's definition of a "session" and "MAU," and IRL's broad representations in the Primary Purchase Agreement. These facts were material to Plaintiff's Series C Investment in IRL and purchase of $150 million of IRL Series C Preferred Shares in total and $7.5 million in IRL common stock from Abraham Shafi personally.

240.     The misrepresentations and omissions by Abraham Shafi were in connection with the "offer or s[ale]" of securities because, based on Abraham Shafi's direct representations, Plaintiff directly acquired ownership of 6,629,775 of IRL Series C Preferred Shares in total and 333,362 IRL shares of IRL common stock from Abraham Shafi personally.

241. Had Abraham Shafi not knowingly misrepresented and omitted material information, Plaintiff would not have signed and closed the Series C, and purchased $150 million of IRL Series C Preferred Shares in total and $7.5 million of IRL common stock from Abraham Shafi personally.

242. As a direct and proximate result of Abraham Shafi's knowing misstatements and omissions, Plaintiff suffered losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
*(Asserted Against Genrikh Khachatryan, Noah Shafi, Yassin Aniss, and Shehab Amin)*
Joint and Several Liability Pursuant to California Corporations Code § 25504

243. Plaintiff hereby incorporates paragraphs 1 through 242 by reference, as if set forth fully herein.

244. California Corporations Code § 25504 provides, in pertinent part, as follows: "every principal executive officer or director [and every person occupying a similar status or performing similar functions] of a corporation so liable [under California Corporations Code § 25501], . . . [and] every employee of a person so liable [under California Corporations Code § 25501] who materially aids in the act or transaction constituting the violation . . . are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

245. As set forth above, Abraham Shafi violated California Corporations Code § 25501.

246. IRL violated California Corporations Code § 25501 because, as a Corporation headquartered in California, IRL made false representations and warranties to Plaintiff including, but not limited to, the representations and warranties made in Sections 2.8(e), 2.11(a), 2.21, and 2.23 of the Primary Purchase Agreement.

247. Each of Defendants was a principal executive officer of IRL. Genrikh Khachatryan was a co-founder of IRL at the time of Series C Investment, and the knowledge of the Company was defined to include his knowledge. Noah Shafi was part of IRL's Founding Team and was IRL's Head of Engineering at IRL at the time of the Series C Investment. Yassin Aniss was part

1 of IRL's Founding Team. Shehab Amin was a data engineer who was soon to become IRL's Head

2 of Data Engineering.

3     248.    Each of Defendants was an IRL employee at the time of the Series C Investment.

4     249.    Each of Defendants aided in Abraham Shafi's fraud. They each received related-

5 party payments through shell entities. Noah Shafi, Yassin Aniss, and Shehab Amin held back-end

6 engineering positions. All had access to IRL user data. All had access to IRL's active user

7 dashboard. Yassin Aniss aided in Abraham Shafi's response to SoftBank's questions about third

8 party verification of IRL's user base. Khachatryan aided IRL in responding to SoftBank's due

9 diligence questions. Within a few months of the Series C Investment, Noah Shafi spent tens of

10 thousands of dollars on proxy services and an AWS server which enabled the placement of bots

11 on IRL. Yassin Aniss and Shehab Amin would go on to destroy evidence to enable the

12 continuation of the scheme.

13     250.    As a result of Defendants material assistance to Abraham Shafi's fraud under

14 California Corporations Code § 25501, Defendants are jointly and severally liable to SoftBank for

15 damages to be determined at trial.

16 **FIFTH CLAIM FOR RELIEF**
*(Asserted Against Abraham Shafi)*

17 Fraud Within the Contract

18     251.    Plaintiff hereby incorporates paragraphs 1 through 250 by reference, as if set forth

19 fully herein.

20     252.    As set forth above, Abraham Shafi caused IRL to issue false representations and

21 warranties in the Primary Purchase Agreement, including, but not limited to, the representations

22 and warranties made in Sections 2.8(e), 2.11(a), 2.21, and 2.23.

23     253.    Abraham Shafi caused IRL to make these misrepresentations to Plaintiff with actual

24 knowledge of their falsity. Abraham Shafi induced Plaintiff to close the Series C and pay $7.5

25 million to Abraham Shafi personally and $150 million for IRL stock in total.

26     254.    Abraham Shafi was a co-founder, director, and the CEO of IRL. By virtue of his

27 position of authority and control, Abraham Shafi had the ability to, and did in fact, control the

28

contents of the Primary Purchase Agreement, including in particular the contents of the representations and warranties made by IRL.

255.    False representations and warranties by IRL in the Primary Purchase Agreement caused Plaintiff to participate in the Series C and, in particular, purchase $7.5 million of IRL common stock from Abraham Shafi personally and $150 million of IRL stock in total.

256.    Plaintiff reasonably and justifiably relied on the representations and warranties that Abraham Shafi caused IRL to make in the Primary Purchase Agreement.

257.    As a result of this reliance, Plaintiff sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
*(Asserted Against all Secondary Sellers)*
<u>Fraud Outside of the Contract</u>

258.    Plaintiff hereby incorporates paragraphs 1 through 257 by reference, as if set forth fully herein.

259.    As set forth above, Abraham Shafi misrepresented and omitted to disclose to Plaintiff material facts concerning IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, and IRL's definition of "session" and "MAU."

260.    Abraham Shafi made these misrepresentations and omissions to Plaintiff with actual knowledge of their falsity.

261.    Plaintiff relied on Abraham Shafi's misrepresentations and omissions, and was induced by them to enter the Series C Investment and pay $7.5 million to Abraham Shafi personally and $150 million for IRL stock in total.

262.    Plaintiff also reasonably and justifiably relied on the representations and warranties that Abraham Shafi caused IRL to make in the Primary Purchase Agreement.

263.    As a result of this reliance, Plaintiff sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### *(Asserted Against all Secondary Sellers)*
Fraudulent Concealment

264. Plaintiff hereby incorporates paragraphs 1 through 263 by reference, as if set forth fully herein.

265. During the due diligence process, Plaintiff relied on the accuracy of Abraham Shafi's and IRL's statements regarding IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's definition of an "active user," and IRL's broad representations in the Primary Purchase Agreement.

266. Secondary Sellers knew about related-party payments and knew that they were not properly disclosed on the disclosure schedule. Plaintiff did not have access to this information. Yet, Secondary Sellers failed to reveal this information to Plaintiff.

267. Secondary Sellers had access to the very backend information that would have revealed the truth about IRL's user data and IRL's definition of "session" and "MAU." Plaintiff did not have access to this information. Secondary Sellers also did not disclose this information to Plaintiff.

268. Secondary Sellers had access to dashboards that would have revealed the truth about IRL's user data and IRL's definition of an "session" and "MAU." Plaintiff did not have access to this information. Secondary Sellers failed to reveal this information to Plaintiff as well.

269. Had Plaintiff been provided with *any* of the above information, it would not have signed and closed the Series C and purchased the $17.5 million of IRL common stock from the Secondary Sellers personally and $150 million of IRL stock in total.

270. As a result of this reliance, Plaintiff sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

## **EIGHTH CLAIM FOR RELIEF**
### *(Asserted Against all Secondary Sellers)*
Conspiracy to Commit Fraud

271. Plaintiff hereby incorporates paragraphs 1 through 270 by reference, as if set forth fully herein.

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

272. Defendants agreed to, and did in fact work together in, an ongoing scheme to defraud Plaintiff by fraudulently inducing Plaintiff into purchasing $17.5 million of IRL common stock from the Secondary Sellers and purchasing $150 million of IRL stock in total, misrepresenting IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's definition of an "active user," and IRL's broad representations in the Primary Purchase Agreement.

273. Defendants committed the overt acts described above in furtherance of their conspiracy.

274. As a result of Defendants' conduct, Plaintiff sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
*(Asserted Against Defendants)*
<u>Aiding and Abetting Fraud</u>

275. Plaintiff hereby incorporates paragraphs 1 through 274 by reference, as if set forth fully herein.

276. As set forth above, Defendants aided and abetted Abraham Shafi's scheme to defraud Plaintiff by fraudulently inducing Plaintiff into purchasing $17.5 million of IRL common stock from the Secondary Sellers and purchasing $150 million of IRL stock in total by misrepresenting IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's definition of an "active user," and IRL's broad representations in the Primary Purchase Agreement. Defendants also aided and abetted the Secondary Sellers' fraudulent concealment.

277. Defendants engaged in this conduct with actual knowledge that the representations that they made, enabled one another to make, and caused IRL to make to Plaintiff were false and misleading.

278. Defendants' conduct was intended to, and did in fact, induce Plaintiff to sign and close the Series C and purchase $17.5 million of IRL common stock from the Secondary Sellers and $150 million of IRL stock in total at an inflated price. Each of Defendants provided substantial assistance in furtherance of the scheme to defraud Plaintiff.

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

279. Plaintiff reasonably and justifiably relied on the information Defendants provided and the misrepresentations they caused IRL to make when Plaintiff signed and closed the Series C and purchased approximately $17.5 million of IRL common stock from Secondary Sellers and $150 million of IRL stock in total at an inflated price.

280. As a result of this reliance, Plaintiff sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

### TENTH CLAIM FOR RELIEF
*(Asserted Against all Secondary Sellers)*
<u>Unjust Enrichment</u>

281. Plaintiff hereby incorporates paragraphs 1 through 279 by reference, as if set forth fully herein.

282. As set forth above, Abraham Shafi and IRL made numerous false representations and warranties concerning IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, and IRL's definition of "session" and "MAU," and IRL's broad representations in the Primary Purchase Agreement.

283. Abraham Shafi and IRL made these misrepresentations to Plaintiff with knowledge of their falsity, with the intent to induce Plaintiff to invest an inflated $150 million in IRL and pay Secondary Sellers approximately $17.5 million based on an overblown $1 billion valuation.

284. Plaintiff reasonably and justifiably relied on the information Abraham Shafi and IRL provided and the misrepresentations Defendants made when Plaintiff invested in IRL for the inflated amount of $150 million.

285. Secondary Sellers were each unjustly enriched by directly receiving millions of dollars for IRL Common Stock that Plaintiff was induced to purchase through fraud. Together, Secondary Sellers received a total of approximately $17.5 million that they would not have received but for their misconduct.

286. As a result of Secondary Sellers' conduct, Plaintiff suffered losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

SULLIVAN & CROMWELL LLP

AMENDED COMPLAINT

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff therefore pray for the following relief:

a.     Awarding Plaintiff compensatory damages, in an amount to be determined at trial, but in any event will exceed $150 million;

b.     Awarding Plaintiff rescission of the Secondary Purchase Agreement;

c.     Awarding Plaintiff punitive damages;

d.     Awarding Plaintiff costs and reasonable attorneys' fees; and

e.     Such other and further relief that the Court deems just and proper.

Dated:        June 3, 2024          **SULLIVAN & CROMWELL LLP**

By _/s/ Brendan P. Cullen_
Brendan P. Cullen (SBN 194157)
Alexander J. Willscher (*pro hac vice*)
Martin Erreich (*pro hac vice*)

Counsel for Plaintiff *SVF II Aggregator (DE) LLC*

## JURY DEMAND

Plaintiff SVF II Aggregator (DE) LLC demands a trial by jury.

Dated:          June 3, 2024                    **SULLIVAN & CROMWELL LLP**

                                                By: _/s/ Brendan P. Cullen_
                                                Brendan P. Cullen (SBN 194157)
                                                Alexander J. Willscher (*pro hac vice*)
                                                Martin Erreich (*pro hac vice*)

                                                Counsel for Plaintiff *SVF II Aggregator (DE) LLC*

AMENDED COMPLAINT