Kalpana Srinivasan (CA Bar No. 237460)
**SUSMAN GODFREY L.L.P**.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310)789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

Stephen Shackelford, Jr (*pro hac vice*)
Shawn Rabin (*pro hac vice*)
Eve Levin (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
srabin@susmangodfrey.com
elevin@susmangodfrey.com

Kemper Diehl (*pro hac vice*)
**SUSMAN GODFREY L.L.P**.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 373-7382
Facsimile: (206) 516-3883
kdiehl@susmangodfrey.com

*Attorneys for Defendant Abraham Shafi*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SVF II AGGREGATOR (DE) LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ABRAHAM SHAFI, GENRIKH KHACHATRYAN, YASSIN ANISS, NOAH SHAFI, and SHEHAB AMIN,<br><br>Defendants. | Case No.: 4:23-cv-03834-YGR<br><br>**DEFENDANTS' OMNIBUS NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Date: November 5, 2024<br>Time: 2:00PM<br><br>ORAL ARGUMENT REQUESTED |

**NOTICE OF MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on November 5, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Oakland Federal District Courthouse, 1301 Clay Street, Oakland, California, Courtroom 1, before the Honorable Yvonne Gonzalez Rogers, Defendants Abraham Shafi, Genrikh Khachatryan, Yassin Aniss, Noah Shafi, and Shehab Amin ("Defendants") will, and hereby do, move this Court to dismiss the Amended Complaint filed by Plaintiff SVF II Aggregator (DE) LLC ("Plaintiff" or "SoftBank") pursuant to Rules 12(b)(6), 8(a), and 9(b) of the Federal Rules of Civil Procedure.  ECF No. 70.

Defendants seek an order dismissing the Complaint on the grounds that Plaintiff has failed to plead claims against them upon which relief can be granted given Plaintiff's failure to satisfy the heightened pleading standards of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, and on the grounds that Plaintiff has failed to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated:  August 6, 2024                                Respectfully Submitted,

                                                      By:   *Stephen Shackelford, Jr.*

Adam J. Fee (SBN 345075)
Ben Nicholson (SBN 317970)
**PAUL HASTINGS LLP**
1999 Avenue of the Stars, 27th Floor
Century City, CA, 90067
adamfee@paulhastings.com
bennicholson@paulhastings.com

*Counsel for Defendants Yassin Aniss,*
*Noah Shafi, and Shehab Amin*

Stephen Shackelford, Jr. (*pro hac vice*)
Shawn Rabin (*pro hac vice*)
Eve Levin (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
srabin@susmangodfrey.com
elevin@susmangodfrey.com

Rees F. Morgan (SBN 229899)
Mark L. Hejinian (SBN 281417)
**COBLENTZ PATCH DUFFY & BASS LLP**
One Montgomery Street, Suite 3000
San Francisco, CA  94104
ef-rfm@cpdb.com
ef-mlh@cpdb.com

*Counsel for Defendant*
*Genrikh Khachatryan*

Kemper Diehl (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 373-7382
Facsimile: (206) 516-3883
kdiehl@susmangodfrey.com

Kalpana Srinivasan (CA Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310)789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

*Attorneys for Defendant Abraham Shafi*

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

ARGUMENT ..................................................................................................................5

I.    SoftBank fails to state a claim under federal law. 5

      A.    Purported Misrepresentations Concerning User Data (Statements 1, 2, 6, and 13) 6

            1.    SoftBank's supporting allegations fail to raise an inference of falsity. ..... 7

            2.    SoftBank cannot rely on the Keystone Report to allege falsity. .............. 14

            3.    SoftBank's remaining allegations do not support a strong inference of scienter. ................................................................................................ 19

      B.    Statements Regarding Measurement of User Data (Statements 5, 7, and 8) ....... 23

      C.    Statements About User Growth (Statements 3 and 10) ...................................... 24

      D.    Payments to Allegedly Affiliated Entities (Statements 11 and 14) .................... 27

      E.    The Definition of "Session" and "MAU" (Statements 4, 9, and 12) ................. 30

      F.    Broad Representations in the Primary Purchase Agreement
            (Statements 15 and 16) ................................................................................... 32

II.   This Court should dismiss SoftBank's state law claims. ...................................................33

      A.    This Court should decline to exercise jurisdiction over SoftBank's state law claims
            and dismiss them as to all Defendants. ................................................................ 33

      B.    This Court should dismiss SoftBank's state law claims against all Defendants on
            the merits because they are based on the same defective theory as the
            federal claims. ................................................................................................ 34

      C.    Each state law claim fails for numerous individual reasons. .............................. 35

            1.    The Amended Complaint fails to state a claim for fraudulent
                  concealment. ...................................................................................... 35

                  a.    The Amended Complaint does not allege that Yassin, Noah, or Mr.
                        Khachatryan concealed or suppressed a material fact. ................. 35

                  b.    The Amended Complaint does not allege actionable nondisclosure
                        by Yassin, Noah, or Mr. Khachatryan........................................... 37

                  c.    The Amended Complaint fails to sufficiently allege scienter. ...... 38

                  d.    The Amended Complaint still fails to sufficiently allege SoftBank
                        suffered damage as a result of any alleged omission by Yassin or
                        Noah. ............................................................................................ 39

i

2.   The Amended Complaint fails to state a claim for conspiracy to commit fraud against Yassin, Noah, or Mr. Khachatryan. ..................................... 40

   a.   The Amended Complaint fails to allege any wrongful conduct in furtherance of the conspiracy. ....................................................... 41

   b.   The Amended Complaint fails to allege any damages arising from the alleged conduct. ......................................................... 42

   c.   Yassin, Noah, and Mr. Khachatryan are legally incapable of committing the tort of civil conspiracy because they did not owe a duty to plaintiff. ............................................................. 42

3.   The Amended Complaint still fails to state a claim for aiding and abetting fraud. ............................................................................................. 42

   a.   The Amended Complaint fails to allege substantial assistance. ... 43

   b.   The Amended Complaint fails to allege a breach of duty. ............ 44

4.   The Amended Complaint fails to state a claim for unjust enrichment against Yassin, Noah, or Mr. Khachatryan. ........................................................ 45

5.   Plaintiff fails to allege the Relative Defendants or Mr. Khachatryan is jointly and severally liable pursuant to California Corporations Code § 25504. ............................................................................................. 45

   a.   The Relative Defendants and Mr. Khachatryan were not principal executive officers. ........................................................ 45

   b.   The Relative Defendants and Mr. Khachatryan did not materially aid a primary violation. .................................................... 47

6.   The Amended Complaint fails to state a claim for fraud outside of the contract. ............................................................................... 49

CONCLUSION ..................................................................................................49

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdo v. Fitzsimmons,*
  No. 17-CV-00851-EDL, 2018 WL 11220494 (N.D. Cal. May 22, 2018) ............................ 44

*Abdo v. Fitzsimmons,*
  No. 17-CV-00851-TSH, 2021 WL 616324 (N.D. Cal. Feb. 17, 2021).................................. 47

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC,*
  70 Cal. App. 4th 226 (2007).................................................................................. 46, 47

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
  7 Cal. 4th 503 (1994) ............................................................................................... 41

*Balkowitsch v. D & M Dev., Inc.,*
  No. 2:15-CV-00196 JAM EF, 2015 WL 3403083 (E.D. Cal. May 27, 2015)............ 44, 45, 46

*Banc of Cal., NA v. McDonnell,*
  No. 18-cv-01194 AG, 2018 U.S. Dist. LEXIS 231608 (C.D. Cal. Nov. 9, 2018)................. 40

*Bank of Am. Corp. v. Superior Court,*
  198 Cal.App.4th 862 (2011)................................................................................ 34, 37

*Casey v. U.S. Bank Nat. Ass'n,*
  127 Cal.App.4th 1138 (2005)..................................................................................... 42

*Chang v. Interactive Brokers LLC,*
  No. 21-cv-05967 NC, 2021 U.S. Dist. LEXIS 227027 (N.D. Cal. Nov. 24,
  2021) ..................................................................................................................... 41

*Crypto Asset Fund, LLC v. Hoard, Inc.,*
  No. 20-CV-438-MMA (AHG), 2020 WL 13556129 (S.D. Cal. Dec. 14, 2020) ............. 44, 45

*Diaz v. Intuit, Inc.,*
  No. 15-cv-01778 EJD, 2017 U.S. Dist. LEXIS 162979 (N.D. Cal. Sep. 29,
  2017) ..................................................................................................................... 42

*E. Ohman J:or Fonder AB v. NVIDIA Corp.,*
  81 F.4th 918 (9th Cir. 2020), *certiorari granted, NVIDIA Corp. v. E. Ohman
  J:or Fonder AB,* No. 23-970 (U.S.), 2024 WL 3014476 .................................. 1, 2, 14, 15, 16

*Eckert v. PayPal Holdings, Inc.,*
  831 F. App'x 366 (9th Cir. 2020) .................................................................... 16, 18

i

*Egan v. Cnty. of Del Norte*,
No. 12-CV-05300 NJV, 2014 WL 46609 (N.D. Cal. Jan. 6, 2014)........................................ 33

*Esoimeme v. Wells Fargo Bank*,
No. 10-cv-2259 JAM EFB, 2011 U.S. Dist. LEXIS 98492 (E.D. Cal. Sep. 1,
2011) ............................................................................................................................ 40

*Fiol v. Doellstedt*,
50 Cal.App.4th 1318 (1996)........................................................................................ 42

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
771 F.3d 1119 (9th Cir. 2014)..................................................................................... 35

*Garcia v. GM Ltd. Liab. Co.*,
No. 18-cv-01313 LJO, 2018 U.S. Dist. LEXIS 208129 (E.D. Cal. Dec. 10,
2018) ............................................................................................................................ 37

*Gardensensor, Inc. v. Stanley Black & Decker, Inc.*,
No. 12-cv-03922 NC, 2012 WL 12925714 (N.D. Cal. Oct. 25, 2012) .................................. 38

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023).......................................................................................... 5

*Hammerling v. Google LLC*,
615 F.Supp.3d 1069 (N.D. Cal. 2022) ........................................................................ 44

*Hellum v. Breyer*,
194 Cal. App. 4th 1300 (2011)..................................................................................... 46

*Herron v. Best Buy Co. Inc.*,
924 F. Supp. 2d 1161 (E.D. Cal. 2013)........................................................................ 37

*Hershewe v. Joyy Inc.*,
2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) ............................................................. 16

*Impac Funding Corp. v. Endresen*,
No. 15-cv-588 JLS, 2015 U.S. Dist. LEXIS 200540 (C.D. Cal. Dec. 16, 2015).................. 42

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005), *abrogated on other grounds by Matrixx
Initiatives, Inc. v. Siracusano*, 536 U.S. 27 (2011) .............................................. 12

*In re Gap Stores Sec. Litig.*,
457 F. Supp. 1135 (N.D. Cal. 1978) ............................................................................ 45

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)....................................................................................... 5

ii

*In re Read-Rite Corp.*,
    335 F.3d 843 (9th Cir. 2003) ................................................................................... 6

*In re Robinhood Ord. Flow Litig.*,
    No. 4:20-CV-9328-YGR, 2022 WL 9765563 (N.D. Cal. Oct. 13, 2022)
    (Gonzalez Rogers, J.) ............................................................................................. 6

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
    No. C-05-0295PJH, 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ......................... 12

*In re Sunrise Techs. Sec. Litig.*,
    No. 92-cv-0948-TEH, 1992 U.S. Dist. LEXIS 18213 (N.D. Cal. Sep. 22, 1992) ................ 39

*Jackson v. Fischer*,
    931 F. Supp. 2d 1049 (N.D. Cal. 2013) ................................................................. 44

*Johnson v. Columbia Properties Anchorage, LP*,
    437 F.3d 894 (9th Cir. 2006) ................................................................................. 33

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ............................................................................. 19, 20

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ............................................................................ 5, 33

*Lentz v. Sanderson Farms, Inc.*,
    No. 19-cv-06570 RS, 2020 U.S. Dist. LEXIS 260468 (N.D. Cal. Feb. 10,
    2020) ..................................................................................................................... 44

*Lyondell Petrochemical Co. Sec. Litig.*,
    985 F.2d 573 (9th Cir. 1993) (unpublished) ........................................................... 6

*Moore v. Hagerty Ins. Agency*,
    LLC, No. 19-CV-05453-EMC, 2020 WL 7053262 (N.D. Cal. May 1, 2020) ....................... 48

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................... 14

*Ohio Six Ltd. v. Motel 6 Operating L.P.*,
    No. CV 11-8102 .................................................................................................... 35

*People v. Koenig*,
    58 Cal. App. 5th 771 (2020) .................................................................................. 46

*Persson v. Smart Inventions, Inc.*,
    125 Cal. App. 4th 1141, 23 Cal. Rptr. 3d 335 (2005) .......................................... 36

*Rhub Communs., Inc. v. Karon*,
    2017 U.S. Dist. LEXIS 124539 (N.D. Cal. Aug. 7, 2017) .................................... 34

iii

*Rogers Enters. v. Hitachi Sols. Am., Ltd.*,
No. 21-cv-913 PSG, 2022 U.S. Dist. LEXIS 25512 (C.D. Cal. Jan. 18, 2022) .......... 38, 39, 40

*Rosen v. Urb. Commons, LLC*,
No. SACV2001973JLSDFMX, 2021 WL 3264147 (C.D. Cal. July 23, 2021) ..................... 46

*Rudolph v. Utstarcom*,
560 F. Supp. 2d 880 (N.D. Cal. 2008) ................................................................. 21

*Scherer v. FCA US*,
565 F. Supp. 3d 1184 (S.D. Cal. 2021) ............................................................... 37

*Sgarlata v. PayPal Holdings, Inc.*,
409 F. Supp. 3d 846 (N.D. Cal. 2019) ................................................................ 16

*Sixa Operations, LLC v. Minchenko*,
No. 19-CV-04219-DMR, 2020 WL 13593704 (N.D. Cal. Aug. 28, 2020) .......................... 33

*Su v. Henry Glob. Consulting Grp.*,
20-cv-02235 ODW, 2022 U.S. Dist. LEXIS 736 (C.D. Cal. Jan. 3, 2022) ........................... 42

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ............................................................................ 40

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....................................................................................... 6

*Wasco Prods, Inc. v. Southwall Techs, Inc.*
435 F.3d 989 (9th Cir.) *cert. denied*, 549 U.S. 817 (2006) .................................... 40

*Webb v. Carter's, Inc.*,
No. CV087367GAFMANX, 2010 WL 11507254 (C.D. Cal. Apr. 1, 2010) ........................ 36

*Yijin Lu v. Deng*,
16-cv-07283 CAS, 2016 U.S. Dist. LEXIS 154395 (C.D. Cal. Nov. 7, 2016) ..................... 41

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..................................................................... *passim*

**Statutes**

15 U.S.C. § 78t(a) ........................................................................................ 5

28 U.S.C. § 1332 ........................................................................................ 33

California Corporations Code § 25401 ..................................................... 34, 44, 46, 47

California Corporations Code § 25504 ........................................................ 44, 45, 46

iv

1

Private Securities Litigation Reform Act ............................................................................. *passim*

Securities Exchange Act of 1934 Section 10(b) ................................................................ 5

**Rules**

Fed. R. Civ. P. 9(b) .............................................................................................................. *passim*

**Other Authorities**

Paddle, Frequently Asked Questions, https://www.paddle.com/about/why-has-
    paddle-charged-me (last accessed August 6, 2024) ................................................... 8

v

### MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff SVF II Aggregator (DE) LLC ("SoftBank") alleges that Abraham Shafi ("Abraham"), his co-founder Genrikh Khachatryan, and several of Abraham's family members (collectively, Defendants) hoodwinked the world's largest venture capital fund into believing their social-media platform IRL had over ten million monthly active users, while in reality—in SoftBank's telling—it had nearly none. SoftBank's Amended Complaint, like its first Complaint, alleges a sweeping fraud in which, for years, Abraham used a bot army to prop up his company, thereby tricking SoftBank into investing $150 million in May 2021 despite SoftBank's robust due diligence.

SoftBank's first attempt to allege this implausible fraud conspiracy failed to meet the stringent pleading standards under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), resulting in the Court's dismissal of all SoftBank's federal claims and most of its state-law claims.

SoftBank's initial Complaint, this Court explained, principally relied on the report of a consultant-for-hire, Keystone Strategy (the "Keystone Report"), and statements by various unnamed former employees. Dkt. No. 69 ("MTD Order") at 2. But SoftBank failed "to plead facts allowing the Court to rely on the allegations in the Keystone Report," *id.*, under the Ninth Circuit's precedents governing the use of third-party reports to support securities fraud claims, *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 930–32 (9th Cir. 2020), *certiorari granted*, *NVIDIA Corp. v. E. Ohman J:or Fonder AB*, No. 23-970 (U.S.), 2024 WL 3014476. And SoftBank additionally failed "to include details about [the former employees'] job descriptions or facts to infer that these employees had access to relevant data." MTD Order at 2. These two defects doomed the majority of SoftBank's securities fraud claims. As to the remaining federal claims, which hinged on SoftBank's allegations that Abraham had secretly funneled payments to certain third parties, the Court held that SoftBank failed to plead the details of the alleged payments to the third parties (or the falsity of Abraham's representations) with sufficient particularity *at the time of SoftBank's investment*. *Id.* The Court therefore dismissed all SoftBank's federal fraud

1  claims on falsity grounds and did not reach the question of scienter.  *Id.* n.2.  Because SoftBank

2  indicated at the motion to dismiss hearing that it could amend to add these details, the Court

3  granted leave to amend these claims.  *Id.* at 2.

4       SoftBank's Amended Complaint does not live up to the promises it made at oral argument

5  and fails to cure the defects in SoftBank's initial Complaint.  For example, SoftBank still

6  fundamentally relies on the unreliable, unsigned Keystone Report.  The Report's authors remain

7  unnamed, and SoftBank's new allegations about the Report's anonymous authors' professional

8  and educational backgrounds only confirm that they had no relevant expertise in bot detection or

9  any related field—perhaps explaining why they are unwilling to identify themselves.  Nor does

10  the Amended Complaint sufficiently support the reliability of the former IRL employees' alleged

11  concerns—SoftBank adds no detail about their roles, responsibilities, or relevant expertise.  And

12  SoftBank's allegations do nothing to resolve the profound chronology issues in its initial

13  Complaint, rehashing the same allegations from a year or more *after* SoftBank's investment.

14       So what did SoftBank's amendments do?

15       First, they significantly *weakened* SoftBank's claims, because SoftBank was forced to

16  drop baseless allegations included in its initial Complaint and to admit other allegations it had

17  attempted to keep out of its original pleadings but accidentally incorporated by reference.  For

18  example, SoftBank now admits that the individuals it originally claimed were "Key Employees"

19  within the meaning of the Primary Purchase Agreement—a prerequisite to certain of its claims—

20  were a low-level data analyst and a non-employee at the time of SoftBank's Series C investment.

21  It admits that alleged payments to proxy service providers were at most *de minimis* before the

22  Series C.  And it admits that in the weeks following Abraham's departure, IRL suffered a series

23  of crippling technical outages—a far more plausible explanation for the loss of users over that

24  period than SoftBank's far-fetched bot-fraud theory.

25       Second, SoftBank rightfully dropped its claims against former defendants who had no

26  alleged connection to the purported fraud whatsoever, except family ties with Abraham Shafi.  But

27  in their stead, SoftBank added a retaliatory claim against Genrikh Khachatryan, whom it did not

28

DEFENDANTS' OMNIBUS NOTICE OF                                    CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

name as a party and did not even mention in the initial Complaint. Why? Because in the interim between the initial Complaint and the Amended Complaint, Mr. Khachatryan joined a lawsuit pending in Delaware Chancery Court, brought by many of IRL's former employees and co-founders against SoftBank's corporate affiliate and its venture capital allies, for destroying the Company.

The Amended Complaint fails to cure SoftBank's defective allegations against the other defendants from the initial Complaint, Noah, Yassin, and Shehab (collectively, the "Relative Defendants"). Even now, having had a second bite at the apple, Plaintiff cannot identify with particularity any acts taken by the Relative Defendants that would render them liable for any of the various claims. The Amended Complaint does no more than assert—illogically and improperly—that the familial relationships among defendants renders the Relative Defendants liable for alleged wrongs committed by others. That is, once again, insufficient to sustain SoftBank's claims against the Relative Defendants, which should be dismissed with prejudice.

Plaintiff's addition of Mr. Khachatryan as a new defendant fares no better. What is conspicuous about the allegations against Mr. Khachatryan is what they do *not* include, even as SoftBank presumably labored to justify adding Mr. Khachatryan to this litigation to avoid the obvious conclusion that he was added in retaliation for his involvement in the action pending in Delaware Chancery Court. The allegations are sparse. Mr. Khachatryan is alleged to have aided in Abraham's answers to due diligence questions generally, but when Plaintiff makes detailed allegations about the misleading statements, Mr. Khachatryan is pointedly *omitted*. Similarly, SoftBank is silent about Mr. Khachatryan's actual position at IRL—because it knows in actuality that he was a front-end engineer with no involvement in anything having to do with the user makeup—and instead alleges generalized "access" to back-end systems. SoftBank asserts no actual misrepresentations or omissions by Mr. Khachatryan. For these reasons and more, the allegations against Mr. Khachatryan lack the particularity necessary to state viable claims and should be dismissed with prejudice.

Third, and more subtly, SoftBank's amendments and its subsequent Statement Chart

3

attempt to disaggregate SoftBank's kitchen-sink theories from one another.   Dkt. No. 76. Specifically, SoftBank alleged in its initial Complaint, and argued vociferously at the motion to dismiss stage, that its theory that IRL used so-called "incent advertising" was part and parcel of its bot-fraud theory.   But in its amendment and subsequent filings in this Court, SoftBank has admitted both tacitly and explicitly that "incent advertising" has nothing at all to do with bots— just as Defendants argued in the first Motion to Dismiss. Whereas previously SoftBank argued in its Statement Chart that its incent advertising allegations supported the falsity of its bot allegations, in its new Statement Chart, it deleted all references to incent advertising in its bot-fraud statements. And in opposition to Defendants' pending Motion to Stay, SoftBank emphatically argued that "the Keystone Report and the related allegations concerning IRL's active user population . . . ha[ve] nothing to do with Plaintiff's other fraud allegations, including, for example, the allegations that Abraham Shafi deliberately provided inaccurate information about IRL's user acquisition spending." Dkt. No. 83 at 7.  Considered separately on their individual merits, SoftBank's various fraud theories are even weaker and less plausible than they were as alleged in the initial Complaint.

Finally, SoftBank's amendments add additional innuendo, irrelevant detail, and outright misstatements.  Given space constraints, Defendants confine themselves here to responding to the theories of fraud articulated in SoftBank's Statement Chart, and respectfully request that the Court hold SoftBank to the same.[1]

---

[1] For example, SoftBank falsely alleges that "[d]iscovery of [] document destruction, among other things, resulted in outside directors on IRL's board forming a special committee (the 'Special Committee') in order 'to oversee the Company's response to the SEC investigation.'" FAC ¶ 11. This is doubly untrue. First, the Special Committee was not formed by "outside directors on IRL's board"—rather, the Special Committee was formed by the unanimous vote of the Board of Directors, including Abraham, as SoftBank itself elsewhere admits, *see* FAC ¶ 103, and as the resolution forming the Special Committee (which SoftBank incorporated by reference, by quotation, in its Complaint) makes clear.  Ex. A.  Second, the Special Committee's formation was not prompted by any "discovery of []document destruction"—the resolution establishing it makes no mention of any document destruction and, again, was unanimously adopted by the Board, including Abraham (whom SoftBank falsely accuses of perpetrating said document destruction).

As another example, SoftBank's Amended Complaint contains similar allegations to its Initial Complaint regarding the so-called Stroz Report.  But unlike SoftBank's initial Statement Chart, its Amended Statement Chart contains no reference whatsoever to the Stroz Report or Defendants' alleged deletion of data from their personal devices.

**ARGUMENT**

**I.      SoftBank fails to state a claim under federal law.**

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 or SEC Rule 10b-5, SoftBank must allege "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation omitted). Under Section 20(a), which provides for liability of a "controlling person," 15 U.S.C. § 78t(a), "a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show that the defendant exercised actual power over the primary violator." *Id.*

"Scienter means the intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (cleaned up). "[D]eliberate recklessness is an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (cleaned up). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 765 (citation omitted and alteration in original).

SoftBank's claims, including its state law claims, are all subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and its federal claims are further subject to the Private Securities Litigation Reform Act (the "PSLRA"). Under both Rule 9(b) and the PSLRA, falsity must be plead with "particularity." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted). "[T]o properly allege falsity" with particularity, "a securities fraud complaint must []'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief[,] state with particularity all facts on which that belief is formed." *Zucco Partners,* 552 F.3d at 990–91 (citation omitted). Further, under the PSLRA, to "adequately plead scienter, the complaint must . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* at 991 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added). Allegations raise a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (emphasis added). Scienter is measured from the time of the purported false statement: SoftBank must allege "particular allegations which strongly imply Defendant[s'] *contemporaneous* knowledge that the statement was false *when made.*" *In re Read-Rite Corp.*, 335 F.3d 843, 847 (9th Cir. 2003) (emphasis added).   Each allegedly false misrepresentation or omission must be considered "individually to determine if dismissal is appropriate." *Lyondell Petrochemical Co. Sec. Litig.*, 985 F.2d 573 (9th Cir. 1993) (unpublished); *see also In re Robinhood Ord. Flow Litig.*, No. 4:20-CV-9328-YGR, 2022 WL 9765563, at *6 (N.D. Cal. Oct. 13, 2022) (Gonzalez Rogers, J.) (examining each statement separately).

SoftBank alleges five separate categories of misstatements.[2]   Each is addressed in turn, and each fails to meet the strictures of Rule 9(b) and the PSLRA.

A. <u>Purported Misrepresentations Concerning User Data (Statements 1, 2, 6, and 13)</u>

As it did in its initial Complaint, SoftBank utterly fails to address each of the many varied statements in this category individually.  Instead, SoftBank relies on its overarching theory that Abraham masterminded a bot-fraud scheme to invent virtually all IRL's users, and broadly claims that all of these alleged statements must therefore have been false.  That group pleading fails to meet the particularity requirement under Rule 9(b) and the PSLRA.  And even taking SoftBank's approach on its own terms, none of the supposed "supporting facts" SoftBank marshals gives rise to an inference of falsity or scienter.

---

[2] These groupings follow the Court's categorization as explained in its Order on the first motion to dismiss. *See* MTD Order at 2.

DEFENDANTS' OMNIBUS NOTICE OF
MOTION TO DISMISS AND MEMORANDUM OF P&As

CASE NO. 4:23-cv-03834-YGR

1      *1.  SoftBank's supporting allegations fail to raise an inference of falsity.*

2          **First**, SoftBank's allegations about IRL's alleged use of proxy IP services to support both

3  falsity and scienter fail to raise any inference of falsity or a strong inference of scienter, for

4  multiple reasons.

5          At the first motion to dismiss stage, the original Defendants argued that SoftBank had

6  failed to plead that any payments to proxy services predated the Series C.  And in dismissing these

7  claims the first time around, this Court observed that Plaintiffs had failed to "plead the details of

8  these payments with sufficient particularity."   MTD Order at 2; *see also* Dkt. No. 68 ("MTD

9  Hearing Tr.") 23:18–25:19. SoftBank has not cured that defect, because it cannot. As the original

10 Defendants explained, IRL did not make any payments to any proxy service providers before the

11 Series C. That, of course, remains true. And in fact, SoftBank's Amended Complaint now makes

12 that point explicit, alleging that "[c]redit card statements show IRL spent tens of thousands of

13 dollars on proxy services which enable bots *from at least September 2021*."  FAC ¶ 205 (emphasis

14 added).   Nowhere does SoftBank allege—even on information and belief—that payments for

15 proxy services started earlier.

16         Despite the laundry list of supposed proxy service providers and intermediaries named in

17 the Amended Complaint, SoftBank has quantified only a single pre-Series C expenditure—a

18 payment of $35,103.93 to Machine Learning, which even SoftBank admits is not itself a proxy

19 service provider—made *more than a year before the Series C*.  *See* FAC ¶ 189. (Discovery will

20 show this was not a payment for proxy services at all, and Defendants do not allege it was.)  And

21 every payment that SoftBank alleges went to a proxy service postdates the Series C in May 2021.

22 *See* FAC ¶ 130 n.22 (payment in November 2022); *id.* ¶ 149 (payments beginning in December

23 2021); *id.* ¶ 150 (payments beginning September 2021); FAC ¶ 151 (payments described as having

24 occurred "by" October 2022); *id.* ¶ 150 n.24 (payment in October and November 2021); *id.* ¶ 152

25 (payment to Amazon Web Services—not a proxy service provider—in September 2021).[3]  As the

26 _____

27 [3] SoftBank alleges "on information and belief" that this Amazon Web Services account was "not

28 for the AWS account upon which the vast majority of IRL's servers operated," but fails to "state

7

Court held the first time around, SoftBank has failed to plead the details of any of these payments with particularity, and these payments do not support an inference of falsity or scienter at the time of the Series C in May 2021.

SoftBank alleges that some unknown number of charges to "Paddle" on Company credit cards pre-dated the Series C, but notably *failed* to quantify any pre-Series C payments, acknowledging only that "the volume of transactions increased substantially following the Series C Investment." *Id.* ¶ 150. This omission (and its acknowledgement about the relative size of the payments) speaks volumes. Moreover, SoftBank's description of "Paddle" as "an alternative name to SmartProxy"—and therefore an alleged proxy service provider—is verifiably untrue. SoftBank does not allege the basis for this inference, nor is there one. Paddle is a payment processor (akin to Stripe or PayPal). *See* Paddle, Frequently Asked Questions, https://www.paddle.com/about/why-has-paddle-charged-me (last accessed August 6, 2024) ("What is Paddle? Paddle is a merchant of record that acts to provide a payment infrastructure to *thousands* of software companies around the world. . . . Why do I have a payment from Paddle.net? If you're seeing a charge from Paddle on your bank or credit card statement, it is likely you have purchased or subscribed to a product supplied by one of the *thousands* of software companies in our network." (emphasis added)). While some of the vendors IRL paid at various times processed those payments through the Paddle service, that proves nothing relevant to this case.

A $35,000 payment to Machine Learning more than a year before the Series C and an unquantified payment to a payment-service provider, Paddle, simply cannot support the sweeping fraud SoftBank alleges, in which IRL supposedly manufactured tens of millions of users from 2018 onward, nor the falsity of Statements 1, 2, 6 and 13.

Moreover, even if the timing of the payments SoftBank alleges did not undermine SoftBank's claims, an allegation that IRL made payments to proxy service providers does not give rise to a cogent inference of wrongdoing. IRL could have used proxy services, and even bots, for many legitimate reasons having nothing to do with falsely inflating IRL's user metrics. How do

---

with particularity all facts" (or any facts, for that matter) "on which that belief is formed." *Zucco Partners*, 552 F.3d at 990–91 (citation omitted).

1   we know this? SoftBank's initial Complaint (though not its Amended Complaint) admitted that

2   IRL personnel contemplated using proxy services to post messages on *other* social media websites

3   encouraging human users to use IRL. Dkt. No. 1 ¶ 82. Even assuming IRL used proxy services to

4   enable bot usage—an inference the allegations of the Amended Complaint do not support—the

5   inference those proxy services (and in turn, bots) were used for the legitimate purposes is stronger

6   than the contrary inference that they were used for the illicit purpose of inflating IRL's user

7   numbers.

8           *Second*, SoftBank's allegations that certain IRL employees did not have access to a

9   dashboard of user metrics, that a disgruntled employee wanted greater access to user data, and that

10   certain data was restricted to "senior executives" also fail to support falsity.  FAC ¶¶ 89–90, 100,

11   101, 153.  SoftBank does not allege that *any of this was true before the Series C*, and in fact

12   acknowledges that these restrictions did not occur until after "the company ha[d] scaled up (by

13   nearly 600%)"—meaning *after* the Series C. FAC ¶ 89.  Moreover, the Complaint admits that

14   unnamed "senior executives," *id.* ¶ 153—who are *not* Defendants, are *not* "Shafi family

15   members," and who the FAC does *not* allege were part of the purported scheme—had access to

16   this data, eliminating any inference of falsity that might arise from the bare fact that certain

17   unspecified IRL employees were restricted from accessing some unspecified data, as well as any

18   inference of scienter that might arise from Abraham's knowledge of those restrictions.   And

19   SoftBank critically fails to allege specifically what data the dashboard contained that supposedly

20   would have revealed the alleged scheme.

21           *Third,* SoftBank's allegations that certain Defendants were "'back-end' engineers" at IRL

22   also fail to support an inference of falsity. *See* FAC ¶ 154.  (Discovery will show that SoftBank's

23   allegation that Defendant Genrikh Khachatryan worked on IRL's back-end systems is flatly

24   untrue.  *See id.*)  As the original Defendants pointed out previously, SoftBank does not even try to

25   allege that Defendants were the *only* "employees whose job responsibilities involved user data,"

26   FAC ¶ 154, so the attempted inference that Defendants were hiding bad data from non-

27   "conspirators" fails. Nor does the Amended Complaint contain any details about *when* these

28

9

1    individuals held "primary 'back-end' engineer" roles (FAC ¶ 64), beyond the vague allegation

2    that it occurred at "various times" in the *years* before the Series C investment.  *Id*. Such vague

3    allegations fall far short of the particularity required to support an inference of falsity.

4         *Fourth,* SoftBank advances statements by three former employees—made long after

5    SoftBank's investment—that are insufficiently reliable and particularized to support SoftBank's

6    sweeping fraud claims. This Court declined to rely on those statements at the first motion to

7    dismiss stage, holding that SoftBank had "fail[ed] to include details about these employees' job

8    descriptions or facts to infer that these employees had access to relevant data."  MTD Order at 2.

9    Yet SoftBank has not included any more details to support the notion that these former employees

10   had any reliable insight into IRL's userbase.

11        **Cameron Boehmer.**   The first employee, now identified as Cameron Boehmer, an IRL

12   "Staff Software Engineer," allegedly raised generic concerns in March 2022 about bot traffic and

13   claimed that images were being uploaded to IRL by bots "or scripts," FAC ¶ 76.  The Amended

14   Complaint, however, entirely fails to allege Mr. Boehmer's responsibilities as a "Staff Software

15   Engineer," why he would have insight into who was uploading images, what purported "evidence"

16   he had uncovered, or what expertise he had in analyzing it.  *Id.*  In short, as in the initial Complaint,

17   SoftBank has failed "to support the probability that a person in the position occupied by the source

18   would possess the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

19   995 (9th Cir. 2009), as amended (Feb. 10, 2009) (citation omitted).  Merely providing the

20   employee's name does not change the analysis. Moreover, nothing in Mr. Boehmer's statement

21   (which, again, came nearly a year after the Series C), indicates that he uncovered evidence of (or

22   even believed there existed) a scheme to inflate user metrics a year earlier.[4]  The allegations

23   regarding Mr. Boehmer's April 2022 letter suffer from the same defect: the Amended Complaint

24   alleges no basis to infer the reliability of Mr. Boehmer's opinion, no facts upon which his

---

[4] The Amended Complaint additionally alleges that two engineers "who aided Boehmer in his investigation of IRL's users" resigned. FAC ¶ 79.  But the Complaint does *not* allege why they resigned, how they aided the purported "investigation," or whether they had any expertise or insight into IRL's users.

conclusions were based, and no allegation that his purported conclusions in April 2022 pertained to the state of the platform in May 2021. *Id.*

**Nick Grant.** Next, SoftBank relies on the statement by Nick Grant in May 2022—again, a year after the Series C, when IRL had nine million *additional* MAUs—that there had been "unusual" traffic drops. FAC ¶ 80. But the Amended Complaint completely fails to explain why traffic drops in a single month in 2022 would be probative of widespread and long-running bot fraud, as opposed to the far more obvious explanation—a bug either in the app or the data.[5]

**Rae Allie.** SoftBank's claims also rely on another employee complaint in May 2022, this time by IRL's Head of Trust and Safety, Rae Allie, as supporting falsity. *See* Dkt. No. 76, Stmt. 1 at 3; FAC ¶ 81. Again, as in the initial Complaint, the Amended Complaint fails to provide the details necessary to support a finding that this individual's statement was reliable: beyond the addition of a name, it contains no details about the "Head of Trust and Safety's" role, his access or insight into user metrics relevant to the alleged misstatements, or when he joined IRL (*i.e.*, before or after the SoftBank investment). Even if credited, this statement is not probative of falsity: the Amended Complaint does not specify what Allie's vague "doubt" about the "MAU/retention information" was; in what respects he found IRL's growth tactics to be "shady" or "questionable"; and whether those statements pertained to the MAU and related metrics at the time of the SoftBank investment or, rather, a year later, at the time of the statement.

The mere addition of these individuals' names does not cure the defect the Court identified at the motion to dismiss stage. Instead, "to meet th[e] particularity requirement for personal sources of information, this circuit has applied the . . . standard that personal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (cleaned up),

---

[5] The Complaint also contains allegations regarding a December 2022 "report" by Mr. Grant, *see* FAC ¶ 100, but SoftBank's Statement Chart indicates it does not rely on that report's putative conclusions regarding bots to support its claims against Defendants. In any event, that "report" suffers from the same defects the other employee statements do.

DEFENDANTS' OMNIBUS NOTICE OF                    CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

*abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 536 U.S. 27 (2011); *see also In re Silicon Storage Tech., Inc., Sec. Litig.*, No. C-05-0295PJH, 2007 WL 760535, at *30– 31 (N.D. Cal. Mar. 9, 2007) ("[D]istrict courts can consider allegations of data and information obtained from 'experts' but . . . such factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with *any* 'confidential informant' *(or other witness)*." (emphasis added)).

*Fifth*, SoftBank also relies on the unattributed *questions*—not statements, but *questions*— of unnamed IRL employees regarding user metrics.  *See* FAC ¶ 90. These unattributed inquiries fall far short of the requirement of reliability demanded under Rule 9(b) and the PSRLA and do not support an inference of falsity.

*Sixth*, SoftBank points to the alleged user collapse in the weeks after Abraham's suspension as CEO in 2023—two years after the SoftBank investment.  FAC ¶ 120.  As Abraham explained at length in his original motion to dismiss, and to this day, SoftBank has never explained why the user loss supports an inference that IRL was overrun with bots.  There simply is no reasonable inference to be drawn from the user loss in May 2023 that Abraham was running an extensive botnet, let alone in May 2021 when SoftBank invested.  To the contrary, IRL's user loss is far more consistent with the explanation Abraham previously offered: the severe technical outages SoftBank did not acknowledge in its first Complaint, but was forced to concede after Abraham attached the Keystone Report to his initial motion to dismiss.  *See* FAC ¶ 120 n.21.

*Seventh*, SoftBank next alleges—for the first time—that IRL's Head of Product Engineering undertook an independent analysis of IRL's user base in the last week of May 2023, after nearly all users had fled the platform.  FAC ¶ 122.  Yet, as it did with the reports cited in its original Complaint, SoftBank *fails to attach Mr. Strand's alleged report to its Complaint*, choosing instead to paraphrase—and presumably, based on SoftBank's treatment in its prior Complaint of the reports it cited but did not attach, to gerrymander—Mr. Strand's supposed findings. In any event, Mr. Strand's alleged findings do not support an inference of falsity here, for numerous reasons.

Mr. Strand's alleged findings had to have been based on data from the experimental "Redshift" database, because as the Keystone Report explains, only the Redshift database (and *not* the BigQuery database) purported to contain IP address data. *See* Dkt. No. 70-1 ("Keystone Rpt.") ¶¶ 5, 6. Yet the RedShift database itself is demonstrably unreliable, as Keystone admitted in its Report, as there is *at least a 50% discrepancy* between the purported active users identified via Redshift versus the active users identified in what even Keystone concedes was "considered the source of truth for counting active users," the BigQuery database. *Id.* ¶¶ 2.c, 5. Findings derived from a dataset that diverges so drastically from "the source of truth" for active user statistics cannot be remotely reliable, let alone reliable enough to support the securities fraud allegations here. Defendants highlighted this issue at argument on the first motion to dismiss. MTD Hearing Tr. at 16:14-17:7 (explaining that "about half of the users in each database did not show up in the other," which was a "profound internal contradiction in the Keystone report"). The Court asked for a response, and the only response SoftBank mustered was to make sinister claims about data deletion, *id.* at 17:9–18:3—the same claims debunked below as facially false and unsupported, *infra* at 19–21. Yet given the chance in an amended complaint to address this "profound internal contradiction in the Keystone report," SoftBank simply ignores it, not even trying to explain it away in their Amended Complaint.

Yet even if one ignores the fundamental unreliability of the data Mr. Strand purportedly used, his "findings" still do not support an inference as falsity. For instance, as alleged in the Amended Complaint, Mr. Strand determined that, of the "top 40,000 IP addresses that were used to access IRL from April 1, 2023, through May 24, 2023," a little more than half were known proxy IP addresses. FAC ¶¶ 127–129. But the Amended Complaint does not explain what it means by the *top 40,000 IP addresses*. Does that mean the 40,000 IP addresses used to accessed IRL *most frequently*? The IP addresses shared amongst the most users? Something else? Without knowing how the *top 40,000 IP addresses* is defined, there is no way to assess whether the sample is representative or, instead, unduly weighted toward proxy IP addresses. (The "top" *anything*— as opposed to a random sample—is likely to be unrepresentative.) Indeed, on SoftBank's own

13

1  account, a shared IP address is more likely to be a *proxy* IP address, meaning that any number of

2  measures of "top" IP addresses would have disproportionately weighted the sample towards

3  proxies.  Moreover, half of the time frame for the data came from the highly unrepresentative

4  period after almost all users had fled the platform, from the end of April to the end of May—a

5  time when "virtually all of the accounts" that were found in the "source of truth" BigQuery

6  database, but *not* in the experimental Redshift database, had left.

7        Finally, SoftBank's tactical pleading obscures whether Mr. Strand's report itself concluded

8  that the users were bots.  Rather, SoftBank has only clearly pleaded that Mr. Strand made the

9  foregoing conclusions about the presence of proxy IP addresses in the Redshift data—which

10  *SoftBank*, but not necessarily *Strand*, characterized as "show[ing] that IRL's supposed active user

11  population actually consisted of millions of bots rather than human users." FAC ¶ 122.

12        2.   *SoftBank cannot rely on the Keystone Report to allege falsity.*

13        SoftBank's allegations regarding bots still rely primarily on a third-party consultant,

14  Keystone Strategy, which concluded in June 2023 that a high proportion of IRL's users from June

15  2022 to June 2023 were bots. *See id.* ¶¶ 139–147.  In dismissing the federal claims in the first

16  Complaint, this Court held that SoftBank had "fail[ed] . . . to plead facts allowing the Court to rely

17  on the allegations in the Keystone Report."  MTD Order at 2.  Namely, the Court held that

18  SoftBank had failed to meet the bar set by *E. Ohman J:or Fonder AB v. NVIDIA Corp.*

19  ("*NVIDIA*"), 81 F.4th 918, 930–32 (9th Cir. 2023), and its predecessors, which require that a

20  securities fraud plaintiff  seeking to rely on a putative expert report describe the expert's

21  qualifications and the basis for its opinion "in the complaint with sufficient particularity to support

22  the probability that a person in the position occupied by the source would possess the information

23  alleged." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir.

24  2004) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). At oral argument, counsel for

25  SoftBank suggested (in response to questioning from the Court) that SoftBank would be able to

26  amend the complaint to allege that the unnamed authors of the Keystone Report were "experts in

27  forensic analysis of computer usage, of, bots, [and] of AI." MTD Hearing Tr. at 14:23–24.

28

14

1    The Amended Complaint fails to live up to these promises, which are basic expectations
2 under the law. Nowhere in the Amended Complaint does SoftBank allege that any "experts in
3 forensic analysis of computer usage, of bots," or "of AI" were responsible for, or even worked on,
4 the Keystone Report.  Rather, the Amended Complaint alleges that "members of the Keystone
5 team that worked on" the Report included "a Ph.D in Mathematics and [sic] experience in data
6 mining & analytics" (not bots, and not forensic analysis of computer usage), "a Ph.D in Economics
7 with extensive computer science experience" (again, not bots or forensic analysis of computer
8 usage), and "a co-lead of Keystone's Information Strategy & Risk practice" (again, no mention of
9 bots or forensic analysis of computer usage).  FAC ¶ 108.  SoftBank never even attempts to
10 translate these buzzwords into concrete qualifications or experience that would support the
11 reliability of Keystone's determination that certain data indicated the presence of bots. In short,
12 the team as described by SoftBank's Amended Complaint comprised a data analyst with
13 mathematics but not bot or even computer-science expertise, a person whose title at Keystone is
14 associated with corporate data storage policies, and an economist with unelaborated "experience"
15 in computer science.  If the drafters of the Keystone Report had any experience with bots at all—
16 let alone with analyzing data to detect bot usage—SoftBank would have said so.  It has not.
17 SoftBank should be held to this Court's decision on the first motion to dismiss, which correctly
18 applied *NVIDIA* and held that the Keystone Report's unnamed authors did not have sufficient
19 alleged qualifications to support SoftBank's reliance on their conclusions. The conclusion still
20 holds.

21    *NVIDIA* is instructive. There, the Ninth Circuit determined that a report created by an
22 "economic consulting firm . . . that specializes in distributed ledger and blockchain technology"
23 and led by individuals who had "PhDs in business economics . . . and held academic, consulting,
24 and business positions in which they have specialized in the economics of blockchain" was
25 qualified to calculate *NVIDIA*'s crypto-related revenue. *E. Ohman J:or Fonder AB v. NVIDIA*, 81
26 F.4th at 929–30.  In short, the Ninth Circuit held that extensive expertise in the business of
27 blockchain qualified the expert there to opine on the business of blockchain.  That is a far cry from

28

1    the smorgasbord of irrelevant, non-bot-related STEM experience and degrees cited by SoftBank

2    here.

3          Nor is the vague allegation that Keystone as a company has "specific experience analyzing

4    bot farms and detection systems, and analyzing network traffic between devices and servers"

5    sufficient. FAC ¶ 108. In making this vague allegation but then failing to allege that the Keystone

6    Report's actual authors had any experience with bots, SoftBank admits that whatever experience

7    *someone else* within Keystone might have had with respect to bots, the team that actually worked

8    on the Keystone Report had *no such experience*.  Moreover, SoftBank does not suggest Keystone

9    as a company has any experience detecting bots—the exercise the Keystone Report putatively

10   undertook. Rather, SoftBank obliquely references "analyzing bot farms and detection systems,"

11   whatever that means.  *Id.*  If anyone who worked on the Keystone Report had expertise in actual

12   *bot detection*, SoftBank would have said so.

13         The Keystone Report also has other hallmarks of unreliability: it relied on "non-public data

14   and information sources"; it "did not corroborate its core conclusions . . . [with] signed, named

15   affidavits from corporate insiders"; and the Complaint "fail[s] . . . to provide basic information

16   about the soundness or quality of the technical analysis contained in the Report, including . . . the

17   accuracy of the methodology used to perform the analysis." *Hershewe v. Joyy Inc.*, 2021 WL

18   6536670, at *5 (C.D. Cal. Nov. 5, 2021); *see also Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp.

19   3d 846, 860 (N.D. Cal. 2019), aff'd sub nom. *Eckert v. PayPal Holdings, Inc.*, 831 F. App'x 366,

20   367 (9th Cir. 2020).

21         Most fundamentally, the Report makes key admissions demonstrating that the data

22   underlying its analysis was massively unreliable.  As the Report explains, IRL maintained two

23   databases with user data—"BigQuery Data" and "Request Data" (the latter of which was stored

24   in the "RedShift" database). Keystone Rpt. ¶¶ 5–6.  The Report acknowledges that BigQuery was

25   the "source of truth for counting active users," and the RedShift database was not employed until

26   "mid/late 2021"—*after the SoftBank investment*—and was not fully populated until "only after

27   early 2022." *Id.* ¶ 6 (quotations omitted).  Then, crucially, the Report admits that even though the

28

16

1    RedShift data used by Keystone showed roughly the same number of active users each month
2    (from July 2022 onward) as the "source of truth" BigQuery data, *half the users in each database*
3    *did not show up in the other database.  See id.* ¶¶ 2.c, 8, 32 (including Figure 1).  Keystone never
4    tries to explain this massive discrepancy, and neither does SoftBank.  Unless we are to believe
5    that IRL actually had 1.5 times as many active users over this period than reported in BigQuery
6    (the mathematical outcome of the two databases showing 50% the same users, and 50% unique
7    users), the only plausible explanation is that the RedShift data is garbage.  With no explanation
8    for this massive discrepancy between the "source of truth" BigQuery data and experimental
9    RedShift data, the RedShift data is at the very least unreliable.

10        Not only was the dataset unreliable; the analyses on which the Keystone Report—and, in
11    turn, the Amended Complaint—principally relies are facially implausible and unsubstantiated.
12    The key finding relied upon by SoftBank in its Amended Complaint is the presence of many
13    groups with duplicate names. *See* Keystone Rpt. ¶¶ 2(a), 13.  Yet the Report acknowledges that
14    users were prompted to create groups upon onboarding and the app *suggested the names of the*
15    *groups to be created*. Keystone Rpt. ¶ 64. To account for this, the Report purportedly undertook
16    an analysis of "chat activity patterns within the most frequently created groups," and found the
17    level of activity to be largely similar across the millions of groups with five most common names.
18    *See id.* ¶¶ 65–67, Fig. 16. Yet the Report fails to give any reason why similar amounts of activity
19    across the large sample set of groups potentially created the same way (during onboarding by
20    human users) is indicative of *bot* activity rather than *human* activity. *See id.* ¶¶ 64–66. Millions of
21    low-activity groups with the same names would be *precisely the expected outcome from IRL's*
22    *method of onboarding human users.*

23        The Amended Complaint also asserts, in support of falsity, that the email domains of IRL's
24    users "did not align with IRL's purported user demographics." FAC ¶ 137; Keystone Rpt. ¶¶ 14–
25    15, 69. But the Report's results show that the *vast* majority of sign-ups came from gmail.com,
26    hotmail.com, yahoo.com, icloud.com, outlook.com, or no email address at all—*i.e.*, what the
27    Report itself characterizes as popular domains. For example, of the email addresses arbitrarily

28

17

sampled from the "Play Video Games" Group, 99% (4,687,432 of 4,712,647 group members) came from these common domain names. Keystone Rpt. ¶¶ 63, 69. Nor does the Report justify its inferential leap between the observed distribution among these domain names and bot activity. And, like all the analyses highlighted in the Amended Complaint and all of the Report's bot analyses, the analysis relied on the data from the unreliable, incomplete, and irrelevant (due to its temporal limitations) RedShift database. *See id.* ¶¶ 62–63. The Report itself indicates that the "spikes" in signups for the purportedly overrepresented email domains occurred months *after* the Series C. *See id.* ¶ 70 & Fig. 18.

The Amended Complaint also highlights the presence of "nonsensical" chat group names. FAC ¶ 138.  But it does not explain why these oddities indicate *bot* rather than *human* activity. Why would 400 *bots* create a group chat with the name Fuyccg? Moreover, these examples amount to around 1,000 examples out of tens if not hundreds of millions of user interactions on IRL over the course of several years. There is no reason to infer that this is a meaningful sample.

The Amended Complaint also claims that Keystone concluded that the "remaining users" who "lacked the granular levels of data necessary to perform a bot analysis" also "were not likely human."  FAC ¶ 145.  But that portion of the Keystone Report provides no reasoning whatsoever for this speculation—it is pure *ipse dixit*, phrased with the qualifying language "likely." Keystone Rpt. ¶ 35.  Moreover, the Amended Complaint in fact *highlights* one of the profound, unexplained internal contradictions in SoftBank's theory of the disappearance of IRL's users.  As the Amended Complaint explains, *it was the accounts that Keystone was unable to conclude were bots that disappeared in May 2023*—by contrast, users that Keystone classified as bots in fact temporarily *increased* after Abraham's suspension.  FAC ¶ 145; Keystone Rpt. ¶ 35 Fig. 7.  This anomaly is likely why SoftBank has been unable to articulate an even potential theory tying the disappearance of users to Abraham's departure.  The much more cogent theory, as Defendants have repeatedly explained, is that the data set upon which Keystone based its bot classification was bunk, and the disappearance of users was due to the technical outages that SoftBank now acknowledges.

Perhaps most striking is the Keystone Report's own acknowledgment that its conclusions

were *limited to the period after June 2022*. The report itself does not definitively draw the inference SoftBank asks the Court to draw here: that the supposed presence of bots on IRL over a year *after* SoftBank's investment indicates the presence of bots on IRL a year earlier. To the contrary, the Report "*verified* IRL's MAU count during the Series C funding rounds," based on the BigQuery Data. *Id.* ¶ 61 (emphasis added).

Though SoftBank attempts to cast the purported absence of certain data before June 2022 in a suspicious light, those suppositions are false, as shown by the Keystone Report itself. Keystone admits IRL stored user data in BigQuery, which it regarded as the "source of truth for counting active users," beginning in "at least 2019." Keystone Rpt. ¶ 5. IRL implemented the *separate*, experimental database, RedShift, in "mid/late 2021," *id.* ¶ 6, but only populated that database "after 'early 2022'." *Id.* Contrary to SoftBank's implication, IRL thus collected user data from "at least 2019," and RedShift data from before the Series C is "missing" only because IRL did not even *start* collecting such data until *after* the Series C.  *See id.* ¶¶ 5,6.

The Keystone Report should be disregarded because it bears no indicia of reliability; but even if it met the Ninth Circuit's reliability test, it still fails to raise an inference of falsity (or scienter).

> ### 3.SoftBank's remaining allegations do not support a strong inference of scienter.

SoftBank also relies on certain additional allegations as supporting scienter alone.  None carries the weight SoftBank ascribes.

*First,* SoftBank points to the change in IRL's Slack retention policy as demonstrating scienter. In so doing, SoftBank seeks something akin to an adverse inference based on the Company's change of its Slack policy on March 17, 2022, because that change happened several days after Mr. Boehmer "announced internally" (though not to Abraham) that he believed many images were uploaded to IRL by "bots or scripts."  FAC ¶¶ 10, 76–77.  But there is not a single allegation in the Complaint suggesting that any Slack data was *lost*—rather, the Complaint alleges only that the Company changed its *default settings* for retention on a prospective basis. *Id.* ¶ 77.

DEFENDANTS' OMNIBUS NOTICE OF
MOTION TO DISMISS AND MEMORANDUM OF P&As

CASE NO. 4:23-cv-03834-YGR

The Complaint similarly does not allege that any data *relevant to this litigation* was lost.  Nor does it contain any allegation that Abraham—then the CEO of a billion-dollar company—had any involvement in determining or directing the particulars of the Company's Slack retention policies.

More fundamentally, there is no authority for the proposition that SoftBank is entitled to an adverse inference at the pleading stage, much less one based on an allegation that there was a single change in the Company's Slack retention policy at some point in the Company's yearslong history that deleted no data at all.  As SoftBank would have it, any securities fraud plaintiff could subvert the PSLRA's requirements by pointing to any change in any corporate retention policy at any time and asking a court to infer that the result was a worst-case-scenario instance of spoliation. But a securities plaintiff "cannot base securities fraud claims on speculation and conclusory allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  And make no mistake: the wholly unsupported inference SoftBank asks the Court to draw here is not merely that data was lost as a result of the change (which is unsupported); not merely that the data that was lost included the Defendants' communications (which is unsupported), FAC ¶ 10; not merely that those communications were relevant to the allegations at issue here (which is unsupported); not merely that the change was *intentional* to effectuate that loss (which is unsupported), *see id.*; *but also* that the individual responsible for that decision was Abraham Shafi.  Otherwise, the change in policy is irrelevant to scienter.

The fulcrum of SoftBank's claim that it should benefit from that unsupported chain of inferences is the supposed chronology.  The Amended Complaint alleges that the change happened in the days after Mr. Boehmer's complaint regarding images uploaded by "bots or scripts." SoftBank seemingly asks the Court to infer that it necessarily follows that Mr. Boehmer's complaint *triggered* the change.  *See* FAC ¶ 76-79.  Yet SoftBank never *alleges* that causal link (upon information or belief or otherwise).  It does not allege so because, as SoftBank well knows, the Slack policy change was planned and announced within IRL well *before* Mr. Boehmer's complaint.

If the Court is inclined to indulge SoftBank's implicit request that it draw the kind of

20

adverse inference of spoliation typically reserved for trial or after an evidentiary hearing, it should consider the clearcut evidence that the change in the Slack retention policy was announced on March 10, 2022, *before* Mr. Boehmer's alleged report, and had been openly and publicly planned and debated in good faith by at least ten employees—many of whom are not alleged to have participated in the fraud—for *months* before that announcement (and before Mr. Boehmer's complaint):



# announcements  –  Mar 10th, 2022

**Hessam** 6:30 PM
**@channel** IMPORTANT NOTE: Update to our Slack data retention policy

Effective next Thursday March 17, 2022 at 5PM PST we will be changing our Slack Message Retention & Deletion Policy. **Private channels** and **Direct Messages (DMs)** will be deleted after **30 days.** Please take a moment and save any messages/files you may need from your conversations in these areas. Document and track important data in Notion. Remember that Slack communication is for ephemeral conversations. Notion is for achieving and referencing. **Public channels** however will continue to retain all messaging history (but we don't track revisions). This is subject to change and at which point, we will make another announcement.

👍 🎉 27 reactions      💬 3 replies

Ex. B; *see also* Ex. C (describing the review of the Slack policy as a "winter/spring cleaning" project, displaying comments from at least ten separate users, including specific references to input by Pim Pronk, Yvonne Lewis, Alex Strand, Claude Spivy, Hessam Samimifar, Elijah Chancey, and "Jan," and referencing consideration of the policy of "deleting messages that are in DMs after a period of time (30 days, 90 days, etc.).").

*Second*, SoftBank alleges that Abraham had various financial motives to induce SoftBank's investment in SoftBank. But "general allegations of intent based upon generalized financial motives are insufficient to establish scienter." *Rudolph v. Utstarcom*, 560 F. Supp. 2d 880, 889 (N.D. Cal. 2008) (citation omitted).

*Third*, SoftBank points to Abraham's statement regarding the change in how IRL measured active users as probative of scienter. But as explained *infra* at 30–32, that allegation is irrelevant to the presence of a purported bot scheme and does not raise an inference of scienter.

*Fourth,* SoftBank points to Abraham's access to "IRL dashboards," which SoftBank claims, in its Chart, showed "usage patterns . . . obviously inconsistent with human use." Dkt. No. 76 at 3. But SoftBank nowhere alleges the *content* of these dashboards, so the supposition that the usage patterns would have made "obvious" the presence of bots is completely unjustified.

21

1    Moreover, that claim is at odds with (1) the fact that IRL's senior executives—not only Shafi

2    family members—had access to the dashboards, FAC ¶ 153; (2) the dashboards were available to

3    all IRL employees before the Series C, FAC ¶ 89; and (3) the Special Committee engaged not one

4    but two separate third-party analyses of bot activity, in addition to Mr. Strand's analysis. Had the

5    dashboard made the presence of bots obvious, all of that would have been for naught, and IRL's

6    non-"conspiring" senior executives would have been aware of the supposed bot scheme years

7    before the Series C.

8        *Fifth*, SoftBank points to Abraham's awareness of the purported proxy service payments

9    as supporting scienter.  But for the reasons explained above, *see supra* 7–9, the alleged payments

10   are irrelevant to SoftBank's theory that IRL was overrun with bots at the time of the Series C and

11   therefore Abraham's supposed knowledge of the alleged payments does not contribute to an

12   inference of scienter.

13       *Sixth*, SoftBank points to Cameron Boehmer's termination days after his supposed

14   whistleblower complaint.  But SoftBank has not alleged, even on information and belief, that the

15   basis for Boehmer's termination was his claims regarding bots—nor could it, because as SoftBank

16   knows, it is not true.  SoftBank's allegation regarding Nick Grant's termination, FAC ¶ 104,

17   suffers from the same defect.

18       *Seventh*, SoftBank claims that "IRL didn't maintain backups of user data, despite low cost

19   and clear business reasons."  Dkt. No. 76 at 4 (citing FAC ¶ 146). As explained at length in

20   Abraham's Motion to Dismiss the initial Complaint and Reply, in the Keystone Report, and at oral

21   argument on the initial motion to dismiss, IRL *did* maintain user data, starting long before the

22   Series C. It is only the *particular* data stored in Redshift database but not the BigQuery database

23   that IRL did not begin storing until "mid/late 2021."  Keystone Rpt. ¶ 6.  And SoftBank has never

24   explained how IRL's fully voluntary effort to begin collecting the Request Data in the Redshift

25   database in "mid/late 2021" is consistent with their narrative that this constituted an effort to

26   obscure a bot scheme.  If Defendants were trying to conceal a long-running bot scheme that

27   predated the Series C, why on earth would they then start collecting the very data that SoftBank

28

claims was necessary to prove they were engaged in such a scheme? Why would they share this new data with people SoftBank claims were not involved in the alleged scheme?  FAC ¶ 153.  If anything, the fact that IRL started collecting such data and sharing it with non-"conspiring" senior executives is strong evidence *against* any inference of scienter.

Moreover, the authors of the Keystone Report are not qualified to opine that maintaining the particular data stored in Redshift is "unusual" for an early-stage startup like IRL, because SoftBank has not alleged that any of those authors have any business, entrepreneurship, start-up, or social media experience at all.  Nor is it "telling" that, in Keystone's (non-expert) estimation, such data is "required for identifying bot activity on the platform" FAC ¶ 146. As the Amended Complaint acknowledges, IRL attempted to use *third-party* bot detection and blocking software to screen for bots.  *See* FAC ¶ 109 n.18.

*Eighth*, and finally, the Amended Complaint attempts to paint Abraham as having "obstruct[ed] Keystone's access to data."  FAC ¶ 116.  But nothing in the Amended Complaint indicates Abraham obstructed anything at all. To the contrary, the Amended Complaint alleges that Abraham reported his belief to the Special Committee that Keystone's initial investigation was exceeding its planned scope, but that "[t]he company [wa]s working on providing what was requested." FAC ¶ 115.  That Abraham allegedly expressed his view to other members of the Board that Keystone's mandate should be more limited is not obstruction.

### B.   Statements Regarding Measurement of User Data (Statements 5, 7, and 8)

The next category of alleged misstatements involves the way IRL measured user data. Namely, Abraham allegedly stated that there existed "some natural variability in signups due to seasonality [ ] and when we launch new geos," FAC ¶ 39, that there was monthly variation in downloads "due to seasonality," FAC ¶ 42, and that third-party trackers would not necessarily accurately capture all IRL users because IRL had a "younger audience" and "anyone under 18" could not be tracked due to privacy restrictions.  FAC ¶ 42.  Even though this Court acknowledged in its first Order dismissing SoftBank's federal claims that these statements are substantively distinct from those pertaining to user growth metrics and user data (in absolute terms, rather than

DEFENDANTS' OMNIBUS NOTICE OF                                    CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

the second-order question of the *measurement* of user data), SoftBank *again* makes no allegations whatsoever that specifically support the falsity of these statements or Abraham's scienter as to them.  *See* MTD Order at 2 (categorizing "Measurement of User Data" separately from other categories of alleged misstatements).  Instead, SoftBank just incorporates its pleadings as to the other categories of statements by reference.  *See* Dkt. No. 76, Stmt. 5 at 12 (citing Statements 1, 3, and 4 for facts relevant to falsity and Statements 1, 3, 4, and, circularly, 5, for facts applicable to scienter), Stmt. 7 at 13 (citing Statements 1, 3, 4, and 5 for facts relevant to falsity and scienter), and Stmt. 8 at 14 (same).

Not a single allegation in the Amended Complaint addresses (let alone undermines the truth of) Abraham's observation that seasonality affected sign-ups or that third-party trackers were inaccurate due to IRL's demographic composition consisting of many young users.  And SoftBank has not alleged—nor could it—that third-party tracking services *can* reliably track the data of individuals under age 18.  Indeed, SoftBank enthusiastically accepted this explanation at the time, and noted that the third-party tracking service itself qualified its findings with the same limitation. *See* Dkt. No. 47-1 at 12 ("[A]gree with you on the data discrepancies w/ App Annie, they highlighted the issue with tracking users under 18 y/o and understand that it is their best estimate. . . . [M]akes complete sense!"). Given the lack of any supporting allegations for SoftBank's claim that Statements 5, 7, and 8 were false or made with scienter, the Court must dismiss SoftBank's fraud claims based on them.

C. Statements About User Growth (Statements 3 and 10)[6]

SoftBank next alleges that Abraham misrepresented IRL's growth as predominantly organic, IRL's total growth spending, and IRL's customer acquisition costs, including by omitting that IRL worked with two vendors, AdAction and Mammoth Media, which IRL allegedly used for "incent advertising" programs. *See* Dkt. No. 76, Stmts. 3, 10.

With respect to Statement 3, as Abraham explained in the initial motion to dismiss, even accepting as true SoftBank's premise that IRL "spent hundreds of thousands of dollars each

---

[6] SoftBank's Original Complaint alleged Statement 3 as two separate statements (Statements 3 and 4).

24

month" on "incent advertising," FAC ¶ 6, SoftBank's conclusion that Statements 3 and 10 were false does not follow. Irrespective of how much IRL spent on user acquisition, SoftBank has failed to allege any facts disproving Abraham's statements that "[t]he *dominant* invite flow today is first to groups and second to events" and that "[w]e grow *predominantly* through direct SMS based invites from one user to another" and "[t]his is a free organic channel." Dkt. No. 76 at 8 (Stmt. 3). Absent any allegations about the relative *predominance* of paid, non-organic growth versus organic growth, the Complaint has failed to allege falsity or scienter. Total expenditure on paid invites to the app has no relation to the *predominance* of organic or non-organic growth. IRL could have been spending a million dollars a month on incent advertising, and still predominantly grown organically.

With respect to the sub-part of Statement 3 that "[w]e spend about $50K a month in paid user acquisition," SoftBank has put forward no reasonable basis for inferring Abraham's scienter. SoftBank points to invoices from AdAction that went to Abraham totaling "hundreds of thousands of dollars for services in late 2020 and early 2021," Dkt. No. 76 at 8 (Stmt. 3), but that amount is consistent with "about $50K a month." In the Amended Complaint itself, SoftBank (with access to IRL's emails) alleges that Abraham was aware of only three discrete AdAction invoices. One of them—from September 2020—apparently covered a five-month period, as the amount SoftBank cites ($109,025.95) is the same as the amount on the August 31, 2020 invoice, which according to SoftBank's own chart was the first AdAction invoice IRL received since March 31, 2020. FAC ¶¶ 163–164. That adds up to roughly $22,000 per month in expense with AdAction. The second, allegedly from October 2020, is apparently a mistake, as it does not even show up (by date or by amount) in SoftBank's supposedly comprehensive table of all AdAction billings to IRL before he Series C. *Compare id.* ¶ 164 *with id.* ¶ 163. And the third, from November 2020, is—again, according to SoftBank's own table—an invoice covering a period of 2.5 months, averaging out to roughly $33,320 of expense per month. In other words, the only evidence SoftBank cites proves, if anything, that from what Abraham knew about the AdAction expenses,

25

they were well *below* $50,000 a month.[7]

Notably, SoftBank avoids making any allegations about how much IRL actually paid, instead alleging only what IRL was *billed* for. That is because, as discovery will show, IRL did not pay the sums reflected in the Complaint.  Rather, IRL ultimately *disputed* hundreds of thousands of dollars of charges reflected in the Amended Complaint.

The Amended Complaint also alleges that in September 2022, Abraham acknowledged in an email that certain payments to the Agency that were invoiced as "infra" should have instead been invoiced as "growth," and therefore IRL's current customer acquisition cost ("CAC") estimates needed to be revised upward.[8] *See* FAC ¶ 93. But this does not indicate that Abraham knew the "$50K a month" statement or related statement that "CAC is ~$0.50 per new user" was inaccurate when those statements were made *a year and a half earlier*. Abraham further stated in that email that "total operating expenses are unchanged"—an assertion that SoftBank does not dispute. *Id.* That matters, because SoftBank's primary theory for Abraham's scienter is that he must have understood that the calculations for monthly paid growth spend and CAC were incorrect at the time they were made. That Abraham may have been aware of the *total* operating expense spend is not probative of whether he was aware of how that spend was accounted across different

---

[7] As for Mammoth Media, SoftBank makes *no* allegations regarding Abraham's knowledge of IRL's overall spend with that company prior to the Series C.  Softbank does allege that Mammoth Media told Abraham that its "cost-per-install for its services" was "$1.50," and points to that as proof that IRL's $0.50 CAC (customer acquisition cost) number was false.  But the $1.50, of course, would only apply to new users generated through Mammoth Media's marketing efforts, so there is no obvious inconsistency between the $1.50/user cost of Mammoth Media's service, and an overall average of $0.50 per customer acquisition cost.  To use a simple example, if one out of every three IRL users came in through Mammoth Media, and two out of every three new IRL users came in through an "organic" channel (such as recommendations from friends on the app), that would equate to a CAC of $0.50.  In sum, SoftBank does not make sufficient allegations to conclude that IRL's use of Mammoth Media is inconsistent with the challenged representations, let alone that Abraham would have been on notice of any such alleged inconsistencies.  Nor does SoftBank even allege that IRL used Mammoth Media for "incent advertising," as it expressly alleged was the case with AdAction—because it was not.

[8] SoftBank also has not alleged that IRL's CAC *at the time of the Series C* was actually $1.35. In fact, SoftBank only alleges that the *then current* CAC (in September 2022) was in fact $1.35.  But that does not bear on what the CAC was more than a year earlier, and, most importantly, *before SoftBank's transformational investment* (which provided a huge infusion of funds that could be used, for instance, for greatly increasing customer acquisition efforts).

1  categories.  Moreover, that Abraham voluntarily acknowledged an inaccuracy in CAC and

2  calculations of growth expenditures as of September 2022 strongly cuts against his alleged

3  scienter.  And there is nothing untoward about a social media app "need[ing] people to download

4  the app."  FAC ¶ 6.  Legitimate, common marketing tactics for social media companies include

5  both "marketing its features [and] demonstrating its utility," FAC ¶ 6, *and* engaging non-

6  traditional advertising campaigns, including incent advertising, which in turn seed organic growth.

7          SoftBank's efforts to manufacture scienter based on Gabi Loeb's alleged exclusion from

8  information about IRL's payments to Format Agency also fail.  SoftBank's conclusory

9  characterization that "Michael Sutyak *and Abraham Shafi* refused to give Gabi Loeb access" is

10  not supported by the Complaint's allegations.    FAC ¶ 176 (emphasis added).   Rather, the

11  Amended Complaint indicates that Loeb repeatedly expressed frustration about Sutyak *to*

12  Abraham—not that Abraham was a part of or complicit in Sutyak's alleged stonewalling with

13  respect to payments to Format Agency.  *See* FAC ¶¶ 176–177. There is no reason to suppose that

14  Abraham had any more visibility into Sutyak's work than did Loeb.  Likewise, the Amended

15  Complaint does not plausibly allege that Abraham directed Sutyak to falsify any invoices,

16  undercutting SoftBank's theory of scienter.  As explained in Abraham's prior briefing, Dkt. No.

17  63 at 17–18, SoftBank's allegations about supposed manipulation of invoices pertained to

18  *projections* for the upcoming month—not *retrospective invoices*.  *See* FAC ¶ 177.

19          SoftBank additionally reprises its argument that the relationship between IRL and Format

20  Agency was concealed from SoftBank. But as explained *infra*, *see* 28–29, contrary to SoftBank's

21  implication, the notion that IRL's payments to Format Agency were kept secret from SoftBank is

22  false.

23          D.  Payments to Allegedly Affiliated Entities (Statements 11 and 14)

24          SoftBank for the first time in its Amended Complaint alleges that payments to Live Awake

25  Inc., Socialite Studios, and App Inc. were not properly disclosed to SoftBank.  These entities

26  appeared nowhere in the Initial Complaint.  These claims fail because SoftBank has not alleged

27  that IRL had *agreements* in excess of $250,000. Section 2.10 of the Primary Purchase Agreement

28

did not require disclosure of any payments IRL had ever made to any entity—rather, it required disclosure only of "agreements, understandings, instruments, contracts or proposed transactions"—in short, of *prospective obligations*—in excess of $250,000.  Ex. D § 2.10(a). Similarly, Section 2.11 of the Primary Purchase Agreement required disclosure only of "agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof."  *Id.* § 2.11(a). SoftBank's Amended Complaint does not allege that any one of these entities had a contract or agreement with IRL, nor that any one of these entities received a single payment *after* the Series C, which demonstrates the absence of any prospective obligation at the time of the Series C.  *See* FAC ¶¶ 186–188.  Nor does SoftBank allege that any payment to any of these entities exceeded $250,000 (indeed, it does not even allege that the *cumulative* payments to the entity allegedly affiliated with Defendant Khachatryan exceeded $250,000). FAC ¶ 187. That is no surprise, as discovery will show that each of these entities was simply a corporate entity through which each relevant Defendant elected to receive their regular compensation from IRL, as is common among start-up companies.

SoftBank also re-ups its arguments that IRL failed to properly disclose to SoftBank its relationships with Format Agency and Machine Learning.

As the original Defendants noted in the initial motion to dismiss, and as SoftBank now admits, the Disclosure Schedule disclosed agreements with both Format Agency and Machine Learning in Section 2.10(a)(i) as "agreements, understandings, instruments, contracts, or proposed transactions to which the Company is a party or by which it is bound that involve . . . obligations . . . [of] the Company in excess of $250,000."[9] Ex. E § 2.10(a)(i); *see also* Ex. D § 2.10(a)(i). SoftBank apparently would have preferred the agreements to have been disclosed under Section 2.11, but as the original Defendants previously noted, SoftBank's theory amounts to little more than a technical objection to the subsection of the Disclosure Schedule in which the

---

[9] Both the Primary Purchase Agreement and the Disclosure Schedule thereto are incorporated in the Complaint by reference and therefore properly considered on the Motion to Dismiss. *See supra* n.2.

28

relationships with those entities appeared. Moreover, that IRL actively disclosed its relationship with both entities cuts strongly against any inference of scienter.

This Court previously dismissed these claims because SoftBank had failed to allege the statements were untrue *at the time of the Series C* investment.  *See* MTD Order at 2.  Far from curing these defects in its Amended Complaint, SoftBank has been forced to admit them. SoftBank now admits what the original Defendants explained in their motion to dismiss: not only was Michael Sutyak, the individual associated with Format Agency, not IRL's Director of Growth at the time of the Series C—he was not even an employee of IRL *at all*.  FAC ¶¶ 179–80.  That fact forecloses SoftBank's claim.  The Primary Purchase Agreement did not require disclosure of agreements with entities associated with *future* employees, or with every vendor, or even with individuals to whom employment offers had been extended (though the Amended Complaint does not even allege that such an offer had been extended at the time of the Series C, instead describing the offer as "forthcoming" at the time of the Series C). FAC ¶ 180. Rather, it required disclosure of agreements with Key Employees.[10]  And though the Amended Complaint alleges that Mr. Sutyak's employment agreement, by its terms, was "effective" as of May 3, 2021, the fact remains that he was not an actual employee at the time of the Series C—and, at a minimum, even if he retroactively became one, the purported omission was not untrue *when it was made.*

Attempting to paint the timing of Mr. Sutyak's hiring in a suspicious light, SoftBank emphasizes that he was hired just one day after the Series C.  FAC ¶ 179.  It is entirely unsurprising that a company would quickly hire new talent after receiving a transformational $150 million investment.  Yet however SoftBank characterizes that chronology, it does not change the basic fact that the purported omission was not untrue when made, because Mr. Sutyak was not an employee at the time of the Series C.

SoftBank further alleges that Mr. Sutyak has previously held himself out as having been

---

[10] A "Key Employee" is defined under the Primary Purchase Agreement as "any executive-level employee (including division director and vice president-level positions) as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property."

29

"Head of Growth" at "Memix" beginning in October 2020, FAC ¶ 181—yet SoftBank itself tacitly acknowledges this could not have been true, as Memix (a separate, highly valuable app developed by the Company) was not launched until *years* after October 2020, and nearly a year and seven months after the Series C.  FAC ¶ 181 n.29.  SoftBank also claims Mr. Sutyak had an IRL domain email address before the Series C.  FAC ¶ 181. But irrespective of how Mr. Sutyak holds himself out, and irrespective of whether Mr. Sutyak had an IRL email address, SoftBank does not dispute that he was not an employee (let alone a *Key Employee*) of the company until after the Series C.

As for the alleged connection between Machine Learning and Defendant Shehab Amin, SoftBank now admits for the first time that Shehab Amin was a mere "data engineer" at the time of the Series C, and did not have more senior titles until after the Series C.  FAC ¶ 27. SoftBank thus does not and cannot allege that Amin was a "Key Employee" of IRL at the time of SoftBank's investment. IRL was therefore not required to disclose payments to Machine Learning under Section 2.11 of the Primary Purchase Agreement, and SoftBank's theory fails.

E.  The Definition of "Session" and "MAU" (Statements 4, 9, and 12)

Abraham's fourth, ninth, and twelfth alleged misstatements were that, in April 2021, IRL was measuring "session[s]" as app opens, *see* FAC ¶ 39, that IRL was measuring MAU as an "opened app or signed in/signup to web and has a session," *see* FAC ¶ 42, and that an "active user" as defined by IRL is a "natural person who . . . has logged in and engaged with the App at least once during the applicable period." *See* Dkt. No. 76, Stmts. 4 at 10-11, 9 at 14, 12 at 18-19.  In support of the falsity of those statements, SoftBank points primarily to its broad allegations relating to the presence of bots on IRL to support its theory of falsity. Yet those bot-related allegations fail to show that the definitions of "Session" or "MAU" were false, because the existence of a bot scheme is irrelevant to how IRL defined a given unit of measurement ("session" or "MAU"), just as a person's height is irrelevant to the definition of an inch.

SoftBank points to two additional allegations in support of its claims, but neither is sufficient to raise an inference of falsity or scienter. The first is that in May 2022—a year after SoftBank's investment, and at a time when IRL had nine million additional MAUs—Abraham

reportedly told *The Information* the definition of MAU that IRL was *then* using was more capacious than its earlier definition.[11] FAC ¶¶ 83–84. But how IRL defined MAU in Spring 2022 is irrelevant to how it defined MAU in Spring 2021—and in any event, the idea that Abraham would openly explain this definition of MAU to *The Information* is entirely at odds with SoftBank's theory that manipulating IRL's MAU numbers was part of a covert, fraudulent, yearslong scheme, and especially at odds with any inference of scienter. The second allegation is that, in June 2022, Abraham allegedly told SoftBank that "roughly two years ago"—*i.e.*, approximately a year before the Series C—IRL "transitioned to tracking only web and mobile engagement as a session." FAC ¶ 86. Again, how IRL defined MAU a year before SoftBank's investment is irrelevant to whether the statements at the time of the Series C were true. SoftBank has also entirely failed to allege scienter. Even if these statements were false, it is wholly unsurprising that Abraham—who is not (and is not alleged to be) an engineer, and who does not possess (and is not alleged to possess) a technical background relevant to these issues—might have misunderstood how MAU was being tallied at a particular time.

SoftBank offhandedly suggests, in a footnote, that the change in the definition of MAU approximately one year before SoftBank's investment somehow itself "is, on its own, a basis for this Amended Complaint." FAC ¶ 157 n.25. But SoftBank entirely omitted such a claim from its Statement Chart, has not alleged why the definition of MAU in mid-2020 would have been material to its investment in mid-2021, and has not alleged that it in fact relied on any contrary representation. Any such argument is belied by the fact that the Disclosure Schedule incorporated into the Primary Purchase Agreement began its MAU disclosures in *December 2020—not* the middle of that year. *See* Ex. E at 3; FAC ¶ 54.

---

[11] SoftBank's Chart appears to separately rely on the Complaint's allegation that *The Information* "reported that IRL relied on 'an unconventional definition" of active users, FAC ¶ 83, but that allegation both materially misstates *The Information*'s reporting and fails as a matter of law. *The Information* reported that some "employees . . . felt the company *may have* used an unconventional definition." Ex. F (emphasis added). And in any event, because SoftBank has failed to allege a basis for the reliability of *The Information*'s reporting, and as explained at length in Defendants' Motion to Dismiss the initial Complaint, *see* Dkt. No. 47 at 10–11, these allegations are insufficiently reliable to form the basis of any inference of falsity or scienter.

DEFENDANTS' OMNIBUS NOTICE OF
MOTION TO DISMISS AND MEMORANDUM OF P&As

CASE NO. 4:23-cv-03834-YGR

1    Without the bot story, SoftBank's allegations that Abraham misstated IRL's methodology

2    for counting active users reduces to complaining about a confusing (and allegedly contradictory)

3    jumble of statements by Abraham at various times after the Series C closed.   A non-engineer

4    allegedly flubbing on one or two occasions the description of how active users were calculated on

5    the app certainly does not give rise, in and of itself, to a strong inference of scienter.

6    Far more important, however, is one simple fact: ***Keystone expressly "verified IRL's MAU***

7    ***count during the Series C funding rounds.***" Keystone Report, ¶ 61 (emphasis added).  While the

8    Keystone team had no experience in bot detection, at least one of them had "experience in data

9    mining & analysis," FAC ¶ 108, which is precisely the kind of experience necessary to analyze

10   whether the raw BigQuery data on user activity was consistent with IRL's (and Abraham's) user

11   activity disclosures.   And that is precisely what Keystone confirmed: "that MAU numbers

12   calculated through the method described above—*i.e.*, counting users with at least one 'Session'

13   event in a time period—are ***consistent with the numbers disclosed during the Series C funding***

14   ***round***."   Keystone Rpt., ¶ 61 & Table 11 (emphasis added).   (Ironically, as the Amended

15   Complaint implicitly acknowledges, Keystone's original mandate had been "'to validate how we

16   [IRL] calculate MAU.'"  FAC ¶ 115 (quoting email from Abraham to Special Committee).  Once

17   Keystone verified that IRL's actual MAU numbers were "consistent with the numbers disclosed

18   during the Series C funding round," Keystone relegated that inconvenient finding to an Appendix

19   of its Report.  Keystone Rpt. ¶ 61.)

20        F.   Broad Representations in the Primary Purchase Agreement (Statements 15 and 16)

21   Finally, SoftBank points to two broad representations that cannot independently support

22   its securities fraud claims. Statement 15, in Section 2.21 of the Primary Purchase Agreement, is a

23   catch-all that warrants that no material misrepresentations or omissions were made in the Primary

24   Purchase Agreement or Disclosure Schedule. SoftBank has not articulated any independent reason

25   why the statement was false when made, nor has it marshaled any distinct facts in support of its

26   theory, apart from the other alleged misrepresentations. It fails for the same reasons as Statements

27   1, 3, 4, 11, and 14.

28

DEFENDANTS' OMNIBUS NOTICE OF                                    CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

1    Statement 16, in Section 2.23 of the Primary Purchase Agreement, states that IRL

2    "delivered to each Purchaser its unaudited financial statements as of March 31, 2021, and for the

3    fiscal year ended December 31, 2020," and those Financial Statements "fairly present in all

4    material respects the financial condition and operating results of the Company."  SoftBank's only

5    citation for the falsity of the statement—apart from a kitchen-sink reference by incorporation to

6    Statements 1, 3, 4, 11, and 14—is to paragraph 219 of its Amended Complaint. But paragraph 219

7    of the Amended Complaint simply recites this claim in conclusory fashion and contains no

8    independent factual allegations.  The Amended Complaint contains no allegations about the

9    contents of any unaudited financial statements delivered to SoftBank in May 2021. Having failed

10   to plead what those financial statements said, or what they should have said, SoftBank has not

11   satisfied its pleading obligations with respect to this alleged false statement.[12] Indeed, this Court

12   observed as much in the hearing on the first motion to dismiss, cautioning SoftBank that the

13   allegation was "just too generic," and that it was not clear "what [SoftBank is] trying to get at

14   here."  MTD Hearing Tr. at 34:18–19.  Though SoftBank committed to "tak[ing] a look at this

15   one," *id.* at 34:24, SoftBank added no allegations to its Amended Complaint to support this theory.

16   The Court should dismiss it.

17   **II.    This Court should dismiss SoftBank's state law claims.**

18          A.  This Court should decline to exercise jurisdiction over SoftBank's state law claims

19              and dismiss them as to all Defendants.

20          Should this Court again dismiss SoftBank's federal claims given their continued

21   deficiencies, the Court should decline to exercise jurisdiction over any remaining state-law claims.

22   SoftBank has not properly alleged diversity jurisdiction under 28 U.S.C. § 1332.  It is axiomatic

23   that the citizenship of an LLC like Plaintiff SVF II Aggregator (DE) LLC is determined by the

24   citizenship of its members. *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899

25

26   _____

     [12] In any event, SoftBank's theory appears to be that its accounting of its growth expenditures
27   misallocated costs across growth and infrastructure.  But any standard financial statement would
     not have described costs at that level of granularity, and SoftBank has not alleged that IRL
28   misrepresented its overall balance sheet, income statement, or cash flows.

DEFENDANTS' OMNIBUS NOTICE OF                          CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

(9th Cir. 2006).  SoftBank alleges that its sole member is SVF II Investment Holdings (Subco) LLC, another LLC whose citizenship is in turn determined by the citizenship of its members.  *See* FAC ¶ 21.  But the Amended Complaint makes no allegations about SVF II Investment Holdings (Subco) LLC's members.  *See id.*  Accordingly, the Amended Complaint does not adequately allege diversity jurisdiction, *Sixa Operations, LLC v. Minchenko*, No. 19-CV-04219-DMR, 2020 WL 13593704, at *2 (N.D. Cal. Aug. 28, 2020), and the only basis for exercising jurisdiction over any surviving state-law claims would be supplemental jurisdiction.  Because "[a] district court should normally decline to exercise supplemental jurisdiction over supplemental state-law claims once all federal claims have been dismissed," *Egan v. Cnty. of Del Norte*, No. 12-CV-05300 NJV, 2014 WL 46609, at *5 (N.D. Cal. Jan. 6, 2014), this Court should do the same.

      B.  <u>This Court should dismiss SoftBank's state law claims against all Defendants on the merits because they are based on the same defective theory as the federal claims.</u>

Each of Plaintiff's state law claims rests on the same alleged fraud as its federal claims, and the state law claims should be dismissed for the same reasons the federal claims should.  The heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to each of SoftBank's state-law claims.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  SoftBank was thus obligated to plead the falsity of each alleged misstatement or omission with particularity for its state law claims to survive the motion to dismiss.

This Court previously dismissed most of SoftBank's state law claims on the first motion to dismiss, including the claims for a fraudulent concealment, conspiracy to commit fraud, aiding and abetting fraud, and violations of California Corporations Code § 25401. With respect to the conspiracy and aiding and abetting claims, the Court specifically admonished Plaintiff that "[s]hould plaintiffs not have additional facts, then the option is not to re-assert insufficient claims but to request that leave remain an option for a defined period of time in the event discovery elucidates."  MTD Order at 3.  Yet Plaintiff has not alleged any additional facts that bolster these claims.

To the contrary, SoftBank has actually *weakened* its state-law fraud claims, for the same reasons discussed above—including those that, in their initial form, survived Defendants' initial motion to dismiss. *See supra* at 2, 7–8, 12.  SoftBank additionally added a "fraud outside the contract" claim for the first time, which (to the extent its basis can be discerned from SoftBank's generalized allegations, *see* FAC ¶¶ 258–263), is based on the exact same theory as its federal claims.  It fails for the reasons they do, too.

        C.   <u>Each state law claim fails for numerous individual reasons.</u>

           1.   *The Amended Complaint fails to state a claim for fraudulent concealment.*

The Court previously dismissed the fraudulent concealment claim for failing to plead "facts with the requisite particularity required under Rule 9(b)."  MTD Order at 3.  Having abandoned its initial theory that the Secondary Sellers "made payments to proxy services and funneled funds to intermediary agencies," *id.* at 3, the Amended Complaint asserts two new theories: that the Secondary Sellers concealed or suppressed material facts by not disclosing (1) related-party payments on the Disclosure Schedule attached to the Primary Purchase Agreement, and (2) that they "had access" to the "backend information" and "dashboards" that "would have revealed the truth about IRL's user data and IRL's definition of 'session' and 'MAU.'"  FAC ¶¶ 266-268.

Putting aside whether any of these theories should be treated as credible given the moving target of Plaintiff's claims, these two new claims do not satisfy the pleading standard for a fraudulent concealment claim.  *Bank of Am. Corp. v. Superior Court*, 198 Cal.App.4th 862, 870 (2011) (internal citations and quotation marks omitted); *see, e.g., Rhub Communs., Inc. v. Karon*, 2017 U.S. Dist. LEXIS 124539, at *30 (N.D. Cal. Aug. 7, 2017) ("Fraud by concealment remains subject to Rule 9(b) and must be pleaded with specificity rather than with 'general and conclusory' allegations") (internal citations omitted).

        **a.   The Amended Complaint does not allege that Yassin, Noah, or Mr. Khachatryan concealed or suppressed a material fact.**

Plaintiff fails to support with factual allegations its claim that Yassin, Noah, and Mr.

Khachatryan learned of the related-party payments and were aware they were not disclosed on the "Disclosure Schedule" appended to the Primary Purchase Agreement. FAC ¶ 266. No factual allegations connect Yassin, Noah, or Mr. Khachatryan to the Primary Purchase Agreement, let alone the content of the Disclosure Schedule attached to it. There is no allegation they had any input regarding the Disclosure Schedule. No allegation they saw the Disclosure Schedule. No allegation they even knew there was a Disclosure Schedule. The Amended Complaint merely alleges that the "Disclosure Schedule" was an attachment to the Primary Purchase Agreement. FAC ¶ 54. But neither Yassin, Noah, nor Mr. Khachatryan were parties to the Primary Purchase Agreement.

Put simply, Yassin, Noah, and Mr. Khachatryan cannot be said to have been aware of facts omitted from a document they never drafted, received, or reviewed. *See Ohio Six Ltd. v. Motel 6 Operating L.P.*, No. CV 11-8102 MMM (EX), 2012 WL 12886208, at *13 (C.D. Cal. Nov. 16, 2012) ("Just as scienter is required before an affirmative misrepresentation is actionable, a defendant must conceal 'facts within his knowledge' to be liable for fraud by omission . . . [Defendant] was unaware of the allegedly concealed facts, and therefore could not have knowingly failed to disclose them").

Moreover, Plaintiff alleges Yassin or Noah knew about only one related-party transaction that was not disclosed in the Disclosure Schedule: that over the course of seventeen months IRL paid $294,000 to App Inc., a company allegedly associated with Yassin and Noah. FAC ¶ 188. Similarly, Mr. Khachatryan is only tied to allegations that "'Socialite Studios' is affiliated with [Mr.] Khachatryan" and that IRL paid it "at least $234,215.91 for 'consulting' services" between January 2020 and May 2021. FAC ¶ 187. Plaintiff does not, nor can it, explain how these transactions were material to it entering into multimillion dollar transactions with a company with a "pre-money valuation" of "$1 billion."[13] FAC ¶ 3; *see Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1130 (9th Cir. 2014) (affirming finding that the "purportedly concealed facts" of an agreement "were not material").

---

[13] Any determination that this information was not material to SoftBank's investment would apply with equal force to the same claim against Abraham.

1      Plaintiff's second theory is that Yassin, Noah, and Mr. Khachatryan "had access" to the

2  "backend information" and "dashboards" that "would have revealed the truth about IRL's user

3  data and IRL's definition of 'session' and 'MAU.'"   FAC ¶¶ 267-268.   But the Amended

4  Complaint does not allege any facts that would render this information material.   Plaintiff does

5  not even allege what it is referring to as the "dashboards" and "backend information."   Nor does

6  Plaintiff allege how Yassin, Noah, and Mr. Khachatryan having access to this information—

7  whatever it may be—could possibly have impacted Plaintiff's decision to invest in IRL.

8      Plaintiff cannot plausibly do so because whether a particular employee has access to a

9  particular piece of information is not important to the decision to purchase stock in that employee's

10  company.  *See Webb v. Carter's, Inc.*, No. CV087367GAFMANX, 2010 WL 11507254, at *7

11  (C.D. Cal. Apr. 1, 2010) ("To establish that an undisclosed fact is material, a plaintiff must show

12  that 'had the omitted information been disclosed,' the reasonable consumer would have been

13  'aware of it and behaved differently.'") (internal citations omitted); *Persson v. Smart Inventions,*

14  *Inc.*, 125 Cal. App. 4th 1141, 1163, 23 Cal. Rptr. 3d 335, 352 (2005) ("Under California law, a

15  fact is material if 'a reasonable man would attach importance to its existence or nonexistence in

16  determining his choice of action in the transaction in question'") (internal citations omitted).

17              **b.  The  Amended  Complaint  does  not  allege  actionable**

18                  **nondisclosure by Yassin, Noah, or Mr. Khachatryan.**

19      Plaintiff's fraudulent concealment claim fails for the additional reason that the Amended

20  Complaint does not allege any facts establishing that Yassin, Noah, or Mr. Khachatryan had a duty

21  to disclose the allegedly omitted information to Plaintiff.   Under California law, there are only

22  four circumstances in which nondisclosure or concealment may constitute actionable fraud: "(1)

23  when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had

24  exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively

25  conceals  a  material  fact  from  the  plaintiff;  and  (4)  when  the  defendant  makes  partial

26  representations but also suppresses some material facts." *Bank of Am. Corp.*, 198 Cal.App.4th at

27  870-71 (internal citation and quotation marks omitted).  None are availing here.

28

DEFENDANTS' OMNIBUS NOTICE OF                    CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

*First*, the Amended Complaint does not attempt to allege that Yassin, Noah, or Mr. Khachatryan owed any fiduciary duties to Plaintiff or had exclusive knowledge of the allegedly omitted facts.  *See* Dkt. 54 at 40 (conceding Yassin and Noah "may not have stood in a fiduciary relationship with SoftBank").

*Second*, as explained above, the Amended Complaint fails to allege Yassin, Noah, or Mr. Khachatryan knew what was in the Disclosure Schedule so they cannot be said to have had exclusive knowledge of something about which Plaintiff fails to allege they had any knowledge.

*Third,* the Amended Complaint fails to sufficiently allege that Yassin, Noah, or Mr. Khachatryan engaged in active concealment because "[m]ere nondisclosure does not constitute active concealment." *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013). "Rather, to state a claim for active concealment, plaintiff must allege specific affirmative acts on the part of the defendants in hiding, concealing or covering up the matters complained of." *Scherer v. FCA US*, 565 F. Supp. 3d 1184, 1196 (S.D. Cal. 2021) (internal citation and quotation marks omitted).  Plaintiff alleges no such specific acts.

*Fourth*, Plaintiff does not allege that Yassin or Noah made any representations at all, partial or otherwise.  *E.g. Garcia v. GM Ltd. Liab. Co.,* No. 18-cv-01313 LJO, 2018 U.S. Dist. LEXIS 208129, at *59 (E.D. Cal. Dec. 10, 2018) ("Plaintiffs failed to sufficiently plead that any partial representations were made by GM, and thus there was no duty to disclose based on partial representations.").  Plaintiff's generalized allegations that Mr. Khachatryan "aided IRL in responding to SoftBank's due diligence questions," FAC ¶ 249, is insufficient, without allegations about *which* due diligence questions Mr. Khachatryan aided in, what representations he made, what he omitted, and how Plaintiff relied on Mr. Khachatryan's omissions.  *See Garcia*, 2018 U.S. Dist. LEXIS 208129, at *59 ("Plaintiffs failed to plead with sufficient particularity 'affirmative acts of concealment'" and "failed to plead with sufficient particularity what representations GM made to them, that Plaintiffs actually relied upon in purchasing the vehicle.").

### c.  The Amended Complaint fails to sufficiently allege scienter.

The Amended Complaint fails to allege that Yassin, Noah, or Mr. Khachatryan intended

to defraud Plaintiff.  Fatally absent from the Amended Complaint are any facts to suggest that Yassin, Noah, or Mr. Khachatryan acted with an intent to defraud.  Plaintiff does not allege that Yassin or Noah had any role, responsibility, or communications with Plaintiff.  There are no allegations they met or spoke with investors.  The Amended Complaint alleges only that Yassin and Noah were employees that sold stock to Plaintiff.  *See* FAC ¶¶ 25-26.  Similarly for Mr. Khachatryan, he sold stock to Plaintiff and supposedly "aided" in responding to unidentified due diligence questions.  FAC ¶¶ 24, 249.  That alone is insufficient.  *See Goodman,* 18 Cal. 3d at 347 ("The mere conclusory allegations that the omissions were intentional and for the purpose of defrauding and deceiving plaintiffs and bringing about the purchase of the stock and that plaintiffs relied on the omissions in making such purchase are insufficient for the foregoing purposes.").

> **d. The Amended Complaint still fails to sufficiently allege SoftBank suffered damage as a result of any alleged omission by Yassin or Noah.**

In the Primary Purchase Agreement, which is governed by Delaware law (Ex. D, § 6.3 (p. 22)), Plaintiff stated that it was "not relying upon any Person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company."  Ex. D, § 3.10 (p. 19).  Plaintiff does not allege that either Yassin, Noah, or Mr. Khachatryan was "the Company" or an officer or director of it.  Thereby, Plaintiff contractually disavowed reliance on any representations or omissions by Yassin, Noah, or Mr. Khachatryan.  *E.g. Gardensensor, Inc. v. Stanley Black & Decker, Inc.,* No. 12-cv-03922 NC, 2012 WL 12925714, at *4–5 (N.D. Cal. Oct. 25, 2012) (Delaware courts have "consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.") (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003); *see also Rogers Enters. v. Hitachi Sols. Am., Ltd.,* No. 21-cv-913 PSG, 2022 U.S. Dist. LEXIS 25512, at *23 (C.D. Cal. Jan. 18, 2022) ("[T]he Court finds Plaintiff's tort claims based on pre-contractual representations barred by the MSA's integration and anti-reliance clause.  Such clauses are enforceable under Delaware law and can

1 | bar fraud claims based on extra-contractual representations or omissions") (citing *Prairie Capital*

2 | *III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50-5 (Del. Ch. 2015)).   Similarly, in the

3 | Secondary Purchase Agreement, Plaintiff "acknowledges" that it had "consulted" its own

4 | "financial, legal and tax advisors," and was "solely responsible for the decision to enter into [the

5 | Secondary Purchase] Agreement." Ex. G, § 4(g) (p. 3).

6 |      In addition, the Amended Complaint does not attribute any of the harm it suffered to

7 | Yassin, Noah, or Mr. Khachatryan.   Plaintiff instead claims that, "[u]ltimately, SoftBank's

8 | decision to purchase IRL shares at a pre-money $1 billion valuation relied on a series of 13

9 | representations by Abraham Shafi and IRL."  FAC ¶ 56.

10 |                 2.  *The Amended Complaint fails to state a claim for conspiracy to commit*

11 |                       *fraud against Yassin, Noah, or Mr. Khachatryan.*

12 |      "A party seeking to establish a civil conspiracy 'must show that each member of the

13 | conspiracy acted in concert and came to a mutual understanding to accomplish a common and

14 | unlawful plan . . .'" *AREI II Cases*, 216 Cal. App. 4th 1004, 1022 (2013) (citing *Choate v. County*

15 | *of Orange*, 86 Cal.App.4th 312, 333 (2000)).   The conspirators must "agree to do some act which

16 | is classified as a civil wrong . . . [and] must have actual knowledge that a tort is planned and concur

17 | in the tortious scheme with knowledge of its unlawful purpose." *Id.* at 1582.   The Amended

18 | Complaint fails to allege Yassin, Noah, or Mr. Khachatryan made any such agreement or shared

19 | any common design.

20 |      This case remains indistinguishable from *In re Sunrise Techs. Sec. Litig.*, No. 92-cv-0948-

21 | TEH, 1992 U.S. Dist. LEXIS 18213 (N.D. Cal. Sep. 22, 1992), where the court dismissed a civil

22 | conspiracy claim predicated on allegations that a corporation and its officers withheld information

23 | from investors to inflate the value of the corporation's stock.   The court found the plaintiff had

24 | "fail[ed] to allege any express agreement among the parties, and to allege any specific facts from

25 | which it could be inferred that an express or tacit agreement existed." *Id.* at 19.   The complaint

26 | alleged only "the role played by each of the defendants in the company, and allege[d] that the

27 | company issued misleading statements." *Id.*   The court concluded that "[a]t most, these are

28 |

DEFENDANTS' OMNIBUS NOTICE OF                CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

1   allegations that an agreement may have existed" but "without the factually specific allegation that

2   defendants directed themselves toward a common wrongful goal, these allegations are insufficient

3   to state a claim for conspiracy." *Id.*

4          Similarly, here, the Amended Complaint fails to sufficiently allege that there was a

5   conspiratorial agreement among Defendants. *See e.g. Banc of Cal., NA v. McDonnell*, No. 18-cv-

6   01194 AG, 2018 U.S. Dist. LEXIS 231608, at *10 (C.D. Cal. Nov. 9, 2018) ("[C]ivil conspiracy

7   requires more than mere association with the tortfeasors and [a]ctual knowledge of the planned

8   tort.  There must also be evidence of some participation or interest in the commission of the

9   offense.") (internal citation and quotation marks omitted).[14]

10              **a.  The Amended Complaint fails to allege any wrongful conduct**

11                  **in furtherance of the conspiracy.**

12          The Amended Complaint describes the alleged conspiracy as "an ongoing scheme" to

13   induce Plaintiff to purchase IRL stock by "misrepresenting IRL's user data, IRL's measurement

14   of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's

15   definition of an 'active user,' and IRL's broad representations in the Primary Purchase

16   Agreement." FAC ¶ 272.  But the Amended Complaint fails to allege particular facts establishing

17   that Yassin, Noah, or Mr. Khachatryan contributed to any of these alleged misrepresentations.

18   There are no allegations that Yassin, Noah, or Mr. Khachatryan made any representations about

19   these things to Plaintiff.  And there are no allegations that connect Yassin, Noah, or Mr.

20   Khachatryan to anyone else's alleged misrepresentation about these subjects.[15] *Wasco Prods, Inc.*

21   *v. Southwall Techs, Inc*. 435 F.3d 989, 991 (9th Cir.) *cert. denied*, 549 U.S. 817 (2006); *see e.g.*

22   *Esoimeme v. Wells Fargo Bank*, No. 10-cv-2259 JAM EFB, 2011 U.S. Dist. LEXIS 98492, at *27-

23   28 (E.D. Cal. Sep. 1, 2011) ("Plaintiff must allege facts showing the role each defendant allegedly

24   played in the conspiracy."); *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) ("In the

25   _____

26   [14] Absent a conspiracy among the Defendants, the conspiracy claim against Abraham fails as well, as the other Defendants are Abraham's only alleged co-conspirators.

27   [15] Plaintiff does identify Abraham's purportedly misleading statements during due diligence, but does not allege that Mr. Khachatryan had any involvement in those alleged misstatements.  *See*

28   FAC ¶¶ 38-50.

41

1  context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y]
2  the role of [each] defendant[] in the alleged fraudulent scheme.'")  (citing *Moore v. Kayport*
3  *Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

4        **b.  The Amended Complaint fails to allege any damages arising**
5                    **from the alleged conduct.**

6        For the reasons stated *supra*, the Purchase Agreements foreclose Plaintiff from alleging
7  that Yassin, Noah, or Mr. Khachatryan caused Plaintiff any damage.

8        **c.  Yassin, Noah, and Mr. Khachatryan are legally incapable of**
9                    **committing the tort of civil conspiracy because they did not owe**
10                   **a duty to plaintiff.**

11       "[T]ort liability arising from conspiracy" requires that the co-conspirator be "legally
12 capable of committing the tort." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503,
13 511 (1994).  "[I]n order for several defendants to be liable for acts in which they did not directly
14 participate, each defendant must have breached a duty to plaintiff." *Yijin Lu v. Deng*, 16-cv-07283
15 CAS, 2016 U.S. Dist. LEXIS 154395, at *13 (C.D. Cal. Nov. 7, 2016).  Plaintiff must prove that
16 each co-conspirator "owes a duty to plaintiff recognized by law and is potentially subject to
17 liability for breach of that duty." *Applied Equip. Corp.*, 7 Cal. 4th at 511.  As discussed *supra*,
18 neither Yassin, Noah, nor Mr. Khachatryan owed Plaintiff a duty.

19       3.  *The Amended Complaint still fails to state a claim for aiding and abetting*
20         *fraud.*

21       The Court previously dismissed this claim for the same reasons it dismissed the conspiracy
22 claim.  MTD Order at 3-4.  And for the same reasons the Amended Complaint still fails to plead
23 the conspiracy claim, it fails to plead the Relative Defendants or Mr. Khachatryan aided and
24 abetted fraud.

25       Under California law, "[t]o state a claim for aiding and abetting a tort, a plaintiff must
26 show that the defendant either: (a) knows the other's conduct constitutes a breach of duty and
27 gives substantial assistance or encouragement to the other to so act or (b) gives substantial

28

42

assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person."  *Chang v. Interactive Brokers LLC*, No. 21-cv-05967 NC, 2021 U.S. Dist. LEXIS 227027, at *7-8 (N.D. Cal. Nov. 24, 2021). "[B]ecause the aiding and abetting claims alleged in the complaint are . . . grounded in the fraudulent scheme, the Rule 9(b) heightened pleading standard applies."  *Id.* at *7.  Plaintiff fails to meet that heightened pleading standard because Plaintiff fails to allege (1) substantial assistance, or (2) the Relative Defendants or Mr. Khachatryan owed Plaintiff a duty, or knew anyone else owed Plaintiff a duty.

### a.   The Amended Complaint fails to allege substantial assistance.

The Amended Complaint alleges that Defendants induced Plaintiff to purchase IRL stock by making various misrepresentations.  FAC ¶ 276.  But the Amended Complaint does not allege that the Relative Defendants made any representations to Plaintiff, or assisted Abraham in making any representations to Plaintiff.  So too with Mr. Khachatryan: he is not alleged to have made a representation directly to Plaintiff, and he is not alleged to have been involved in providing purportedly misleading answers to Plaintiff's due diligence questions.  *See* FAC ¶¶ 38-50.

To the extent Plaintiff means to allege the Relative Defendants or Mr. Khachatryan aided and abetted fraud by failing to intervene and stop the alleged nondisclosure of certain facts, California law is clear that "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting."  *Fiol v. Doellstedt*, 50 Cal.App.4th 1318, 1326 (1996); *see also Diaz v. Intuit, Inc*., No. 15-cv-01778 EJD, 2017 U.S. Dist. LEXIS 162979, at *13-14 (N.D. Cal. Sep. 29, 2017) ("[F]ailure to act does not constitute substantial assistance for purposes of aiding and abetting liability.").  Rather, "[s]ubstantial assistance requires a significant and active, as well as a knowing participation in the wrong."  *Impac Funding Corp. v. Endresen*, No. 15-cv-588 JLS, 2015 U.S. Dist. LEXIS 200540, *6-7 (C.D. Cal. Dec. 16, 2015) (internal citation and quotation marks omitted); *see also Casey v. U.S. Bank Nat. Ass'n,* 127 Cal.App.4th 1138, 1146 (2005) (aiding and abetting "necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a

43

1   wrongful act.") (citation and quotation marks omitted).  The allegations are insufficient to establish

2   that the Relative Defendants or Mr. Khachatryan had a significant, active, or knowing participation

3   in any alleged wrong.  *See, e.g., Su v. Henry Glob. Consulting Grp.*, 20-cv-02235 ODW, 2022

4   U.S. Dist. LEXIS 736, at *14 (C.D. Cal. Jan. 3, 2022) ("To satisfy the substantial assistance prong,

5   Rule 9(b) requires that Plaintiffs plead the specific acts or omissions that comprise the necessary

6   substantial assistance.  Generalized and conclusory allegations that a defendant aided and abetted

7   the principal wrongdoers will not suffice.")  (internal citations and quotation marks omitted).

8   **b.  The Amended Complaint fails to allege a breach of duty.**

9   Even if Plaintiff had sufficiently alleged substantial assistance, which it does not, the aiding

10  and abetting claim still fails because the Amended Complaint does not sufficiently allege Noah,

11  Yassin, Shehab, or Mr. Khachatryan (1) owed Plaintiff a duty, or (2) knew anyone else's conduct

12  breached any such duty.

13  *First*, as already discussed *supra* Section II.C.2.c, neither Yassin, Noah, nor Mr.

14  Khachatryan owed Plaintiff a duty.  And the Court has already ruled Shehab did not:  Plaintiff

15  "fail[ed] to plead facts establishing that [Shehab] . . . owed [Plaintiff] any duty."  MTD Order at

16  3.  None of the amendments in the Amended Complaint fix that issue, nor could they.

17  *Second*, Plaintiff fails to allege that the Relative Defendants or Mr. Khachatryan knew of

18  any alleged duty owed to Plaintiff by Abraham.  Plaintiff does allege that the Relative Defendants

19  and Mr. Khachatryan had access to the information that Plaintiff alleges it did not (*e.g.* FAC ¶¶

20  267-268) but stops short of saying the Relative Defendants or Mr. Khachatryan made any false

21  representations about that information.  Plaintiff also stops short of alleging the Relative

22  Defendants or Mr. Khachatryan knew about anyone else making representations about that

23  information.  Indeed, Plaintiff pointedly does *not* allege Mr. Khachatryan's involvement in

24  Abraham's specific due diligence statements concerning users.  *See* FAC ¶¶ 38-50.  Accordingly,

25  the Amended Complaint fails to allege that the Relative Defendants and Mr. Khachatryan had

26  knowledge of anyone breaching a duty to Plaintiff.

27

28

44

1          4.   *The Amended Complaint fails to state a claim for unjust enrichment*

2                *against Yassin, Noah, or Mr. Khachatryan.*

3        The Court previously upheld the unjust enrichment claim "[b]ecause the Court upholds the

4 fraud within contract claim."  MTD Order at 4.  But the "fraud within contract claim" is not

5 brought against Yassin, Noah, or Mr. Khachatryan.  Therefore, because no fraud claims stand

6 against Yassin, Noah, or Mr. Khachatryan, there is no basis for an unjust enrichment claim against

7 them.  The pleading failures discussed relating to Plaintiff's other claims are also fatal to its unjust

8 enrichment claim.  *See, e.g., Lentz v. Sanderson Farms, Inc.*, No. 19-cv-06570 RS, 2020 U.S. Dist.

9 LEXIS 260468, at *24 (N.D. Cal. Feb. 10, 2020) ("[P]laintiffs have failed to plead with the

10 requisite particularity their predicate claims sounding in fraud.  The unjust enrichment claim must

11 therefore be dismissed"); *Hammerling v. Google LLC*, 615 F.Supp.3d 1069, 1096–97 (N.D. Cal.

12 2022) (Where plaintiffs fail to plead with particularity that defendants committed an actionable

13 misrepresentation or omission, "the unjust enrichment claim cannot stand.").

14          5.   *Plaintiff fails to allege the Relative Defendants or Mr. Khachatryan is*

15                *jointly and severally liable pursuant to California Corporations Code §*

16                *25504.*

17        Because Plaintiff fails to allege an underlying violation of Section 25501 of the California

18 Corporations Code, *see supra* Section II.B, Plaintiff also fails to state a claim under Section 25504,

19 which requires an underlying violation of Section 25501.  *E.g. Abdo v. Fitzsimmons*, No. 17-CV-

20 00851-EDL, 2018 WL 11220494, at *25 (N.D. Cal. May 22, 2018) ("To recover against

21 Defendants as secondarily liable under § 25504, Plaintiffs must sufficiently allege . . . primary

22 liability under § 25501[.]"); *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1064 (N.D. Cal. 2013)

23 ("[I]n the absence of a viable claim of primary liability, plaintiff cannot state a claim against the [

24 ] defendants for control person liability under § 25504.").  Regardless, Plaintiff fails to allege the

25 other necessary components of a Section 25504 claim.

26          **a.   The Relative Defendants and Mr. Khachatryan were not**

27             **principal executive officers.**

28

45

1    Section 25504 creates joint and several liability for "every principal executive officer or

2    director of a corporation so liable."   Cal. Corp. Code § 25504.   The Amended Complaint

3    incorrectly concludes that the Relative Defendants were principal executive officers of IRL by

4    alleging that they were on "IRL's Founding Team" and/or "Head" of an engineering team.   FAC

5    ¶ 247.   But Plaintiff describes Noah, Yassin, and Shehab as "employee[s]" and "back-end

6    engineer[s]."   *Id*. ¶¶ 248-49.   These are not the higher-level roles that California courts find make

7    someone a principal executive officer.   *See, e.g., Balkowitsch v. D & M Dev., Inc.*, No. 2:15-CV-

8    00196 JAM EF, 2015 WL 3403083, at *2 (E.D. Cal. May 27, 2015) (defendant was "President"

9    of the company); *Crypto Asset Fund, LLC v. Hoard, Inc.*, No. 20-CV-438-MMA (AHG), 2020

10   WL 13556129, at *9 (S.D. Cal. Dec. 14, 2020) (defendant was "President & Chief Executive

11   Officer" of the company); *cf. In re Gap Stores Sec. Litig.*, 457 F. Supp. 1135, 1146 (N.D. Cal.

12   1978) (defendant was Vice President of Distribution and did "not come within the coverage of

13   California Corporations Code § 25504").

14   Similarly, for Mr. Khachatryan, Plaintiff characterizes his employment with IRL in several

15   ways, and all of which either allege or support the reasonable (and correct) inference that Mr.

16   Khachatryan was an employee of IRL—not a principal executive officer.   Plaintiff initially alleges

17   that Mr. Khachatryan "was a co-founder of IRL and a *senior engineer* at the Company from 2016

18   until June 2023."   FAC ¶ 24 (emphasis added).   During his tenure, Mr. Khachatryan "also worked

19   on IRL's back-end systems" as one of "the primary *employees* whose job responsibilities involved

20   user data."   *See* FAC ¶ 154 (emphasis added).   In the leadup to the Series C Investment, "SoftBank

21   was . . . introduced to Khachatryan as a *member* of IRL who was assisting with IRL's responses

22   to due diligence questions."   *See* FAC ¶ 37 (emphasis added).   And, critically, he "was an IRL

23   *employee* at the time of the Series C Investment."   FAC ¶ 248 (emphasis added); *see also* FAC ¶

24   33 ("At the time of the Series C, IRL had 15 full-time employees, including Defendants").   All of

25   these allegations reflect that Mr. Khachatryan was an IRL employee for the duration of his tenure

26

27

28

46

1    at the company.[16]   Again, these roles do not make Mr. Khachatryan a principal executive officer.

2    *See, e.g., Balkowitsch* , 2015 WL 3403083, at *2; *Crypto Asset Fund, LLC*, 2020 WL 13556129,

3    at *9; *cf. In re Gap Stores Sec. Litig.*, 457 F. Supp. at 1146.

4        Plaintiff's sole assertion that purports to sow any doubt about Mr. Khachatryan's

5    employment status with IRL is its unsupported allegation that Mr. Khachatryan "was a principal

6    executive officer of IRL."   FAC ¶ 247.   Not only does this allegation conflict with Plaintiff's

7    various, specific allegations that he was a "senior engineer" and an "employee," but the

8    particularized allegation in the very next sentence fails to support it—that "[Mr.] Khachatryan was

9    a co-founder of IRL at the time of Series C Investment, and the knowledge of the Company was

10   defined to include his knowledge" does not sufficiently allege him to be a "principal executive

11   officer of IRL."   *Id*.   And the bare assertion of being a "principal executive officer" conflicts with

12   the next allegation that he was a "an IRL *employee*" at the time of the Series C investment.   *See*

13   FAC ¶ 248 (emphasis added); *see also id.* ¶ 33 (referring to Mr. Khachatryan as an "employee" at

14   "the time of the Series C").   And that allegation—that he was "an IRL *employee*" at the time of the

15   Series C investment (FAC ¶ 248)—is what matters.   *See Rosen v. Urb. Commons, LLC*, No.

16   SACV2001973JLSDFMX, 2021 WL 3264147, at *3 (C.D. Cal. July 23, 2021) (a defendant may

17   not be subject to section 25504 liability as a director of the primary violator if they did not hold

18   that status at the time of the allegedly fraudulent transaction).   The Relative Defendants and Mr.

19   Khachatryan Did Not Materially Aid in the Violation as Employees

20       **b.   The Relative Defendants and Mr. Khachatryan did not**

21       **materially aid a primary violation.**

22       Section 25504 also creates joint and several liability for "every employee of a person"

---

23   [16] As discovery will demonstrate, Softbank knew at the time of the Series C Investment that Mr.
24   Khachatryan was an employee, not an officer.   Among the "data room materials" Plaintiff
     "extensive[ly] review[ed]," *see* FAC ¶ 50, was a copy of Mr. Khachatryan's 2016 employment
25   agreement—he was "a Co-Founder" and reported to the CEO and President.   IRL's Bylaws, also
     in the data room, do not list "Co-Founder" as an officer-level position.   Further, a "Current and
26   Projected Headcount" document in the data room labeled Mr. Khachatryan (typically referred to
     as "Henry") as a Lead Engineer for iOS, meaning a front-end engineer who "focus[es] on the
27   experience of a user on a website or app[.]"   *See* FAC ¶ 154.   Others, not Mr. Khachatryan, were
28   listed as back-end engineers.

47

liable for a violation of Section 25501 "who materially aids in the act or transaction constituting the violation."  Cal. Corp. Code § 25504.  Liability "is contingent upon a showing that the individual 'materially aid[ed] in the act or transaction . . . constituting the violation[.]'"[17] *See Balkowitsch*, 2015 WL 3403083, at *2 (citation omitted).  Courts have interpreted this element to require that the secondary defendant "materially aided, not simply in the transaction, but in the violation" itself.  *See Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 70 Cal. App. 4th 226, 256 (2007).  Thus, a plaintiff is "required to plead facts showing [the secondary defendant's] knowledge of the false or misleading nature of the representations" constituting the primary violation, or else that "[they] knew facts giving [them] reasonable grounds to know the statements were false or misleading." *See id.* (footnote and citation omitted).  But in addition to "the material facts which were omitted from an investor," a secondary defendant "must also have known or had reason to know that the facts were *withheld* from the party so defrauded." *See Abdo v. Fitzsimmons*, No. 17-CV-00851-TSH, 2021 WL 616324, at *23 (N.D. Cal. Feb. 17, 2021) (emphasis added).

Plaintiff alleges the Relative Defendants and Mr. Khachatryan were employees of IRL.  FAC ¶¶ 33, 248.  And Plaintiff alleges IRL violated Section 25501 by making "false representations and warranties" in the Primary Purchase Agreement.  FAC ¶ 246.  But Plaintiff fails to allege the Relative Defendants or Mr. Khachatryan materially aided that imagined violation.  Nor could Plaintiff make such an allegation because the Relative Defendants and Mr. Khachatryan were not parties to the Primary Purchase Agreement, and there are no allegations that they had any knowledge of, or even saw, the representations made in the Primary Purchase Agreement. *See Abdo*, 2021 WL 616324, at *23 (defendants "must also have known or had reason to know that the facts were *withheld* from the party so defrauded.") (emphasis added).

The Amended Complaint also claims Abraham violated Section 25501 by allegedly

---

[17] Where defendants are principal executive officers and directors, by contrast, "the plain language of section 25504 means that principal executive officers and directors are presumptively liable for their corporation's issuance of unqualified securities, regardless of whether they participated in the transactions at issue, or controlled the issuer." *Hellum v. Breyer*, 194 Cal. App. 4th 1300, 1310 (2011); *People v. Koenig*, 58 Cal. App. 5th 771, 804 (2020) (same).

"misrepresent[ing] and omit[ing] to disclose to Plaintiff facts concerning IRL's user data, IRL's measurement of user data, IRL's user base growth methods, IRL's payments to affiliated entities, IRL's definition of a 'session' and 'MAU,' and IRL's broad representations in the Primary Purchase Agreement." FAC ¶ 239. But, as previously explained, the Amended Complaint fails to allege the Relative Defendants or Mr. Khachatryan materially aided that alleged violation. The Amended Complaint does not allege the Relative Defendants had any knowledge of or role in any alleged representation made by Abraham to Plaintiff, so they cannot be said to have materially aided Abraham. Nor does Plaintiff sufficiently allege Mr. Khachatryan's material aid in the violation. Plaintiff alleges that it was "introduced to Khachatryan as a member of IRL who was assisting with IRL's responses to due diligence questions," FAC ¶ 37, but does not specifically allege what exact due diligence questions Mr. Khachatryan in fact helped to respond to. *See also id*. ¶ 249. When Plaintiff *does* identify the due diligence questions and answers it alleges were misleading, Plaintiff does *not* allege Mr. Khachatryan's involvement. *See id*. ¶¶ 38-50.

6. *The Amended Complaint fails to state a claim for fraud outside of the contract.*

To state a claim for fraud, Plaintiff must allege "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity or 'scienter'; (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting in damage." *Moore v. Hagerty Ins. Agency*, LLC, No. 19-CV-05453-EMC, 2020 WL 7053262, at *8 (N.D. Cal. May 1, 2020) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)). Plaintiff fails to allege that Noah, Yassin, or Mr. Khachatryan made any representation to Plaintiff outside of a contract, let alone a false representation.[18]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss

---

[18] Plaintiff falls again at all the other hurdles for the same reasons it fails to state its other claims against Noah, Yassin, and Mr. Khachatryan. The elements of the fraud claim largely overlap with the elements of the other claims brought against Noah, Yassin, and Mr. Khachatryan, so the arguments made there apply equally here.

49

1    SoftBank's Amended Complaint in its entirety.

2    Dated: August 6, 2024                    Respectfully Submitted,

3                                             By:  *Stephen Shackelford, Jr.*

4    _____

5    Adam J. Fee (SBN 345075)                 Stephen Shackelford, Jr. (*pro hac vice*)
     Ben Nicholson (SBN 317970)               Shawn Rabin (*pro hac vice*)
6    **PAUL HASTINGS LLP**                     Eve Levin (*pro hac vice*)
                                              **SUSMAN GODFREY L.L.P.**
7    1999 Avenue of the Stars, 27th Floor     1301 Avenue of the Americas, 32nd Fl.
     Century City, CA, 90067                  New York, New York 10019
8    adamfee@paulhastings.com                 Telephone: (212) 336-8330
     bennicholson@paulhastings.com            Facsimile: (212) 336-8340
9                                             sshackelford@susmangodfrey.com
                                              srabin@susmangodfrey.com
10   *Counsel for Defendants Yassin Aniss,*   elevin@susmangodfrey.com
     *Noah Shafi, and Shehab Amin*
11                                            Kemper Diehl (*pro hac vice*)
                                              **SUSMAN GODFREY L.L.P.**
12   Rees F. Morgan (SBN 229899)              401 Union Street, Suite 3000
     Mark L. Hejinian (SBN 281417)            Seattle, WA 98101
13   **COBLENTZ PATCH DUFFY & BASS LLP**      Telephone: (206) 373-7382
     One Montgomery Street, Suite 3000        Facsimile: (206) 516-3883
14   San Francisco, CA  94104                 kdiehl@susmangodfrey.com
     ef-rfm@cpdb.com
15   ef-mlh@cpdb.com                          Kalpana Srinivasan (CA Bar No. 237460)
                                              **SUSMAN GODFREY L.L.P.**
16                                            1900 Avenue of the Stars, Suite 1400
     *Counsel for Defendant*                  Los Angeles, California 90067
17   *Genrikh Khachatryan*                    Telephone: (310)789-3100
                                              Facsimile: (310) 789-3150
18                                            ksrinivasan@susmangodfrey.com

19                                            *Attorneys for Defendant Abraham Shafi*

20

21

22

23

24

25

26

27

28

DEFENDANTS' OMNIBUS NOTICE OF                CASE NO. 4:23-cv-03834-YGR
MOTION TO DISMISS AND MEMORANDUM OF P&As

1

## **ATTESTATION OF CONCURRENCE**

2

    I am the ECF user whose ID and password are being used to file Defendants' Omnibus

3

Notice of Motion and to Dismiss the Amended Complaint, and the Memorandum of Points and

4

Authorities In Support Thereof. Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that each of the

5

signatories identified above has concurred in the filing of this document.

6

Dated: August 6, 2024                           By: */s/ Stephen Shackelford, Jr.*

7
                                                Stephen Shackelford, Jr.
                                                *Counsel on behalf of Defendant Abraham Shafi*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51