1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

SVF II AGGREGATOR (DE) LLC,

Plaintiff,

v.

ABRAHAM SHAFI, et al.,

Defendants.

Case No.  23-cv-03834-YGR

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS;**

**ORDER GRANTING MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**

Re: Dkt. Nos. 88, 94

Plaintiff brings this action under federal and state securities statutes and causes of action arising under common law against five individual defendants, namely: Abraham Shafi, Noah Shafi, Yassin Aniss, Shehab Amin, and Genrikh Khachatryan.  Plaintiff alleges that each defendant participated in a scheme to make false and misleading statements about In Real Life's ("IRL") user data and growth strategy to induce plaintiff to invest in the IRL platform.  Currently pending is defendants' omnibus motion to dismiss the complaint.  Having carefully considered the pleadings and the briefing on the motions, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.[1]

## I.    BACKGROUND

### A.    Factual Background

Plaintiff alleges as follows:

Get Together Inc., more commonly known as In Real Life ("IRL"), was a social media website and mobile application founded in 2017.  (Dkt. No. 70, Amended Complaint ("FAC"), ¶ 1.)  The application allowed its users to plan live events and message other users through public

---

[1] On April 16, 2024, the Court heard argument on defendants' first Motion to Dismiss. Pursuant to the Court's order on that motion, plaintiffs amended the complaint and defendants filed the instant motion. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without further oral argument.

groups or direct message.  (*Id.* ¶ 31.)  Defendants Abraham Shafi, [2] Noah Shafi, Yassin Aniss, and Shehab Amin were all part of IRL's founding team.  (*Id.* ¶ 29.) IRL branded itself as "The Messaging Social Network for the Next Generation."  (*Id.* ¶ 30.)

In Spring 2021, IRL appeared to be growing rapidly and seemed well positioned for further viral growth.  (*Id.* ¶ 2.)  Plaintiff SVF Aggregator (DE) LLC ("Softbank" or "SVF Aggregator") sought to invest in the growing platform through an upcoming Series C investment round.  (*Id.*) To induce the investment, IRL CEO Abraham Shafi caused the company to represent to plaintiff that its mobile app already had been downloaded by 25% of US Teens under 18 years old; that IRL had 12 million monthly active users ("MAUs"); and that it was growing at a "meteoric" 400% year-over-year rate.  (*Id.* ¶ 36.)  Additionally, IRL reported strong user engagement and retention metrics, which showed that nearly 30% of its MAUs were using the platform daily.  (*Id.* ¶ 1.)  IRL also represented that it accomplished its growth "organically," with less than $50,000 per month devoted to customer acquisition.  (*Id.*)

On May 3, 2021, SoftBank and IRL held a due diligence meeting in which SoftBank asked whether IRL had any "material agreements with its directors, officers, and members."  (*Id.* ¶ 49.)  In a written response, Shafi caused IRL to state that it had "[n]one (other than offer letters, advisor agreements, etc.)" and, during the meeting, asserted that it had "no other related party arrangements."  (*Id.*)

In reliance on these representations, on May 18, 2021, SVF Aggregator paid $150 million to purchase IRL shares, $17.5 million of which SVF Aggregator purchased directly from Abraham Shafi, Noah Shafi, Khachatryan, and Aniss.  (*Id.* ¶¶ 52–53.)

Noah Shafi, Aniss, and Amin were high-level employees at IRL who each "held back-end engineering positions" and "had access to IRL user data."  (*Id.* ¶ 249.)

SVF Aggregator's investment was memorialized through two agreements: a Primary Purchase Agreement, executed on May 18, 2021, and signed on IRL's behalf by Shafi, (Dkt. No. 88-5), and a Secondary Purchase Agreement, signed by all four sellers named above.  (Dkt. No.

---

[2] The Court generally refers to Abraham Shafi as "Shafi."

United States District Court
Northern District of California

88-8). In the runup to executing the Primary Purchase Agreement, "Khachatryan aided IRL in responding to SoftBank's due diligence questions" and "Aniss aided in Abraham Shafi's response to SoftBank's questions about third party verification of IRL's user base." (FAC ¶ 249.)

Unbeknownst to plaintiff, at the time of its investment the vast majority of IRL's user base consisted of bots.  A bot is a software application that runs automated tasks to imitate human activity, such as messaging. To hide the presence of these bots, IRL funneled tens of thousands of dollars to proxy services, which would mask the true IP addresses of the bots on the platform, allowing the bots to appear as organic users.  (*Id.* ¶ 125.)  Defendants also used "incent" or "incentivized" advertising to encourage app downloads and user traffic.  (*Id.* ¶ 160.)  As part of this advertising strategy, for example, incent advertisers may encourage users of a mobile app game to download IRL's app in exchange for in-game currency.  (*Id.*)  Before Softbank's investment, Shafi had directly worked with growth vendors like AdAction and Mammoth Media, who provide services such as incent advertising for a fee.  (*Id.* ¶¶ 164, 167.)  IRL thus spent hundreds of thousands of dollars a month on growth in spring 2021, when Shafi told SoftBank it was only spending about "$50K."  (*Id.* ¶¶ 163–68.)

 Looking to conceal these payments, Shafi routed the payments through the "Format Agency," a shell company controlled by IRL's Head of Growth, Michael Sutyak.  (*Id.* ¶¶ 165, 169–74.)  Shafi and Sutyak worked to convince IRL's CFO that the company's growth spending was really for maintaining the app's infrastructure.  (*Id.* ¶¶ 175–77.)

Other self-interested payments routinely made by IRL from 2020-2021 were not revealed as required by the purchase agreement. More specifically, IRL paid companies called:

- Live Awake, Inc. "at least $620,000 dollars in a series of 20 payments labeled alternatively as for 'contractors' or 'payroll & salary & wages.'" (*Id.* ¶ 185.) In reality, Live Awake, Inc. is a California corporation.  Shafi is listed as its registered agent and his personal address is listed as its place of business. (*Id.*)

- Socialite Studios at least "$234,215.91 for 'consulting' services," though that company is affiliated with Khachatryan. (*Id.* ¶ 187.)

- App Inc. at least "$294,000, largely in response to unaddressed invoices for 'So. ware Services,'" when in reality App Inc. is a Delaware corporation affiliated with Noah Shafi and Aniss, created by the former, who is also listed as its CEO and CFO. (*Id.* ¶ 188.)

- Machine Learning LLC over half a million dollars. Although the existence of a consulting agreement was disclosed to plaintiffs, the fact that Shehab Amin controls the company was not. (*Id.* ¶ 189.)

Defendants continued this overarching scheme by prohibiting other employees who were not aware of the scheme from accessing core IRL user data. (*Id.* ¶ 153.) They routinely rejected requests to access user data by IRL employees who believed the user information was important to their job functions. (*Id.*)

On March 13, 2022, Software Engineer Cameron Boehmer—supported by two other IRL engineers—announced internally that IRL was riddled with bot activity, and that the company had inflated its user figures by relying on bot traffic. (*Id.* ¶¶ 76, 79.) Rae Allie, IRL's Head of Trust and Safety, and Nick Grant, an IRL Software Engineer, echoed these concerns in May 2022. (*Id.* ¶¶ 80–82.) When these employee concerns were escalated to the defendants, they terminated Boehmer and changed IRL's Slack messaging retention policy, so that "direct messages between employees and private Slack 'channels' were permanently deleted after only 30 days." (*Id.* ¶¶ 77–79.)

Following Boehmer's allegations, an article in *The Information* suggested that IRL relied on "an unconventional definition" of active users "to make the app appear bigger than it is." (*Id.* ¶ 83.) In response to *The Information*, Shafi confirmed that IRL used an active user definition that did not require an active user to open the app. (*Id.* ¶ 84 ("[I]t is difficult for the measurement firms to track users who don't open the IRL mobile app in a particular month but interact with the service through email and text messages or via Google Calendar.").) When SoftBank noted to Shafi that this was inconsistent with the Primary Purchase Agreement, he changed his story, explaining that just before Softbank's investment, IRL adopted a narrower active user definition. (*Id.* ¶¶ 85–86.)

United States District Court
Northern District of California

1    In August 2022, IRL received a subpoena from the U.S. Securities and Exchange

2  Commission.  (*Id.* ¶ 92.)  By the end of September 2022, IRL's response to the SEC investigation

3  was in progress and Shafi admitted to SoftBank that IRL had previously misreported its growth

4  spending.  (*Id.* ¶ 93.)  He explained that 20% of IRL's total operating expenses had been

5  improperly reported as "infrastructure" spending rather than for "paid acquisition/advertising."

6  (*Id.*)  In November 2022, IRL's Board discovered that Shafi's sister Alia Shafi had deleted a

7  project management note relevant to issues the SEC was investigating three days after IRL

8  received the SEC Subpoena.  (*Id.* ¶ 98.)

9    In January 2023, IRL's board of directors formed a special committee to investigate the

10  SEC's allegations, and, in March 2023, the special committee retained its own counsel.  (*Id.*

11  ¶¶ 103, 105.)  The special committee also retained both Keystone Strategy—"an economics and

12  technology consultant with specific experience analyzing bot farms and detection systems, and

13  network traffic"—to analyze IRL's active user data, and Stroz Friedberg—a digital forensics

14  firm—to image and analyze employee devices.  (*Id.* ¶¶ 108, 113.)  Shafi and Amin were reluctant

15  to provide the necessary user data, stalling Keystone's progress.  (*Id.* ¶¶ 110–12.)  Shafi and Amin

16  also urged the special committee to call off Keystone's in-depth review of IRL's user population.

17  (*Id.* ¶¶ 111, 114–15.)

18    In April 2023, the special committee removed Shafi as CEO after discovering that he

19  improperly charged millions of dollars of personal expenses to IRL credit cards.  (*Id.* ¶¶ 117–19.)

20  In the days following his departure, IRL's active user population nearly disappeared.  (*Id.* ¶ 120.)

21  IRL's Head of Engineering, Alex Strand, investigated IRL's user data, finding substantial

22  evidence that a large proportion of IRL's users were associated with IP addresses known to be

23  used by proxy services, demonstrating that IRL's active user metrics were likely false.  (*Id.*

24  ¶¶ 122–31.) Further, Keystone was able to obtain the IRL user data necessary for its analysis.  (*Id.*

25  ¶ 133.)  Keystone relied on that data to confirm Strand's findings and to identify numerous

26  additional indicia of fake user activity on IRL and prepared a report.

27    The Keystone report concluded that over 95% of IRL users since June 2022 were bots and

28  that the sudden drop in active users following Shafi's departure was explained by the

5

disappearance of these bots from the platform.  (*Id.* ¶ 144.)  Keystone was unable to reach firm conclusions about the prevalence of bots on IRL in spring 2021 because IRL only maintained backups of user data dating from June 2022, a fact the report noted was "unusual."  (*Id.* ¶ 146.)

The special committee's investigation also showed that defendants Shafi, Aniss, and Amin, along with non-parties Alia Shafi and Jacob Shafi, took coordinated steps to conceal defendants' scheme and the true nature of IRL, including deletion of electronic evidence.  (*See, e.g.*, *id.* ¶¶ 110–115.)  For example, Shafi, Aniss, and Amin, plus Jacob Shafi restored their mobile devices from an earlier backup, which permanently deleted information created between the backup date and the restoration date.  Shafi specifically restored his phone from a backup only two days before it was to be imaged as part of IRL's response to the SEC investigation.  (*Id.* ¶ 196.)  In the days following the announcement of the SEC investigation, Aniss, Jacob Shafi, and Alia Shafi all deleted certain text messages: Alia Shafi deleting one message sent on the date of the SEC subpoena, and Aniss also deleting text messages after receiving the SEC subpoena but before devices were imaged for production to the SEC.  (*Id.*)

On June 23, 2023, the IRL board of directors unanimously voted, along with SVF Aggregator and the requisite number of IRL shareholders, to dissolve the company and return its remaining assets to shareholders.  (*Id.* ¶ 202.)  IRL's website and app went offline four days later.  (*Id.*)

### B.    Procedural History

The initial complaint in this action was filed on July 31, 2023.  (Dkt. No. 1.)  On May 2, 2024, the Court issued an Order denying in part and granting in part defendants' initial motions to dismiss, with leave to amend.  On June 3, 2024, plaintiff filed the FAC.  Defendants again move to dismiss.  (Dkt. No. 88).

## II.    LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), plaintiff must allege sufficient details to give the defendants fair notice of the nature of the claim and the grounds upon which it rests.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554 (2007).

Rule 9 establishes a heightened pleading standard for allegations of fraud. Fed. R. Civ. P.

United States District Court
Northern District of California

9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (to be alleged with particularity under Rule 9(b), a plaintiff must allege "the who, what, when, where, and how" of the alleged fraudulent conduct) (internal citations and quotations omitted); *see also Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1060 (C.D. Cal. 2014) (applying Rule 9(b)'s heightened pleading standard to state law claims brought in federal court).

### III.    VIOLATION OF SECTION 10(B) OF THE SECURITIES AND EXCHANGE ACT AND RULE 10B-5 (COUNT 1)

Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim under Section 10b, a plaintiff must "show that the defendant made a statement which was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis in original). Under the heightened pleading requirement demanded by the Private Securities Litigation Reform Act ("PSLRA"), to state a Section 10(b) claim, plaintiffs must allege facts sufficient to establish: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). With respect to the scienter requirement, the Court must view the allegations as a whole and determine whether plaintiff has

United States District Court
Northern District of California

United States District Court
Northern District of California

1  raised an inference of scienter that is "cogent and compelling, thus strong in light of other

2  explanations," to satisfy the PSLRA standard. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784

3  (9th Cir. 2008) (citing *Tellabs Inc.* v. *Makor Issues & Rts., Ltd.*, *Tellabs*, 551 U.S. 308 (2007).

4  When assessing the allegations holistically, the Court views circumstances that are probative of

5  scienter with a practical and common-sense perspective. *Id.*

6        The amended complaint only asserts these claims against Abraham Shafi.

7        **A.    Material Misrepresentation or Omission**

8        "Materially misleading statements or omissions by a defendant constitute the primary

9  element of a section 10(b) and rule 10b–5 cause of action." *In re Immune Response Sec. Litig.*,

10  375 F.Supp.2d 983, 1017 (S.D. Cal. 2005) (quoting *Marksman Partners, L.P. v. Chantal Pharm.

11  Corp.*, 927 F.Supp. 1297, 1305 (C.D. Cal. 1996)).  To plead falsity, a complaint must "specify

12  each statement alleged to have been misleading, [and] the reason or reasons why the statement is

13  misleading." 15 U.S.C. § 78u–4(b)(1)(B).  Plaintiff, "in addition to alleging the 'time, place[,] and

14  nature of the alleged fraudulent activities,' must 'plead evidentiary facts' sufficient to establish

15  any allegedly false statement 'was untrue or misleading when made.'" *Wozniak v. Align Tech.,

16  Inc.*, 850 F.Supp.2d 1029, 1034 (N.D. Cal. 2012) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1082

17  (9th Cir. 1995)).

18        "Central to a 10b–5 claim is the requirement that a misrepresentation or omission of fact

19  must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is

20  material when there is "a substantial likelihood that the disclosure of the omitted fact would have

21  been viewed by the reasonable investor as having significantly altered the 'total mix' of

22  information made available." *Basic*, 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway,

23  Inc.*, 426 U.S. 438, 449 (1976)).  Put another way, a "statement or omission is misleading in the

24  securities fraud context 'if it would give a reasonable investor the impression of a state of affairs

25  that differs in a material way from the one that actually exists.'" *Reese v. BP Exploration (Alaska)

26  Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982,

27  985 (9th Cir. 2008)).  To plead materiality, the allegations must "suffice to raise a reasonable

28  expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow

the court to draw the reasonable inference that the defendant is liable." *Matrixx*, 563 U.S. at 43 (internal citations and quotation marks omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera*, 610 F.3d at 1108 (internal citations and quotation marks omitted).

Plaintiff identifies sixteen different actionable misrepresentations. (*See* Dkt. No. 76 (Misrepresentations Chart)). The Court groups these misrepresentations into five overlapping categories for purposes of analysis.

### 1.    Misrepresentations Concerning User Data (Statements 1, 2, 6, and 13)

Plaintiff alleges that Shafi caused IRL to make numerous misrepresentations concerning IRL's user data and user base. For example, IRL boasted of "15% MoM [month-over-month] Growth over 12 Months"; "400% YoY [year-over-year] Growth"; "3.5M DAU [daily active users]"; "6.3M WAU [weekly active users]"; "28 Chats per day per DAU"; "1MM+ Hours in average time organized & spent together a day"; and that "10% US Population under 30 Uses IRL." (FAC, ¶¶ 34, 36 (Statements 1, 2, and 6); *see also* FAC, ¶ 54 (Statement 13).)

Plaintiff relies on the findings of the Keystone Report, information from named former employees, and non-retention of documents to demonstrate falsity. The Court addresses each.

### a)    Keystone Report

The FAC describes Keystone Strategy as a third-party expert retained by the board's special committee. (FAC ¶ 108.) Keystone conducted in-depth analysis of IRL's internal data, and its report provides a detailed analysis to support its conclusions. The report found clear signs that from at least June 2022, the vast majority of the users on the platform were bots. Keystone's primary method of bot identification was through IP address analysis. In June 2022, 19.9 million user accounts—nearly 90% of IRL's user base, changed IP addresses for every request. (Dkt. No. 70-1; FAC, Ex. A ("Keystone Rep.") ¶ 20.)[3] Human users, on the other hand, would have only a

---

[3] The FAC attached the report and thus the Court may consider its findings in ruling on the instant motion. "In ruling on a [Rule] 12(b)(6) motion, a court may generally consider only allegations [i] contained in the pleadings, [ii] exhibits attached to the complaint, and [iii] matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

United States District Court
Northern District of California

small number of changes to their IP address, such as when they log in from a different location, their router resets, or they are traveling while using the IRL mobile app.  (Keystone Rep. ¶ 20.)  Bot accounts also used IP addresses identified as being offered by proxy services.  (*Id.* ¶ 24.)  Keystone validated its bot classifications by analyzing the activity of those accounts labeled as bots, finding repeated "signature activity patterns" within and across user accounts that bots would follow.  (*Id.* ¶¶ 22, 23.)  Further, from "a sample of 1,000 suspected bot accounts, Keystone found that 99.5% of them shared more than 90% of their IP addresses" and that many IP addresses used by IRL users appeared on lists of IP addresses that were "known for proxy server or bot abuse."  (FAC ¶¶ 141–42.)

The report also noted suspicious user activity indicative of bots on the platform.  Keystone found that across the five most common group names, the distributions of daily chats were almost identical.  (*Id.* ¶ 66.)  Millions of groups with duplicate names existed, with only a handful of these groups being available to the public.  For example, over 4.7 million groups were titled "Play Video Games," none of which were public; over 4.3 million groups were titled "Book Club," three of which were public; and over 2 million groups were titled "Call of Duty Squad," none of which were public.  (*Id.* ¶ 63.)  Keystone also found large numbers of groups with identical nonsensical names: 394 private groups were named "Kvjfdu," 383 were named "Dvgb", and 381 were named "Hfcbdb."  (*Id.* ¶ 68.)  The report also found an irregular share of signups from Hotmail and Yahoo email addresses and a significant number of obscure email names and "burner" email addresses.  As one example, over 5,000 users with the email domain "[@]best-john-boats.com" signed up for IRL February and March 2022 alone.  (*Id.* ¶ 72.)

Defendants contend that plaintiff fails to plead that the Keystone Report was sufficiently reliable because the FAC does not specifically allege that authors of the report had an expertise in detecting bots.  The Court disagrees. Plaintiff's allegations include the following: (i) Keystone Strategy, which authored the Keystone Report, is an "economics & technology consultant with specific experience analyzing bot farms and detection systems, and analyzing network traffic between devices and servers."  (FAC ¶ 108).   At the time of its investigation, Keystone employed "dozens of computer and data scientists experienced in complex data extraction and analysis, and

United States District Court
Northern District of California

1    reverse engineering of applications." (*Id.*)  (ii) Members of the Keystone team that worked this

2    investigation included: a Ph.D in Mathematics with experience in data mining & analysis; a Ph.D

3    in Economics with extensive computer science experience; and a co-lead of Keystone's

4    Information Strategy & Risk practice.  (*Id.*)  Thus, Keystone's expertise and access to IRL data

5    sufficiently establish the Keystone Report's reliability for purposes of a motion to dismiss.  *See*

6    *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)

7    (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)) (crediting expert as being in a position

8    to know Oracle's accounting practices when that expert had reviewed the billing and payment

9    histories of some of Oracle's customers, spoken with Oracle employees regarding customer

10   payments, and provided specific and detailed reporting of the statements of the Oracle

11   employees).[4]

12          Defendants also argue that Keystone's methodology renders its findings unreliable.

13   Specifically, defendants point to a partial overlap between the individual users reflected in

14   RedShift, which was the database used by Keystone, and the individual users captured in

15   BigQuery, which was the database IRL used to present active user metrics to investors.  (Keystone

16   Rep. ¶¶ 5–7, 19.)  Defendants contend that the Keystone Report's conclusions reflecting the

17   RedShift data must have been "garbage" given this data discrepancy. (Dkt. No. 88, Defendants'

18   Omnibus Motion to Dismiss ("Mtn.") at 17.)  These potential issues in the Keystone Report do not

19   render the Report's conclusions as implausible.  Defendants may raise these arguments at trial.

20                    **b)**          **Named Former Employees Witnesses**

21          Next, plaintiff's allegations rely on the testimony and public statements of former

22   employees.  First, on March 13, 2022, Cameron Boehmer, an IRL software engineer, raised

23   concerns that "99% of images . . . [are] uploaded by bots or scripts – not real users," and that he

24   had "uncovered significant evidence of fraud by the company in trying to inflate its user numbers

25   to the media and investors by including bot traffic," facts he escalated to defendant Amin.  (FAC ¶

26

27          [4] The Court is aware of *NVIDIA Corp. v. E:Ohman J:Or Fonder AB*, No. 23-9170 (U.S.),
     2024 WL 989551, at *29.  If necessary, the Court can always reconsider at a later juncture. The
28   analysis provided with respect to the motion to stay remains valid.

United States District Court
Northern District of California

76.)  IRL terminated Boehmer five days after he raised these concerns.  (*Id.* ¶ 79.)  In an April 2022 letter to IRL, Boehmer stated that IRL "intentionally [lied] to the media and investors about the actual amount of traffic on the company's platform so that it appeared that it [was] being used by far more people than are actually using it, and that IRL knew that the numbers it was disclosing included the high percentage of bot traffic."  (*Id.*)

Second, in May 2022, Nick Grant, an IRL Software Engineer who was personally responsible for the operation of IRL's live systems for 12 hours of the day, prepared a report that analyzed "highly unusual traffic drops" occurring for hours at a time throughout the month.  (*Id.* ¶ 80.)  Specifically, Grant noted that at one point "US traffic dropped an extreme amount, very suddenly [and] Latin America traffic spiked up enormously, very suddenly[.]  LatAm traffic 'almost' (but not quite) perfectly 'masked' the US traffic drop."  (*Id.*)  Grant filed a whistleblower grievance against IRL, Shafi, and Amin in December 2022 in which he and multiple employees concluded that "the majority of IRL 'users' are in fact, bots, controlled by a botnet." (*Id.* ¶ 100.) He further found that IRL employees, who were experienced professionals, had their access to user data unreasonably restricted, while Shafi's family members had favored access to that information.  (*Id.* ¶¶ 100–101.)

Third, in May 2022, Rae Allie, IRL's Head of Trust and Safety resigned abruptly, writing to Shafi and other IRL executives that he "strongly doubt[s] some of the numbers we report externally and internally to employees"; that he "accepted [his] offer to work at IRL (and stock based compensation) based on IRL MAU/retention information that I have doubts in"; and that IRL's "growth tactics are shady and questionable."  (*Id.* ¶ 81.)

Fourth, Alex Strand, IRL's Head of Product Engineering, found that the IP addresses representing millions of supposed IRL users were known to be proxy addresses.  (*Id.* ¶¶ 122–31.) Specifically, Strand aggregated a list of the top 40,000 IP addresses that were used to access IRL from April 1, 2023 through May 24, 2023.  (*Id.* ¶ 126.)  Comparing the top 40,000 IP addresses of IRL's users against the list of documented proxy IP addresses, Strand found that 23,418 of them were already known to be proxy addresses just based on the single list to which he had access. (*Id.* ¶ 128.)

1    Contrary to defendants' assertions, the strictures applying to unnamed witnesses as

2    outlined in *Zucco Partners, LLC v. Digimarc Corp.* do not apply here. *See* 552 F.3d 981 (9th Cir.

3    2009). In any event, the Court finds these allegations pass muster under *Zucco Partners*.  There,

4    the Ninth Circuit held that where a complaint relies on both confidential witnesses and other

5    factual information, such as documentary evidence, a plaintiff "need not name their sources as

6    long as the latter facts provide an adequate basis for believing that the defendants' statements were

7    false." *Id.* at 995 (internal citations and quotations removed).  If such "additional evidence is

8    absent, confidential witness statements may only be relied upon where the confidential witnesses

9    are described with sufficient particularity to support the probability that a person in the position

10   occupied by the source would possess the information alleged." *Id.* (internal citations and

11   quotations removed).  Here, the Keystone Report provides ample evidence corroborating the

12   particularized statements of these witnesses.  Moreover, plaintiff names the witnesses, alleges

13   descriptive job titles, and provides detailed allegations demonstrating personal knowledge of the

14   facts alleged.

15            **c)      Analysis**

16            To determine falsity as to statements relating to user data, the Court must first infer that the

17   site's user base consisted almost entirely of bots between June 2022 and May 2023.

18            Defendants point to the Keystone Report itself to undermine this contention.  Specifically,

19   defendants point to findings from the report showing that active user activity began "slowing on

20   May 3," that a notification issue was detected on May 9, and that user activity was only throttled

21   on May 13.  (Keystone Rep. ¶ 11.)  These issues, defendants contend, lead to the user base's

22   increasing frustration with the platform that led to the collapse of IRL's user base.  According to

23   this theory, IRL lost 1.5 million active daily users from a notification issue on May 9 and then lost

24   nearly all the rest of its millions of daily users from connectivity issues that lasted a single day.

25   Even in the fast-moving world of social media, this theory does not vitiate plaintiff's more

26   obvious explanation: that the millions of users disappeared over a period of days because they

27   were bots.  *Starr* v. *Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("Plaintiff's complaint may be

28   dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's

13

1  explanation is *im*plausible") (emphasis in original)).

2      Next, plaintiff asks the Court to infer that the site was overrun by bots in April 2021 when

3  the relevant misrepresentations took place.

4      Defendants claim that even if IRL was overrun by bots after June 2022, the Court cannot

5  make the inference that its user base consisted primarily of bots any time before that.  In effect,

6  defendants ask the Court to conclude that just about all the millions of human users left the

7  platform after April 2021 and were suddenly replaced by bots sometime between April 2021 and

8  June 2022.  In a vacuum, the notion that the vast majority of human users uniformly abandoned

9  the app within fourteen months is a possibility.  But in light of the extensive allegations describing

10  the overwhelming presence of bots after June 2022, the more plausible inference is that IRL never

11  had those millions of human users in the first place.  Accordingly, the Court reasonably infers that

12  IRL's user base consisted of an extremely high percentage of bots around the time of plaintiff's

13  investment.  *See Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund* v. *Transocean Ltd*.,

14  866 F. Supp. 2d 223, 241 (S.D.N.Y. 2012) ("In light of the similarity of the problems described by

15  reports and witnesses with respect to practices before and after the date of the [alleged

16  misstatement]—and given that all facts in the Complaint are taken as true and all reasonable

17  inferences are drawn in Plaintiffs' favor at this stage—it is reasonable to infer that the practices

18  were in place at the time of the [alleged misstatement].")

19      Because each user metric figure alleged—which necessarily accounts for bot activity

20  encompassed in these metrics—would be skewed to the point of being false and misleading, the

21  Court finds that Statements 1, 2, 6, and 13 are adequately alleged to be false and misleading.

### 2.    Measurement of User Data (Statements 5, 7, and 8)

23      Plaintiff alleges that Shafi caused IRL to make false and misleading statements about the

24  measurement or fluctuation of the user data.  Namely, when plaintiff asked why the user data

25  fluctuated every month, Shafi stated:

26          There is some natural variability in signups due to seasonality around
           certain events and when we launch new geos. We have not focused on

27          massive top line growth but rather retention & engagement to date to
           ensure our growth is lasting and that our engagement is deepening.

28

United States District Court
Northern District of California

(FAC ¶ 39 (Statement 5); *see also id.* ¶ 42 (Statements 7, 8).)  When plaintiff asked why IRL's user metrics did not align with third-party verification services, Shafi responded that the third-party report was "definitely not accurate" because figures reporting only app downloads would not capture all IRL users who accessed the IRL platform via both the app and the internet website and because tracking anyone under 18 years old was "technically not allowed."  (*Id.* ¶ 42 (Statement 7).)

In terms of plausibility, if an overwhelming proportion of these "users" were indeed bots, Shafi's explanations pointing to such fluctuations and user data measurement issues amounts to an effort in misdirection to conceal the fact that bots overran the platform.  Accordingly, the Court finds plaintiff adequately alleges that these statements created an "impression of a state of affairs that differs in a material way from the one that actually exist[ed]."  *Berson*, 527 F.3d at 985 (quoting *Brody* v. *Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

### 3.     User Base Growth Methods (Statements 3 and 10)

Plaintiff alleges Shafi caused IRL to make false and misleading statements relating to IRL's user base growth methods.  Namely, Shafi stated that:

> [t]he dominant invite flow today is first to groups and second to events.  We grow predominantly through direct SMS based invites from one user to another.  This is a free organic channel (users are not incentivized or paid for these invites, and must invite each friend individually with no bulk invites.)  Unlike other apps that spend aggressively to acquire new users, we spend very little.

(FAC ¶ 39 (Statement 3); *see also id.* ¶ 48 (Statement 10).)  Shafi also stated that:

> [w]e spend about $50K a month in paid user acquisition.  This is mainly to seed new geos [geographies] and interest groups, versus maintaining existing ones. Our CAC [customer acquisition cost] is ~$0.50 per new user, and each new user on average results in a total of 21 additional users organically through multiple generations of referrals.

(FAC ¶ 39 (Statement 3).)  Plaintiff contends that these statements were false and misleading because IRL's primary means of acquiring non-bot users was through incent advertising, which was not "free" or "organic."  Specifically, plaintiff alleges that Shafi knew IRL was spending on average over $760,000 a month on user growth strategies between January 1, 2021 and May 1, 2021 rather than the $50,000 Shafi represented.  (*Id.* ¶ 183.)  Plaintiff further alleges that given

United States District Court
Northern District of California

United States District Court
Northern District of California

1    these expenses, as well as the fact that Mammoth Media's cost per download alone was $1.50, that

2    Shafi's representation that the customer acquisition cost (CAC) was about $0.50 per actual user,

3    was similarly false and misleading.  (*Id.*)  In further support of falsity, plaintiff alleges that in

4    September 2022, Shafi acknowledged in an email that certain payments to the Agency invoiced as

5    "infra" should have instead been invoiced as "growth," and that IRL's CAC estimates needed to

6    be revised from $0.41 to $1.35.  (*Id.* ¶ 93.)

7        For purposes of plausibility, the Court notes that if the user base was comprised primarily

8    of bots, then it is plausible that the predominant form of growth for the platform was less likely to

9    have been "organic."  Moreover, if the platform were overrun by bots, incent advertising would be

10   all the more necessary to drive app downloads to avoid a suspicious disconnect between users and

11   app downloads.  Even if IRL were not overrun by bots, the more plausible theory supported by the

12   allegations above is that IRL spent far more than $0.50 per CAC and that the "dominant" invite

13   flow for human users was driven by incent advertising rather than organic means.

14       Taken together, these facts support an inference that IRL did not grow predominantly

15   through organic means during the relevant period. As with the statements analyzed above,

16   defendants offer competing alternative theories to explain away the statements.  The Court does

17   not here resolve that ultimate factual dispute.  The Court merely finds Statements 3 and 10 are

18   adequately alleged to be false and misleading.

19          **4.    Payments To Allegedly Affiliated Entities (Statements 11 and 14)**

20       Plaintiff alleges that Shafi caused IRL to represent in Section 2.11(a) of the Primary

21   Purchase Agreement that IRL had disclosed any "agreements, understanding or proposed

22   transaction . . . between the Company and any of its officers, directors, consultants, or Key

23   Employees, or any Affiliate thereof."  (*Id.* ¶ 54.)  The Primary Purchase Agreement defined "Key

24   Employee" as:

> any executive-level employee (including division director and vice
> president-level positions) as well as any employee or consultant who
> either alone or in concert with others develops, invents, programs or
> designs any Company Intellectual Property.

27   (*Id.* ¶ 54 n.9.)

Plaintiff alleges that representations in the Primary Purchase Agreement (Statement 14) and Disclosure Schedule (Statement 11) were false and misleading because defendants failed to disclose relationships with vendors that were controlled by "Key Employees" prior to or in connection with the Primary Purchase Agreement. Plaintiff alleges that these representations were material because a potential lack of arm's-length dealing meant that corporate insiders could have used IRL to provide value to themselves to investors' detriment. (*Id.* ¶ 69.)

The FAC alleges that IRL paid (i) Live Awake Inc., an entity controlled by Shafi, at least $620,000 between January 7, 2020 and March 29, 2021; (ii) Socialite Studios, an entity affiliated with Khachatryan, at least $234,215.91 from January 2020 to May 2021; (iii) App Inc., an entity affiliated with Noah Shafi and Aniss, at least $294,000 from January 2020 to May 2021; and (iv) Machine Learning LLC, an affiliate of Amin, at least $35,103.93 from January 2020 to December 2020. (*Id.* ¶¶ 185–89.) Plaintiff also alleges that Shafi failed to disclose that alleged IRL employee Michael Sutyak controlled the Format Agency, which plaintiff alleges was used to hide payments to entities like AdAction. (*Id.* ¶¶ 172–182.)

Defendants contend that plaintiff fails to allege that defendants Noah Shafi, Khachatryan, Aniss, and Amin, as well as non-party Michael Sutyak, were "Key Employee[s]" of IRL under the contract, which places these relationships outside the contract's disclosure requirements. The Court examines each individual in turn.

As for Khachatryan, plaintiff alleges that was a co-founder and "senior engineer" at the time of the Series C investment. Given the potential executive authority invested in the title of "senior engineer," as well as his status as a co-founder of IRL, the Court finds that Khachatryan plausibly qualifies as a "Key Employee."

As for Noah Shafi, plaintiff alleges that he was a co-founder of IRL and served as Head of Engineering at the time of the Series C investment. Despite the wide proliferation of titles like "Vice President" or "Director" in large corporations, it is more than reasonable to infer that the Head of Engineering at a social media startup with fifteen employees was a "Key Employee" as contemplated under the contract.

17

With respect to Aniss and Amin, plaintiff alleged that Aniss served as a back-end developer for IRL from 2017 to 2023. Amin allegedly served as a data engineer, was part of IRL's founding team, and was promoted in March 2022 to "Data Team Lead." Both are related to Shafi. In the context of the start up, this is a closer call. Until a more full record is developed, the Court finds this to be sufficiently alleged for purposes of whether Shafi should have disclosed them.

As for non-party Michael Sutyak, defendants contend that he was not an employee at all at the time of the Series C investment. Plaintiff alleges that Sutyak's employment at IRL was memorialized in an agreement dated one day after the Series C Investment closed on May 18, 2021, and that under this employment agreement, the employment was effective as of May 3, 2021. (*Id.* ¶ 179). Plaintiff further alleges that Sutyak was assigned his own email address with an IRL domain before discussions about SoftBank's Series C Investment began. (*Id.* ¶ 181). Plaintiff also alleges that at the time this action was filed, Michael Sutyak's LinkedIn profile stated that he was "Head of Growth" at "Memix" beginning in October 2020, which was a separate app launched by IRL in December 2022, and that Sutyak continues to hold himself out as having served as a "Director, Growth & Product" at a "Tech Unicorn" starting in October 2020. (*Id.* ¶¶ 181, 215.) The Court finds that plaintiff adequately alleged that Sutyak was employed at the time of the Series C and held a "Key Employee" position as "Head of Growth."

Because Shafi failed to disclose the relationships described above, as well as the magnitude of the company's payments to the entities and the services with whom each were affiliated, plaintiff adequately alleges that these statements were false and misleading.

### 5. Definition of "Session" and "MAU" (Statements 4, 9, and 12)

Plaintiff alleges that Shafi misrepresented IRL's definition of "session" and "MAU." Namely, in April 2021, plaintiff asked Shafi about the definition of session in reference to "counting active users based on a session" of platform usage. (FAC ¶ 39 (Statement 4).) Shafi responded that a session is defined as "an app open." (*Id.*) On April 21, 2021, plaintiff asked about IRL's definition of the term MAU, to which Shafi explained, "MAU is opened app or signed in/signup to web and has a session." (*Id.* ¶ 42 (Statement 9).) Plaintiff further alleges that

Shafi caused IRL to represent in Section 2.8(e) of the Primary Purchase Agreement that an "active user" is "a natural person who (i) has registered with the App as a North American resident and has logged in and engaged with the App at least once during the applicable period and (ii) to the Knowledge of the Company, is in compliance with the App Terms" and that "to the Company's Knowledge, no Active User was generated by any click farm or similar service, bot, automated program or similar device."  (*Id.* ¶ 54 (Statement 12).)

Plaintiff contends that these representations were false and misleading because IRL's definition of MAU did not depend on users that "opened [the] app or signed in/signup to web and ha[ve] a session," but instead depended on the presence of bot activity.  In other words, representations that IRL required a "user" to open the app to be counted towards its user metrics were material to SoftBank as they suggested that "users" were actually engaging with the App's features.  (*Id.* ¶ 71.)

With respect to the representation in Statement 12 that "no Active User was generated by any click farm or similar service, bot, automated program or similar device," the Court finds the allegation that the statement is false and misleading sufficiently alleged given the allegations that the majority of IRL's users were bots.

With respect to Statements 4 and 9 however, even if the numbers underlying the platform usage figures were inaccurate due to the presence of bots on the platform, it does not follow that the definitions provided for the terms in the remaining statements are necessarily inaccurate. Moreover, how IRL defined MAU in Spring 2022 is not dispositive as to how it defined MAU in Spring 2021.  Accordingly, the Court does not find that plaintiff adequately alleged Statements 4 or 9 to be false or misleading. These statements are stricken from the claim.

### 6.    Broad Representations in the Primary Purchase Agreement (Statements 15 and 16)

Plaintiff alleges that Shafi caused IRL to make broad representations to SoftBank in Sections 2.21 and 2.23 of the Primary Purchase Agreement guaranteeing that IRL made generally truthful representations during negotiations and in the contract itself as false and misleading. Section 2.21 of the Primary Purchase Agreement provided that:

> The Company has made available to the Purchasers all the information that would reasonably be required for deciding whether to acquire the Shares. No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchasers at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

(FAC ¶ 54 (Statement 15).)  Because the Court has found that plaintiff adequately alleged that Shafi caused IRL to make numerous material misrepresentations, this statement is adequately alleged to be false and misleading.

Section 2.23 represented that IRL's financial statements "fairly present in all material respects the financial condition and operating results of the Company."  (FAC ¶ 54 (Statement 16).)  Plaintiff contends this statement is false and misleading because Shafi inaccurately portrayed IRL's spending on "infrastructure" and "growth."  (*Id.*)  Because the FAC contains no allegations about the contents of any financial statements delivered to plaintiff in May 2021, these allegations do not satisfy the PSLRA.  This statement is stricken from the claim.

*** 

In sum, the Court finds that statements 1, 2, 3, 5, 6, 7, 8, 10, 11, 12, 13, 14, and 15 are adequately alleged to be false and misleading by Abraham Shafi.  Statements 4, 9, and 16 are stricken.

## B.    Scienter

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  To plead scienter adequately, the complaint must "state with particularity facts giving rise to *a strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis supplied).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324 (citation omitted).  Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference."  *Id.* at 326.  In determining whether this requirement is met,

United States District Court
Northern District of California

the Court must view the allegations as a whole and determine whether plaintiffs have raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP*, 542 F.3d at 784 (citing *Tellabs*, 551 U.S. at 326). When assessing allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective. *Id.*

Nonetheless, the PSLRA demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson*, 527 F.3d at 989 (emphasis in original). A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314. The inference must be that "the defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness.*" *Zucco*, 552 F.3d at 991 (emphasis supplied) (internal quotation marks omitted). Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry*, 542 F.3d at 782. "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)). "[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so [may] provide some reasonable inference of intent," but are not independently sufficient. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 974, *abrogated on other grounds by S. Ferry LP*, 542 F.3d at 784. The Ninth Circuit has approved of a dual analysis — "first considering whether any individual allegation gives rise to scienter and then assessing the allegations in combination"—to determine scienter. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702-03 (9th Cir. 2012). Accordingly, the Court first considers each type of allegation by itself and then considers them in combination to obtain a "holistic" view of scienter allegations for each theory.

### 1. Core Operations Theory

"The core operations theory of scienter relies on the principle that corporate officers have

United States District Court
Northern District of California

knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). "There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (internal cites omitted).

To support scienter under the core operations theory, plaintiff points to allegations that at the time of the Series C investment, Shafi was the co-founder, CEO, and a board member of IRL; that his family members and friends held positions across the company; that IRL only had fifteen full-time employees; and that he held himself out as IRL's public face. (FAC ¶¶ 23, 28, 29, 31, 33.) Plaintiff further alleges that Shafi had access to IRL's active user data and that this data demonstrated "obvious" indicia of bots. (*Id.* ¶¶ 63, 111.)

Creating, maintaining, and concealing the presence of millions of bots on the IRL platform necessarily entailed planning, effort, and expenditure. So, too, did efforts to fund incent advertising and then conceal that funding through intermediaries. Although a company's small size does not necessarily trigger the core operations inference, IRL's fifteen employees could barely fill a medium-sized conference room at the time of the Series C investment. It strains credulity to argue that, if true, Shafi, as CEO of a social media startup devoted to the growth of its user base, would have been oblivious to the overwhelming, years-long presence of bots on the platform or the concealed funding arrangements to employee-affiliated entities as alleged. *See, e.g.*, *Berson*, 527 F.3d at 988 ("[I]t is hard to believe that [defendants] would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work."); *Mulderrig* v. *Amyris, Inc.*, 492 F. Supp. 3d 999, 1027 (N.D. Cal. 2020) ("That [defendants] would not have known that the millions of dollars in revenues had not been realized, despite their constant monitoring of the company's debts and the revenues, and their duties to active

remediation plan on the financial controls issues, rises to the level of the 'absurd.'"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("Moreover, the inference that high-level executives . . . would know that the company was being sued in a product liability action is sufficiently strong."); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1256 (W.D. Wash. 2009) (plaintiffs adequately plead that financial institution's "technological capabilities were critical to its core operations"); *No. 84 Employer-Teamster Joint Council Pension Trst. Fund v. Am. West Hold. Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (finding evidence that Board members attended meetings sufficient to show scienter where it would be "absurd" to suggest the Board did not know about FAA investigations); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) (finding "absurd" that CEO and CFO would not know about issues pervading manufacturing and quality control divisions—the "heart of a company whose main business is manufacturing pharmaceuticals for public consumption").  The Court therefore finds that the core operations doctrine supports an inference of scienter.

### 2.    Knowingly False Statements

Alternatively, a "plaintiff can plead scienter by alleging that defendants actually knew of, or had access to, information contradicting the challenged statements."  *Jaeger* v. *Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 873 (W.D. Wash. 2022) (citing *S. Ferry LP*, 542 F.3d at 786); *see also SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. 2020) ("that the defendants published statements when they knew facts suggesting the statements were inaccurate" is "classic evidence of scienter").

Plaintiff alleges that Shafi made statements he knew to be false to plaintiff at the time of the Series C investment.  As for statements relating to user data specifically, plaintiff again points to the fact that defendants, including Shafi, controlled IRL's user data prior to the Series C Investment until Shafi's suspension.  (FAC ¶ 206).  This data, plaintiff alleges, would have been obvious to any observer.  (*Id.*)

Plaintiff next points to Shafi's statement that IRL was spending "$50K a month" on growth.  Plaintiff contends these statements were knowingly false because Shafi knew that IRL was spending approximately $180,000 monthly with AdAction alone from December 2019 to May

2021 and approximately $425,000 monthly with Mammoth Media alone from January 2021 to May 2021.  (*Id.* ¶ 210.)  Mammoth Media provided Shafi with its daily spending on marketing efforts such that Shafi knew Mammoth's charge for every app download it generated.  (*Id.* ¶ 167). Plaintiff further alleges that Shafi routinely corresponded with Michael Sutyak regarding Format Agency's payment of outstanding AdAction invoices.  Plaintiff alleges that Shafi was the sole IRL employee copied on emails with AdAction from as early as March 2020 (*Id.* ¶ 164), that he was the contact person for payment requests (*Id.* ¶ 165), and that AdAction billed IRL over $3.2 million for "INCENT" services between December 2019 and May 2021 (*Id.* ¶ 163).  For example, on January 14, 2021, Sutyak emailed Shafi asking for IRL to complete reimbursement to Format Agency for three AdAction invoices dated December 3, 2020, December 12, 2020, and January 7, 2020, totaling $267,430.79.  (*Id.* ¶ 172.)  Plaintiff also alleges that when CFO Gabi Loeb was "asking about our spend projections again," Shafi also instructed Sutyak to "add [an] extra 98k into infra" and suggested that he "say we are planning on testing pushing a little more sms this month."  (*Id.* ¶ 177.)

Defendants' argument that Shafi publicly admitted that the misallocation to growth was an "honest mistake" is undermined by the fact that the statement came shortly after the SEC's subpoena, as well as Shafi's attempt to conceal IRL's growth spending from its CFO.[5]  Moreover, the notion that the FAC "does not plausibly allege that Abraham directed Sutyak to falsify any invoices" comes close to requiring the exact sort of smoking gun the law is clear plaintiff need not provide in a complaint. (*See* Mtn. at 27.)

Plaintiff also alleges that shortly before Shafi made statements relating to IRL's user data, the CEO of Mammoth Media informed Shafi that "IRL got hit by a massive bot attack generating millions of fake groups to join."  (*Id.* ¶ 155.)  As alleged, Mammoth Media was working closely

---

[5] Defendants note that a voluntary acknowledgement of the falsity of these statements eighteen months after the fact cannot establish scienter at the time the statements were made, and thus the September 28, 2022 email included in the complaint cannot support scienter. True enough, but the Court can credit the acknowledgement as part of a broader narrative plaintiff paints in the FAC. This is particularly true where, as here, Shafi had access to the information needed to ascertain the falsity of the statement at the time it was made.

with IRL during this period to the point they were providing daily tracking on IRL's growth activities. (*Id.* ¶ 167.) Although this statement could suggest an external bot attack, the statement plausibly put Shafi on notice of the potential presence of bots on the platform, thus adding to an inference of scienter.

Together, these allegations support an inference of knowing falsity for statements relating to user data and IRL's growth methods.

### 3.     Spoilation of Evidence

Next, plaintiff contends that Abraham Shafi's attempt to destroy or hide evidence contributes to an inference of scienter. According to a report from third-party expert Stroz Friedberg, Shafi restored his phone from a backup, destroying information on the device, one day before it was to be imaged as part of the SEC's investigation. (*Id.* ¶¶ 194–200.) As alleged, such an action is a way to conceal data created or modified on the device between the date of the backup and the date of the restoration. (*Id.* ¶ 197.) Adding to this inference, between October and December 2022, Shafi, Aniss, Amin, and Jacob Shafi all restored their mobile devices from a backup. (*Id.* ¶ 196.) Stroz Friedberg noted that it was "unusual for four out of five devices in a given analysis to have been restored from a backup within a short timeframe, as such restorations are usually reserved for when a new phone is purchased or a phone needs to be reset due to a significant malfunction." (*Id.* ¶ 197 (internal cites omitted).)

The Court finds that Shafi's alleged efforts at spoilation support an inference of scienter. *See Apple Inc.* v. *Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012) ("A trial court's discretion regarding the form of a spoliation sanction is broad, and can . . . [include] instructing the jury that it may draw an adverse inference.").

### 4.     Holistic Analysis

As a whole, the allegations supporting the core operations inference, knowing falsity as to key misrepresentations, and potential spoilation give rise to a strong inference of scienter. The Court does not reach this conclusion lightly. In so holding, the Court has considered possible non-culpable explanations for the misrepresentation alleged. However, the allegations in the FAC render such possibilities relatively less persuasive than the inference that plaintiff meets the

United States District Court
Northern District of California

1    scienter requirement of the PSLRA.

2         Accordingly, the Court **DENIES** the motion as to the Section 10(b) and 10b-5 claim. As to

3    Abraham Shafi, the claim may proceed with regard to statements 1-3, 5-8, and 10-15.

4    **IV.     SECTION 20(A) OF THE SECURITIES EXCHANGE ACT (COUNT 2)**

5         "[U]nder Section 20(a), a defendant may be liable for securities violations if (1) there is a

6    violation of the Act and (2) the defendant directly or indirectly controls any person liable for the

7    violation." *S.E.C.* v. *Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (citations omitted).  As with the

8    first claim, the FAC only alleges violations of Section 20(a) by Abraham Shafi.

9         The Court finds that Shafi acted as a controlling person of IRL within the meaning of

10   Section 20(a) of the Exchange Act because he was a co-founder of the company, a member of the

11   Board of Directors, and the Chief Executive Officer.  (FAC ¶ 23.)  Plaintiff adequately alleges that

12   through his control position, Shafi knowingly caused IRL to make false representations.

13   Defendants do not appear to challenge the 20(a) claim outside of the predicate section 10(b)

14   violation.  As such, the Court **DENIES** the motion as to the Section 20(a) claim as to Abraham

15   Shafi.

16   **V.      CALIFORNIA CORPORATIONS CODE §§ 25401, 25501 AND 25504 (COUNTS 3 AND 4)**

17        Plaintiff brings a claim for fraud in the sale of securities under state law against Abraham

18   Shafi (Count 3), and a claim for joint and several liability for the same against Genrikh

19   Khachatryan, Noah Shafi, Yassin Aniss, and Shehab Amin (Count 4).

20        A violation under Section 25401 requires that a defendant (i) "offered or sold a security,

21   (ii) in California, (iii) by means of a material misrepresentation or omission.'" *OTC Energy, LLC*

22   *v. Shen*, 2023 WL 2628689, at *5 (C.D. Cal. Jan. 11, 2023).

23        To satisfy the "in California" requirement, the geographic nexus must be to the offer or

24   acceptance of the sale of the security, not to the misrepresentations.  *See Zakinov v. Ripple Labs,*

25   *Inc.*, 2020 WL 922815, at *16 (N.D. Cal. Feb. 26, 2020) (citing Cal. Corp. Code § 25008).

26   Plaintiff now adequately alleges that the offer and acceptance of securities occurred in California.

27   (FAC ¶ 238.)  Having adequately pleaded the federal securities claim, the FAC adequately pleads

28   a primary violation of California Corporation Code §§ 25401 and 25501 against Shafi.

California Corporations Code § 25504 provides, in pertinent part, as follows:

> [E]very principal executive officer or director [and every person occupying a similar status or performing similar functions] of a corporation so liable [under California Corporations Code § 25501], . . . [and] every employee of a person so liable [under California Corporations Code § 25501] who materially aids in the act or transaction constituting the violation . . . are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

Secondary liability under Section 25504 is "broader than its federal law counterpart." *Jackson* v. *Fischer*, 2013 WL 6732872, at *14 (N.D. Cal. Dec. 20, 2013). Joint and several liability is not reserved for those who possess "control" over underlying violations, but rather, "in a broad fashion," is "impose[d]" in three circumstances: (i) on "every principal executive officer" of a corporation that commits a violation, (ii) on "every person occupying a similar status or performing similar functions," and (iii) on "every employee . . . who materially aids in the act or transaction constituting the violation." *Hellum* v. *Breyer*, 123 Cal. Rptr. 3d 803, 810 (Cal. Ct. App. 2011) (quoting Cal. Corp. Code § 25504).

As for Khachatryan, plaintiff argues he falls within the scope of the phrase "occupying a similar status or performing similar functions" as a principal executive officer because, according to the Series C, he was listed among those with "knowledge" of the company along with Shafi and IRL president Krutal Desai. The Court previously noted that it was plausible to infer, based on Khachatryan's status as a senior engineer and co-founder, that he was a Key Employee as that term was used in the Primary Purchase Agreement. However, the Court does not find that this earlier finding, by itself, allows for the plausible inference that Khachatryan is a "principal executive officer" as the legislature used the term in Section 25504. In looking for other allegations in the FAC to support the alleged status, the Court finds none. Though the legislature clearly intended to broaden the scope of liability with Section 25504, holding an employee liable merely because one contract referenced his knowledge would likely extend liability beyond the legislature's intent. As such, the Court does not find Khachatryan to have "occupied a similar status or performed similar functions" to Shafi.

United States District Court
Northern District of California

1    Thus, in order for plaintiff's Section 22504 claims to survive, only the third option

2  remains.  Plaintiff must demonstrate that the named defendants "materially aid[ed] in the act or

3  transaction constituting the violation." Cal. Corp. Code § 25504. Here, plaintiff alleges that

4  Khachatryan falls within this category because he is secondarily liable as an "employee" and was

5  a participant in the transaction.  In particular, the Primary Purchase Agreement tied representations

6  specifically to Khachatryan's knowledge, along with two other individuals.  Again, the Court is

7  not convinced that the reference is sufficient to allege he materially aided the transaction as

8  contemplated by the statute. It is beyond dispute that Khachatryan worked at IRL, but the

9  inclusion of Khachatryan as someone with a generally wide knowledge of the company is not the

10  same as presenting "facts showing [his] knowledge of the false or misleading nature of the

11  representations in the offering documents." *ApolloCap. Fund, LLC v. Roth Cap. Partners, LLC*,

12  158 Cal. App. 4th 226, 256 (2007).

13    Plaintiff urges that "it defies reason to assume that Khachatryan had no knowledge of the

14  representations contained within the agreement," but has not met its burden to plead facts showing

15  his knowledge of those representations' alleged falsity. Similarly, the Court will not accept the

16  barebones statement that Khachatryan "worked on IRL's back-end systems" as sufficient to meet

17  plaintiff's pleading standard. (*See* FAC ¶ 154.)

18    Plaintiff also contends that Noah Shafi, Aniss, and Amin aided Shafi's fraudulent acts and

19  omissions. As alleged in the FAC, prior to the Series C Investment Noah Shafi, Aniss, and Amin:

20    • Occupied roles as "'back-end' engineers at IRL" who had access to user data that

21       was withheld from engineers and thus they "prevented other employees from

22       discovering the scheme . . . ." (*Id.* ¶ 154.)

23    • Deleted data from their personal devices as the SEC was beginning to investigate

24       IRL, which corroborates their scienter. (*Id.* ¶¶ 193-97.)[6]

25    • Received related-party payments to their entity affiliates prior to the Series C

26       Investment, which were not disclosed. (*Id.* ¶¶ 187-89.)

27

28    _____

6 These allegations pertain to Aniss and Amin.

1   Plaintiff contends that these facts allow the Court to infer that defendants "materially aid[ed] in the

2   act" of the fraud perpetrated on SoftBank, and they are secondarily liable under Section 25504

3   even without participation in the "transaction."

4       The Court does not find that these allegations amount to liability. Using defendants' own

5   job titles as evidence of aiding fraud, as proven by the very fact that their job afforded them the

6   potential to commit the fraud, relies on circular logic. Likewise, the data deletion, while of use to

7   supplement the myriad other facts giving rise to an inference of scienter as to Abraham Shafi,

8   cannot by itself demonstrate aiding in the fraudulent transaction. Nor does the receipt of payment

9   itself demonstrate any connection to Abraham Shafi's fraud by nondisclosure without a showing

10  that these defendants themselves were obligated to disclose the payment. The failure to disclose

11  related-party payments may indeed support liability, but plaintiff fails to plead facts demonstrating

12  anyone other than Abraham Shafi is responsible for the nondisclosure. The receipt of payment

13  itself is not the relevant action giving rise to liability.

14      In reading the FAC holistically, however, the Court notes that it does state that payments to

15  one vendor, SmartProxy, "were at times handled by Noah Shafi" and payments to another,

16  Machine Learning LLC, went to an entity controlled by Amin. (FAC ¶ 130.)  The FAC alleges

17  that both these individuals "facilitated IRL's use of bots through the use of proxy IP addresses."

18  (*Id.* ¶ 149.) Strand found as much during his investigation, and Strand's findings in turn assisted

19  the Keystone report. (*See id*. ¶¶ 122-33.) This is sufficient at the motion to dismiss stage, to

20  demonstrate an affirmative step to hide accurate user information about the prevalence of bots

21  amongst IRL's user baser, on the part of Noah Shafi and Shehab Amin. As alleged, these

22  individuals actively facilitated payments to a third party vendor they knew would help hide

23  reliance on bots to demonstrate user growth. Thus, if the allegations are true, these are acts which

24  "materially aided" Shafi's fraud. As to the other elements of the underlying cause of action, for

25  largely the same reasons stated above, plaintiff has adequately pled that it would have acted

26  differently had it known about the bot activity, and that it was injured as a result.

27      Therefore, the Court **DENIES** the motion to dismiss the claim for fraud in the sale of

28  securities against Abraham Shafi, **GRANTS** the motion to dismiss the claim for joint and several

United States District Court
Northern District of California

29

1    liability with regard to defendants Genrikh Khachatryan and Yassin Aniss, and **DENIES** the motion

2    to dismiss the joint and several liability claim with respect to Noah Shafi and Shehab Amin.

3    **VI.    COMMON LAW CLAIMS**

4        **A.    Fraud Outside of Contract (Count 6)**

5        In California, the elements of fraud are: (a) misrepresentation (false representation,

6    concealment, or nondisclosure); (b) scienter; (c) intent to defraud; (d) justifiable reliance; and (e)

7    resulting damage. *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997).

8        Plaintiff's claim for fraud *within* the contract against Shafi survived the Court's first order

9    on defendants' motion to dismiss.  Plaintiff now pleads a claim for fraud *outside* the contract

10   against Shafi, Kachatryan, Aniss, and Noah Shafi which defendants move to dismiss. Plaintiff's

11   opposition clarifies that the claim relies on affirmative steps these defendants took to avoid

12   disclosure of material facts, specifically: restricting "other employees' access to IRL's user data,"

13   using shell companies to facilitate related party payments, assisting with the completion of false

14   due diligence answers (as to Khachatryan), and "facilitating payments to proxy service providers

15   which supplied IP addressed to prop up bot activity on IRL." (Oppo. at 50.)

16       Ultimately, Count 6 alleges fraud by omissions which were outside the context of these

17   defendants' obligations pursuant to either the primary or secondary purchase agreement. Thus, the

18   count fails because plaintiff fails to plead any facts which indicate that Anis, Khachatryan, or

19   Noah Shafi incurred any general obligation to disclose information to plaintiff by mere virtue of

20   their employment with IRL. *See Augustine v. Talking Rain Beverage Co., Inc.*, 386 F. Supp. 3d

21   1317, 1330 (S.D. Cal. 2019) ("Under California law, an allegedly fraudulent omission is

22   actionable only if the omission is contrary to a representation actually made by the defendant, or

23   an omission of a fact the defendant was obliged to disclose. California courts have generally

24   rejected a broad obligation to disclose . . . .") (internal cites omitted).

25       The motion to dismiss Count 6 is therefore **GRANTED**.

26

27       **B.    Fraudulent Concealment (Count 7)**

28       Under California law, the elements of a count for "fraud based on concealment

*United States District Court*
*Northern District of California*

30

are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Bank of Am. Corp. v. Super. Ct.*, 198 Cal. App. 4th 862, 870 (2011) (internal citations and quotation marks omitted).

To maintain a count for fraud through "nondisclosure or concealment of facts, there must be allegations demonstrating that the defendant was under a legal duty to disclose those facts." *Los Angeles Memorial Coliseum Comm'n. v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 831 (2015). Duty arises in four circumstances: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Id.* (internal cites omitted). Moreover, where no fiduciary relationship exists, "the duty to disclose generally presupposes a relationship grounded in some sort of *transaction* between the parties. . . . Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement." *Id.* (internal cites omitted) (emphasis in original).

For the same reasons set forth above, the claim may proceed against Shafi.

With respect to the scenarios identified and the other secondary sellers, plaintiff has not shown a duty because the allegations do not indicate that a fiduciary relationship existed between the parties nor that partial (or any) representations were made by Khachatryan, Aniss, or Noah Shafi. Thus, the Court must discern whether plaintiff has shown a duty either through defendants' exclusive knowledge or active concealment of material facts.

Plaintiff's case against Khachatryan, Aniss, and Noah Shafi rests on two theories: the omission of material information regarding related-party transactions, and the exclusive access these defendants had to dashboards and "back-end information" about user data that was material

to plaintiff's investment decision.

The first theory fails to support the claim as to Khachatryan and Aniss, as the related-party transactions were only required to be disclosed as per the Primary Purchase Agreement, to which these defendants were not party. Defendants correctly note that the FAC does not include any allegations that they were even aware of its contents. Plaintiff's singular reference to IRL "structur[ing its] business so that SoftBank could not discover evidence of [its] fraud," and to Khachatryan and Aniss's assistance with the general due diligence process are insufficient to allege these individiuals were aware of the significance the related-party transactions held in plaintiff's mind, particularly in light of the heightened pleading requirements.

The second theory is likewise insufficient as to Khachatryan and Aniss. To prevail by exclusive knowledge, plaintiff must show not only that defendants had exclusive knowledge of the information, but that defendants knew they were "not known to or reasonably discoverable by the plaintiff." *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970). Further, under the active concealment prong, plaintiff must show that defendants took "affirmative acts . . . in hiding, concealing, or covering up the matters complained of." *Czuchaj*, 2014 WL 1664235 at *6. "Mere nondisclosure does not constitute active concealment." *Id.*

Plaintiff has not shown that any of these three defendants knew what was or was not disclosed to plaintiff in the process surrounding the purchase agreements. Whereas the FAC paints a general picture of a company whose leadership was intent on hiding information on its user base, it never names any of these defendants in any action connected to that deception. All three named defendants are identified as individuals who had access to the true information about user data, but this alone does not give rise to the inference that they were involved in a coverup. The paragraphs cited in the FAC to support these defendants' exclusive knowledge reveal only that some *other* group of employees raised red flags and suffered consequences, and that some company leadership took steps to hide user data. Alone, these are insufficient to demonstrate knowledge that material information was being withheld from plaintiff. True, Aniss, Noah Shafi, and Khachatryan were employees with access to relevant information, and they were not terminated. Yet, the FAC does not connect the whistleblower activity, or IRL's response thereto, to these individual defendants.

That said, under the exclusive knowledge prong, actively handling payments to proxy providers demonstrates exclusive knowledge of information plaintiff could not reasonably discover. As alleged, the entire purpose of the proxy provider scheme was to hide IRL's actual user numbers. Involvement in such a scheme therefore necessarily entails knowledge plaintiff could not have deduced on its own. Thus, on this basis, the claim against Noah Shafi can survive.[7]

As such, the Court **GRANTS** the motion to dismiss the claim for fraudulent concealment with regard to defendants Genrikh Khachatryan and Yassin Aniss, and **DENIES** it with respect to Noah Shafi and Abraham Shafi.

## C.    Conspiracy to Commit Fraud (Count 8)

The tort of conspiracy requires a plaintiff to plead "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Kidron v. Movie Acquisition Corp*., 40 Cal. App. 4th 1571, 1581 (1995). The conspirators must "agree to do some act which is classified as a civil wrong . . . [and] must have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." *Id.* at 1582. Rule 9(b) imposes heightened pleading requirements where "the object of the conspiracy is fraudulent." *Wasco Prods, Inc. v. Southwall Techs, Inc*., 435 F.3d 989, 991 (9th Cir.), *cert. denied*, 549 U.S. 817 (2006). "Mere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate" does not constitute conduct in

---

[7] Defendants also assert that "SoftBank contractually disavowed reliance on any representations or omissions by Aniss, Noah, or Khachatryan." (Dkt. No. 92, Defendants' Omnibus Reply in support of the Motion to Dismiss ("Reply") at 28.) Support for this comes from the Primary Purchase Agreement, which contained a clause stating, in full:

> **Exculpation Among Purchasers**
> Each Purchaser acknowledges that it is not relying upon any Person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company. Each Purchaser agrees that no Purchaser nor the respective controlling Persons, officers, directors, partners, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Shares.

(Dkt. No. 88-5, Mtn., Ex. D, § 3.10.) Plaintiff points out that the purpose of the paragraph is to insulate any *purchaser* from liability to *another* purchaser. The Court agrees.

United States District Court
Northern District of California

1   furtherance of a conspiracy.  *Oxford St. Props., LLC v. Robbins*, 2011 WL 13214282, at *2 (C.D.

2   Cal. Feb. 24, 2011).

3        Plaintiff alleges three categories of wrongful acts committed by Shafi, Noah Shafi,

4   Khachatryan, and Aniss which give rise to a conspiracy claim, all similar to those previously

5   discussed, namely: (i) the hiding of payments to themselves funneled thorough shell entities; (ii)

6   the restriction of access to, and hiding of, IRL's underlying user figures; and (iii) as to Noah Shafi

7   specifically, the payments to proxy service providers through intermediaries to conceal bot activity

8   on IRL.  Plaintiff argues these acts demonstrate a scheme to fraudulently induce plaintiff into

9   purchasing both $17.5 million of IRL common stock from the four defendants and $150 million of

10  IRL stock in total. (FAC ¶ 272.)

11       The first two theories on which plaintiffs rely cannot support conspiracy liability. The FAC

12  is devoid of facts showing an agreement to cooperate in furtherance of the conspiracy. As

13  explained above, these theories of liability are insufficient to support the case for the underlying

14  fraudulent behavior. Thus, for the conspiracy claim to survive, the allegations would have to

15  support the surviving claims for fraud, namely those connected to Abraham Shafi's omissions and

16  misrepresentations in connection with the Primary Purchasing Agreement. As defendants note,

17  there are no allegations secondary sellers other than Abraham Shafi were even aware of what was

18  or was not disclosed to plaintiff in connection with that agreement; nor are there allegations that

19  Amin, Katcharyan, or Noah Shafi agreed amongst themselves to withhold information on user

20  data or self-interested payments. Because such "mere knowledge" is insufficient, in this respect,

21  the FAC is too.

22       Plaintiff's reliance on *AREI II Cases* is unavailing. There, a California Court of Appeal

23  found an adequate fraud conspiracy claim where the complaint demonstrated the defendant's

24  "close involvement" to develop a fraudulent "master deal" over many months, including "primary

25  responsibility for drafting [a related] offering memorandum," and where he "acted as a go-

26  between" for the parties. 216 Cal. App. 4th 1004, 1023 (2013). Here, by contrast, the FAC only

27  shows that while Khachatryan, Noah Shafi, and Aniss were employees who worked closely with

28  Shafi, it does not chronicle any extensive involvement in the drafting or execution of the Primary

United States District Court
Northern District of California

34

1  Purchase Agreement.[8] Rule 9(b) requires more as to each defendant.

2       That said, as with fraudulent concealment, the FAC can support a conspiracy allegation

3  with regard to Noah Shafi's payment to proxy services. The FAC alleges that the routine payment

4  to proxy service providers was intended to permit "an army of bots [to] mask [their] true IP

5  address[es] by relying on a larger set of 'proxy' IP addresses." (FAC, ¶ 125.) It also proffers a

6  nexus between Noah Shafi's actions (handling the payments) and Shafi's actions by alleging that

7  the payments for which Noah Shafi was at least partially responsible were "made through Format

8  Agency, a consulting firm that Abraham Shafi relied on as an intermediary for relationships that

9  he wanted to conceal." (*Id.* ¶ 130.) Thus, concrete facts are alleged from which the Court can infer

10 an agreement to cooperate between Abraham and Noah Shafi: as regards the proxy services

11 allegations, the FAC pleads specific facts showing that the actions of these two individuals were

12 coordinated and would only have made sense in the context of the other's role in the scheme.

13      Accordingly, the Court finds that the FAC sufficiently alleges a limited conspiracy that

14 "can be inferred from the words, actions, or interdependence of activities and persons involved."

15 *See Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n.*, 298 F.3d 768, 775 (9th Cir. 2002).

16      Thus, for largely the same reasons discussed above with regard to the allegations of

17 fraudulent concealment, the motion with respect to the conspiracy claim is **DENIED** as to Abraham

18 Shafi and Noah Shafi and **GRANTED** as to Yasin Aniss and Genrikh Khachatryan.

19           **D.      Aiding and Abetting Fraud (Count 9)**

20      Liability may be imposed "on one who aids and abets the commission of an intentional tort

21 if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial

22 assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in

23 accomplishing a tortious result and the person's own conduct, separately considered, constitutes a

24 breach of duty to the third person." *Saunders v. Super. Ct.*, 27 Cal. App.4th 832, 846 (1994).  To

25 satisfy the knowledge element, an aider and abettor must have "actual knowledge of the specific

26 primary wrong the defendant substantially assisted."  *In re First Alliance Mortg. Co.*, 471 F.3d

27

28      _____

        [8] Here, once again, the general allegation of Khachatryan's generic involvement with the
        due diligence process does not suffice.

United States District Court
Northern District of California

977, 993 (9th Cir. 2006) (internal citation removed); *see also Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp.2d 1101, 1119 (C.D. Cal. 2003) (plaintiff must plead actual knowledge of the primary violation); *Howard v. Super. Ct.*, 2 Cal. App. 4th 745, 749 (1992) (". . . while aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.").   The substantial assistance prong of aiding and abetting fraud "must be pleaded with particularity."  *Su v. Henry Glob. Consulting Grp*, 2022 WL 19392, at *4, *13 (C.D. Cal. Jan. 3, 2022) (internal citations and quotation marks omitted).

The allegations for this count are the same as those discussed above. Because this count, like the others, requires an affirmative act, and requires a pleading "with particularity," the Court finds largely as it does with the other claims. Payment to proxy services can constitute the requisite affirmative acts, but neither the receipt of payment nor knowledge of a company's user base can.

Thus, the FAC sufficiently alleges that both Noah Shafi and Shehab Amin facilitated payments to proxy services, and thus as to them and Shafi, the motion to dismiss Count 9 is **DENIED**. The motion to dismiss Count 9 is **GRANTED** as to Genrikh Khachatryan and Yasin Aniss.

### E.    Unjust Enrichment (Count 10)

Unjust enrichment is not an independent claim but a form of restitution.  The remedy involves the "receipt of a benefit and unjust retention of the benefit at the expense of another." *Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 855 (Cal. Ct. App. 2014), *as modified on denial of reh'g* (Feb. 27, 2014) (quotations omitted).  Where the theory is based on fraud, the complaint is subject to Rule 9(b).  *Puri v. Khalsa*, 674 Fed.Appx. 679, 690 (9th Cir. 2017) (applying Rule 9(b) to unjust enrichment based on fraud); *see also, Hammerling v. Google LLC*, 615 F.Supp.3d 1069, 1096–97 (N.D. Cal. 2022); and *Rojas-Lozano v. Google, Inc.*, 159 F.Supp.3d 1101, 1120 (N.D. Cal. 2016).

As to Shafi, the Court already denied the motion in its prior order.

As to the others, the parties' briefing seems to agree that this portion of the motion rises and falls with the Court's decision on liability for the underlying fraud. As the Court has dismissed

the fraud counts as to Genrikh Khachatryan and Yasin Aniss, the motion as to them is **GRANTED**. Since the Court has allowed claims against Noah Shafi to proceed in conjunction with conspiracy to commit fraud and aiding and abetting fraud, the motion as to him is **DENIED**.

## VII.    MOTION TO RELATE

Also pending before the Court is defendants' motion to consider where this case should be related to a civil action brought by the Securities and Exchange Commission surrounding many of the same events that form the basis of the FAC, namely *Securities and Exchange Commission v. Shafi*, 4:24-cv-04636-RFL. The Court **GRANTS** the motion.[9]

> Under Civil Local Rule 3-12:
> > An action is related to another when: (1) The actions concern substantially the same parties, property, transaction, or event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges.

As the SEC notes in opposition, some differences, including different pleading standards, apply to the two actions. That said, the factual overlap is significant.  There is no reason for two judicial officers to spend significant resources addressing how the same factual circumstances map onto different claims.  The risk of "an unduly burdensome duplication of labor" is significant. The case is hereby related.

## VIII.    CONCLUSION

For the reasons stated above, the Court rules as follows:

**1.**    The motion as to the first claim is **DENIED**.

**2.**    The motion as to the second claim is **DENIED**.

**3.**    The motion as to the third claim is **DENIED**.

**4.**    The motion as to the fourth claim is **DENIED** as to Shehab Amin and Noah Shafi and **GRANTED** as to Yasin Aniss and Genrikh Khachatryan.

**5.**    The motion as to the sixth claim is **GRANTED**.

---

[9] The Court notes that it appears defendant failed to comply with the District's rules regarding notice to judges of both cases.  *See* Civil Local Rule 3:12 ("A courtesy copy of the motion must be lodged with the assigned Judge in each apparently related case under Civil L.R. 5-1(d)(7).")

6.  The motion as to the seventh claim is **DENIED** as to Noah Shafi and Abraham Shafi and **GRANTED** as to Genrikh Khachatryan and Yassin Aniss.

7.  The motion as to the eighth claim is **DENIED** as to Abraham Shafi and Noah Shafi and **GRANTED** as to Yasin Aniss and Genrikh Khachatryan.

8.  The motion as to the ninth claim is **DENIED** as to Abraham Shafi, Noah Shafi, and Shehab Amin and **GRANTED** as to Genrikh Khachatryan and Yasin Aniss.

9.  The motion as to the tenth claim is **DENIED** as to Noah Shafi and **GRANTED** as to Genrikh Khachatryan and Yasin Aniss.

10. The motion to determine whether cases should be related is **GRANTED**.  The cases are hereby related.

Further leave to amend is denied.  Should discovery uncover specific facts which can support new allegations under the law, plaintiffs may move to amend. Answers to the FAC shall be filed within fourteen days of this Order.  A case management conference is hereby scheduled for **March 31, 2025 at 2:00 p.m.** on the Zoom platform.

This terminates Docket Nos. 88 and 94.

**IT IS SO ORDERED.**

Dated:  2/27/2025

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**